**No. _____**

## In the United States Court of Appeals
## for the Ninth Circuit

*In re* THOMAS EUGENE CREECH,

                                    Plaintiff–Petitioner,

v.

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF
IDAHO,

                                    Respondent,

IDAHO COMMISSION OF PARDONS AND PAROLE
AND JAN M. BENNETTS, Ada County Prosecuting Attorney, in her
official capacity,

                                    Real Parties in Interest.

From the United States District Court for the
District of Idaho in Case No. 1:24-cv-00066-AKB,
The Honorable Amanda K. Brailsford

**PETITION FOR WRIT OF MANDAMUS EXHIBITS**

**CAPITAL CASE**

Jonah J. Horwitz, ID Bar No. 10494
Christopher M. Sanchez, ID Bar No. 12070
Assistant Federal Defenders
Federal Defender Services of Idaho
702 W. Idaho St., Ste. 900, Boise, ID 83702
Tel: (208) 331-5530; Fax: (208) 331-5559
ECF: Jonah_Horwitz@fd.org
         Christopher_M_Sanchez@fd.org
Attorneys for Plaintiff–Petitioner.

| Ex. | Dkt. | Document | Date | Page(s) |
|---|---|---|---|---|
| 1 | 40 | Memorandum Decision and Order Denying Plaintiff's Motion for Recusal | 07/08/2024 | 001-011 |
| 2 | 39 | Plaintiff's Reply in Support of Motion for Recusal [Dkt. 36] | 06/12/2024 | 012-023 |
| 3 | 38 | Defendant Idaho Commission of Pardons and Parole's Opposition to Plaintiff's Motion for Recusal [Dkt. 36] | 05/31/2024 | 024–034 |
| 4 | 37 | Prosecutor Bennetts' Opposition to Motion for Recusal [Dkt. 36] | 05/31/2024 | 035–043 |
| 5 | 36 | Motion for Recusal | 05/10/2024 | 044–046 |
| 6 | 36-1 | Plaintiff's Memorandum in Support of Motion for Recusal | 05/10/2024 | 047–062 |
| 7 | 36-2 | Exhibit 1 in Support of Memorandum in Support of Motion for Recusal: United States Senate Committee on the Judiciary Questionnaire for Judicial Nominees | 05/10/2024 | 063–101 |
| 8 | 36-3 | Exhibit 2 in Support of Memorandum in Support of Motion for Recusal: Declaration of Beryl Price, dated May 10, 2024 | 05/10/2024 | 102–104 |
| 9 | 36-4 | Exhibit 3 in Support of Memorandum in Support of Motion for Recusal: Transcript of Opening Remarks by Jan Bennetts; and Partial Transcript of Remarks by Hon. Amanda K. Brailsford, Investiture Ceremony of Hon. Amanda K. Brailsford, Jan. 2, 2019 | 05/10/2024 | 105–109 |

i

| 10 | 35 | Reply in Support of Defendant Idaho Commission of Pardons and Parole's Motion to Dismiss Amended Complaint [Dkt. 31] | 05/01/2024 | 110–119 |
|----|----|----|----|----|
| 11 | 34 | Prosecutor Bennetts' Reply in Support of Joinder to Motion to Dismiss Amended Complaint and Motion to Dismiss Amended Complaint [Dkts. 31 and 32] | 05/01/2024 | 120–130 |
| 12 | 32 | Jan M. Bennetts' Motion to Dismiss and Joinder in Defendant Idaho Commission of Pardons and Parole's Motion to Dismiss Amended Complaint (Dkt. 31) | 03/29/2024 | 131–134 |
| 13 | 31 | Defendant Idaho Commission of Pardons and Parole's Motion to Dismiss Amended Complaint [Dkt. 30] | 03/29/2024 | 135–138 |
| 14 | 31-1 | Memorandum in Support of Defendant Idaho Commission of Pardons and Parole's Motion to Dismiss Amended Complaint | 03/29/2024 | 139–150 |
| 15 | 30 | Amended Complaint | 03/15/2024 | 151–186 |
| 16 | 18 | Memorandum Decision and Order Denying Plaintiff's Motion for Preliminary Injunction | 02/23/2024 | 187–204 |
| 17 | 18 | Memorandum Decision and Order Denying Plaintiff's Motion for Preliminary Injunction | 02/23/2024 | 205–214 |
| 18 | 17-1 | Notice of Factual Development | 02/22/2024 | 215–218 |
| 19 | 15 | Reply in Support of Motion for Preliminary Injunction [Dkt. 4] | 02/16/2024 | 219–254 |
| 20 | 15-2 | Exhibit 2 in Support of Reply in Support of Motion for Preliminary Injunction: Declaration of Christopher M. Sanchez | 02/16/2024 | 255–258 |

| 21 | 12-2 | Exhibit G to Declaration of Ashley Dowell: Commutation Hearing Minutes, Jan. 19, 2024 | 02/13/2024 | 259–273 |
| 22 | 12-3 | Exhibit L to Declaration of Ashley Dowell: Commutation Decision, Jan. 29, 2024 | 02/13/2024 | 274–276 |
| 23 | 11 | Prosecutor Bennetts' Opposition to Motion for Preliminary Injunction [Dkt. 4] | 02/13/2024 | 277–295 |
| 24 | 10-1 | Memorandum in Support of Motion to Expedite Discovery | 02/09/2024 | 296–312 |
| 25 | 7 | Order | 02/09/2024 | 313–314 |
| 26 | 4-1 | Memorandum in Support of Motion for Preliminary Injunction | 02/08/2024 | 315–349 |
| 27 | 4-3 | Exhibits 2 in Support of Motion for Preliminary Injunction: Ada County Prosecutor's Office Press Release dated Jan. 19, 2024 | 02/08/2024 | 350–353 |
| 28 | 1 | Complaint for Equitable, Declaratory, and Injunctive Relief | 02/05/2024 | 354–381 |
| 29 | ------ | Death Warrant, *State v. Creech,* Ada Cnty. Dist. Ct., No. CR-FE-0000-10252 | 01/30/2024 | 382–385 |
| 30 | ------ | Order Staying Execution, *State v. Creech,* Ada Cnty. Dist. Ct., No. CR-FE-0000-10252 | 10/19/2023 | 386–388 |
| 31 | ------ | Opposition to Motion to Stay Execution, *State v. Creech,* Ada Cnty. Dist. Ct., No. CR-FE-0000-10252 | 10/19/2023 | 389–394 |
| 32 | ------ | Emergency Motion for Stay of Execution, *State v. Creech,* Ada Cnty. Dist. Ct., No. CR-FE-0000-10252 | 10/18/2023 | 395–407 |

| 33 | ------ | Death Warrant, *State v. Creech,* Ada Cnty. Dist. Ct., No. CR-FE-0000-10252 | 10/12/2023 | 408–411 |
|---|---|---|---|---|

# EXHIBIT 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| THOMAS EUGENE CREECH, | Case No. 1:24-cv-00066-AKB |
| Plaintiff, | |
| v. | **MEMORANDUM DECISION AND ORDER DENYING PLAINTIFF'S MOTION FOR RECUSAL** |
| IDAHO COMMISSION OF PARDONS AND PAROLE and JAN BENNETTS, Ada County Prosecuting Attorney, in her official capacity, | |
| Defendants. | |

Pending before the Court is Plaintiff Thomas Eugene Creech's motion for recusal of the undersigned pursuant to 28 U.S.C. § 455(a) and the Due Process Clause (Dkt. 36). Having reviewed the record, I find that the facts and legal arguments are adequately presented and that oral argument would not significantly aid my decision-making process, and I decide the motion on the briefs. Dist. Idaho Loc. Civ. R. 7.1(d)(1)(B); *see also* Fed. R. Civ. P. 78(b) ("By rule or order, the court may provide for submitting and determining motions on briefs, without oral hearings."). For the reasons set forth below, I deny Mr. Creech's motion.

## BACKGROUND

In 1995, an Idaho state district court sentenced Mr. Creech to death for murdering another inmate by beating him to death with a sock filled with batteries. After the state court issued a death warrant, the Idaho Commission of Pardons and Parole granted Mr. Creech's petition for a clemency hearing to decide whether to recommend that Idaho's Governor commute Mr. Creech's

death sentence to a fixed life sentence. The Ada County Prosecutor's Office (ACPO) was designated to present on the State's behalf at the hearing.

The Commission held the clemency hearing on January 19, 2024. At that hearing, attorney Jill Longhurst of the ACPO made a presentation recommending against commutation. (Dkt. 11-1 at p. 12) (identifying Ms. Longhurst as presenter). Mr. Creech alleges that during the prosecutor's presentation, she told the Commission he was guilty of murdering Daniel Walker in 1974. (Dkt. 1 at ¶¶ 52-62). Mr. Creech asserts this statement is untrue. (*Id.* at ¶ 64). Further, Mr. Creech alleges that during the presentation, the prosecutor "showed the Commission a slide with an image of a sock with Mr. Creech's name" allegedly "written on it" and that by doing so, she "reveal[ed] a photo of the murder weapon for the first time." (*Id.* at ¶ 164; *id.* at p. 20, § C). Mr. Creech also alleges that on the same day of the hearing, the ACPO issued a press release stating the Walker "cold case was solved" and that Mr. Creech had murdered Walker. (*Id.* at ¶ 63).

On January 29, 2024, the Commission issued a decision denying commutation. On February 5, Mr. Creech filed this action under 42 U.S.C. § 1983 against the Commission and the ACPO, naming Jan Bennetts as a defendant in her official capacity as the elected Ada County Prosecuting Attorney. (Dkt. 1 at p. 1). Mr. Creech alleges his due process rights were violated during the hearing.[1] On February 8, Mr. Creech moved for a preliminary injunction under Rule 65(a) of the Federal Rules of Civil Procedure to enjoin his execution during this case's pendency and for expedited discovery. (Dkts. 4, 10).

I denied those motions. I concluded that while "some minimal procedural safeguards apply to clemency proceedings," a federal court is "not authorized to review the substantive merits of a

---

[1]        Although his allegations are lengthy, Mr. Creech's recusal motion focuses on the prosecutor's statements regarding the Walker murder, the photograph of the sock, and the press release.

clemency proceeding." (Dkt. 18 at pp. 8-9) (quotation marks omitted). I found Mr. Creech failed to clearly show he is likely to succeed on the merits of his due process claim because the Commission provided him with more than minimal due process in conducting the hearing. (*Id.* at pp. 10-11). Further, I concluded that because Mr. Creech does not have a constitutional right to a clemency hearing, it necessarily follows he does not have a due process right to post-hearing proceedings including, for example, discovery regarding the clemency hearing. (*Id.* at p. 12).

Finally, although I declined to review the merits, I noted the hearing minutes contradict Mr. Creech's allegations that the prosecutor showed a photograph of the murder weapon; instead, the minutes state she displayed a photograph of "the *matching* sock" found in Mr. Creech's cell. (*Id.* at p. 13) (quoting Dkt. 11-1 at p. 20). I also noted that during the hearing the prosecutor discussed numerous murders which Mr. Creech allegedly committed and that the Commission's decision did not appear to have been unduly influenced either by the Walker murder or by the sock photograph because the Commission did not mention either when explaining its decision. (*Id.* at pp.13-14).

The Ninth Circuit affirmed my decision; the Supreme Court denied Mr. Creech's petition for a writ of certiorari; and the Idaho Department of Correction later suspended the execution because the medical team was unable to carry out the lethal injection. (Dkts. 21, 25, 26). Thereafter, both the Commission and the ACPO moved to dismiss Mr. Creech's complaint in this case under Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim. After the motions were fully submitted but before I ruled on them, Mr. Creech filed the instant motion to disqualify me. The basis for Mr. Creech's motion is my relationship with the Ada County Prosecuting Attorney, Ms. Bennetts.

In support of Mr. Creech's recusal motion, he filed the declaration of an investigator who attested that, while investigating me in March and April 2024, he discovered my response to the "Questionnaire for Judicial Nominees," which I had submitted to the United States Senate Judiciary Committee in support of my nomination to be a federal district judge. (Dkt. 36-3 at ¶ 3). In that response, I disclosed that, while I was a judge on the Idaho Court of Appeals:

> [A]n individual convicted of a crime in Ada County, Idaho, filed a civil action against public officials including the Ada County Prosecutor, who is a personal friend. Because the plaintiff filed the action against her individually (not in her capacity as the county prosecutor), I determined that my impartiality might reasonably be questioned and that the issue was incurable. I have searched both the Court's electronic database and publicly-available electronic databases and have been unable to locate the case's citation, although I believe the appeal was filed in 2019.

(Dkt. 36-2 at p. 22). Further, the investigator attested he discovered video footage of my January 2019 investiture at the Idaho Court of Appeals. (Dkt. 36-3 at ¶ 5). At this investiture, Ms. Bennetts spoke, and I referred to her as "my dear friend" during my comments. (Dkt. 36-4 at p. 4).

## LEGAL STANDARD

Mr. Creech seeks to disqualify me under the Due Process Clause and 28 U.S.C. § 455, which is the primary source of disqualification law in the federal judicial system. Mr. Creech relies on § 455(a), which provides that "any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." The United States Supreme Court has explained the goal of § 455(a) is "to avoid even the appearance of partiality." *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 860 (1988) (quotation marks omitted). The standard for determining impartiality is purely objective. *United States v. Holland*, 519 F.3d 909, 913 (9th Cir. 2008) (applying "objective test"); *Clemens v. U.S. Dist. Ct. for Cent. Dist. of Ca.*, 428 F.3d 1175, 1178 (9th Cir. 2005) (same).

The Ninth Circuit has ruled that under § 455(a), the objective inquiry for determining impartiality is whether a reasonable person with knowledge of all the facts would conclude the judge's impartiality might reasonably be questioned or would perceive a significant risk the judge would resolve the case on a basis other than the merits. *Holland*, 519 F.3d at 913. A reasonable person for purposes of the inquiry is a "well-informed, thoughtful observer" and not a "hypersensitive or unduly suspicious" person. *Id.* (quoting *In re Mason*, 916 F.2d 384, 386 (7th Cir. 1990)); *see also Clemens*, 428 F.3d at 1178 (stating standard and describing reasonable person's nature).

An analysis of whether § 455(a) requires disqualification "is necessarily fact-driven and may turn on subtleties in the particular case." *Holland*, 519 F.3d at 913. The court must be guided by an independent examination of the unique facts and circumstances and not by a comparison to similar situations in other cases. *Id.* Further, "[t]he standard 'must not be so broadly construed that it becomes, in effect presumptive, so that recusal is mandated upon the merest unsubstantiated suggestion of personal bias or prejudice.'" *Id.* (quoting *United States v. Cooley*, 1 F.3d 985, 993 (10th Cir. 1993)). When the law and the facts do not support a legitimate reason for disqualification, a judge has a "strong . . . duty to sit." *Clemens*, 428 F.3d at 1179 (quoting *Nichols v. Alley*, 71 F.3d 347, 351 (10th Cir. 1995)).

Like § 455(a)'s objective standard, "the Due Process Clause may sometimes demand recusal even when a judge has no actual bias." *Rippo v. Baker*, 580 U.S. 285, 287 (2017) (per curiam) (quotation marks and alteration omitted). Under the Due Process Clause, "[r]ecusal is required when, objectively speaking, the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable." *Id.* (quotation marks omitted). The inquiry is "not whether a judge harbors an actual, subjective bias, but instead whether, as an

objective matter, the average judge in his position is likely to be neutral, or whether there is an unconstitutional potential for bias." *Williams v. Pennsylvania*, 579 U.S. 1, 8 (2016) (quotation marks omitted). The Ninth Circuit has stated that this inquiry "reaches every procedure which would offer a possible temptation to the average judge to forget the burden of proof or which might lead him not to hold the balance nice, clear and true between the State and the accused" and that it "requires a realistic appraisal of psychological tendencies and human weaknesses." *Echavarria v. Filson*, 896 F.3d 1118, 1131 (9th Cir. 2018) (quotation marks and alteration omitted).

## ANALYSIS

Mr. Creech asks the Court to enter an order of disqualification "to guarantee the public's confidence in the federal judiciary" and to ensure the Court's decisions will be "perceived as beyond ethical reproach." (Dkt. 36-1 at p. 14). In support, Mr. Creech characterizes my relationship with Ms. Bennetts as, for example, a "thirty-plus-year friendship" and a "social entanglement." (*Id.* at pp. 4, 9). Based on his characterization of the relationship, Mr. Creech argues, among other things, that I might not want to "saddle" Ms. Bennetts with "the reputational cost[]" of criticism "for serious ethical breaches" and that I might be "motivated to shield a close friend from the possibility of discovery uncovering [her] misconduct." (*Id.* at pp. 6-7, 10). Mr. Creech's characterization of my relationship with Ms. Bennetts, however, is both inaccurate and unsupported.

Ms. Bennetts and I worked together in the chambers of the Honorable Thomas G. Nelson of the Ninth Circuit Court of Appeals as law clerks from approximately August 1993 until August 1994, when Ms. Bennetts' clerkship concluded. My clerkship with Judge Nelson had the hallmarks of a clerkship with which many current and former law clerks are familiar, including long hours in chambers, hard work, mutual support, and camaraderie among chambers staff. During the year

that I clerked with Ms. Bennetts, we became friends. After Ms. Bennetts' clerkship concluded, however, I lost touch with her. We did not pursue a personal friendship independent of our shared clerkship experience.

For example, since Ms. Bennett's clerkship concluded, she has never been to my home nor I to hers. We have not taken vacations together, celebrated holidays together, or shared family occasions together. We have not regularly communicated either by correspondence or by telephone, and in fact, we have rarely communicated. Occasionally, however, I have seen Ms. Bennetts at professional events including, for example, at Idaho State Bar events, at a picnic Judge Nelson organized for his former law clerks, and at a judicial memorial service for him in 2011. None of these encounters were planned. I did, however, briefly reconnect with Ms. Bennetts after being appointed to the Idaho Court of Appeals in January 2019. Our interactions were limited to meeting before my investiture, attending the investiture, and meeting again shortly after the investiture.

While my relationship with Ms. Bennetts began in 1993, my personal interactions with her since 1994 have been very limited and professional rather than social in nature. Courts have concluded that such a relationship does not give rise to grounds for disqualification. For example, in *United States v. Lovaglia*, 954 F.2d 811 (2d Cir. 1992), the Second Circuit considered the "temporal context" of a relationship between a judge and lawyer who had been "very close socially" but whose social relationship had "drifted away and ceased" before the judge was asked to recuse himself in a case involving the lawyer. *Id.* at 816. The Second Circuit held that the judge did not abuse his discretion by refusing to recuse himself because the social relationship had ended "seven or eight years" before the disqualification issue arose. *Id.* at 817; *see also Moran v. Clarke*, 296 F.3d 638, 649 (8th Cir. 2002) (en banc) (considering "depth and duration" of relationship

including "reciprocal visits to one another's homes" in analyzing recusal request), *abrogated in part on other grounds* by *Manuel v. City of Joliet, Ill.*, 580 U.S. 357 (2017).

In resolving Mr. Creech's recusal motion, I conclude that a reasonable person with knowledge of *all* the facts of my relationship with Ms. Bennetts would *not* either conclude my impartiality might be reasonably questioned or perceive a significant risk that I would resolve the case on a basis other than the merits. *See Holland*, 519 F.3d at 913 (identifying standard under § 455(a)). Further, under the Due Process Clause, I conclude an objective observer would *not* conclude the probability of an actual bias on my part is too high to be constitutionally tolerable. *See Rippo*, 580 U.S. at 287 (identifying Due Process standard for recusal). Rather, my relationship with Ms. Bennetts is within the bounds of the legal profession's ordinary standard of conduct for two former law clerks who worked closely together for a short period thirty years ago and who temporarily rekindled that relationship to briefly celebrate a professional achievement. *See United States v. Murphy*, 768 F.2d 1518, 1537 (7th Cir. 1985) (discussing the common and desirable "legal culture friendships among judges and lawyers"). Under such circumstances, "a well-informed, thoughtful observer" would not question my impartiality. *Holland*, 519 F.3d at 913.

Despite the limited, professional nature of my relationship with Ms. Bennetts, Mr. Creech argues that I "have already essentially recognized [my] friendship with [Ms.] Bennetts requires recusal in cases where [her] conduct is personally implicated." (Dkt. 36-1 at p. 5). I disagree. Mr. Creech bases his argument on the fact that, sometime in early 2019 after my investiture at the Idaho Court of Appeals, I recused myself from an appeal in a case filed against Ms. Bennetts personally. I have some recollection of this recusal but have been unable to locate the case or any information related to it, as I noted in my response to the Questionnaire for Judicial Nominees. (Dkt. 36-2 at p. 22). I recall, however, recusing myself both because I had recent interactions with

Ms. Bennetts in 2019 and because the case specifically named her personally in her individual capacity. Contrary to Mr. Creech's argument, the fact that I recused myself in that case under different circumstances more than five years ago is not a basis for my disqualification in this case. *See Diversified Numismatics, Inc. v. City of Orlando, Fla.*, 949 F.2d 382, 385 (11th Cir. 1991) ("Prior recusals, without more, do not objectively demonstrate an appearance of partiality."); *see also Holland*, 519 F.3d at 913 (noting analysis must be based on unique facts and circumstances of each case); *Lovaglia*, 954 F.2d at 816 (considering temporal context).

Moreover, since 2019, I have routinely presided over cases involving the ACPO while Ms. Bennetts has been the elected Ada County Prosecuting Attorney.[2] Although I have not tallied the number of or the results in those cases, both the Commission and the ACPO have provided citations to at least some of the cases. (*See* Dkt. 37 at p. 4 (citing decisions ruling against ACPO's interests); *id.* at pp. 4-5 (citing decisions addressing allegations of ACPO's prosecutorial misconduct); Dkt. 38 at pp. 7-8 (same)). For example, I authored *Baker v. State*, 494 P.3d 1256 (Idaho Ct. App. 2021). In that appeal, the Idaho Court of Appeals reversed the dismissal of Baker's post-conviction petition challenging his conviction for first-degree murder of an infant. *Id.* at 1262. The court remanded the case for an evidentiary hearing to determine whether the ACPO had failed to produce exculpatory evidence under *Brady v. Maryland*, 373 U.S. 83 (1963), including evidence that an incarcerated witness received favorable treatment in exchange for his trial testimony against Baker. *Baker*, 494 P.3d at 1273-79.

In other words, I have already ruled in favor of a defendant in a first-degree murder case in a manner raising questions about the ACPO's ethical behavior during a period when

---

[2]     Ms. Bennetts has been the elected Ada County Prosecuting Attorney since 2014. (Dkt. 38 at p. 7 n.2).

Ms. Bennetts was the elected Ada County Prosecuting Attorney. As in this case, the record in *Baker* did not reflect Ms. Bennetts' involvement in any unethical decisions.[3] Baker's defense counsel, however, could have conceivably questioned Ms. Bennetts' personal conduct on remand. Nevertheless, I was not motivated to rule against Baker to protect Ms. Bennetts. My ruling in *Baker* in 2021 contradicts Mr. Creech's argument in this case that a reasonable person would believe I am biased and motivated to rule in the ACPO's favor to protect Ms. Bennetts.

I am also not persuaded by Mr. Creech's other arguments that my impartiality is reasonably questioned in this case. Those arguments include that "the stakes" in this case, the case's procedural posture, the applicable legal framework, and the ACPO's "tone" in response to Mr. Creech's allegations justify my recusal. (Dkt. 36-1 at pp. 9-12). Contrary to these arguments, the applicable standards and analysis remain the same despite that Mr. Creech is subject to the death penalty. Mr. Creech has not cited any legal authority to the contrary.

Absent a legitimate reason justifying recusal, "a judge should participate in cases assigned." *Holland*, 519 F.3d at 912 (quotation marks omitted). Such is the case here. Accordingly, based on the foregoing, I deny Mr. Creech's motion for recusal.

## ORDER

**IT IS ORDERED** that Plaintiff's Motion for Recusal (Dkt. 36) is **DENIED**.

DATED: July 08, 2024

Amanda K. Brailsford
U.S. District Court Judge

---

[3]     While Mr. Creech accuses Ms. Bennetts personally of unethical behavior in his recusal motion, those accusations are unsupported conjecture. (*See, e.g.*, Dkt. 36-1 at p. 8) (asserting Ms. Bennetts is "directly tethered" to wrongful conduct).

# EXHIBIT 2

Nicole Owens
EXECUTIVE DIRECTOR
Christopher M. Sanchez, Idaho Bar No. 12070
Jonah J. Horwitz, Idaho Bar No. 10494
Assistant Federal Defenders
FEDERAL DEFENDER SERVICES OF IDAHO
702 W. Idaho Street, Suite 900
Boise, ID 83702-8929
Telephone: (208) 331-5530
ECF:   Jonah_Horwitz@fd.org
        Christopher_M_Sanchez@fd.org

*Attorneys for Plaintiff Thomas Eugene Creech*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| **THOMAS EUGENE CREECH,** | ) | **Case No. 1:24-cv-00066-AKB** |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | **PLAINTIFF'S REPLY IN SUPPORT** |
| | ) | **OF MOTION FOR RECUSAL** |
| **IDAHO COMMISSION OF PARDONS** | ) | **[DKT. 36]** |
| **AND PAROLE et al.,** | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

Although she is in theory a "servant of the law," *United States v. Agurs*, 427 U.S. 97, 111 (1976), Defendant Bennetts has directed her deputies to spend taxpayer money to ensure that her "very dear friend," Dkt. 36-4 at 2, decides whether her office lied to send a man to be executed while Defendant Bennetts watched him put to death.  Mr. Creech disagrees.

### I.  The disqualification motion is timely.

As a preliminary matter, the Ada County Prosecuting Attorney's Office (ACPA) offers a law-free assertion that the recusal motion is tardy.  *See* Dkt. 37 at 2.  The ACPA's belief is that Mr. Creech "conspicuously" sought disqualification "while a motion to dismiss his complaint is under advisement."  Dkt. 37 at 2.  But Mr. Creech lacked any reason to pursue recusal earlier.  The

REPLY IN SUPPORT OF MOTION FOR RECUSAL - 1

timeliness of a recusal motion is judged with reference to the moment the party "knew grounds for disqualification." *United States v. Rogers*, 119 F.3d 1377, 1382 (9th Cir. 1997). [1]  Mr. Creech first became aware of a need to consider disqualification on March 6, 2024,[2] when his counsel became aware that Judge Brailsford recused herself from a case while on the Idaho Court of Appeals because of her relationship with Defendant Bennetts.  *See* Dkt. 36-3.  Mr. Creech diligently investigated the matter and did not have all of the key information supporting his motion until April 25, when counsel discovered the investiture video.  *See id.*  The disqualification motion was filed slightly more than two weeks later, on May 10, which is expeditious by any measure.  Even if the clock is understood as running from the earliest possible date—the finding of the questionnaire—the motion would still be timely.  Roughly two months would then have elapsed before the filing of the motion.  That is not an unreasonable amount of time for counsel to deliberate over whether such a delicate motion is necessary, prepare the pleading, revise it, and so forth.  *See Rogers*, 119 F.3d at 1382 (citing cases in which recusal motions were found untimely after delays of nine, eight, and four months).

The same analysis refutes the ACPA's unfounded insinuations about the relationship between the recusal issue and the pending motions to dismiss.  *See* Dkt. 37 at 6.  Because the motions to dismiss were filed March 29, *see* Dkts. 31, 32. and the questionnaire was uncovered April 25, and given the timelines for civil litigation, *see* Dist. Idaho Loc. Civ. R. 7.1(b)(3), (c)(1), there is no conceivable world in which the two matters would have escaped overlap.  It is also unclear what ruse the ACPA thinks it has discerned.  The motions to dismiss were no surprise,

---

[1] Unless otherwise noted, all internal quotation marks and citations are omitted, and all emphasis is added.

[2] Henceforth, all dates are in 2024 unless otherwise specified.

REPLY IN SUPPORT OF MOTION FOR RECUSAL - 2

**014**

since the defendants have consistently endeavored to prevent the ACPA's conduct at the clemency hearing from receiving any judicial review.  Why would Mr. Creech wait for them?

It would also be inequitable to find Mr. Creech's disqualification motion untimely when the information supporting it was in the possession of Judge Brailsford and Defendant Bennetts, but not that of undersigned counsel.  There is a mechanism for potential recusal grounds to be disclosed to parties so that they can, if they wish, consent.  *See* 28 U.S.C. § 455(e); *see also Sanders v. Univ. of Idaho*, No. 3:19-cv-225, 2021 WL 1534969, at *4 (D. Idaho Apr. 19, 2021) (explaining one judge's practice of issuing a "disclosure to counsel at the earliest possible date" whenever the judge "ha[s] a connection with a party or an attorney that . . . might cause some discomfort for the parties in the case" and inviting counsel to request recusal).  That did not occur here.  Defendant Bennetts should not be rewarded for withholding the information calling for disqualification and then objecting when it is unearthed by opposing counsel.

## II.    The defendants misstate the legal test.

The defendants repeatedly frame the recusal standard as turning on whether the judge is actually biased.  *See, e.g.*, Dkt. 38 at 5 ("[Mr.] Creech believes Judge Brailsford reached her decision due to her partiality.").  That is wrong.  Disqualification is "to be evaluated on an *objective* basis, so that what matters is *not* the reality of bias or prejudice but its *appearance*."  *Liteky v. United States*, 510 U.S. 540, 548 (1994) (first emphasis in original).  The defendants extend an invitation to apply a version of the test that has led the Supreme Court to repeatedly reverse other judges.  *See, e.g.*, *Rippo v. Baker*, 580 U.S. 285, 287 (2017) (per curiam) (summarily vacating because the lower court "applied the wrong legal standard" by forgetting that the law "may sometimes demand recusal even when a judge has no actual bias").  Contrary to the defendants' view, the potential appearance of impropriety is the heart of the matter, not actual bias.  For the same reasons, a recusal would not signal that any actual bias infected the Court's prior rulings in

REPLY IN SUPPORT OF MOTION FOR RECUSAL - 3

the case.  Just the opposite.  *See In re Apollo*, 535 F. App'x 169, 175 (3d Cir. 2013) (per curiam) (granting a petition for mandamus and reassigning a case because, while the court did "not doubt the Judge's ability to preside impartially," "the accumulation of her connections to the litigation endangers the appearance of neutrality that is essential for the judiciary to retain the public's trust.").

### III.    The defendants inadequately deal with the prior recusal.

Recognizing how significantly it weakens their position, the defendants try their best to move the spotlight away from the case in which Judge Brailsford recused herself for the very same reason that she was "a personal friend" of Defendant Bennetts and if she stayed on her "impartiality might reasonably be questioned."  Dkt. 36-2 at 21.  One of the defendants' shared tactics is to simply recast Mr. Creech's motion as hinging entirely on the investiture video, which allows them to conveniently forget the prior recusal.  *See* Dkt. 37 at 1; Dkt. 38 at 4.

Notwithstanding that gambit, many of the defendants' statements are refuted in their entirety by the earlier recusal.  For instance, the ACPA ironically suggests that only a "hypersensitive" person would see a potential appearance of bias stemming from Judge Brailsford participating in a case because of Defendant Bennetts.  Dkt. 37 at 6.  Similarly, the Parole Commission (Commission) feels that only "an overly suspicious mind incapable of understanding the professional and personal relationships" at issue would question partiality here.  Dkt. 38 at 4.  Yet it was Judge Brailsford herself who detected an appearance of partiality and saw a need for recusal while on the Court of Appeals.  *See* Dkt. 36-2 at 21.  Likewise, while the Commission faults Mr. Creech for giving insufficient weight to the fact that "Judge Brailsford's oath of office requires her" to be impartial, Dkt. 38 at 4, she had the same obligation at the Court of Appeals, which is presumably the precise reason she recused herself from the older case.

REPLY IN SUPPORT OF MOTION FOR RECUSAL - 4

**016**

Because the earlier recusal undermines their stance, the defendants bend the law to discount its importance. They rely on the rule that a court weighing a recusal motion is not supposed to conduct "a comparison to similar situations in other cases." Dkt. 37 at 4; *accord* Dkt. 38 at 2. The defendants misinterpret the rule. Courts have been instructed not to engage in a "comparison to similar situations *addressed by prior jurisprudence*." *United States v. Holland*, 519 F.3d 909, 913 (9th Cir. 2008). In other words, a recusal decision is not governed by published caselaw in the sense other legal issues might be. Certainly, the Ninth Circuit has not declared that it is irrelevant to disqualification when a judge has previously recused herself for what is seemingly the exact same reason presented in a new motion.

The only meaningful way for the defendants to address the prior recusal case would have been by distinguishing it, which they barely attempt to do. Both defendants rely perfunctorily on the fact that Defendant Bennetts was apparently sued in her individual capacity in the earlier case. *See* Dkt. 37 at 4; Dkt. 38 at 7. However, neither defendant says why that difference matters. In that regard, it is telling that the ACPA does not shed any light on the nature of the lawsuit that led to the recusal, as it presumably could easily have done since it filed its opposition on behalf of Defendant Bennetts herself, who ostensibly knows (unlike Mr. Creech) why she was sued. It is inappropriate for the ACPA to withhold the vital information from the public record and then ask the Court to draw inferences in its own favor based on the gap. If anything, the ACPA's silence dictates the opposite inference—that Defendant Bennetts was sued for actions that she took while discharging her duties as Ada County Prosecutor, just as she was here. *See* Dkt. 36-1 at 6 n.3. And no matter what those actions were, it is doubtful that they cost a man his life, as alleged here.

The Commission creatively endeavors to spin the prior recusal in its favor, viewing the case as proving that "Judge Brailsford knows when to recuse herself." Dkt. 38 at 7. This approach

REPLY IN SUPPORT OF MOTION FOR RECUSAL - 5

would imply that inconsistent recusal decisions are desirable, as they can always be justified on the basis that the judge must be animated by some distinction between cases that others are not privy to.  There is no foothold in recusal law for such an approach.  It is difficult to imagine "a reasonable person," *Preston v. United States*, 923 F.2d 731, 734 (9th Cir. 1991), whose sense of impartiality is motivated by a blind faith in judges' infallibility.

Lastly, the ACPA does its best to distance the prior recusal on the basis that it occurred five years ago.  *See* Dkt. 37 at 4.  But if the relationship between Judge Brailsford and Defendant Bennetts has changed since then, it was incumbent upon the latter to provide evidence of that, since she has access to the facts and not Mr. Creech.  She has not done so.  Moreover, the Senate questionnaire—which was completed only last year—stated that Defendant Bennetts "*is* a personal friend," in the present tense. Dkt. 36-2 at 21.  The average person would have no reason to suppose that the relationship between Defendant Bennetts and Judge Brailsford has changed to make the appearance of bias any less today than it was when she previously recused herself.

## IV.    Judge Brailsford's other cases do not defeat the motion.

Finding little to help their cause in the crucial Court of Appeals case, the defendants resort to a scattershot array of other irrelevant opinions from the same tribunal.  *See* Dkt. 37 at 4; Dkt. 38 at 7.  Quantity does not make up for the defendants' lack of quality.

To begin, none of the referenced cases are remotely comparable to the present one in terms of either how personally involved Defendant Bennetts was or in terms of how damaging a finding in Mr. Creech's favor would be to the ACPA.  As to the former, the link between Defendant Bennetts and the listed cases is remote at best as a categorical matter.  Every single one of the cases is either a criminal or a post-conviction proceeding.  The ACPA was not a party to any of them.  In each case, it was the Attorney General and not the ACPA that handled the appeal—the only litigation that Judge Brailsford was concerned with.  It is thus incorrect for the ACPA to

REPLY IN SUPPORT OF MOTION FOR RECUSAL - 6

**018**

describe any of these specified cases as generating "ruling[s] against the Prosecutor's Office." Dkt. 37 at 4.  At most, they were rulings against the State of Idaho.

Even if the cases were considered germane for disqualification purposes, they would not move the needle for the defendants.  By all appearances, Defendant Bennetts herself has no direct tie to any of the cases.  Her name does not appear in any of the appellate opinions.  The strongest statement the Commission can muster on the subject is that "Judge Brailsford had no qualms in reversing the trial court and remanding the case for investigation," i.e., not for relief, "into claims of prosecutorial misconduct involving *Ms. Bennetts' direct reports*."  Dkt. 38 at 8.  It is not clear what the Commission's basis is to make even that characterization—the case in question does not indicate the rank of any of the prosecutors involved, or even name them.  *See generally Baker v. State*, 494 P.3d 1256 (Idaho Ct. App. 2021).  Setting that aside, the Commission is in error to portray *Baker* as finding in a defendant's favor on "claims of prosecutorial misconduct."  Dkt. 38 at 8.  *Baker* contains no criticism of prosecutorial honesty or professionalism.  It is written in an extremely mild manner.  *See id.* at 1278 ("The prosecutor's strategic decision to present facts related to these arguments and to make them during closing argument may have heightened the prosecution's obligation to investigate their veracity . . . ."); *see also Agurs*, 427 U.S. at 110 ("If the suppression of evidence results in constitutional error, it is because of the character of the evidence, not the character of the prosecutor.").

The same is true of the defendants' citations more broadly—none of them opine on the morality of the ACPA.  In several of them, the actions that led to reversal were taken by police officers or others who were not even in the ACPA.  *See, e.g.*, *State v. Nelson*, No. 47418, 2021 WL 4259144, at *4 (Idaho Ct. App. Sept. 20, 2021) (focusing on whether a police officer had reasonable suspicion to detain).  There is a chasm between the cases the defendants are

REPLY IN SUPPORT OF MOTION FOR RECUSAL - 7

highlighting, where the ACPA's conduct was nominally and superficially implicated, and the present action, where Ms. Bennetts has been named as a defendant based on allegations that her office presented false evidence at a commutation hearing that she personally attended to facilitate an execution that she observed after a deceptive press release that she issued. *See* Dkt. 36-1 at 7. The Commission intimates that Ms. Bennetts' involvement in the clemency and execution constitutes nothing more than "attention to her professional duties as the elected prosecutor." Dkt. 38 at 5. Still, the defendants do not point to a single fact in any of their cited cases where Defendant Bennetts was personally involved in the proceedings in an even passably comparable way.

Finally, it is worth observing how insignificant the defendants' citations are as a statistical matter. Judge Brailsford participated in 1,450 opinions while on the Court of Appeals, 95% of which (approximately 1,378) were criminal. *See* Dkt. 36-2 at 8. Collectively, the defendants have located five cases they regard as adverse to the ACPA. *See* Dkt. 37 at 4. One of them is in reality the opposite—it vacated a favorable ruling for a defendant on the State's appeal. *See State v. Riley*, No. 47372, 2021 WL 454250, at *1 (Idaho Ct. App. Feb. 9, 2021), *aff'd but criticized*, 514 P.3d 982 (Idaho 2022). Thus, the defendants stake their argument on four cases. A Westlaw search for Judge Brailsford's name and "Ada County" yields 618 hits. Four out of 618 is .6%. Mr. Creech is unsure what in that number cries out "impartial" to the defendants.

The ACPA's federal cases are even further afield. In one of them, Defendant Bennetts' name appears nowhere on the docket or in the Court's decision, and the claims are run-of-the-mill challenges to a state criminal proceeding. *See Crossett v. Idaho*, No. 1:23-cv-389, 2023 WL 6119779 (D. Idaho Sept. 18, 2023). The other involved a pro se plaintiff whose allegations were "almost entirely incomprehensible." *Garcia v. Baskin*, No. 1:23-cv-482, 2024 WL 2272676, at *1 (May 20, 2024). These cases bear no resemblance to Mr. Creech's. What they really prove is

REPLY IN SUPPORT OF MOTION FOR RECUSAL - 8

how accurate Mr. Creech was in assuring the Court that a disqualification order here would have only modest ramifications for other cases. *See* Dkt. 36-1 at 13.

**V.    The nature of this case favors recusal.**

To the defendants, the fact that this is a capital case is no reason to err on the side of caution and ensure the public is satisfied in the integrity of the process. The defendants are mistaken.

Preliminarily, the ACPA misreads Mr. Creech's motion by classifying it as "aris[ing] from the Court's previous substantive ruling within the case" in violation of the principle that "disqualification is not required where allegations arise from the adjudication of claims during the course of litigation." Dkt. 37 at 7. Mr. Creech is not relying on the Court's prior rulings in the sense that he is ascribing bias to them—something that he is not, as noted above, required to do. He is relying on the prior rulings because they demonstrate how problematic the appearance of bias is in the special context of claims that involve a man's life and accusations that the ACPA committed an egregious and intentional fraud in a proceeding that drew leadership's interest.

For its part, the Commission focuses on minimizing the magnitude of this case. According to the Commission, no one's life is on the line because Mr. Creech cannot avoid an execution by prevailing. *See* Dkt. 38 at 4. That perspective is belied by what happened in February, when the Court denied a motion that would have prevented an execution, *see* Dkt. 18, and shortly thereafter the State attempted to put Mr. Creech to death. The Commission is equally misguided in submitting that Mr. Creech does not seek relief from an execution in his amended complaint, *see* Dkt. 38 at 4, when he expressly does just that, *see* Dkt. 30 at 34. Moreover, even if the "only" issue is whether to order a second commutation hearing, a finding in Mr. Creech's favor would still mean that Defendant Bennetts' office sent a man to the execution chamber after lying to the Parole Commission, which would be damaging enough to the ACPA's reputation such that it does make sense to err on the side of recusal.

REPLY IN SUPPORT OF MOTION FOR RECUSAL - 9

**021**

## VI.     The prior appeals in the case are irrelevant.

Consistent with their general strategy of short-circuiting a full and fair process here by relying on the preliminary-injunction litigation, the defendants look to the Ninth Circuit's opinion as a reason to ignore the serious partiality concerns here.  *See* Dkt. 38 at 6.  To the Commission's mind, there is no need for Mr. Creech to have an unbiased judge with respect to Rule 12(b)(6) dismissal because the stay denials "have been adjudicated and affirmed."  *Id.*  That is nonsensical.  Apart from the Commission's ongoing confusion over the difference between preliminary injunctions and Rule 12(b)(6), which have the opposite burden structures, *see* Dkt. 33 at 6–7, Mr. Creech is entitled to a case free from the appearance of bias regardless of the procedural posture. The same is true of the ACPA's tack, also on-brand, of eliding legal niceties like standards of review and asking the Court to simply assume that its version of events is correct and that Mr. Creech is merely "deflecting the blame through baseless claims of deceit."  Dkt. 37 at 6.  If the federal courts ultimately agree with the ACPA that it behaved appropriately at the clemency hearing after a full and fair process, so be it.  But Mr. Creech, like any litigant, is guaranteed the appearance of an impartial decision-maker in presiding over that litigation.

## VII.    Conclusion

In light of the above, and to avoid the possibility of delay occasioned by appellate litigation regarding the disqualification issue, *see In re Cement Antitrust Litig.*, 673 F.2d 1020, 1027 (9th Cir. 1981), Mr. Creech respectfully requests that Judge Brailsford grant his motion and recuse herself from this case.

DATED this 12th day of June 2024.

*/s/ Jonah J. Horwitz*
Jonah J. Horwitz

*Christopher M. Sanchez*
Christopher M. Sanchez

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 12th day of June 2024, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which is designed to send a Notice of Electronic Filing to persons including the following:

Dayton P. Reed
Heather McCarthy
Sherry A. Morgan
civilpafiles@adacounty.id.gov
Counsel for Defendant Bennetts

Karin Magnelli
kmagnell@idoc.idaho.gov
Rebecca Strauss
rstrauss@idoc.idaho.gov
Counsel for Defendant Parole Commission

*/s/ Julie Hill* _____
Julie Hill

# EXHIBIT 3

**RAÚL LABRADOR**
**ATTORNEY GENERAL OF IDAHO**

**KARIN MAGNELLI, ISB #6929**
Lead Deputy Attorney General, Idaho Department of Correction
**REBECCA STRAUSS, ISB #11285**
Deputy Attorneys General, Idaho Department of Correction
1299 North Orchard St., Suite 110
Boise, Idaho 83706
Telephone: (208) 658-2095
Facsimile: (208) 327-7485
E-mail: kmagnell@idoc.idaho.gov; rstrauss@idoc.idaho.gov

*Attorneys for Idaho Commission of Pardons and Parole*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| **THOMAS EUGENE CREECH**,<br>　　　　Plaintiff,<br><br>v.<br><br>**IDAHO COMMISSION OF PARDONS AND PAROLE; JAN M. BENNETTS,** Ada County Prosecuting Attorney, in her official capacity,<br><br>　　　　Defendants. | **Case No. 1:24-cv-00066-AKB**<br><br>**DEFENDANT IDAHO COMMISSION OF PARDONS AND PAROLE'S OPPOSITION TO PLAINTIFF'S MOTION FOR RECUSAL [DKT. 36]** |

Defendant Idaho Commission of Pardons and Parole ("Commission"), by and through undersigned counsel, hereby submits its Opposition to Plaintiff's ("Creech") Motion for Recusal.

### LEGAL STANDARD

There is "a general proposition that, in the absence of a legitimate reason to recuse [her]self, a judge should participate in cases assigned." *United States v. Holland*, 519 F.3d 909, 912 (9th Cir. 2008). This proposition is derived from the "judicial power" with which judges are vested. *See* U.S. CONST. art. III, § 1. Simultaneously, a judge shall not sit in cases in which her "impartiality might reasonably be questioned." 28 U.S.C. § 455(a); *see also Code of Conduct for United States*

DEFENDANT IDAHO COMMISSION OF PARDONS AND PAROLE'S OPPOSITION TO
PLAINTIFF'S MOTION FOR RECUSAL - 1

**025**

*Judges, Cannons 2 and 3; Liteky v. United States*, 510 U.S. 540, 548 (1994). Judges "are as bound to recuse [them]selves when the law and facts require as [they] are to hear cases when there is no reasonable factual basis for recusal." *Holland*, 519 F.3d at 912; *see also Clemens v. U.S. Dist. Ct. for Cent. Dist. of California*, 428 F.3d 1175, 1179 (9th Cir. 2005) (A judge has "as strong a duty to sit when there is no legitimate reason to recuse as he does to recuse when the law and facts require."). However, "[t]he Supreme Court has recognized only a few circumstances in which an appearance of bias necessitates recusal to ensure due process of law." *Greenway v. Schriro,* 653 F.3d 790, 806 (9th Cir. 2011). Typically, the Supreme Court has only mandated recusal where a judge has a direct, personal, or substantial connection to the outcome of a case or to its parties. *See In re Murchison,* 349 U.S. 133, 136 (1955) (concluding that "no man is permitted to try cases where he has an interest in the outcome").

Because § 455(a) inquiries are so fact driven, the analysis of a particular claim must be guided, "not by comparison to similar situations addressed by prior jurisprudence, but rather by an independent examination of the unique facts and circumstances of the particular claim at issue." *Clemens*, 428 F.3d at 1178. Generally, judges are given latitude when exercising their discretion to determine whether they should recuse themselves.

"Any justice, judge, or magistrate **judge of the** United States shall disqualify himself in any proceeding in which his impartiality might **reasonably** be questioned." 28 U.S.C. § 455(a) (emphasis added). "The reasonable person is not someone who is hypersensitive or unduly suspicious, but rather is a well-informed, thoughtful observer. The standard must not be so broadly construed that it becomes, in effect, presumptive, so that recusal is mandated upon the merest unsubstantiated suggestion of personal bias or prejudice." *Holland*, 519 F.3d at 913 (internal quotations omitted).

DEFENDANT IDAHO COMMISSION OF PARDONS AND PAROLE'S OPPOSITION TO
PLAINTIFF'S MOTION FOR RECUSAL - 2

**026**

<u>FACTS</u>

Ms. Bennetts, the elected Ada County Prosecutor, spoke at Judge Brailsford's investiture in 2019, when she was appointed to the Idaho Court of Appeals. Dkt. 36-4. Ms. Bennetts recounted their friendship beginning when they clerked for Judge Thomas Nelson in 1993 until the day of Judge Brailsford's investiture in 2019. The speech reflected a professional friendship between Judge Brailsford and Ms. Bennetts built upon professional respect. Ms. Bennetts described two friends who celebrate each other's professional achievements but admittedly "go months and even years without catching up". *Id.* at 2.  Mr. Creech relies upon Ms. Bennetts' comments during a professional ceremony commemorating Judge Brailsford's significant career milestone as the foundation of his failed attempt to create an appearance of impartiality.

Judge Brailsford has shown she is aware of her duty to recuse herself from cases when her impartiality may be reasonably questioned and has in fact recused herself on one occasion when Ms. Bennetts was sued in her individual capacity. Dkt. 36-2, p. 21. Judge Brailsford has also demonstrated the ability to hold the Ada County Prosecutor's Office accountable and require further inquiry into allegations of prosecutorial misconduct. *See infra Baker*. Finally, contrary to Plaintiff's repeated references to her personal interest, unsupported by evidence, Ms. Bennetts does not have a personal stake in this matter.

Recusal is not warranted in this case.

<u>ARGUMENT</u>

A. <u>A reasonable person would not question Judge Brailsford's impartiality in this case.</u>

Creech twists the facts and circumstances present in this matter. He cites Ms. Bennetts' engagement in professional and official duties, imbues them with personal motivations, and infers the elected prosecutor has "an individual investment in the execution of Mr. Creech by attending

DEFENDANT IDAHO COMMISSION OF PARDONS AND PAROLE'S OPPOSITION TO
PLAINTIFF'S MOTION FOR RECUSAL - 3

**027**

the event in person." Dkt. 36-1, p. 7. Creech fails to identify any evidence supporting his factual averments or speculative conclusions.

Creech claims Ms. Bennetts' comments during Judge Brailsford's 2019 investiture, acknowledging professional respect and personal affection, create such an appearance of impartiality requiring recusal by Judge Brailsford. The circumstances depicted by Creech would only raise a question of impropriety for a "hypersensitive or unduly suspicious" person, not a well-informed, thoughtful observer. *See Holland*, 519 F.3d at 913 ("The reasonable person is not someone who is hypersensitive or unduly suspicious, but rather is a well-informed, thoughtful observer."). Creech ascribes the reasonable person with an overly suspicious mind incapable of understanding the professional and personal relationships forged between members of Idaho's bar. Likewise, he disregards the public's ability to acknowledge that Judge Brailsford's oath of office requires her to put aside those professional and personal relationships and commit to impartial and just adjudications, an oath she has upheld. A well-informed and thoughtful public will rationally consider the scant evidence in this case and reasonably decide Judge Brailsford does not have an apparent conflict let alone an actual one.

Contrary to Creech's claims, a decision by Judge Brailsford adverse to Creech does not result in Mr. Creech's execution through deceit. Dkt. 36-1, p. 9. Likewise, a decision by Judge Brailsford favorable to Creech does not spare him from his death sentence. *Id.* Such a remedy is not even available in this proceeding. This case does not challenge Creech's guilt, conviction, or sentence, but addresses whether Creech's due process rights were violated during his clemency proceeding. Creech states he is seeking a remedy that "an execution be prohibited by the Court". *Id*. That is not the relief sought in the Amended Complaint. Assuming Creech establishes a due process violation and prejudice sufficient to overcome harmless error, Judge Brailsford can, at

DEFENDANT IDAHO COMMISSION OF PARDONS AND PAROLE'S OPPOSITION TO PLAINTIFF'S MOTION FOR RECUSAL - 4

028

most, enter an order that the Commission provide Creech with a new clemency hearing. However, Judge Brailsford previously considered Creech's claims in a light most favorable to him and found he was unlikely to succeed on the merits of his claims—a decision upheld by the Ninth Circuit and denied certiorari by the United States Supreme Court. *See* Dkt. 27 and Dkt. 26.

Presumably and without any legal or factual basis, Creech believes Judge Brailsford reached her decision due to her partiality for Ms. Bennetts and Judge Brailsford's desire to protect her friend's reputation. *See* Dkt. 36-1, pp. 9-10. Creech further opines Judge Brailsford will continue to protect Ms. Bennetts. *Id.* at 10-11. Creech goes further however and appears to allege that Judge Brailsford will be motivated to vindicate her prior decision and professional reputation based on that relationship. *See Id.* at 10 ("A ruling in Creech's favor now would signify that Judge Brailsford in February approved of an execution secured by fraud perpetrated on behalf of a good friend."). Creech cites Ms. Bennetts' attention to her professional duties as the elected prosecutor as evidence of her vested personal interest in the outcome of Creech's clemency hearing. He speculates that any adverse findings related to the Ada County Prosecutor's Office would have a direct, personal impact. This, according to Creech, supports his assertion that a reasonable person would question Judge Brailsford's impartiality. Dkt. 36-1, pp. 7-9. Creech confuses Ms. Bennett's ethical and professional responsibilities as the elected Ada County Prosecutor with any personal investment.

Creech does not cite to any conduct or statements by Judge Brailsford that would lead a reasonable person to question her impartiality in this case, other than the Court's prior legal rulings. *See Studley*, 783 F.2d at 939 ("The alleged prejudice must result from an extrajudicial source; a judge's prior adverse ruling is not sufficient cause for recusal."). Her decision to deny Creech's preliminary injunction motion was upheld by the Ninth Circuit (Dkt, 27) and the U.S. Supreme

Court (Dkt. 26). The Ninth Circuit found, "Creech's alleged violations do not call into doubt the stated rationales for the Commissioners' votes." (Dkt. 27, p. 12), which confirmed Judge Brailsford's finding that "the Commission's decision does not appear to have been unduly influenced by either the Walker murder or the sock photograph." Dkt. 18, p. 14. Considering that the adverse rulings have been adjudicated and affirmed, there is no actual basis upon which Creech can point to bias by Judge Brailsford. Creech's repeated mantra that Judge Brailsford is motivated to protect Ms. Bennetts arises from his unsupported suspicions and personal stake in this litigation. *See, e.g.,* 36-1, p. 7 (alleging the Court would not "saddle a 'dear friend' with such reputational costs."), pp. 9-10 (claiming that if the Court found deceit by staff, it would be imputed to Ms. Bennetts, and the Court would not willingly "convey such a message" about her friend), p. 10 (contending the Court "might be motivated to shield a close friend" from discovery of misconduct), p. 12 (averring the Court would be "inclined to insulate a close friend from" the ordeal of an inquiry). Creech has not pointed to evidence supporting a reasonable inference that Ms. Bennetts has a personal stake in the litigation or that Judge Brailsford has a desire to vindicate the elected prosecutor's reputation.

"A judge is not required to forsake established friendships and professional relationships with members of the bar just because [s]he has taken a seat on the bench." *Carolina Cas. Ins. Co. v. Helsley*, No. 1:10-cv-916-LJO-MJS *(E.D. Cal. November 30, 2020), citing *United States v. Moseian*, 972 F.2d 1346 at *5 (9th Cir. Aug. 18, 1992) (per curiam) (unpublished). *See also* Guide to Judiciary Policy, Vol. 2B, Ch. 2, No. 11: Disqualification Where Long-Time Friend or Friend's Law Firm is Counsel (U.S. Courts, 2024), https://www.uscourts.gov/rules-policies/judiciary-policies/ethics-policies/published-advisory-opinions. Although Judge Brailsford and Jan Bennetts are friends and have known each other for three decades, they do not share a close relative or

DEFENDANT IDAHO COMMISSION OF PARDONS AND PAROLE'S OPPOSITION TO PLAINTIFF'S MOTION FOR RECUSAL - 6

similar relationship. Instead, they sometimes "go months and even years without catching up". Dkt. 36-4, p. 2. Creech has provided no information suggesting Judge Brailsford has a vested interest in the outcome of this case apart from wild conjecture. Only a hypersensitive or unduly suspicious person would question Judge Brailsford's impartiality; the well-informed, thoughtful observer would not question Judge Brailsford's ability to be impartial.

B.  Judge Brailsford is aware of her duty to recuse herself.

While sitting on the Idaho Court of Appeals, Judge Brailsford likely heard and adjudicated many cases handled by the Ada County Prosecutor's Office.[1] *See, e.g., Baker v. State*, 169 Idaho 284, 494 P.3d 1256 (Ct. App. 2021); *State v. Nelson*, No. 47418, 2021 WL 4259144 (Idaho Ct. App. Sept. 20, 2021). No one suggested that Judge Brailsford could not preside over cases in which the Ada County Prosecutor's Office was involved during her tenure on that court. Dkt. 36-2, p. 21. Creech does not advocate for that now. *See* Dkt. 36-1, p. 13. She decided sua sponte to recuse herself when Ms. Bennetts was sued "individually (not in her capacity as the county prosecutor)" to avoid a reasonable appearance of partiality. Dkt. 36-2, p. 21. Judge Brailsford knows when to recuse herself. She rightfully does not feel that need in the immediate case.

Additionally, Judge Brailsford has demonstrated that she can fairly adjudicate claims against the Ada County Prosecutor's Office involving potential prosecutorial misconduct, even where that conduct could implicate Ms. Bennetts professionally and unquestionably affects her office.[2] *See Baker v. State*, 169 Idaho 284, 494 P.3d 1256 (Ct. App. 2021). In a unanimous opinion

---

[1] Judge Brailsford estimated she has filed or joined 1,450 opinions during her time on the Idaho Court of Appeals with 95% of those being criminal cases. Dkt. 36-2, pp. 7-8.

[2] Even though Jan Bennetts was not the elected prosecutor during the alleged *Brady* violation, she was the Assistant Chief Deputy of the Criminal Division when the case was filed in 2010 and Chief of Staff in 2013 when the second jury trial occurred. *Elect Jan Bennetts: About Jan*, https://www.electjanbennetts.com/about (last visited May 16, 2024). In 2014, she was appointed the Ada County Prosecutor, a position she still holds today.

DEFENDANT IDAHO COMMISSION OF PARDONS AND PAROLE'S OPPOSITION TO PLAINTIFF'S MOTION FOR RECUSAL - 7

authored by Judge Brailsford, the Idaho Court of Appeals unanimously reversed the district court's decision to dismiss the *Brady* claims raised against the Ada County Prosecutor's Office and remanded the case to the trial court. Judge Brailsford directed the trial court to hold "a thorough and exacting evaluation [of the potential *Brady* claim] after an evidentiary hearing to determine whether the [Ada County Prosecutor's Office] undermined confidence in the jury's verdict by suppressing favorable information…." *Id.* at 305, 494 P.3d at 1277.

Creech raises a claim involving a factual scenario substantially similar to the facts Judge Brailsford considered in *Baker*. While *Baker* raised a *Brady* violation and Creech alleges a due process violation—both assert harm resulting from claimed prosecutorial misconduct. Creech claims that the procedural posture favors recusal because if Defendants' Motion to Dismiss is denied, the case will begin discovery, which could possibly "uncover[] misconduct by her or her office". *Id.* Yet, in 2021, Judge Brailsford had no qualms in reversing the trial court and remanding the case for investigation into claims of prosecutorial misconduct involving Ms. Bennetts' direct reports.

Creech, citing *Holland*, insinuates the balance tips in favor of recusal because of a "close" question. Dkt. 36-1, p. 2. However, this is not a close case, despite Creech's unsubstantiated suggestions of personal bias or prejudice. Creech acknowledges the distinction between a judge's obligations in a case where a friend is defending an official capacity suit juxtaposed with one where a friend is being sued individually. He attempts to circumvent that distinction with several layers of as-yet unsupported factual speculation. Creech relies upon his unsubstantiated allegations that (1) Ada County Prosecutor's Office staff presented false information during the clemency proceeding, (2) Ada County Prosecutor's Office staff purposefully and intentionally lied during the clemency proceeding, and (3) Ada County Prosecutor's Office staff's conduct adversely

DEFENDANT IDAHO COMMISSION OF PARDONS AND PAROLE'S OPPOSITION TO
PLAINTIFF'S MOTION FOR RECUSAL - 8

"impact[s] [Ms. Bennetts] personally". *See* Dkt. 36-1, p. 8. He claims his conclusions necessarily flow because "elected chiefs routinely become exemplars of [prosecutorial] misbehavior in the public sphere.", pointing to the example of Harry Connick, the New Orleans District Attorney who faced widespread derision after a series of episodes involving the suppression of exculpatory evidence, to support this theory. *Id.* at 6-7. One must take a number of factual and logical leaps before equating Ms. Bennetts to Harry Connick. First, the former New Orleans prosecutor's office engaged in a pattern of misconduct, not just one instance. *See Connick v. Thompson*, 563 U.S. 51, (2011), Ginsburg, J., dissenting ("[T]he evidence demonstrated that misperception and disregard of *Brady's* disclosure requirements were pervasive in Orleans Parish."). Second, Creech has had the opportunity for court review of his allegations against the Ada County Prosecutor's Office during the preliminary injunction litigation and neither the District Court (Dkt. 18), the Ninth Circuit (Dkt. 27), nor the Supreme Court (Dkt. 26) granted relief. Creech's claim that Judge Brailsford would lack impartiality because she does not want her dear friend to end up like Harry Connick fails on every level.

## <u>CONCLUSION</u>

For the foregoing reasons, the Commission respectfully requests this Court deny Plaintiff's Motion for Recusal.

Respectfully submitted this 31st day of May 2024.

OFFICE OF THE ATTORNEY GENERAL

*/s/ Karin Magnelli*_____
Karin Magnelli
Deputy Attorney General

*/s/ Rebecca Strauss*_____
Rebecca Strauss
Deputy Attorney General
Attorneys for Commission

DEFENDANT IDAHO COMMISSION OF PARDONS AND PAROLE'S OPPOSITION TO PLAINTIFF'S MOTION FOR RECUSAL - 9

**CERTIFICATE OF SERVICE**

I certify that on May 31, 2024, I caused to be served a true and correct copy of the foregoing via CM/ECF Electronic Notification:

Jonah Horwitz: Jonah_Horwitz@fd.org
Christopher M. Sanchez: Christopher_M_Sanchez@fd.org
*Counsel for Plaintiff*

Dayton Reed: dreed@adacounty.id.gov
*Counsel for Defendant Bennetts*

<u>/s/ Rebecca Strauss</u>
Rebecca Strauss
Deputy Attorney General

DEFENDANT IDAHO COMMISSION OF PARDONS AND PAROLE'S OPPOSITION TO
PLAINTIFF'S MOTION FOR RECUSAL - 10

**034**

# EXHIBIT 4

**JAN M. BENNETTS**
ADA COUNTY PROSECUTING ATTORNEY

**DAYTON P. REED**
**HEATHER M. McCARTHY**
**SHERRY A. MORGAN**
Deputy Prosecuting Attorneys
Civil Division
200 W. Front Street, Room 3191
Boise, ID  83702
Telephone:  (208) 287-7700
Facsimile:  (208) 287-7719
Idaho State Bar Nos. 10775, 6404, & 5296
Email:  civilpafiles@adacounty.id.gov

*Attorneys for Ada County Prosecutor Jan M. Bennetts*

### IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| THOMAS EUGENE CREECH,<br><br>     Plaintiff,<br><br>vs.<br><br>IDAHO COMMISSION OF PARDONS AND PAROLE; JAN M. BENNETTS, Ada County Prosecuting Attorney, in her official capacity,<br><br>    Defendant. | **Case No. 1:24-cv-066-AKB**<br><br>**PROSECUTOR BENNETTS' OPPOSITION TO MOTION FOR RECUSAL [DKT. 36]** |

  More than five years ago, Prosecutor Bennetts spoke at Judge Brailsford's investiture ceremony for her appointment on the Idaho Court of Appeals, a different court than the one this case is heard in today. Creech asserts that because Prosecutor Bennetts spoke at that investiture ceremony over five years ago, Judge Brailsford is required to recuse herself from this case—and

PROSECUTOR BENNETTS' OPPOSITION TO MOTION FOR RECUSAL [DKT. 36] – PAGE 1

**036**

that his due process rights are violated by her hearing his case—merely because Creech makes baseless, unanimously rejected claims of misconduct by a member of Prosecutor Bennetts' Office. He conspicuously brings his motion to recuse while a motion to dismiss his complaint is under advisement, having already received an adverse ruling on his motion for preliminary relief on grounds that could be fatal to his entire case. But Creech fails to provide evidence that would cause a reasonable, well-informed, thoughtful observer to doubt Judge Brailsford's impartiality. A reasonable person with knowledge of the facts would see that Judge Brailsford has a years-long record of impartiality in hearing cases involving the Ada County Prosecutor's Office, including where ethical issues are raised.

## I.    STANDARD

This Court is well aware of the ethical duties of a federal judge and is well aware of the standard governing a motion for recusal under 28 U.S.C. § 455(a):

> Section 455(a) provides that "any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. § 455(a). The United States Supreme Court has explained the goal of § 455(a) is "to avoid even the appearance of partiality." *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 860 (1988). The standard for determining impartiality is purely objective. *United States v. Holland*, 519 F.3d 909, 913 (2008) (applying "objective test"); *Clemens v. United States Dist. Court for Central Dist. of California*, 428 F.3d 1175, 1178 (9th Cir. 2005) (same).

> The Ninth Circuit has ruled that the inquiry for determining impartiality is whether a reasonable person with knowledge of all the facts would conclude the judge's impartiality might reasonably be questioned or would perceive a significant risk the judge would resolve the case on a basis other than the merits. *Holland*, 519 F.3d at 913. A reasonable person for purposes of the inquiry is a "well-informed, thoughtful observer" and not a "hypersensitive or unduly suspicious" person. *Id.* (quoting *In re Mason*, 916 F.2d 384, 386 (7th Cir. 1990)); *see also Clemens*, 428 F.3d at 1178 (stating standard and describing reasonable person's nature). Further, "the standard 'must not be so broadly construed that it becomes, in effect presumptive, so that recusal is mandated upon the merest unsubstantiated suggestion of personal bias or prejudice.'" *Holland*, 519 F.3d at 913 (quoting

PROSECUTOR BENNETTS' OPPOSITION TO MOTION FOR RECUSAL [DKT. 36] – PAGE 2

*United States v. Cooley*, 1 F.3d 985, 993 (10th Cir. 1993)). When the law and the facts do not support a legitimate reason for disqualification, a judge has a "strong duty to sit." *Clemens*, 428 F.3d at 1179 (quoting *Nichols v. Alley*, 71 F.3d 347, 351 (10th Cir. 1995)).

An analysis of whether § 455(a) requires disqualification "is necessarily fact-driven and may turn on the subtleties in the particular case." *Holland*, 519 F.3d at 913. The court must be guided by an independent examination of the unique facts and circumstances and not by a comparison to similar situations in other cases. *Id.* In conducting this analysis, I accept as true the allegations in Mr. Strother's affidavit. *Cf. United States v. Azhocar*, 581 F.2d 735, 738 (9th Cir. 1978) (addressing disqualification under 28 U.S.C. § 144 and noting "inquiry is addressed to the facial sufficiency of the affidavit not to the truth or falsity stated therein").

*Mining Logistics & Reclamation v. E3 Realty Advisors, Inc.*, No. 1:23-CV-00376-AKB, 2023 WL 8702788, at *1–2 (D. Idaho Dec. 14, 2023) (Brailsford, J.). As to Creech's allegation that his due process rights are violated by Judge Brailsford presiding over this case, such allegations rise to the level of a due process violation only in the most extreme instances, such as a direct conflict of interest, not mere allegations of bias and prejudice. *Benjamin O. v. Kijakazi*, No. 1:21-CV-00403-CWD, 2022 WL 17539120, at *9 (D. Idaho Dec. 8, 2022) (Dale, J.) (citing *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 821 (1986)).

## II.   ARGUMENT

Creech's entire argument for recusal boils down to the fact that Prosecutor Bennetts spoke at Judge Brailsford's Idaho Court of Appeals investiture ceremony over five years ago, before she had yet to decide a single case. He presents no evidence of partiality toward the Ada County Prosecutor's Office since Lawyer Brailsford became Judge Brailsford, a point in time when all relationships with lawyers must change in order to maintain an appropriate professional distance with colleagues who would inevitably appear before her.

While serving on the Idaho Court of Appeals—the court assigned to decide a majority of the criminal appeals in Idaho—Judge Brailsford heard and ruled on numerous cases involving the

Ada County Prosecutor's Office. She has authored decisions ruling against the Prosecutor's Office. *E.g. State v. Borek*, No. 49021, 2022 WL 4295418, at *6 (Idaho Ct. App. Sept. 19, 2022) (Brailsford, J.) (vacating conviction and remanding); *State v. Nelson*, No. 47418, 2021 WL 4259144, at *1 (Idaho Ct. App. Sept. 20, 2021) (Brailsford, J.) (vacating, reversing, and remanding); *State v. Riley*, No. 47372, 2021 WL 454250, at *1 (Idaho Ct. App. Feb. 9, 2021) (Brailsford, J.).

She has joined opinions ruling against the Prosecutor's Office. *E.g.*, *State v. Jacobsen*, 166 Idaho 832, 836, 464 P.3d 318, 322 (Ct. App. 2020) (joining the unanimous panel vacating the conviction, reversing, and remanding); *State v. Hayes*, No. 45601, 2019 WL 2070466, at *1 (Idaho Ct. App. May 10, 2019) (joining the unanimous panel vacating the conviction, reversing, and remanding).

Creech argues that this case is different because his claims question the ethics of the Prosecutor's Office, and he asserts that his claims reflect personally on Prosecutor Bennetts. He points out that Judge Brailsford reported in candor a single instance of recusing herself five years ago, in her first year as a judge, in an unidentified case, because Prosecutor Bennetts was named personally as a defendant, not in her capacity as Ada County Prosecutor. Creech's argument is contrary to the requirement that "[t]he court must be guided by an independent examination of the unique facts and circumstances and not by a comparison to similar situations in other cases," *see Mining Logistics & Reclamation*, 2023 WL 8702788, at *1–2 (quoting *United States v. Holland*, 519 F.3d 909, 913 (2008)), including the single, unidentified case he points to.

Nevertheless, while serving on the Idaho Court of Appeals, Judge Brailsford heard multiple cases and authored opinions involving claims of prosecutorial misconduct against the Ada County Prosecutor's Office, and she did not find it necessary to recuse herself merely because an ethical

PROSECUTOR BENNETTS' OPPOSITION TO MOTION FOR RECUSAL [DKT. 36] – PAGE 4

issue was raised while Prosecutor Bennetts led the Office. *E.g.*, *State v. Wright*, No. 48927, 2023 WL 2850008, at *27 (Idaho Ct. App. Apr. 10, 2023) (sitting on a panel hearing an appeal involving a claim of prosecutorial misconduct); *Lundquist v. State*, No. 48741, 2022 WL 6886167, at *1 (Idaho Ct. App. Oct. 12, 2022) (Brailsford, J.) (affirming summary dismissal of post-conviction petition raising *Brady* claim); *Rush v. State*, No. 48562, 2022 WL 414352, at *6 (Idaho Ct. App. Feb. 11, 2022) (joining the unanimous panel affirming summary dismissal of post-conviction petition raising *Brady* claim); *Baker v. State*, 169 Idaho 284, 307, 494 P.3d 1256, 1279 (Ct. App. 2021) (Brailsford, J.) (reversing summary dismissal of post-conviction petitioner's Baker's *Brady* claim and remanding for an evidentiary hearing); *State v. Dearing*, No. 46053, 2019 WL 5820901, at *5 (Idaho Ct. App. Nov. 7, 2019) (sitting on a panel hearing an appeal involving a claim of prosecutorial misconduct).

Even as a federal district judge, Judge Brailsford has presided over a case naming Prosecutor Bennetts in both her official and personal capacities, *ONIS-CARBINE GARCIA, Plaintiff, v. NANCY BASKIN, in her official/personal capacity; JAN BENNETTS, in her official/personal capacity; & MICHAEL GUY, in his official/personal capacity, Defendants.*, No. 1:23-CV-00482-AKB, 2024 WL 2272676 (D. Idaho May 20, 2024) (Brailsford, J.), and a case naming the Ada County Prosecutor's Office as a defendant, *Crossett v. Idaho*, No. 1:23-CV-00389-AKB, 2023 WL 6119779, at *1 (D. Idaho Sept. 18, 2023) (Brailsford, J.).

A reasonable, well-informed, thoughtful observer would see that more than five years ago Prosecutor Bennetts spoke in celebration of a colleague's career achievements before that colleague had decided her first case, and that Creech has absolutely no evidence that anything but appropriate professional distance was maintained to the present. That reasonable, thoughtful observer would see that in the years she served on the Idaho Court of Appeals, Judge Brailsford

PROSECUTOR BENNETTS' OPPOSITION TO MOTION FOR RECUSAL [DKT. 36] – PAGE 5

determined she was not prejudiced or biased regarding the Ada County Prosecutor's Office, nor did she have a conflict of interest, and she determined that it would be appropriate to hear numerous cases involving the Prosecutor's Office, including cases that questioned that Office's ethics. That observer would see that only once did she choose to recuse herself—five years ago, while in her first year as a judge and serving on a different court—when "the subtleties in the particular case" caused her to make that "fact-driven" choice. *See Mining Logistics & Reclamation*, 2023 WL 8702788, at *1–2 (quoting *Holland*, 519 F.3d at 913). A reasonable, well-informed observer would see that Judge Brailsford is impartial and harbors no prejudice or bias for or against Creech or the Prosecutor's Office, and that Creech has not presented any evidence of a direct conflict of interest. A reasonable observer—who is neither hypersensitive nor unduly suspicious, *Holland*, 519 F.3d at 913, and who lacks an incentive to shop for a different judge at this particular point in the proceedings—would have no reason to question Judge Brailsford's impartiality regarding this case.

Contrary to Creech's assertions, there is nothing about this case that requires recusal any more than any other case in which a disgruntled convicted criminal points the finger of blame at law enforcement, the prosecutor, and the judge in an attempt to avoid, minimize, or delay punishment for their crimes. Creech is a serial killer who brutally murdered another inmate while serving a life sentence—causing his victim to suffer an actual lingering, torturous death—but he blames the Ada County Prosecutor that he will be executed for it, deflecting the blame through baseless claims of "deceit" rather than recognizing that his fate is the result of his own depraved actions in bludgeoning, kicking, and stomping a person to death. Dkt. 36-1, p. 9. Neither Creech nor any other litigant should be allowed to benefit from recklessly casting aspersions in this way.

PROSECUTOR BENNETTS' OPPOSITION TO MOTION FOR RECUSAL [DKT. 36] – PAGE 6

A reasonable observer would see these for what they are: common tactics of last resort that don't automatically cast doubt on a judge's impartiality.

Creech tries to sneak in an argument that a prior adverse ruling disqualifies Judge Brailsford from continuing to hear this case. He observes that this Court has already ruled against him on his motion for preliminary relief, and he asserts that Judge Brailsford would avoid ruling in his favor now because that would reveal that Judge Brailsford "approved of an execution secured by fraud." Dkt. 36-1, p. 10. This argument for recusal arises from the Court's previous substantive ruling within the case, but disqualification is not required where allegations arise from the adjudication of claims during the course of litigation. *United States v. Dillon*, No. 1:16-CR-00037-BLW, 2024 WL 380877, at *1 (D. Idaho Jan. 31, 2024) (citing *Focus Media, Inc. v. Nat'l Broadcasting Co. (In re Focus Media, Inc.)*, 378 F.3d 916, 930 (9th Cir. 2004)).

A reasonable, well-informed, thoughtful observer would see no reason to doubt Judge Brailsford's impartiality. Creech's motion—conspicuously filed while a motion to dismiss is under advisement—provides no evidence or reason to impugn Judge Brailsford's ability to maintain appropriate professional distance for the past five years, and it provides no sufficient reason why the facts of this particular case justify recusal.

### III.   CONCLUSION

The motion for recusal should be denied.

**DATED** this 31st day of May, 2024.

JAN M. BENNETTS
Ada County Prosecuting Attorney


By:   */s/ Dayton P. Reed*_____
Dayton P. Reed
Deputy Prosecuting Attorney

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 31st day of May, 2024, I filed the foregoing PROSECUTOR BENNETTS' OPPOSITION TO MOTION FOR RECUSAL [DKT. 36] electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

> Christopher Sanchez
> Jonah J. Horwitz
> FEDERAL DEFENDER SERVICES OF IDAHO
>
> Karin Magnelli
> Rebecca Strauss
> OFFICE OF THE ATTORNEY GENERAL OF IDAHO

AND I FURTHER CERTIFY that on such date I served the foregoing on the following non-CM/ECF Registered Participants in the manner indicated as follows:

N/A

> By:  /s/ Chyvonne Tiedemann
>      Legal Assistant

# EXHIBIT 5

Nicole Owens
EXECUTIVE DIRECTOR
Christopher M. Sanchez, Idaho Bar No. 12070
Jonah J. Horwitz, Idaho Bar No. 10494
Assistant Federal Defenders
FEDERAL DEFENDER SERVICES OF IDAHO
702 W. Idaho Street, Suite 900
Boise, ID 83702-8929
Telephone: (208) 331-5530
Facsimile: (208) 331-5559
ECF:  Jonah_Horwitz@fd.org
      Christopher_M_Sanchez@fd.org

*Attorneys for Plaintiff Thomas Eugene Creech*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| **THOMAS EUGENE CREECH,** | ) | **Case No. 1:24-cv-00066-AKB** |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | **MOTION FOR RECUSAL** |
| | ) | |
| **IDAHO COMMISSION OF PARDONS** | ) | |
| **AND PAROLE**; and **JAN M.** | ) | |
| **BENNETTS**, Ada County Prosecuting | ) | |
| Attorney, in her official capacity, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

Due to her personal relationship with one of the defendants, for the reasons

set forth in the accompanying memorandum in support, and pursuant to 28 U.S.C.

§ 455 and the Due Process Clause, Plaintiff Thomas Eugene Creech respectfully asks

Judge Brailsford to recuse herself from the instant case.

Motion for Recusal – Page 1

**045**

DATED this 10th day of May 2024.

*/s/ Jonah J. Horwitz*
Jonah J. Horwitz

*/s/ Christopher M. Sanchez*
Christopher M. Sanchez

Attorneys for Plaintiff Thomas Eugene Creech

## CERTIFICATE OF SERVICE

I hereby certify that on this 10th day of May 2024, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which is designed to send a Notice of Electronic Filing to persons including the following:

Dayton P. Reed
Heather McCarthy
Sherry A. Morgan
civilpafiles@adacounty.id.gov
Counsel for Defendant Bennetts

Karin Magnelli
kmagnell@idoc.idaho.gov
Rebecca Strauss
rstrauss@idoc.idaho.gov
Counsel for Defendant Parole Commission

*/s/ Julie Hill*
Julie Hill

Motion for Recusal – Page 2

**046**

# EXHIBIT 6

Nicole Owens
EXECUTIVE DIRECTOR
Christopher M. Sanchez, Idaho Bar No. 12070
Jonah J. Horwitz, Idaho Bar No. 10494
Assistant Federal Defenders
FEDERAL DEFENDER SERVICES OF IDAHO
702 W. Idaho Street, Suite 900
Boise, ID 83702-8929
Telephone: (208) 331-5530
Facsimile: (208) 331-5559
ECF:  Jonah_Horwitz@fd.org
       Christopher_M_Sanchez@fd.org

*Attorneys for Plaintiff Thomas Eugene Creech*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| **THOMAS EUGENE CREECH,** ) | **Case No. 1:24-cv-00066-AKB** |
| ) | |
| Plaintiff, ) | |
| v. ) | **PLAINTIFF'S MEMORANDUM** |
| ) | **IN SUPPORT OF MOTION** |
| **IDAHO COMMISSION OF PARDONS** ) | **FOR RECUSAL** |
| **AND PAROLE**; and **JAN M.** ) | |
| **BENNETTS**, Ada County Prosecuting ) | |
| Attorney, in her official capacity, ) | |
| ) | |
| Defendants. ) | |
| ) | |
| ) | |
| _____ ) | |

        Due to her personal relationship with one of the defendants, for the reasons

set forth below, and pursuant to 28 U.S.C. § 455 and the Due Process Clause, Plaintiff

Thomas Eugene Creech respectfully asks Judge Brailsford to recuse herself from this

case.

Memorandum in Support of Motion for Recusal – Page 1

**048**

## I.    Standard

"Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which h[er] impartiality might reasonably be questioned." 28 U.S.C. § 455(a). Whether a judge's impartiality might reasonably be questioned is "to be evaluated on an *objective* basis, so that what matters is not the reality of bias or prejudice but its appearance." *Liteky v. United States*, 510 U.S. 540, 548 (1994) (emphasis in original).[1] Thus, the question is "whether a reasonable person with knowledge of all the facts would conclude that the judge's impartiality might reasonably be questioned." *Preston v. United States*, 923 F.2d 731, 734 (9th Cir. 1991). Analysis of this question "is necessarily fact-driven and may turn on subtleties in the particular case." *United States v. Holland*, 519 F.3d 909, 913 (9th Cir. 2008). "If it is a close case, the balance tips in favor of recusal." *Id.* at 912.

Similarly, the Due Process Clause requires recusal when "there is an unconstitutional potential for bias." *Williams v. Pennsylvania*, 579 U.S. 1, 8 (2016). The due-process test turns on whether "the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable" and the court must ask whether "the average judge in [her] position is likely to be neutral." *Rippo v. Baker*, 580 U.S. 285, 287 (2017) (per curiam).

---

[1] Unless otherwise noted, all internal quotation marks and citations are omitted, and all emphasis is added.

Memorandum in Support of Motion for Recusal – Page 2

## II.  Facts

During the nomination process for her current federal judicial appointment, Judge Brailsford filled out a questionnaire in which she was asked to recount her history of recusals. *See* Ex. 1 at 21. At the time, Judge Brailsford was sitting on the Idaho Court of Appeals. Judge Brailsford noted that she had only recused herself from one case at the court of appeals. *See id.* In that case, she recused herself sua sponte because the defendant in a criminal appeal had separately "filed a civil action against public officials including the Ada County Prosecutor, who is a personal friend." *Id.* Judge Brailsford explained: "Because the plaintiff filed the action against her individually (not in her capacity as the county prosecutor), I determined that my impartiality might reasonably be questioned and that the issue was incurable." *Id.*

Judge Brailsford was nominated for the federal bench in January 2023. *See* Kelcie Moseley-Morris, *Idaho appeals court judge to be nominated to federal bench, White House announces*, Idaho Capital Sun (Jan. 18, 2023), https://idahocapitalsun.com/briefs/idaho-appeals-court-judge-nominated-to-federal-bench-white-house-announces/. At that time, Defendant Jan M. Bennetts was serving—as she does today—as the elected Ada County Prosecutor. *See* Idaho Prosecuting Attorneys Association, Ada County, Jan Bennetts, https://ipaa-prosecutors.org/prosecutor/ada/. Thus, the Ada County Prosecutor who led Judge Brailsford to recuse herself because the two were personal friends was presumably Defendant Bennetts.

Memorandum in Support of Motion for Recusal – Page 3

**050**

On January 2, 2019, an investiture ceremony was held to mark Judge Brailsford's appointment to the Idaho Court of Appeals. *See* Ex. 2. At the ceremony, Defendant Bennetts made remarks at Judge Brailsford's invitation in which she detailed the thirty-plus-year friendship between the two. *See* Ex. 3 at 1–3.[2] Defendant Bennetts described the "vivid memories" she had of working with Judge Brailsford "nearly 24/7 in . . . chambers" during their shared clerkship, where they met in 1993. *Id.* Reflecting on their time together, Defendant Bennetts spoke fondly of her close relationship with Judge Brailsford:

> You will hear more about Amanda the lawyer from Mr. Andersen in a few moments, but before I leave the podium, a few words about Amanda the friend. Amanda and I met by circumstance, but we became friends by choice. Amanda is the kind of friend you feel incredibly fortunate to find. They're few and far between. She is a remarkable person—compassionate, empathetic and genuine. . . . In the years since our clerkship, I have followed Amanda's career and life with great pride and joy. Pride in a colleague's accomplishments and joy for a very dear friend. We have continued to share lunches, not at the Piper Pub, and although we may go months and even years without catching up, Amanda is the kind of friend for whom I would drop everything if she needed me and I know she would do the same. She shares in the excitement of successes and is supportive in challenging times. You can't ask for more than that.

*Id.* at 2. Defendant Bennetts concluded her remarks by calling Judge Brailsford "a role model in work and in life." *Id.* at 3

---

[2] Exhibit 3 is a partial transcription of the investiture ceremony. The video in its entirety is available at https://www.idahoptv.org/shows/idahoinsession/archive/. It can be found by selecting the subheading "Idaho Supreme Court" under "Idaho Supreme Court Proceedings" and then "Download MP4" under "Investiture of Judge Amanda K. Brailsford, January 2, 2019."

Memorandum in Support of Motion for Recusal – Page 4

At the conclusion of the ceremony, Judge Brailsford voiced her gratitude to Defendant Bennetts from her new seat on the bench: "Thank you to my dear friend Jan Bennetts for your kind words and unfailing support. Jan and I are kindred spirits." *Id.*

## III.  Analysis

In Mr. Creech's respectful view, the facts recited above call for recusal.

First, Judge Brailsford appears to have already essentially recognized that her friendship with Defendant Bennetts requires recusal in cases where the latter's conduct is personally implicated. As noted above, Judge Brailsford previously recused herself because of her relationship with Defendant Bennetts when the latter was personally sued by a litigant because, if she had remained on the appeal, her "impartiality might reasonably be questioned." Ex. 1 at 21. In taking that course of action, Judge Brailsford was presumably following Idaho law regarding recusals. *See Bradbury v. Idaho Jud. Council*, 233 P.3d 38, 44 (Idaho 2009) (clarifying that the standard for recusal in Idaho state courts is whether "the judge's impartiality might reasonably be questioned"). The state-law test is for all intents and purposes identical to the federal one. *See id.* at 45 (characterizing federal recusal cases as "instructive" while citing approvingly from them). In short, if there was a potential appearance of partiality in the prior case, there is one here as well.

Mr. Creech recognizes that he did not sue Defendant Bennetts in her personal capacity, as was the case in the appeal in which Judge Brailsford previously recused

Memorandum in Support of Motion for Recusal – Page 5

herself.[3] *See* Dkt. 30 at 1 (naming Defendant Bennetts in her professional capacity). Nevertheless, Mr. Creech respectfully suggests that the distinction does not undermine the need for recusal in the present matter. To begin, although Defendant Bennetts has not been sued in her personal capacity in the formal sense, her individual conduct is very much at issue in the litigation. The amended complaint accuses the Ada County Prosecuting Attorney's Office (ACPO) of presenting false evidence at Mr. Creech's commutation hearing. *See id.* at 7–30. As the amended complaint observes, Defendant Bennetts is the head of the ACPO. *See id.* at 3. Consequently, the ACPO was acting in Defendant Bennetts' name and under her supervision when it engaged in the alleged misconduct at issue in the case. If the ACPO is found to have offered false evidence, it would undeniably reflect at least in part on Defendant Bennetts. Indeed, when prosecutorial offices are criticized for serious ethical breaches, elected chiefs routinely become exemplars of the misbehavior in the public sphere. *See, e.g.*, David Alan Sklansky, *The Nature and Function of Prosecutorial Power*, 106 J. Crim. L. & Criminology 473, 517 n.269 (2016) (observing that New Orleans District Attorney Harry Connick and his office became

---

[3] Mr. Creech's investigation has been unable to identify either the appeal from which Judge Brailsford recused herself or the civil lawsuit that led to the disqualification. If more information is made available to him about those proceedings, he would compare in more detail the situation then with the circumstances at bar. For instance, it would be noteworthy if the individual in the civil case sued Defendant Bennetts for actions that she took while discharging her duties as Ada County Prosecutor. Then, the fact that the individual sued Defendant Bennetts in her personal capacity would be an even less meaningful distinction from the instant case.

Memorandum in Support of Motion for Recusal – Page 6

"a national whipping boy for violating defendants' rights" after a series of episodes involving the suppression of exculpatory evidence). A reasonable citizen might well question whether a judge would have an incentive not to saddle a "dear friend" with such reputational costs. *See Moran v. Clarke*, 296 F.3d 638, 649 (8th Cir. 2002) (en banc) ("The image of one sitting in judgment over a friend's affairs would likely cause the average person in the street to pause."), *abrogated on other grounds as recognized by Stockley v. Joyce*, 963 F.3d 809, 821 (8th Cir. 2020).

Those costs would be increased by the reasonable citizen's assumption that Defendant Bennetts was closely supervising the activity in question. It has been thirty years since an inmate convicted by the ACPO was executed. *See Wells by and through Kehne v. Arave*, 18 F.3d 656 (9th Cir. 1994) (per curiam). During the same period, a number of individuals sentenced to death in Ada County escaped execution by dying of natural causes in prison or obtaining sentencing relief. *See, e.g.*, *Fields v. Blades*, D. Idaho, No. 1:95-cv-422, Dkt. 372; *Sivak v. Hardison,* 658 F.3d 898 (9th Cir. 2011). Defendant Bennetts herself expressed her individual investment in the execution of Mr. Creech by attending the event in person. *See* Idaho Department of Correction, Execution Updates, https://www.idoc.idaho.gov/content/news/execution-updates. And Defendant Bennetts underscored her role in the commutation proceedings themselves by sitting in the witness gallery during the hearing. The handling prosecutor emphasized her boss's presence to the Commissioners, stressing how long she had been the head of the office and declaring that she was "here in support of the death penalty today." Dkt. 30 at 27; *see* Dkt. 15-2 at 1–2.

Memorandum in Support of Motion for Recusal – Page 7

Given the unusually high-profile nature of the matter, the ACPO's devotion to a long-awaited execution, and Ms. Bennetts' particular association both with putting Mr. Creech to death and with having his clemency petition denied, it is fair to presume that any adverse judicial findings about her office would impact her personally.

Furthermore, Ms. Bennetts is directly tethered to at least some of the wrongful conduct alleged in Mr. Creech's case. For example, the amended complaint takes issue with a press release that the ACPO issued the day of the commutation hearing. In the press release, the ACPO stated—falsely, in Mr. Creech's opinion—that the Daniel Walker case had been "solved." Dkt. 30 at 10. The press release was presented to the public as coming from the ACPO as a whole, not from any individual deputy prosecutor. *See* Dkt. 4-3. No doubt the public would have understood the press release as essentially a statement by Defendant Bennetts, who is the face of the office. It is difficult to imagine that a press release of this sort, which generated publicity from around the country, *see* Dkt. 15-13, would not have been authorized by Defendant Bennetts. The deception at the heart of Mr. Creech's claim is therefore tied in a straightforward fashion to Defendant Bennetts.

It is concerning, for disqualification purposes, that any judicial questioning of the truthfulness of the press release would be inconsistent with the praise Judge Brailsford directed at Defendant Bennetts at her investiture. One of the very first things Judge Brailsford did after donning her robe and taking her official seat on the bench was to commend Defendant Bennetts' scrupulousness, telling the audience

Memorandum in Support of Motion for Recusal – Page 8

that she had won the Idaho State Bar Professionalism Award, which was "most apropos of Jan[.]" Ex. 3 at 3. Judge Brailsford further elaborated that Defendant Bennetts was "a consummate professional every day, all day, for her entire career." *Id.* The factual basis of Mr. Creech's lawsuit directly contradicts Judge Brailsford's statements regarding Defendant Bennetts. That kind of tension spurs reservations in a reasonable onlooker's mind about whether a judge is able "to hold the balance nice, clear and true between the" litigants. *Echavarria v. Filson*, 896 F.3d 1118, 1131 (9th Cir. 2018).

It is also critical to remember the stakes in the litigation and how they affect the recusal inquiry. This is a capital case in which one of Mr. Creech's requested remedies is that an execution be prohibited by the Court. *See* Dkt. 30 at 34. The life-or-death nature of the proceedings has two important implications here. First, "[w]hen a defendant's life is at stake, the [Supreme] Court has been particularly sensitive to insure that every safeguard is observed." *Gregg v. Georgia*, 428 U.S. 153, 187 (1976) (plurality op.). It is especially crucial to ensure that no potential appearance of impropriety attaches to the case, which weighs in favor of disqualification in an abundance of caution. *See Holland*, 519 F.3d at 912 ("If it is a close case, the balance tips in favor of recusal.").

Second, the centrality of an execution to the proceedings makes the social entanglement at issue more problematic. If Mr. Creech's allegations are correct, it would mean that Defendant Bennetts' office sent a man to his attempted execution through deceit. A reasonable person would surely question a judge's willingness to

Memorandum in Support of Motion for Recusal – Page 9

convey such a message to the world about a "dear friend." The dynamic is further complicated by the fact that Judge Brailsford has already denied a stay of execution in connection with the case at bar. *See Creech v. Idaho Comm. of Pardons & Parole*, No. 1:24-cv-066, 2024 WL 756308 (D. Idaho Feb. 23, 2024), *aff'd*, 94 F.4th 851 (9th Cir. 2024) (per curiam). A ruling in Mr. Creech's favor now would signify that Judge Brailsford in February approved of an execution secured by a fraud perpetrated on behalf of a good friend. That is not a scenario conducive to the appearance of complete impartiality. Moreover, and significantly, the capital character of the present action was not a feature of the Idaho Court of Appeal's matter in which recusal was nevertheless warranted, since that tribunal hears no death-penalty cases. As a result, the current case is an even stronger candidate for disqualification.

In addition, the procedural posture of the case favors recusal. The defendants have both filed motions to dismiss Mr. Creech's amended complaint for failure to state a claim. *See* Dkts. 31, 32. If the motions are denied, the case would head into discovery as a matter of course. *See, e.g.*, *Carter v. DeKalb Cnty.*, 521 F. App'x 725, 728 (11th Cir. 2013) (per curiam) ("[D]iscovery follows the filing of a well-pleaded complaint." (emphasis omitted)). Even if there is no ultimate victory for Mr. Creech on the merits, the reasonable outsider would wonder whether a judge might be motivated to shield a close friend from the possibility of discovery uncovering misconduct by her or her office.

By way of one example, when Mr. Creech sought expedited discovery in connection with preliminary-injunction litigation, he requested leave to pose an

Memorandum in Support of Motion for Recusal – Page 10

interrogatory asking who was responsible for the misleading language in the Walker press release discussed above. *See* Dkt. 10-1 at 14. A likely answer would be Defendant Bennetts. Another area that would be ripe for discovery concerns communications between the ACPO and the San Bernardino District Attorney (SBDA). It is undersigned counsel's position that the ACPO and the SBDA have worked in concert so that Mr. Creech would be falsely accused at the commutation hearing of murdering Mr. Walker without either office having to defend the allegations in a court of law. *See, e.g.*, Dkt. 17-1. Undersigned counsel have supported their theory by pointing to the fact that the SBDA, Jason Anderson, has announced that he will not charge Mr. Creech while simultaneously insisting without evidence that he has proof of his guilt beyond a reasonable doubt. *See id.* If permitted, Mr. Creech would pursue discovery into communications between the ACPO and the SBDA. It is foreseeable that such messages would involve Defendant Bennetts, since she is Mr. Anderson's counterpart in Ada County.

Relatedly, the matter of what legal framework the Court brings to bear on Mr. Creech's claim raises impartiality concerns. During the preliminary-injunction dispute, ACPO attorneys—i.e., Defendant Bennetts' subordinates—argued strenuously that precedent does not allow for any consideration of whether prosecutorial assertions at a clemency hearing are true or false. *See* Dkt. 11 at 10–13. This Court agreed with the ACPO and concluded the law permits no judicial inquiry into "the validity of the evidence." *Creech*, 2024 WL 756308, at *5. The upshot of that determination is that there was no investigation by the Court into whether

Memorandum in Support of Motion for Recusal – Page 11

Defendant Bennetts and her staff propagated falsehoods about the commutation evidence. Currently, the Court is being called upon to reassess that interpretation of the law while it adjudicates the motions to dismiss the amended complaint. *See* Dkt. 31-1 at 8; Dkt. 33 at 18–20. The Court's adjudication of the question will resolve, as it did before, whether Defendant Bennetts and her employees are subjected to a judicial evaluation of their honesty, or whether they are spared that experience. It might well cross the mind of a reasonable spectator that a judge would be more inclined to insulate a close friend from such an ordeal.

The tone struck by the ACPO's filings further reinforces the understandable intensity of that office's desire not to be deemed duplicitous. In opposing a preliminary injunction, the ACPO chided Mr. Creech for "recklessly casting aspersions" and "vehemently denie[d] [his] baseless allegations." Dkt. 11 at 10 n.5. Whenever the ACPO has denied the allegations in court filings, it has done so in a document that states, in the very first line, that it is coming from "Jan M. Bennetts," whose name then appears as the first signatory at the conclusion of the pleading as well. *Id.* at 1, 17. In this fashion, Defendant Bennetts has signaled to the Court that she has a strong vested interest in seeing the allegations rejected. Recall that this is from someone who told a public assembly that Judge Brailsford "is the kind of friend for whom I would drop everything if she needed me and I know she would do the same." Ex. 3 at 2. The risks created by this friendship to the appearance of neutrality are undeniable.

Memorandum in Support of Motion for Recusal – Page 12

Mr. Creech recognizes that "[a] judge is not required to forsake established friendships and professional relationships with members of the bar just because [s]he has taken a seat on the bench." *United States v. Moseian*, 972 F.2d 1346, Nos. 91-10188, 91-10197, 1992 WL 197408, at *5 (9th Cir. Aug. 18, 1992) (per curiam). To that end, Mr. Creech is not suggesting that any case in which Defendant Bennetts' office was previously involved necessitates an automatic recusal by Judge Brailsford. There are doubtlessly many habeas cases, to name one prime category, in which Defendant Bennetts or her underlings represented the State at trial, and in which few if any of the apprehensions outlined above would be present. *See, e.g.*, *Hawkins v. Christensen*, No. 1:13-cv-321, 2022 WL 60667, at *2 (D. Idaho Jan. 6, 2022) (mentioning that Defendant Bennetts served as one of the trial prosecutors in a habeas case). Nonetheless, that does not weaken the case for recusal under the extraordinary facts now before the Court.

What is more, from Mr. Creech's research, it seems that a recusal order here would have limited ramifications for other cases. *See In re Literary Works in Elec. Databases Copyright Litig.*, 509 F.3d 136, 140 (2d Cir. 2007) ("[W]e as judges must balance our duty to appear impartial against several practical considerations, including the availability of other judges, the cost in judicial resources of recusal and reassignment of the case to different judges, and the interest of the parties and the public in a swift resolution of the dispute."). During the ten years in which Defendant Bennetts has been in office, she has only been named as a defendant in a handful of federal actions. In most of them, she has been sued only because the cause of action

Memorandum in Support of Motion for Recusal – Page 13

related to criminal law enforcement in Ada County in some way, and Defendant Bennetts was accordingly a relevant actor as a technical matter. *See, e.g.*, *Planned Parenthood of Great Nw. & Haw. Islands v. Wasden*, 410 F. Supp. 3d 1108 (D. Idaho 2019). Mr. Creech's searches on Westlaw did not reveal a single other federal case remotely comparable to the present one, where Defendant Bennetts has been named in a lawsuit involving serious accusations of false evidence presented by her office in a matter that elicited her personal attention. Far from disrupting the Court's general business, an order of disqualification would only serve to guarantee the public's confidence in the federal judiciary and its determination to be perceived as beyond ethical reproach.

## IV.  Conclusion

In light of the above, Mr. Creech respectfully requests that Judge Brailsford grant his motion and recuse herself from this case.

DATED this 10th day of May 2024.

*/s/ Jonah J. Horwitz*
Jonah J. Horwitz

*Christopher M. Sanchez*
Christopher M. Sanchez

Attorneys for Plaintiff Thomas Eugene Creech

## CERTIFICATE OF SERVICE

I hereby certify that on this 10th day of May 2024, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which is designed to send a Notice of Electronic Filing to persons including the following:

Dayton P. Reed
Heather McCarthy
Sherry A. Morgan
civilpafiles@adacounty.id.gov
Counsel for Defendant Bennetts

Karin Magnelli
kmagnell@idoc.idaho.gov
Rebecca Strauss
rstrauss@idoc.idaho.gov
Counsel for Defendant Parole Commission

/s/ Julie Hill
Julie Hill

Memorandum in Support of Motion for Recusal – Page 15

062

# EXHIBIT 7

*Thomas Eugene Creech v. Idaho Commission of Pardons and Parole; and Jan M.*
*Bennetts, Ada County Prosecuting Attorney, in her official capacity*
Case No. 1:24-cv-00066-AKB

Submitted in Support of Memorandum in Support of Motion for Recusal

# EXHIBIT 1

## (United States Senate Committee on the Judiciary
## Questionnaire for Judicial Nominees)

UNITED STATES SENATE
COMMITTEE ON THE JUDICIARY

QUESTIONNAIRE FOR JUDICIAL NOMINEES

## PUBLIC

1. **Name**: State full name (include any former names used).

   Amanda Kathleen Brailsford
   Amanda Kathleen Felton

2. **Position**: State the position for which you have been nominated.

   United States District Judge for the District of Idaho

3. **Address**: List current office address. If city and state of residence differs from your place of employment, please list the city and state where you currently reside.

   Idaho Court of Appeals
   451 West State Street
   Boise, Idaho  83720

4. **Birthplace**: State year and place of birth.

   1967, Twin Falls, Idaho

5. **Education**: List in reverse chronological order each college, law school, or any other institution of higher education attended and indicate for each the dates of attendance, whether a degree was received, and the date each degree was received.

   1990 – 1993, University of Idaho College of Law; J.D. (*summa cum laude*), 1993

   1985 – 1989, University of Idaho; B.A. (*cum laude*), 1989

6. **Employment Record**: List in reverse chronological order all governmental agencies, business or professional corporations, companies, firms, or other enterprises, partnerships, institutions or organizations, non-profit or otherwise, with which you have been affiliated as an officer, director, partner, proprietor, or employee since graduation from college, whether or not you received payment for your services. Include the name and address of the employer and job title or description.

   2019 – present
   Idaho Court of Appeals
   451 West State Street
   Boise, Idaho  83720

Court of Appeals Judge

2013 – 2017; 2018
Andersen Schwartzman Woodward Brailsford, PLLC (now defunct)
(formerly known as Andersen Banducci, PLLC)
101 South Capital Boulevard
Boise, Idaho  83702
Member (2013 – 2017)
Counsel (2018)

1995 – 2013; Summer 1992
Holland & Hart LLP
800 West Main Street, Suite 1750
Boise, Idaho  83702
Partner (2003 – 2013)
Associate (1995 – 2002)
Summer Associate (summer 1992)

1993 – 1995
U.S. Court of Appeals for the Ninth Circuit
550 West Fort Street, Suite 400
Boise, Idaho  83724
Law Clerk for the Honorable Thomas G. Nelson

1992 – 1993
University of Idaho
875 Perimeter Drive
Moscow, Idaho  83843
Judicial Advisor to Dean of Students

1991 – 1993
University of Idaho College of Law
875 Perimeter Drive
Moscow, Idaho  83844
Teaching Assistant

Summer 1991
University of Idaho College of Law
875 Perimeter Drive
Moscow, Idaho  83843
Research Assistant

Other Affiliations (uncompensated):

Flying Triangle, Inc.
18274 Highway 30

2

**066**

Hagerman, Idaho 83332
Minority Shareholder, Director

7. **Military Service and Draft Status**:  Identify any service in the U.S. Military, including dates of service, branch of service, rank or rate, serial number (if different from social security number) and type of discharge received, and whether you have registered for selective service.

I did not serve in the military.  I was not required to register with the selective service.

8. **Honors and Awards**:  List any scholarships, fellowships, honorary degrees, academic or professional honors, honorary society memberships, military awards, and any other special recognition for outstanding service or achievement.

Martindale Hubbell, AV Preeminent rating (2012 – present)

Litigation Counsel of America, Fellow (2017 – 2018)

Chambers USA, America's Leading Lawyers (2009 – 2017)

Leadership Boise (1998 – 1999)

University of Idaho College of Law
        University of Idaho Alumni Award for Excellence (1993)
        J. Blaine Anderson Memorial Scholarship (1992 – 1993)

University of Idaho
        Outstanding Senior Award (1989)
        Phi Beta Kappa (1989)
        Phi Kappa Phi (1989)
        Sigma Tau Delton (1989)
        Grace V. Nixon Scholarship (1985 – 1988)
        David Scholarship (1988 – 1989)

9. **Bar Associations**:  List all bar associations or legal or judicial-related committees, selection panels or conferences of which you are or have been a member, and give the titles and dates of any offices which you have held in such groups.

Federal Bar Association, Idaho Chapter
        Founding Member (2004)
        Nominating Committee, Chairman (2006)

Idaho State Bar Association (1993 – present)

Idaho Supreme Court Evidence Rules Advisory Committee (2016 – 2019)

3

**067**

Inns of Court, Boise Chapter (2000 – 2001)

University of Idaho College of Law Conclave (2006)

10. **Bar and Court Admission:**

    a. List the date(s) you were admitted to the bar of any state and any lapses in membership.  Please explain the reason for any lapse in membership.

       Idaho, 1993

       There have been no lapses in membership.  I have been an inactive member on judicial status since my appointment to the Idaho Court of Appeals in 2019.

    b. List all courts in which you have been admitted to practice, including dates of admission and any lapses in membership.  Please explain the reason for any lapse in membership.  Give the same information for administrative bodies that require special admission to practice.

       United States Court of Appeals for the Ninth Circuit, 1993
       United States District Court for the District of Idaho, 1993

       There have been no lapses in membership.

11. **Memberships:**

    a. List all professional, business, fraternal, scholarly, civic, charitable, or other organizations, other than those listed in response to Questions 9 or 10 to which you belong, or to which you have belonged, since graduation from law school.  Provide dates of membership or participation, and indicate any office you held.  Include clubs, working groups, advisory or editorial boards, panels, committees, conferences, or publications.

       Law Advisory Council for University of Idaho College of Law
            Emeritus Member (2012 – present)
            Member (2007 – 2011)

       Silver Sage Girl Scouts Council, Inc.
            Member, Board of Directors (1996 – 2000)
                Personnel Committee, Chairman (1996 – 2000)
                Executive Director Selection Committee (1999)
                Affirmative Action Task Force (1999)

    b. The American Bar Association's Commentary to its Code of Judicial Conduct states that it is inappropriate for a judge to hold membership in any organization that invidiously discriminates on the basis of race, sex, or religion, or national

4

**068**

origin. Indicate whether any of these organizations listed in response to 11a above currently discriminate or formerly discriminated on the basis of race, sex, religion or national origin either through formal membership requirements or the practical implementation of membership policies. If so, describe any action you have taken to change these policies and practices.

To my knowledge, these organizations do not currently discriminate nor have they ever formally discriminated on the basis of race, sex, religion, or national origin either through formal membership requirements or the practical implementation of membership policies.

12. **Published Writings and Public Statements**:

    a.  List the titles, publishers, and dates of books, articles, reports, letters to the editor, editorial pieces, or other published material you have written or edited, including material published only on the Internet. Supply four (4) copies of all published material to the Committee.

Idaho Employment Law Newsletters by Holland & Hart LLP, M. Lee Smith Publishers, April 1996 to approximately September 2002. I edited and occasionally wrote articles related to employment law topics for this monthly newsletter. I did not retain, and am unable to locate, copies of the newsletters or articles that I wrote or edited.

"Ask Walter" News Column, Idaho Statesman, approximately June 1998 to approximately October 2001. I occasionally wrote and edited articles for this newspaper column, which ran under the name of Walter H. Bithell, a partner at Holland & Hart. The topics related to general legal questions submitted to the newspaper. I did not retain, and am unable to locate, copies of the columns or the articles that I wrote or edited.

    b.  Supply four (4) copies of any reports, memoranda or policy statements you prepared or contributed in the preparation of on behalf of any bar association, committee, conference, or organization of which you were or are a member. If you do not have a copy of a report, memorandum or policy statement, give the name and address of the organization that issued it, the date of the document, and a summary of its subject matter.

Idaho Supreme Court Evidence Rules Advisory Committee, report recommending changes to the Idaho Rules of Evidence. While I was a member of the committee, I attended a meeting on December 1, 2017, regarding the incorporation of certain changes to the Federal Rules of Evidence into the Idaho Rules of Evidence. Minutes of this meeting supplied. Comments on the proposed amendments were solicited in January 2018, and a court staff attorney transmitted a report on this subject in February 2018 to the Idaho Supreme Court on the recommended amendments. Report supplied.

5

**069**

c.  Supply four (4) copies of any testimony, official statements or other communications relating, in whole or in part, to matters of public policy or legal interpretation, that you have issued or provided or that others presented on your behalf to public bodies or public officials.

None.

d.  Supply four (4) copies, transcripts or recordings of all speeches or talks delivered by you including commencement speeches, remarks, lectures, panel discussions, conferences, political speeches, and question-and-answer sessions.  Include the date and place where they were delivered, and readily available press reports about the speech or talk.  If you do not have a copy of the speech or a transcript or recording of your remarks, give the name and address of the group before whom the speech was given, the date of the speech, and a summary of its subject matter. If you did not speak from a prepared text, furnish a copy of any outline or notes from which you spoke.

I have searched electronic databases and paper files that I have maintained in an effort to identify all events responsive to this question and have located the following information. I have no notes, transcripts, or recordings for any of the speeches identified.

April 14, 2022:  Speaker, Appellate Section of the Idaho State Bar Association, Boise, Idaho.  I spoke to this group about the history and operations of the Idaho Court of Appeals.  The Idaho State Bar Association's address is 525 West Jefferson Street, Boise, Idaho 83702.

August 19, 2021:  Speaker, University of Idaho College of Law, Boise, Idaho.  I spoke to a group of new law students about legal ethics at the College's Professionalism Day Program during student orientation at the Boise campus. The University of Idaho College of Law's Boise campus is located at 501 West Front Street, Boise, Idaho 83702.

March 10, 2020:  Speaker, University of Idaho College of Law, Moscow, Idaho.  I sat on a panel with other Idaho Court of Appeal judges and spoke about professional development to a group of law students at the College's Moscow campus.  The College of Law's Moscow campus is located at 875 Perimeter Drive, Moscow, Idaho 83844

1999 (specific date unknown):  Speaker, Holland & Hart Employment Law Update, Denver Tech Center, Colorado.  I spoke to human resource managers about recent developments in employment law.  The Denver address for Holland & Hart is 555 17th Street, Suite 3200, Denver, Colorado 80202.

1999 (specific date unknown):  Speaker, Idaho Human Resources Organization,

6

**070**

Boise, Idaho. I spoke to human resources personnel about recent developments in employment law. The Idaho Human Resources Organization appears to be defunct.

1998 (specific dates unknown): Speaker, Council on Education in Management Seminars, Boise, Idaho. On two occasions, I spoke to human resources personnel and managers on employment law issues including privacy rights, drugs and alcohol in the workplace, and sexual harassment. On three other occasions, I spoke to human resources personnel and managers on employment law issues including risk-free hiring, at-will employment, and privacy rights. The Council on Education in Management appears to be defunct.

e.  List all interviews you have given to newspapers, magazines or other publications, or radio or television stations, providing the dates of these interviews and four (4) copies of the clips or transcripts of these interviews where they are available to you.

Press Release, "Idaho Gov. Otter: Moeller Appointed to Supreme Court" (Nov. 30, 2018). Copy supplied.

13. **Judicial Office**: State (chronologically) any judicial offices you have held, including positions as an administrative law judge, whether such position was elected or appointed, and a description of the jurisdiction of each such court.

Since 2019, I have served as a judge on the Idaho State Court of Appeals. In 2018, the Governor of Idaho, Leroy "Butch" Otter appointed me to fill an unexpired term of a retired judge. In 2020, I ran for, and was elected to, a six-year term on the Court.

Idaho Code section 1-2406 establishes the jurisdiction for the Idaho Court of Appeals. The Court of Appeals has jurisdiction to hear and decide all cases that the Idaho Supreme Court assigns to it, which are primarily criminal appeals. The Supreme Court may not assign appeals invoking the Supreme Court's original jurisdiction or appeals involving capital punishment sentences, the industrial commission, or the public utilities commission.

a.  Approximately how many cases have you presided over that have gone to verdict or judgment?

I estimate that I have filed or joined in approximately 1,450 opinions during my time on the Idaho Court of Appeals, not counting cases dismissed before argument.

i.  Of these cases, approximately what percent were:

jury trials:            N/A
bench trials:           N/A

7

**071**

    ii.   Of these cases, approximately what percent were:

        civil proceedings:     5%
        criminal proceedings:   95%

b.   Provide citations for all opinions you have written, including concurrences and dissents.

    See attached list of opinions.

c.   For each of the 10 most significant cases over which you presided, provide: (1) a capsule summary of the nature of the case; (2) the outcome of the case; (3) the name and contact information for counsel who had a significant role in the trial of the case; and (4) the citation of the case (if reported) or the docket number and a copy of the opinion or judgment (if not reported).

    1.  *State v. Galindo*, No. 48123, ___ P.3d ___, 2022 WL 4372204 (Idaho Ct. App. Sept. 22, 2022).

Galindo appealed his conviction for trafficking methamphetamine, challenging the denial of his motion to suppress. After an officer lawfully stopped the vehicle Galindo was driving, Galindo complained he was ill and responded affirmatively when asked if he wanted an ambulance. As paramedics examined Galindo in the ambulance, the officer prepared the traffic citation. Paramedics were still examining Galindo when the officer completed writing the citation so he remained in his patrol vehicle and began writing the traffic stop narrative. Meanwhile, a second officer asked for and received Galindo's consent to search the vehicle. After Galindo exited the ambulance, the first officer, who had prepared the citation, began explaining the citation to Galindo. As the first officer was explaining the citation, the second officer found a digital scale with visible methamphetamine residue in the vehicle. As a result, the first officer did not return Galindo's documentation or serve the citation. About six seconds after the first officer finished explaining the citation, the second officer found methamphetamine in the vehicle. Galindo moved to suppress, arguing the first officer unlawfully extended the stop by not interrupting Galindo's medical examination to serve him the citation and rendered his consent to the search invalid. The district court denied this motion. On appeal, the Idaho Court of Appeals, in an opinion I authored, affirmed the denial, concluding Galindo—not the officer—delayed the traffic stop by requesting and receiving medical treatment. Further, we rejected Galindo's argument that the first officer should have interrupted Galindo's medical treatment to deliver the citation.

Counsel for Appellant:
Kiley A. Heffner
Idaho State Public Defender's Office

8

**072**

322 East Front Street, Suite 570
Boise, ID  83702
(208) 334-2712

Counsel for Respondent:
Kenneth K. Jorgensen
Idaho Attorney General's Office, Criminal Law Division
954 West Jefferson Street, Second Floor
Boise, ID  83720
(208) 334-4534

2.  *State v. Colpitts*, No. 47388, 511 P.3d 873 (Idaho Ct. App. 2022).

Colpitts appealed her conviction for first-degree murder arguing the district court
erred by admitting audio recordings of an inmate's jailhouse calls and refusing to
instruct the jury that a witness was an accomplice as a matter of law.  In an
opinion I authored, the Idaho Court of Appeals ruled that the district court's
evidentiary rulings and jury instructions were not in error and affirmed the
conviction.

Counsel for Appellant:
Andrea W. Reynolds
Sally J. Cooley
Idaho State Public Defender's Office
322 East Front Street, Suite 570
Boise, ID  83702
(208) 334-2712

Counsel for Respondent:
Kenneth K. Jorgensen
Idaho Attorney General's Office, Criminal Law Division
954 West Jefferson Street, Second Floor
Boise, ID  83720
(208) 334-4534

3.  *State v. Olvera*, No. 47546, 2021 WL 5175079 (Idaho Ct. App. Nov. 8, 2021).

The jury found Olvera, a juvenile, guilty of robbery and first-degree murder after
another juvenile was shot multiple times and died.  On appeal, Olvera challenged
the district court's denial of his suppression motion, asserting he did not waive his
Fifth Amendment rights knowingly, voluntarily, and intelligently.  Olvera argued
that he did not understand his *Miranda* rights and that his mother's absence
during his confession was a factor in determining whether he understood his
rights.  In an opinion I authored, the Idaho Court of Appeals ruled that substantial
and competent evidence supported the district court's conclusion that Olvera
knowingly, voluntarily, and intelligently waived his Fifth Amendment rights.

9

Counsel for Appellant:
Ben P. McGreevy
Idaho State Public Defender's Office
322 East Front Street, Suite 570
Boise, ID 83702
(208) 334-2712

Counsel for Respondent:
Andrew V. Wake
Idaho Attorney General's Office, Criminal Law Division
954 West Jefferson Street, Second Floor
Boise, ID 83720
(208) 334-4534

4. *State v. Nelson*, No. 47418, 2021 WL 4259144 (Idaho Ct. App. Sept. 20, 2021).

Nelson appealed his conviction for trafficking in methamphetamine, challenging the district court's denial of his suppression motion. Nelson argued the officers lacked reasonable suspicion to detain him outside a hotel based on a call from "hotel management and staff" reporting complaints from unidentified hotel guests about sexual and drug activity in one of the rooms. In an opinion I authored, the Idaho Court of Appeals ruled that the tip from "hotel management and staff" lacked adequate indicia of reliability to establish reasonable suspicion, reversed the district court's order denying the suppression motion, and vacated the conviction. On remand, the prosecution dismissed the charges against Nelson.

Counsel for Appellant:
Justin M. Curtis
Idaho State Public Defender's Office
322 East Front Street, Suite 570
Boise, ID 83702
(208) 334-2712

Counsel for Respondent:
Kale D. Gans
Idaho Attorney General's Office, Criminal Law Division
954 West Jefferson Street, Second Floor
Boise, ID 83720
(208) 334-4534

5. *Baker v. State*, No. 47793, 494 P.3d 1256 (Idaho Ct. App. 2021).

At trial, the State admitted the testimony of an inmate incarcerated with Baker who testified Baker had confessed to murdering his infant daughter, and the jury

convicted Baker of first-degree murder.  Subsequently Baker filed a petition for post-conviction relief alleging numerous claims of ineffective assistance of counsel and a violation under *Brady v. Maryland*, 373 U.S. 83 (1963).  Baker's *Brady* claim alleged the State failed to disclose:  (1) the inmate's prior testimony in an unrelated murder trial in which the inmate had also testified to another individual's murder confession; and (2) the inmate's incarceration records showing he had been transferred to a minimum-security facility following his testimony despite a notation in his file that he was ineligible for such a transfer. The district court summarily dismissed Baker's claims, and Baker appealed.  In an opinion I authored, the Idaho Court of Appeals ruled that Baker established genuine issues of material fact in support of his *Brady* claim and remanded for further proceedings on that claim; it affirmed the district court's dismissal of Baker's other claims.  On remand, the parties entered into a settlement agreement in which the prosecution agreed to a reduction of Baker's sentence in the underlying case in exchange for a stay of Baker's post-conviction proceedings pending the results of Baker's upcoming parole hearing.

Counsel for Appellant:
Craig H. Durham
Ferguson Durham PLLC
223 North 6th Street, Suite 325
Boise, ID  83702
(208) 724-2617

Counsel for Respondent:
Kenneth K. Jorgensen
Idaho Attorney General's Office, Criminal Law Division
954 West Jefferson Street, Second Floor
Boise, ID  83720
(208) 334-4534

6.  *State v. Doe (2020-47)*, No. 48444, 483 P.3d 1039 (Idaho Ct. App. 2021).

A mother appealed the magistrate court's judgment terminating her parental rights to her five minor children.  The mother argued the court's findings that she neglected the children and that terminating her parental rights was in the children's best interests were unsupported.  Additionally, she argued the court failed to consider the coronavirus pandemic's impact on her ability to perform her case plan.  In an opinion I authored, the Idaho Court of Appeals affirmed, ruling that substantial and competent evidence supported the magistrate court's findings and that the mother failed to show the pandemic adversely affected her ability to perform her case plan.

Counsel for Appellant:
James T. Baird
601 Pole Line Road, Suite 4

Twin Falls, ID  83301
(208) 736-3050

Counsel for Respondent:
Rockne K. Lammers
121 3rd Avenue East
Jerome, ID  83338
(208) 324-7200

Theodore R. Larsen
(physical address unavailable)
Jerome, ID  83338
(208) 420-9644

7.  *State v. Taylor*, No. 47260, 481 P.3d 767 (Idaho Ct. App. 2021).

A jury convicted Taylor of first-degree murder for killing his father and second-degree murder for killing his mother.  Taylor appealed his conviction for first-degree murder, arguing the State failed to present sufficient evidence to prove premeditation.  In an opinion I authored, the Idaho Court of Appeals ruled that substantial, competent circumstantial evidence was sufficient to prove Taylor's premeditation to murder his father and affirmed the conviction.

Counsel for Appellant:
Elizabeth A. Allred
Sally J. Cooley
Idaho State Public Defender's Office
322 East Front Street, Suite 570
Boise, ID  83702
(208) 334-2712

Counsel for Respondent:
Kale D. Gans
Idaho Attorney General's Office, Criminal Law Division
954 West Jefferson Street, Second Floor
Boise, ID  83720
(208) 334-4534

8.  *State v. Page*, No. 46352, 2020 WL 241570 (Idaho Ct. App. Jan. 14, 2020).

Page appealed her conviction for possession of methamphetamine, challenging the district court's denial of her suppression motion.  Page argued the officers abandoned their community caretaking duties to conduct an investigation into criminal activity without reasonable suspicion.  In an opinion I authored, the Idaho Court of Appeals ruled that the stark contrast between the officers' testimony and the video from an officer's body camera showed the district court's

factual findings were clearly erroneous. We reversed the district court's order and dismissed Page's conviction. On remand, the district court dismissed the charges against Page.

Counsel for Appellant:
Brian R. Dickson
Idaho State Public Defender's Office
322 East Front Street, Suite 570
Boise, Idaho  83702
(208) 334-2712

Counsel for Respondent:
Kenneth K. Jorgensen
Idaho Attorney General's Office, Criminal Law Division
954 West Jefferson Street, Second Floor
Boise, ID  83720
(208) 334-4534

9. *Marsalis v. State*, No. 45583, 2019 WL 2305120 (Idaho Ct. App. May 30, 2019), *aff'd*, 458 P.3d 203 (Idaho 2020).

A jury convicted Marsalis of rape after he allegedly drugged the victim. Subsequently, Marsalis filed a petition for post-conviction relief alleging numerous claims of ineffective assistance, including that his counsel failed to seek exclusion of the State's expert witness, who had an expertise in forensic toxicology and pharmacology and who testified about the victim's intoxication at the time of the rape based on retrograde extrapolation. Marsalis also alleged his counsel failed to advise him of his speedy trial rights under the Interstate Agreement on Detainers. The district court summarily dismissed Marsalis' claims, and he appealed. In an opinion I authored, the Idaho Court of Appeals ruled that Marsalis established genuine issues of material fact in support of his claims that his counsel failed to seek exclusion of the State's expert witness and to advise Marsalis of his speedy trial rights. We reversed the district court's dismissal of these claims, remanded the case for an evidentiary hearing, and affirmed the dismissal of Marsalis' other claims. The Idaho Supreme Court affirmed our decision, and on remand, Marsalis' claims of ineffective assistance of counsel proceeded to trial.

Counsel for Appellant:
Greg S. Silvey
1161 West River Street
Boise, ID  83702
(208) 286-7400

Counsel for Respondent:
Kenneth K. Jorgensen

13

**077**

Idaho Attorney General's Office, Criminal Law Division
954 West Jefferson Street, Second Floor
Boise, ID 83720
(208) 334-4534

10. *Severson v. State*, No. 45780, 2019 WL 1787315 (Idaho Ct. App. Apr. 14, 2019).

After a 17-day trial, a jury convicted Severson of first-degree murder for killing his wife and of poisoning her food or medicine. Subsequently, Severson filed successive petitions for post-conviction relief alleging numerous claims of ineffective assistance of trial and appellate counsel. Following an evidentiary hearing on Severson's third petition, the district court dismissed his claims and Severson appealed. Following a review of the entire record, the Idaho Court of Appeals ruled, in an opinion I authored, that the district court did not err in dismissing Severson's claims and affirmed its denial of his petition.

Counsel for Appellant:
John R. Kormanik
Kormanik & Sneed LLP
206 West Jefferson Street
Boise, ID 83702
(208) 288-1888

Counsel for Respondent:
Kenneth K. Jorgensen
Idaho Attorney General's Office, Criminal Law Division
954 West Jefferson Street, Second Floor
Boise, ID 83720
(208) 334-4534

d. For each of the 10 most significant opinions you have written, provide: (1) citations for those decisions that were published; (2) a copy of those decisions that were not published; and (3) the names and contact information for the attorneys who played a significant role in the case.

1. *State v. Galindo*, No. 48123, ___ P.3d ___, 2022 WL 4372204 (Idaho Ct. App. Sept. 22, 2022).

Counsel for Appellant:
Kiley A. Heffner
Idaho State Public Defender's Office
322 East Front Street, Suite 570
Boise, ID 83702
(208) 334-2712

14

**078**

Counsel for Respondent:
Kenneth K. Jorgensen
Idaho Attorney General's Office, Criminal Law Division
954 West Jefferson Street, Second Floor
Boise, ID  83720
(208) 334-4534

2.  *State v. Colpitts*, 511 P.3d 873 (Idaho Ct. App. 2022).

Counsel for Appellant:
Andrea W. Reynolds
Sally J. Cooley
Idaho State Public Defender's Office
322 East Front Street, Suite 570
Boise, ID  83702
(208) 334-2712

Counsel for Respondent:
Kenneth K. Jorgensen
Idaho Attorney General's Office, Criminal Law Division
954 West Jefferson Street, Second Floor
Boise, ID  83720
(208) 334-4534

3.  *State v. Olvera*, No. 47546, 2021 WL 5175079 (Idaho Ct. App. Nov. 8, 2021).

Counsel for Appellant:
Ben P. McGreevy
Idaho State Public Defender's Office
322 East Front Street, Suite 570
Boise, ID  83702
(208) 334-2712

Counsel for Respondent:
Andrew V. Wake
Idaho Attorney General's Office, Criminal Law Division
954 West Jefferson Street, Second Floor
Boise, ID  83720
(208) 334-4534

4.  *State v. Nelson*, No. 47418, 2021 WL 4259144 (Idaho Ct. App. Sept. 20, 2021).

Counsel for Appellant:
Justin M. Curtis
Idaho State Public Defender's Office

322 East Front Street, Suite 570
Boise, ID 83702
(208) 334-2712

Counsel for Respondent:
Kale D. Gans
Idaho Attorney General's Office, Criminal Law Division
954 West Jefferson Street, Second Floor
Boise, ID 83720
(208) 334-4534

5.  *Baker v. State*, No. 47793, 494 P.3d 1256 (Idaho Ct. App. 2021).

Counsel for Appellant:
Craig H. Durham
Ferguson Durham PLLC
223 North 6th Street, Suite 325
Boise, ID 83702
(208) 724-2617

Counsel for Respondent:
Kenneth K. Jorgensen
Idaho Attorney General's Office, Criminal Law Division
954 West Jefferson Street, Second Floor
Boise, ID 83720
(208) 334-4534

6.  *State v. Doe (2020-47)*, No. 48444, 483 P.3d 1039 (Idaho Ct. App. 2021).

Counsel for Appellant:
James T. Baird
601 Pole Line Road, Suite 4
Twin Falls, ID 83301
(208) 736-3050

Counsel for Respondent:
Rockne K. Lammers
121 3rd Avenue East
Jerome, ID 83338
(208) 324-7200

Theodore R. Larsen
(physical address unavailable)
Jerome, ID 83338
(208) 420-9644

7. *State v. Taylor*, No. 47260, 481 P.3d 767 (Idaho Ct. App. 2021).

Counsel for Appellant:
Elizabeth A. Allred
Sally J. Cooley
Idaho State Public Defender's Office
322 East Front Street, Suite 570
Boise, ID  83702
(208) 334-2712

Counsel for Respondent:
Kale D. Gans
Idaho Attorney General's Office, Criminal Law Division
954 West Jefferson Street, Second Floor
Boise, ID  83720
(208) 334-4534

8. *State v. Page*, No. 46352, 2020 WL 241570 (Idaho Ct. App. Jan. 14, 2020).

Counsel for Appellant:
Brian R. Dickson
Idaho State Public Defender's Office
322 East Front Street, Suite 570
Boise, ID  83702
(208) 334-2712

Counsel for Respondent:
Kenneth K. Jorgensen
Idaho Attorney General's Office, Criminal Law Division
954 West Jefferson Street, Second Floor
Boise, ID  83720
(208) 334-4534

9. *Marsalis v. State*, No. 45583, 2019 WL 2305120 (Idaho Ct. App. May 30, 2019), *aff'd*, 458 P.3d 203 (Idaho 2020).

Counsel for Appellant:
Greg S. Silvey
1161 West River Street
Boise, ID  83702
(208) 286-7400

Counsel for Respondent:
Kenneth K. Jorgensen
Idaho Attorney General's Office, Criminal Law Division
954 West Jefferson Street, Second Floor

17

**081**

Boise, ID 83720
(208) 334-4534

10. *Severson v. State*, No. 45780, 2019 WL 1787315 (Idaho Ct. App. Apr. 14, 2019).

Counsel for Appellant:
John R. Kormanik
Kormanik & Sneed LLP
206 West Jefferson Street
Boise, ID 83702
(208) 288-1888

Counsel for Respondent:
Kenneth K. Jorgensen
Idaho Attorney General's Office, Criminal Law Division
954 West Jefferson Street, Second Floor
Boise, ID 83720
(208) 334-4534

e.  Provide a list of all cases in which certiorari was requested or granted.

The United States Supreme Court has not granted, and no party has requested, certiorari in any case that I have authored or joined in the opinion.

f.  Provide a brief summary of and citations for all of your opinions where your decisions were reversed by a reviewing court or where your judgment was affirmed with significant criticism of your substantive or procedural rulings. If any of the opinions listed were not officially reported, provide copies of the opinions.

The Idaho Supreme Court reversed the Idaho Court of Appeals' decision in the following cases, which I authored:

*State v. Miramontes*, No. 47628, 2021 WL 5366693 (Idaho Ct. App. Nov. 18, 2021), *rev'd*, 517 P.3d 849 (Idaho 2022). While officers were conducting a probationary check on an individual at a residence, they saw Miramontes exit the residence carrying a bag. After an officer repeatedly ordered Miramontes to stop, she complied and dropped the bag. Later, when an officer asked Miramontes for her identification, she explained it was in the bag. Another officer opened the bag to retrieve the identification and discovered drugs and drug paraphernalia. Miramontes moved to suppress the evidence arguing the officers lacked reasonable suspicion to detain her and to search the bag. The district court ruled that the officers lawfully detained Miramontes but did not address her argument that the officers lacked reasonable suspicion to search her bag. On appeal, Miramontes argued only that the officers unlawfully searched her bag. The Idaho

18

Court of Appeals affirmed the district court, ruled Miramontes failed to preserve for appeal whether the search of the bag was unlawful, and relied on Idaho Supreme Court authority that an appellate court will not review an assignment of error unless the record discloses an adverse ruling on the issue. The Idaho Supreme Court concluded it is no longer mandatory for an appellant to obtain an adverse ruling from the trial court to preserve an issue for appellate review, expressly overruled its prior authority to the contrary, and remanded to the district court to analyze whether the search of the bag was unlawful.

*State v. Wilson*, No. 47275, 2020 WL 4876845 (Idaho Ct. App. Aug. 20, 2020) *rev'd*, 495 P.3d 1030 (Idaho 2021). An officer encountered Wilson and his passengers in the drive-through lane of a fast food restaurant following a known informant's report of a drunk driver. The officer saw empty beer cans in the car, smelled the strong odor of alcohol, and asked Wilson to pull into the parking lot where the officer arrested Wilson for driving under the influence. The district court granted Wilson's suppression motion, rejecting the State's argument that the officer was performing a community caretaking function and ruling that reasonable suspicion did not support Wilson's detention because the presence of empty cans and the odor of alcohol did not establish Wilson himself had consumed alcohol. The Idaho Court of Appeals reversed this decision, ruling that the officer's observations in the drive-through lane established reasonable suspicion. The Idaho Supreme Court reversed, ruling that the State failed to preserve for appellate review whether the officer had reasonable suspicion to detain Wilson when he ordered Wilson to pull into the parking lot.

The Idaho Supreme Court affirmed the Idaho Court of Appeals' decisions in the following cases, which I authored, but criticized my ruling:

*State v. Neimeyer*, No. 46857, 2020 WL 2534003 (Idaho Ct. App. May 19, 2020), *aff'd*, 490 P.3d 9 (Idaho 2021). Neimeyer appealed her judgment of conviction for possession of methamphetamine, marijuana, and drug paraphernalia. Neimeyer argued the district court erred by taking judicial notice of and relying on a local ordinance prohibiting an open container of alcohol in her vehicle to deny her suppression motion. The Idaho Court of Appeals affirmed the district court's decision ruling that the court properly took judicial notice of the ordinance. On review, the Idaho Supreme Court also affirmed the district court's denial of the suppression motion. It ruled, however, that Neimeyer failed to preserve for appeal the issue of whether the district court erred by judicially noticing the ordinance and declined to address the merits of the issue.

*State v. Riley*, No. 47372, 2021 WL 454250 (Idaho Ct. App. Feb. 9, 2021), *aff'd*, 514 P.3d 982 (Idaho 2022). A Boise police officer initiated a traffic stop of Riley for expired registration tags. During the stop, the officer inquired whether Riley had contraband in the car. Then, while writing Riley a ticket, the officer had a conversation with backup officers who arrived on the scene with a drug dog. The videos from the officers' body cameras captured these conversations. After the

drug dog alerted on Riley's car, officers discovered drugs and drug paraphernalia. Riley moved to suppress this evidence, arguing the officer's conversations unrelated to the traffic stop unlawfully extended the stop. The district court granted the motion, finding it could not conclude whether conversations unlawfully extended the stop. The State appealed, arguing this finding was clearly erroneous. The Idaho Court of Appeals ruled that a review of the synchronized videos showed the conversations did not unlawfully extend the stop. On review of this decision, the Idaho Supreme Court likewise reversed the district court ruling, holding that the videos showed the conversations did not extend the stop unlawfully. The Court, however, criticized the Court of Appeals for relying on a case, *State v. Still*, 453 P.3d 220 (Idaho Ct. App. 2019), which the Idaho Supreme Court overruled after the Idaho Court of Appeals issued its decision in *Riley*.

*State v. Glodowski*, No. 45285, 457 P.3d 917 (Idaho Ct. App. 2019), *aff'd*, 457 P.3d 917 (2019). Glodowski was required to register as a sex offender in Wisconsin and relocated to Idaho. The Idaho State Police Bureau of Criminal Identification reviewed Glodowski's Wisconsin conviction and concluded that his conduct was "substantially equivalent" to a violation of Idaho law and that he was required to register as a sex offender in Idaho. Glodowski did not challenge this conclusion and registered in Idaho. Thereafter, the State charged him with failure to register when he failed to return his quarterly verification form. Before trial, the State moved *in limine* for a ruling that Glodowski's Wisconsin's conviction was "substantially equivalent" to a violation of Idaho law, and the district court ruled that it was. On appeal, Glodowski challenged this ruling, and the Idaho Court of Appeals concluded the Bureau's order was final; the district court lacked authority to review the order and re-determine the issue; and thus, it lacked jurisdiction. The Idaho Supreme Court affirmed, concluding that the district court improperly allowed the State to seek determination of the Bureau's order but that the error did not deprive the court of jurisdiction; rather, it was harmless error.

g. Provide a description of the number and percentage of your decisions in which you issued an unpublished opinion and the manner in which those unpublished opinions are filed and/or stored.

To date, I have authored 203 opinions, 23 of which have been published. The remaining opinions are unpublished, although all of those unpublished opinions are available in Westlaw. Additionally, all my opinions are reported on the Idaho Supreme Court's website, https://isc.idaho.gov, and stored in the Court's network.

h. Provide citations for significant opinions on federal or state constitutional issues, together with the citation to appellate court rulings on such opinions. If any of the opinions listed were not officially reported, provide copies of the opinions.

I have not authored any significant opinions on federal or state constitutional issues. The Idaho Court of Appeals is an error correcting court and does not address significant federal or state constitutional issues. *See* Idaho Code

20

**084**

§ 2406(2) (noting "error review and correction functions" of Idaho Court of Appeals).

i.  Provide citations to all cases in which you sat by designation on a federal court of appeals, including a brief summary of any opinions you authored, whether majority, dissenting, or concurring, and any dissenting opinions you joined.

I have not sat by designation on any federal court of appeals.

14. **Recusal:**  If you are or have been a judge, identify the basis by which you have assessed the necessity or propriety of recusal (If your court employs an "automatic" recusal system by which you may be recused without your knowledge, please include a general description of that system.)  Provide a list of any cases, motions or matters that have come before you in which a litigant or party has requested that you recuse yourself due to an asserted conflict of interest or in which you have recused yourself sua sponte.  Identify each such case, and for each provide the following information:

a.  whether your recusal was requested by a motion or other suggestion by a litigant or a party to the proceeding or by any other person or interested party; or if you recused yourself sua sponte;

b.  a brief description of the asserted conflict of interest or other ground for recusal;

c.  the procedure you followed in determining whether or not to recuse yourself;

d.  your reason for recusing or declining to recuse yourself, including any action taken to remove the real, apparent or asserted conflict of interest or to cure any other ground for recusal.

I assess the necessity or propriety of recusal based on the Idaho Judicial Code of Conduct.  I have never been requested to recuse myself on any case.  I, however, have sua sponte recused myself in one appeal before the Idaho Court of Appeals.  In that case, an individual convicted of a crime in Ada County, Idaho, filed a civil action against public officials including the Ada County Prosecutor, who is a personal friend.  Because the plaintiff filed the action against her individually (not in her capacity as the county prosecutor), I determined that my impartiality might reasonably be questioned and that the issue was incurable.  I have searched both the Court's electronic database and publicly-available electronic databases and have been unable to locate the case's citation, although I believe the appeal was filed in 2019.

15. **Public Office, Political Activities and Affiliations:**

a.  List chronologically any public offices you have held, other than judicial offices, including the terms of service and whether such positions were elected or appointed.  If appointed, please include the name of the individual who appointed you.  Also, state chronologically any unsuccessful candidacies you have had for elective office or unsuccessful nominations for appointed office.

21

**085**

Other than my position as a judge on the Idaho Court of Appeals, I have not held any public offices. In 2018, I unsuccessfully applied for an appointed position on the Idaho Supreme Court.

b.  List all memberships and offices held in and services rendered, whether compensated or not, to any political party or election committee. If you have ever held a position or played a role in a political campaign, identify the particulars of the campaign, including the candidate, dates of the campaign, your title and responsibilities.

I have not ever held any memberships or offices or rendered any services to any political party or election committee. I have also not held any position or played any role in any political campaign, other than my 2020 reelection campaign.

16. **Legal Career:** Answer each part separately.

a.  Describe chronologically your law practice and legal experience after graduation from law school including:

i.  whether you served as clerk to a judge, and if so, the name of the judge, the court and the dates of the period you were a clerk;

From 1993 to 1995 I clerked for Judge Thomas G. Nelson of the U.S. Court of Appeals for the Ninth Circuit.

ii.  whether you practiced alone, and if so, the addresses and dates;

I have never practiced law alone.

iii.  the dates, names and addresses of law firms or offices, companies or governmental agencies with which you have been affiliated, and the nature of your affiliation with each;

1995 – 2013
Holland & Hart LLP
800 West Main Street, Suite 1750
Boise, Idaho  83702
Partner (2003 – 2013)
Associate (1995 – 2002)

2013 – 2018
Andersen Schwartzman Woodard Brailsford PLLC (now defunct)
(formerly known as Andersen Banducci PLLC)
101 South Capital Boulevard, Suite 1601
Boise, Idaho  83702

22

**086**

Member (2013-2017)
Counsel (2018)

iv.  whether you served as a mediator or arbitrator in alternative dispute
resolution proceedings and, if so, a description of the 10 most significant
matters with which you were involved in that capacity.

I have never served as a mediator or arbitrator in any alternative dispute
resolution proceedings.

b.  Describe:

i.  the general character of your law practice and indicate by date when its
character has changed over the years.

I began my law practice as an associate at Holland & Hart LLP, in the
Boise, Idaho office.  From 1995 into 1997, the nature of my practice was
very general.  I did not have an assigned department, but rather I assisted
all senior attorneys in the Boise office (and occasionally other Holland &
Hart offices) in their practice areas including general business, civil
litigation, bankruptcy, employment law, and environmental law.

In 1998, I began focusing my practice primarily on employment law,
including both litigation and business advising, although I also continued
to support senior attorneys in their respective practice areas.  During this
time, much of my practice involved advising employers on human
resources issues and defending employers in litigation, in both state and
federal courts, and before the Equal Employment Opportunity
Commission and the Idaho Human Rights Commission.

In 2002, I became a partner at Holland & Hart and my practice focused
primarily on civil litigation.  During this time, I handled all aspects of civil
litigation, including managing clients and litigation teams; conducting
written and deposition discovery; working with expert witnesses; briefing
and arguing motions, including discovery and substantive legal issues;
participating in mock trials; preparing for and presenting at trial; and
handling post-trial proceedings.  Beginning in about 2006, much of the
civil litigation I handled was complex in nature, requiring intensive
management and involving issues on a national level.

In 2013, I formed a new law firm, Andersen Schwartzman Woodard
Brailsford PLLC (formerly known as Andersen Banducci PLLC).  My
practice continued to focus on complex civil litigation, including national
multi-district class actions, until I resigned as a member from the firm in
2017.  During 2018, I worked for the firm on a contract basis on numerous
civil litigation matters.

23

**087**

Since 2019, I have served as a judge for the Idaho Court of Appeals.

    ii.  your typical clients and the areas at each period of your legal career, if any, in which you have specialized.

From 1995 until about 1998, the types of clients I represented were diverse and included individuals, small businesses, closely held corporations or similar business entities, and corporations having legal issues in Idaho. Beginning in 1999, my clients were most often employers, although I occasionally represented corporate executives or physicians in employment law matters in Idaho.

Beginning in 2002 until about 2011, my client base shifted to corporations and Idaho agricultural producers organized under various types of legal entities ranging from sole proprietorship to large corporations. From 2011 until 2018, my clients continued to be Idaho agricultural producers but also included agricultural cooperatives, some individuals, business entities, law firms, and a public university.

  c.  Describe the percentage of your practice that has been in litigation and whether you appeared in court frequently, occasionally, or not at all. If the frequency of your appearances in court varied, describe such variance, providing dates.

From 1995 until about 2002, my practice was at least 50 percent in civil litigation. After 2002, my practice was nearly 100 percent civil litigation. I frequently appeared in court at all stages of litigation including appearing at court hearings for preliminary injunctions; motions to dismiss for failure to state a claim or lack of jurisdiction; discovery related motions; summary judgment motions; motions *in limine*, including *Daubert* motions; mock trials; trial proceedings in both jury and court trials; post-trial motions; and appellate arguments.

    i.  Indicate the percentage of your practice in:

| | | |
|---|---|---|
| 1. federal courts: | 60% | |
| 2. state courts of record: | 35% | |
| 3. other courts: | 0% | |
| 4. administrative agencies: | 5% | |

    ii.  Indicate the percentage of your practice in:

| | |
|---|---|
| 1. civil proceedings: | 100% |
| 2. criminal proceedings: | 0% |

  d.  State the number of cases in courts of record, including cases before administrative law judges, you tried to verdict, judgment or final decision (rather than settled), indicating whether you were sole counsel, chief counsel, or associate counsel.

24

**088**

As an associate or other support attorney, I estimate I assisted on approximately 20 cases in state or federal court that were tried to verdict. Additionally, I handled the following trial responsibilities: As sole counsel, I tried one case to verdict in a bench trial; as co-counsel I tried one case to verdict in a bench trial; as co-counsel, I tried two cases to verdict in jury trials, including one trial lasting 17 weeks in federal court. I also estimate that I either handled as sole counsel or assisted on at least 20 cases resolved by summary judgment.

     i. What percentage of these trials were:

| | |
|---|---|
| 1. jury: | 75% |
| 2. non-jury: | 25% |

e. Describe your practice, if any, before the Supreme Court of the United States. Supply four (4) copies of any briefs, amicus or otherwise, and, if applicable, any oral argument transcripts before the Supreme Court in connection with your practice.

I have not practiced before the Supreme Court of the United States.

17. **Litigation**: Describe the ten (10) most significant litigated matters which you personally handled, whether or not you were the attorney of record. Give the citations, if the cases were reported, and the docket number and date if unreported. Give a capsule summary of the substance of each case. Identify the party or parties whom you represented; describe in detail the nature of your participation in the litigation and the final disposition of the case. Also state as to each case:

a. the date of representation;

b. the name of the court and the name of the judge or judges before whom the case was litigated; and

c. the individual name, addresses, and telephone numbers of co-counsel and of principal counsel for each of the other parties.

1. *United Potato Growers of America, Inc., et al. v. Jones, Waldo, Holbrooke & McDonough, P.C., et al.*, Idaho State Court, Fifth Judicial District, Twin Fall County, Case No. CV42-15-4106 (Bevan, J.).

I assisted lead counsel in this case representing the plaintiffs, including two potato cooperatives and several of their grower members, against their former legal counsel, which negligently advised them that their marketing and other activities were immune from antitrust liability under the Capper-Volstead Act, 7 U.S.C. § 291. This inaccurate legal advice resulted in the cooperatives being sued in multi-district class actions causing them to incur liability for purported damages and significant legal fees. My involvement in this case included preparing pleadings; propounding and responding to written

discovery; and assisting in preparing pretrial motions. The case resolved through mediation. My representation in this case spanned from approximately 2017 to 2018.

Co-Counsel:
John J. Janis
Hepworth Holzer, LLP
537 West Bannock Street, Suite 200
Boise, ID 83702
(208) 369-9676

Primary Opposing Counsel:
Matthew L. Lalli
Snell & Wilmer
15 West South Temple, Suite 1200
Salt Lake City, UT 84101
(801) 257-1900

2. *Clark et al. v. Jones Gledhill Fuhrman Gourley, et al.*, Idaho State Court, Fourth Judicial District, Ada County, Case No. CV-OC-2016-04633 (Hoagland, J.).

I was lead counsel in this litigation and represented the defendants, the Jones Gledhill law firm and two of its attorneys in an action brought by Mr. Clark. Mr. Clark alleged Jones Gledhill had failed to protect his interest in an attorney fee lien under Idaho Code § 3-205. The underlying action was a wrongful death action arising from the carbon dioxide poisoning death. Mr. Clark co-counseled with the Spence Law Firm to represent the plaintiffs in that wrongful death action; Jones Gledhill represented the defendants in that case. When the underlying action settled, Jones Gledhill transmitted the settlement funds to the Spence Law Firm and not to Mr. Clark, whose representation the plaintiffs had previously terminated. Mr. Clark sued Jones Gledhill for failing to protect his purported attorney fee lien against the settlement funds. My participation in this case included briefing and arguing the motion to dismiss for failure to state a claim, which the district court granted, and briefing and arguing the appeal. The Idaho Supreme Court affirmed the dismissal. My representation in this case spanned from approximately 2016 to 2017.

Co-Counsel:
Steven B. Andersen
Kirton McConkie
1100 West Idaho Street
Boise, ID 83702
(208) 370-3325

Primary Opposing Counsel:
Eric R. Clark
(physical address unknown)
Eagle, ID
(208) 830-8084

26

**090**

Reported Decisions:
*Clark v. Jones Gledhill Fuhrman Gourley, P.A.*, 409 P.3d 795 (Idaho 2017).

3. *Clark et al. v. The Spence Law Firm et al.*, Idaho State Court, Third Judicial District, Canyon County, Case No. CV-2016-06347 (Perry, J.).

I was lead counsel in this case brought by the plaintiff, Mr. Clark, against three of his former clients in a wrongful death action; his former co-counsel in that case, the Spence Law Firm; and two Spence attorneys. The plaintiffs alleged under numerous different theories that his former clients and co-counsel owed him fees for recoveries occurring after the clients terminated his representation in the wrongful death case. My participation in this case included propounding and responding to voluminous discovery, drafting and arguing numerous discovery and other motions, including summary judgment motions. The case resolved in mediation. My representation in this case spanned from approximately 2015 to 2017.

Co-Counsel:
Steven B. Andersen
Kirton McConkie
1100 West Idaho Street
Boise, ID  83702
(208) 370-3325

Primary Opposing Counsel:
Eric R. Clark
(physical address unknown)
Eagle, ID
(208) 830-8084

4. *Pinnacle Great Plains Operating Company, LLC v. Wynn Dewsnup Revocable Trust, et al.*, D. Idaho, Case No. 4:13 cv-00106-EJL-CWD (Dale, M.J.).

In this case, I was lead counsel representing the plaintiff, a corporate farm investor, which asserted fraud and breach of contract claims against the seller of a farm, alleging the seller failed to disclose the poor quality of underground irrigation water. Eventually, the investor also asserted claims against its own realtor for fraudulently concealing the irrigation water quality problem in violation of the Idaho Real Estate Brokerage Representation Act, Idaho Code §§ 54-2082 - 2097. *Pinnacle Great Plains Operating Company, LLC v. 1 Stop Realty, Kirk Swenson*, Case No. 1:17-cv-00120-BLW (D. Idaho) (Dale, M.J.). I handled all aspects of this litigation from its inception including briefing and arguing motions; propounding and responding to written discovery; taking and defending depositions; retaining and working with experts to prepare their reports; and briefing and arguing various pretrial motions. The case settled in mediation shortly before trial. My representation in this case spanned from approximately 2013 to 2017.

Co-Counsel:
Steven B. Andersen
Kirton McConkie
1100 West Idaho Street
Boise, ID  83702
(208) 370-3325

Primary Opposing Counsel:
Matthew McGee
Boise State University
Office of the General Counsel
University Plaza
960 South Broadway Avenue, Suite 250
Boise, ID  83725
(208) 426-1203

Reported Decisions:
*Pinnacle Great Plains Operating Co., LLC v. Wynn Dewsnup Revocable Trust*, 996 F. Supp. 2d 1026 (D. Idaho 2014).

5.  *Boise State University v. The American Athletic Conference*, Idaho State Court, Fourth Judicial District, Ada County, Case No. CV CV-2013-6584 (Copsey, J.).

I was co-lead counsel representing Boise State University against the American Athletic Conference (formerly known as the Big East Conference) for breach of contract and a declaratory judgment that a $5 million contractual penalty was inapplicable for BSU's decision not to have its football program join the ACC.  My involvement in this case included managing the client relationship; drafting pleadings; managing information released to the press; propounding and responding to discovery requests; developing an electronic discovery protocol; briefing and arguing discovery motions, including a complicated attorney-client privilege motion; taking and defending depositions; and participating in mediation.  The case settled at mediation.  My representation in this case spanned from approximately 2013 to 2014.

Co-Counsel:
Steven B. Andersen
Kirton McConkie
1100 West Idaho Street
Boise, ID  83702
(208) 370-3325

Primary Opposing Counsel:
Benjamin C. Block
Covington & Burling LLP
One CityCenter
850 Tenth Street, Northwest

Washington, DC  20001
(202) 662-6000

6. *In re Fresh and Process Potatoes Antitrust Litigation Class Action*, D. Idaho, Multi-District Litigation, Case No. 4:10-MDL-2186-BLW-CWD (Winmill, J.; Dale, M.J.).

In this national class action, I was co-lead counsel representing two agricultural cooperatives organized under the Capper-Volstead Act, 7 U.S.C. § 291, and approximately 18 Idaho potato growers, processors, and marketers, who were allegedly members of or otherwise participated in these cooperatives. The case arose out of the cooperatives' activities to stabilize potato prices both in Idaho and nationally under the Capper-Volstead Act, which provides growers with immunity for collectively processing, preparing for market, handling, and marketing their produce. The plaintiffs included two classes of potato purchasers—direct and indirect purchasers—who disputed defendants' immunity and alleged $5 billion in damages. Under antitrust laws, each defendant faced joint and several liability for these damages. My participation in this case included all aspects of its preparation for trial including handling voluminous, complicated discovery disputes and the related briefing and oral arguments; defending approximately 30 depositions; managing client relations; communicating and coordinating with co-defendants' counsel; and participating in numerous mediations. After extensive, complex discovery and multiple mediations, the case settled for $19 million. My representation of these defendants also involved related litigation, including two cases brought by plaintiffs who opted out of the class action: *Associated Wholesale Grocers, Inc. v. United Potato Growers of America*, Case No. 13-cv-2182 JAR/DJW (D. Kan.), and *Winn-Dixie Stores, Inc. and Bi-Lo Holding, LLC v. United Potato Growers of America*, Case No. 3:15-cv-1243-J-34MCR (M.D. Fl.). My representation in these cases spanned from approximately 2011 to 2016.

Co-Counsel:
Steven B. Andersen
Kirton McConkie
1100 West Idaho Street
Boise, ID  83702
(208) 370-3325

Bob Rosenfeld (deceased)
Orrick, Herrington & Sutcliff
405 Howard Street
San Francisco, CA  94105
(415) 773-5700

Christopher E. Ondeck
Proskauer Rose LLP
1001 Pennsylvania Avenue, Northwest
Suite 600 South
Washington, DC  20004

(202) 416-6800

Primary Opposing Counsel:
James J. Pizzirusso
Hausfeld LLP
888 16th Street, Northwest
Washington, DC 20006
(202) 540-7200

Reported Decisions:
*In re Fresh and Process Potatoes Antitrust Litigation*, 834 F. Supp. 2d 1141 (D. Idaho 2011); 744 F. Supp. 2d 1381 (D. Idaho 2010).

7. *Truckstop.net LLC v. Sprint Communications Co.*, D. Idaho, Case Nos. CV-04-561-S-BLW, CV-05-138-BLW (Winmill, J.).

I was co-lead counsel in this litigation representing the plaintiff, a wireless internet provider, which contracted with Sprint Communications to install wireless internet access at truckstops across the United States.  The plaintiff alleged a breach of contract claim against Sprint Communications and a claim for tortious interference against its parent company, Sprint, which instructed Sprint Communications to breach the contract.  My participation in this case included assisting in the temporary restraining order filings and related hearing; drafting and responding to extensive, voluminous discovery; taking and defending numerous depositions; briefing an interlocutory appeal; briefing and arguing numerous discovery and pretrial motions, including summary judgment motions; working with experts to prepare expert reports; preparing for trial including preparing fact and expert witnesses, deposition designations, preparing exhibits and exhibit lists; presenting at a mock trial; arguing pretrial motions; and participating in settlement negotiations. The case settled on the eve of trial for a significant but confidential amount.  My representation in this case spanned from approximately 2005 to 2010.

Co-Counsel:
Steven B. Andersen
Kirton McConkie
1100 West Idaho Street
Boise, ID  83702
(208) 370-3325

Timothy Getzoff
Holland & Hart LLP
1800 Broadway, Suite 300
Boulder, CO 80302
(303) 473-2734

Primary Opposing Counsel:
Dane H. Butswinkas

Williams & Connolly LLP
680 Maine Avenue, Southwest
Washington, DC  20024
(202) 434-5000

Stephen R. Thomas
Hawley Troxell
877 West Main Street
Boise, ID  83702
(208) 344-6000

Reported Decisions:

*Truckstop.Net, LLC v. Sprint Corp.*, 547 F.3d 1065 (9th Cir. 2008).

8. *Intermountain Eye and Laser Centers, PLLC v. Miller*, Idaho State Court, Fourth
   Judicial District, Ada County (McLaughlin, J.).

I was lead counsel in this litigation and represented the defendant, a doctor, whose former
employer brought a breach of contract claim against him alleging he violated a post-
termination, non-competition clause.  I handled all aspects of this litigation including
propounding and responding to discovery, briefing and arguing discovery motions, taking
and defending depositions, briefing and arguing the summary judgment motion, briefing
and arguing the appeal, and handling mediation.  The defendant prevailed on summary
judgment; the Idaho Supreme Court reversed the judgment on appeal; and the case settled
shortly thereafter for a nominal amount.  My representation in this case spanned from
approximately 2003 to 2006.

Co-Counsel:
Steven B. Andersen
Kirton McConkie
1100 West Idaho Street
Boise, ID  83702
(208) 370-3325

Primary Opposing Counsel:
Hon. Warren Jones (deceased)

Neil McFeeley
Eberle Berlin
1111 West Jefferson Street, Suite 530
Boise, ID  83701
(208) 344-8535

Reported Decisions:
*Intermountain Eye and Laser Centers, PLLC, v. Miller*, 127 P.3d 121 (Idaho 2005).

9. *Adams et al. v. United States et al.*, D. Idaho, Civ. No. 03-0049-E-BLM (Winmill, J.).

I was co-lead counsel in this litigation representing approximately 130 Idaho growers with farming operations in southeastern Idaho who alleged tort claims against the Bureau of Land Management (BLM) and numerous product liability claims against E. I. du Pont de Nemours and Company (DuPont). These claims arose out of the BLM's application of a potent herbicide manufactured by DuPont, Oust, on large swaths of burnt, barren Idaho rangelands. Following the BLM's Oust applications, winds blew Oust off-target and onto thousands of acres of Idaho farmland, contaminating those lands for as many as four years from 2000 through 2004. My participation in this case included preparing tort claims; researching and drafting the complaint against DuPont; collecting voluminous documentation about the growers' farming operations; managing and handling all matters related to discovery, including numerous voluminous document productions, taking and defending approximately 80 depositions, and preparing expert witnesses; handling numerous pretrial motions; arguing pending motions; preparing and supervising the preparation of exhibit lists, deposition designations, trial witnesses, and demonstratives; presenting at multiple mock trials; drafting a jury questionnaire; assisting in the jury selection; preparing witnesses; preparing and supervising the preparation of trial motions related to evidentiary issues and directed verdicts; preparing jury instructions; and assisting with post-trial motions. The jury rendered a verdict for the four-bellwether plaintiffs and awarded them $17.8 million in damages. I prepared a motion and briefing seeking preclusive effect of the jury's verdict and the district court's findings of fact and conclusions of law, and the court ruled the bellwether trial conclusively established the defendants' liability and causation. I assisted in the preparation of briefing for subsequent appeals. Thereafter, the remaining 126 growers settled each of their claims after a very complex mediation in which I participated. This representation spanned from approximately 2002 to 2011.

Co-Counsel:
Steven B. Andersen
Kirton McConkie
1100 West Idaho Street
Boise, ID 83702
(208) 370-3325

Peter C. Houtsma
6613 South Prescott Way
Littleton, CO 80120
(303) 669-6756

Primary Opposing Counsel:
Christina M. Falk
U.S. Department of Justice
Civil Division, Environmental Tort Litigation Section
950 Pennsylvania Avenue, Northwest

Washington, DC  20530
(202) 514-2000

The Honorable Regina M. Rodriguez
Arraj United States Courthouse
901 19th Street
Denver, CO 80294
(303) 335-2170

Reported Decisions:

*Adams v. United States*, 658 F.3d 928 (9th Cir. 2011); 622 F. Supp. 2d 996 (D. Idaho 2009)

10. *Spur Products Corp. v. Stoel Rives*, Idaho State Court, Fourth Judicial District, Ada County (Wilper, J.).

I was lead counsel in this litigation and represented the defendant, a regional law firm, against its former client, which alleged the law firm committed malpractice by demanding the client either become current on its billings or settle its case at mediation. The plaintiff alleged $6 million in damages.  I handled all aspects of this case, including propounding and responding to discovery, briefing and arguing discovery motions, meeting with and preparing expert witnesses, taking and defending depositions, preparing and arguing multiple summary judgment motions, preparing and arguing two appeals, and preparing the case for trial.  Ultimately, the defendant prevailed at trial.  My representation in this case spanned from approximately 2002 to 2008.

Co-Counsel:
Walter H. Bithell
Bithell Law
175 North Capitol Boulevard
Boise, ID  83702
(208) 336-4440

Primary Opposing Counsel:
Jeffrey Strother
1036 East Iron Eagle Drive, Suite 156
Eagle, ID  83616
(208) 342-2425

Reported Decisions:
*Spur Products Corp. v. Stoel Rives*, 153 P.3d 1158 (Idaho 2007); 122 P.3d 300 (Idaho 2005).

18. Legal Activities:  Describe the most significant legal activities you have pursued, including significant litigation which did not progress to trial or legal matters that did not

33

**097**

involve litigation. Describe fully the nature of your participation in these activities. List any client(s) or organization(s) for whom you performed lobbying activities and describe the lobbying activities you performed on behalf of such client(s) or organizations(s). (Note: As to any facts requested in this question, please omit any information protected by the attorney-client privilege.)

In addition to my involvement in significant litigation, I was actively involved in various aspects of firm administration as a partner at Holland & Hart. For example, I was the hiring partner for the Boise office from 2003 until about 2010. As the hiring partner, I was responsible for the recruitment of associates and non-partner attorneys and the Boise office summer associate program. During this time, I was also a member of the firm's recruitment committee, which oversaw firm-wide hiring of associates and non-partner attorneys and the firm's summer associate program. I participated in the firm's taskforce to evaluate the firm's associate review process and requirements for attaining partnership. During my time at Holland & Hart, I actively mentored numerous litigation and other associates in all aspects of the practice of law, including helping to develop their skills and to support their progress towards partnership.

Later, I became a founding member of a litigation boutique, Andersen Banducci. In forming this law firm, I was responsible for all aspects of the firm's startup including finances, budgeting, staffing, human resources, technology, and business development. After the firm's formation, I remained responsible for all aspects of its management and the day-to-day business operations, including most particularly the human resources function, which involved hiring and managing staff and non-partner attorneys. I continued mentoring junior attorneys to help them in developing their litigation skills and attaining partnership.

Since becoming a judge on the Idaho Court of Appeals, I have continued mentoring junior attorneys, including law clerks and staff attorneys. My goal is to assist them in developing their research, writing, and appellate skills and in becoming independent thinkers with the necessary skills to succeed in the practice of law. Additionally, I have volunteered my time to present to law students at the University of Idaho College of Law about ethical issues and professional development and to participate in mock interviews with students who are preparing to enter into the job market.

Outside of the practice of law, I was a founding member of the Idaho Chapter of the Federal Bar Association. As a committee member, I recruited other members, assisted with organization, scheduled and attended meetings, and kept meeting minutes. Additionally, I was the chair of the nominating committee. Further, until recently, I have been a member of the Idaho Supreme Court's Evidence Rules Advisory Committee, which is charged with updating and revising the Idaho Rules of Evidence. While on this committee, I reviewed proposed revisions, researched numerous issues, and reported to the committee regarding possible revisions. Recently, the Idaho Supreme Court requested that I chair the Civil Jury Instruction Committee for purposes of updating the Idaho's civil jury instructions. I am currently working on recruiting members for the committee.

I have not performed any lobbying activities or registered as a lobbyist.

19. **Teaching**:  What courses have you taught?  For each course, state the title, the institution at which you taught the course, the years in which you taught the course, and describe briefly the subject matter of the course and the major topics taught.  If you have a syllabus of each course, provide four (4) copies to the committee.

   None.

20. **Deferred Income/ Future Benefits**:  List the sources, amounts and dates of all anticipated receipts from deferred income arrangements, stock, options, uncompleted contracts and other future benefits which you expect to derive from previous business relationships, professional services, firm memberships, former employers, clients or customers.  Describe the arrangements you have made to be compensated in the future for any financial or business interest.

   None.

21. **Outside Commitments During Court Service**: Do you have any plans, commitments, or agreements to pursue outside employment, with or without compensation, during your service with the court? If so, explain.

   None.

22. **Sources of Income**:  List sources and amounts of all income received during the calendar year preceding your nomination and for the current calendar year, including all salaries, fees, dividends, interest, gifts, rents, royalties, licensing fees, honoraria, and other items exceeding $500 or more (if you prefer to do so, copies of the financial disclosure report, required by the Ethics in Government Act of 1978, may be substituted here).

   When my nomination is formally submitted to the Senate, I will file my Financial Disclosure Report and will supplement this Questionnaire with a copy of that Report.

23. **Statement of Net Worth**:  Please complete the attached financial net worth statement in detail (add schedules as called for).

   See attached Net Worth Statement.

24. **Potential Conflicts of Interest**:

   a. Identify the family members or other persons, parties, categories of litigation, and financial arrangements that are likely to present potential conflicts-of-interest when you first assume the position to which you have been nominated.  Explain how you would address any such conflict if it were to arise.

No family members or other persons, parties, categories of litigation, or financial arrangements are likely to present potential conflicts of interest for me; I do not anticipate any conflicts.

b. Explain how you will resolve any potential conflict of interest, including the procedure you will follow in determining these areas of concern.

If confirmed, I would resolve any matters involving actual or potential conflicts of interest by applying 28 U.S.C. § 455, the Code of Conduct for United States Judges, and any other relevant ethical canons or rules.

25. **Pro Bono Work**: An ethical consideration under Canon 2 of the American Bar Association's Code of Professional Responsibility calls for "every lawyer, regardless of professional prominence or professional workload, to find some time to participate in serving the disadvantaged." Describe what you have done to fulfill these responsibilities, listing specific instances and the amount of time devoted to each.

My pro bono commitment has included my membership on the Board of Directors from 1996 through 2000 for the Silver Sage Girl Scouts Council, Inc., a non-profit organization governing Girl Scouts in Idaho and parts of Oregon and Nevada. My commitment to this organization included generally giving pro bono legal advice, including on personnel matters and real property issues; interviewing prospective employees; participating in fundraising and other events on a regular basis; and regularly attending emergency, quarterly, and annual meetings. After my term on the Board expired in 2000, I continued to provide pro bono legal advice to Girl Scouts on a regular basis.

From 2007 until 2011, I served as a member of the Law Advisory Council for the University of Idaho, College of Law. The Council assists and advises the dean and other College personnel. As a member of the Council, I assisted in identifying and acquiring financial support for the College, advocated for the College, gave advice on the College's programs, built working relationships within the University, and assisted the College's placement and recruitment programs. I remain an emeritus member.

26. **Selection Process**:

a. Please describe your experience in the entire judicial selection process, from beginning to end (including the circumstances which led to your nomination and the interviews in which you participated). Is there a selection commission in your jurisdiction to recommend candidates for nomination to the federal courts? If so, please include that process in your description, as well as whether the commission recommended your nomination. List the dates of all interviews or communications you had with the White House staff or the Justice Department regarding this nomination. Do not include any contacts with Federal Bureau of Investigation personnel concerning your nomination.

On January 14 and 18, 2022, Idaho Senator Mike Crapo's chief of staff contacted me about my interest in the position. On January 25, I spoke to Senator Crapo about that subject. On February 3, Idaho Senator Jim Risch's chief of staff interviewed me; on February 15, both Senators' chiefs of staff interviewed me; and then on February 22, Senators Crapo and Risch interviewed me. On March 17, Senators Crapo and Risch notified me they had submitted my name to the White House for consideration.

On April 22, 2022, I interviewed with attorneys from the White House Counsel's Office, and I have had contact with White House Counsel's Office officials since that date. On April 29, I was notified that my name was being submitted to the Office of Legal Policy at the Department of Justice for vetting. Since May 2, 2022, I have been in contact with officials from the Office of Legal Policy. On January 18, 2023, the President announced his intent to nominate me.

b. Has anyone involved in the process of selecting you as a judicial nominee discussed with you any currently pending or specific case, legal issue or question in a manner that could reasonably be interpreted as seeking any express or implied assurances concerning your position on such case, issue, or question? If so, explain fully.

No.

# EXHIBIT 8

*Thomas Eugene Creech v. Idaho Commission of Pardons and Parole; and Jan M. Bennetts, Ada County Prosecuting Attorney, in her official capacity*

Case No. 1:24-cv-00066-AKB

Submitted in Support of Memorandum in Support of Motion for Recusal

# EXHIBIT 2

**(Declaration of Beryl Price, dated May 10, 2024)**

## DECLARATION OF BERYL PRICE

I, Beryl Price, mindful of the penalties of perjury, declare as follows:

1.   I am a person over eighteen (18) years of age and competent to testify.

2.   I am an investigator with the Capital Habeas Unit for the Federal Defender Services of Idaho (CHU).

3.   On March 6, 2024, while carrying out my investigative duties in the Creech case, I discovered a questionnaire that Judge Amanda K. Brailsford submitted to the United States Senate after she was nominated to a seat on the federal bench in the District of Idaho.

4.   The document attached as Exhibit 1 to the memorandum in support of the motion to recuse, filed on today's date, is a true and correct copy of the Senate questionnaire.

5.   After I came across the questionnaire, I began looking for video footage of Judge Brailsford's January 9, 2019 investiture at the Idaho Court of Appeals. It was not until April 25, 2024 that I was able to locate that video online.

6.   At the direction of counsel, I prepared on April 26, 2024 a partial transcript of select portions of the investiture video. The document attached as Exhibit 3 to the memorandum in support of the motion to recuse, filed on today's date, is a true and correct copy of the partial transcript that I prepared, which is in turn a true and correct reflection of the words spoken on the investiture video.

7.   I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 10th day of May 2024 at Boise, Idaho.


*/s/ Beryl Price*
Beryl Price


DECLARATION OF BERYL PRICE - 1

**104**

# EXHIBIT 9

*Thomas Eugene Creech v. Idaho Commission of Pardons and Parole; and Jan*

*M. Bennetts, Ada County Prosecuting Attorney, in her official capacity*

Case No. 1:24-cv-00066-AKB

Submitted in Support of Memorandum in Support of Motion for Recusal

# EXHIBIT 3

**(Transcript of Opening Remarks by Jan Bennetts; and Partial Transcript of Remarks by Judge Amanda K. Brailsford, Investiture Ceremony of Judge Amanda K. Brailsford, Jan. 2, 2019)**

### Investiture Ceremony of Judge Amanda K. Brailsford, January 2, 2019

### Transcript of Opening Remarks by Jan Bennetts

Thank you. May it please the court. Esteemed members of the Judiciary, Governor Otter, members of Idaho and Federal Bar, Amanda's family and honored guests. It is truly an honor and privilege to share in Amanda's celebration today. As I have reflected on what I would say, the weight of doing justice to Amanda on this monumental occasion has not been far from my mind from the minute she asked me to speak. The fact that I have poured over my words in preparation for these comments demonstrates, maybe even more so than the actual words themselves, the level of respect that I have for Amanda. Amanda and I first met when we clerked for the Honorable Thomas G. Nelson at the Ninth Circuit Court of Appeals chambered here in Boise. Our paths intersected beginning in 1993 after Amanda graduated summa cum laude from the University of Idaho College of Law and began her clerkship with Judge Nelson. From the very moment that I met Amanda, we shared a camaraderie that is born through hard work and mutual respect. I knew Amanda would leave her mark on the legal profession when she first stepped into Judge Nelson's Chambers. She immediately immersed herself in the work, which was no small task. As you can imagine, and appropriately so, Judge Nelson had extremely high standards and expectations not only for himself, but for his law clerks. Rather than viewing those expectations as insurmountable or even daunting, Amanda relished in the daily challenges and crushing workloads. I was extremely impressed with Amanda's work ethic and a wisdom beyond her years. We shared a sense of gravity and commitment in the work that we were doing. We shared our dedication to giving our very best to Judge Nelson. I have vivid memories of Amanda and I spending, at times, and those of you who are law clerks know this, nearly 24/7 in the chambers working at a feverish pace in the cycle of Ninth Circuit calendars. At that time, we did not receive appellate materials electronically and I recall like yesterday, the arrival of cases assigned to Judge Nelson for the next calendar—boxes upon boxes lining the bookshelves waiting for Amanda and I to delve into the pages and pages of briefs and transcripts. As we worked on our cases, Judge Nelson encouraged us to express our opinions with him and with each other. This process gave me a very unique insight into Amanda's abilities. My appreciation for her critical thinking skills quickly grew into a very deep respect. As I observed her work, she was a very quick study and she dove into the work with enthusiasm, a laser focus that is unmatched, and an attention to detail as well as tremendous ability to deconstruct and analyze complex issues.

Amanda's brilliant intellect—and I don't use the word brilliant very often, but I do here because it's very fitting—her brilliant intellect is tempered by a common sense approach. Amanda has always been an excellent communicator, articulating her position with poise and eloquence regardless of the audience or the venue. And importantly, she has mastered the art of listening. She's an attentive and understanding listener, which is a quality that served her well in practice and will most certainly serve her well on the bench. You will hear more about Amanda the lawyer from Mr. Andersen in a few moments, but before I leave the podium, a few words about Amanda the friend. Amanda and I met by circumstance, but we became friends by choice. Amanda is the kind of friend you feel incredibly fortunate to find. They're few and far between. She is a remarkable person—compassionate, empathetic and genuine. When the opportunity arose for she and I to take a break from chambers, which wasn't very often, we inevitably and predictably had lunch at the Piper Pub. I say inevitable and predictable because it was the only place we ever went for lunch. It was far enough for a break but not too far from chambers, where it seemed we lived and breathed. I recall those lunches with fondness. It is during those times that our relationship as colleagues developed into a friendship. We discussed our lives, our challenges, our hopes, our dreams for the future. As we shared our life's experiences, it was clear to me that Amanda's work ethic came much like mine did with a sense of accomplishment for a job well done after putting in a hard day's work. In the years since our clerkship, I have followed Amanda's career and life with great pride and joy. Pride in a colleague's accomplishments and joy for a very dear friend. We have continued to share lunches, not at the Piper Pub, and although we may go months and even years without catching up, Amanda is the kind of friend for whom I would drop everything if she needed me and I know she would do the same. She shares in the excitement of successes and is supportive in challenging times. You can't ask for more than that. In addition to our friendship, perhaps Amanda's greatest gift to me has been learning from her. Not only as I worked alongside her, but in the years since. There is simply no doubt in my mind that I'm a better advocate for my time working with her and I'm a better person because of her friendship. As Amanda transitions to the bench, I offer a few thoughts. To the parties who will soon appear before Amanda: she will need you to be well prepared because she will be more prepared than anyone else in the courtroom. She will be fair. She will be open-minded. And she will be exceptional in her grasp of the facts, the law, and in her legal analysis. You will need to stay on your toes and be prepared for probing questions. To her colleagues on the bench: you're in for a treat. You will be impressed with how hardworking she is and how conscientious she is. You will find it a treat every day to work with her. She will

navigate her new role with integrity, a sense of duty, professionalism, and yes, of course, hard work. To Amanda's family: thank you for sharing her with us in the legal profession and for sharing her with her friends. She is a role model in work and in life. I began my remarks by recalling my prediction that Amanda would leave her mark on the legal profession, and she most certainly has. The very qualities she demonstrated in her clerkship are the very same qualities that made her become a successful law partner and will define her legacy on the bench. And by the way, I do not use the word legacy lightly. It is well deserved and well earned. In this circumstance, it is rare to leave a legacy but it is extraordinary to have the opportunity to leave two. I have no doubt Amanda will leave a long-lasting legacy on the bench, just as she has done in practice, and I could not be more excited for her or more proud of her than I am today as I watch her take the oath which triggers the beginning of her distinguished career as a judge. Thank you.

—

### Partial Transcript of Remarks by Judge Amanda K. Brailsford

Thank you to my dear friend Jan Bennetts for your kind words and unfailing support. Jan and I are kindred spirits. At the very same time I was growing up on the ranch in Hagerman, Jan was growing up on the ranch in Challis. On the ranch, we both learned the value of hard work. We also both have always had very high expectations for ourselves. Jan has vastly exceeded the world's expectations for a young girl growing up in rural Idaho. Among her many accomplishments, Jan is the first woman to hold the office of the Ada County Prosecutor. She leads an office of 150 lawyers and support staff in the most populated county in Idaho. This upcoming year, Jan will be the President of the Idaho Prosecuting Attorneys Association. She has received the Professionalism Award from the Idaho State Bar. This award goes to the Idaho attorney who has engaged in extraordinary activities in the legal profession and who exhibits legal excellence. The award is most apropos of Jan, a consummate professional every day, all day, for her entire career. I greatly admire Jan and I know there are many more great things to come for her.

# EXHIBIT 10

**RAÚL LABRADOR**
**ATTORNEY GENERAL OF IDAHO**

**KARIN MAGNELLI, ISB #6929**
Lead Deputy Attorney General, Idaho Department of Correction
**REBECCA STRAUSS, ISB #11285**
Deputy Attorneys General, Idaho Department of Correction
1299 North Orchard St., Suite 110
Boise, Idaho 83706
Telephone: (208) 658-2095
Facsimile: (208) 327-7485
E-mail: kmagnell@idoc.idaho.gov; rstrauss@idoc.idaho.gov

*Attorneys for Idaho Commission of Pardons and Parole*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| **THOMAS EUGENE CREECH**,<br>    Plaintiff,<br><br>v.<br><br>**IDAHO COMMISSION OF PARDONS AND PAROLE; JAN M. BENNETTS,** Ada County Prosecuting Attorney, in her official capacity,<br><br>    Defendants. | Case No. 1:24-cv-00066-AKB<br><br>**REPLY IN SUPPORT OF DEFENDANT IDAHO COMMISSION OF PARDONS AND PAROLE'S MOTION TO DISMISS AMENDED COMPLAINT [DKT. 31]** |

Defendant Idaho Commission of Pardons and Parole ("Commission"), by and through undersigned counsel, hereby submits its Reply in Support of its Motion to Dismiss Amended Complaint as follows:

Prior to Thomas Creech's ("Creech") scheduled February 28, 2024, execution, this case received an expedited review on the merits. Both this Court and the Ninth Circuit concluded that Creech was unlikely to succeed on the merits of any of his claims and denied his motion for a preliminary injunction. In doing so, both this Court and the Ninth Circuit made a legal determination that Creech's due process rights were not violated during the commutation hearing.

REPLY IN SUPPORT OF DEFENDANT IDAHO COMMISSION OF PARDONS AND
PAROLE'S MOTION TO DISMISS AMENDED COMPLAINT - 1

**111**

Further, the Ninth Circuit found that error, if any, was harmless beyond a reasonable doubt. The legal framework regarding Creech's due process claims has not changed since the courts made these determinations.

Therefore, Defendants respectfully request that this Court dismiss this case.

## I.   The Law of the Case Doctrine Applies.

"Under the 'law of the case' doctrine, 'a court is generally precluded from reconsidering an issue that has already been decided by the same court, or a higher court in the identical case.'" *United States v. Alexander*, 106 F.3d 874, 876 (9th Cir. 1997). The Commission agrees that generally the law of the case doctrine does not apply to preliminary injunction decisions. *See Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dep't of Agr.*, 499 F.3d 1108, 1114. However, a readily recognized exception applies in this case. "A fully considered appellate ruling on an issue of law made on a preliminary injunction appeal…become[s] the law of the case for further proceedings in the trial court on remand and in any subsequent appeal." *Id.*; *see also Malaney v. UAL Corp.*, 552 F. App'x 698, 700 (9th Cir. Jan. 16, 2014) (Unpub. Disp.) ("a purely legal conclusion" made while "affirming the district court's denial of a preliminary injunction…constitutes binding law of the case").

A court may only exercise its discretion to depart from the law of the case where: 1) the first decision was clearly erroneous; 2) an intervening change in the law has occurred; 3) the evidence on remand is substantially different; 4) other changed circumstances exist; or 5) a manifest injustice would otherwise result. Failure to apply the doctrine of the law of the case absent one of the requisite conditions constitutes an abuse of discretion. *United States v. Alexander*, 106 F.3d 874, 876 (9th Cir. 1997).

A. Creech was afforded due process.

REPLY IN SUPPORT OF DEFENDANT IDAHO COMMISSION OF PARDONS AND
PAROLE'S MOTION TO DISMISS AMENDED COMPLAINT - 2

Creech argues the law of the case doctrine does not apply because the decisions by this Court and the Ninth Circuit concluding Creech received all process to which he was due were not "fully considered". (Dkt. 33, pg. 3). This argument has no merit.

**1.   Law of the case applies because the court holdings are conclusions of law.**

Creech primarily argues that the preliminary injunction proceedings were rushed and points to the speed at which this Court as well as the Ninth Circuit issued its opinions. (Dkt. 33, pp. 3-5). Creech boldly suggests neither court was able to carefully deliberate before reaching its respective decision. *Id.* However, this Court and the Ninth Circuit provided hastened proceedings to allow Creech an opportunity to establish a Constitutional deprivation before his fast-approaching execution date. The expedited nature of the proceedings does not excuse Creech's failure to demonstrate a Constitutional injury or negate the decision makers' reasoned and careful deliberation. The record before this Court and the Ninth Circuit was substantial and the arguments were fully briefed by all parties. This Court also considered and denied Creech's Motion to Expedite Discovery, finding he did not have a right to discovery. (Dkt. 18, pg. 17).

This case is not about a sock or a murder in California; this case involves whether Creech received minimal due process during his clemency hearing. Creech had the burden to establish entitlement to a preliminary injunction to allow an opportunity to develop his claim that his due process rights were violated. He failed to meet this burden, even when his claims were taken in the light most favorable to Creech. Creech has not cured his failures in his Amended Complaint. The facts Creech asserts in his Amended Complaint are the same facts presented to this Court and the Ninth Circuit during the preliminary injunction proceedings. The Ninth Circuit presumed those same facts were true, but rejected Creech's due process claims, finding the facts were, at worst, harmless error. The Ninth Circuit's holdings are necessarily conclusions of law.

REPLY IN SUPPORT OF DEFENDANT IDAHO COMMISSION OF PARDONS AND
PAROLE'S MOTION TO DISMISS AMENDED COMPLAINT - 3

**113**

The purpose of the law of the case is to avoid relitigating the same issues. This Court, the Ninth Circuit, and even the Supreme Court of the United States considered these claims and found that Creech was afforded all appropriate due process. Each court denied Creech's application to enjoin his execution knowing that that decision would most likely result in his death.

### 2. Law of the case applies because there is no applicable exception.

No applicable exception warrants departure from the law of the case in this case.

Creech asserts that this Court's decision was clearly erroneous. He cites *City of L.A., Harbor Div. v. Santa Monica Baykeeper* in support, reiterating that a district court has the "procedural power to reconsider, rescind, or modify [its own] interlocutory order". (Dkt. 33, pg. 17). However, *Baykeeper* did not involve an erroneous order; rather, the district court withdrew a certification order because it had entered the order before the opposing party had time to file an opposition and without considering the timely filed opposition. *See* 254 F.3d 882, 884 (9th Cir. 2001). Contrary to Creech's bare protestations, this Court correctly interpreted Creech's complaint as an improper attempt to infringe on the propriety of the clemency decision. Additionally, this Court and the Ninth Circuit fully engaged with Creech's claims in considering his preliminary injunction motion; both concluded that Creech's due process rights were not violated. The Supreme Court of the United States denied Creech's application for a stay of execution and the petition for a writ of certiorari. Dkt. 26. Creech has not demonstrated a clearly erroneous decision by any of the three levels of the judicial system.

There has been no intervening change in law or other changed circumstance, and Creech makes no allegation of such.

Creech's minor edits to his Amended Complaint do not affect the legal conclusions previously made. Creech attempts to argue that the revised facts in his Amended Complaint, which

REPLY IN SUPPORT OF DEFENDANT IDAHO COMMISSION OF PARDONS AND PAROLE'S MOTION TO DISMISS AMENDED COMPLAINT - 4

**114**

must be taken as true, rebut the Commission's contention that the evidence presented during the commutation proceeding was true (Dkt. 33, pp. 7-8), but these same allegations have already been rejected. Additionally, the Commission has never spoken to the veracity of the prosecutor's statements, as Creech acknowledges[1], but has maintained the prosecutor's statements regarding the sock and Walker murder were immaterial to the Commission's decision. Creech has not provided any new information or presented a new argument that would change the prior analysis of this Court or that of the Ninth Circuit, which both found that Creech is unlikely to succeed on the merits of his due process claims. Rather, Creech is inviting this Court to engage in a substantive review of the Commission's decision and speculate that the sock and the Walker murder had any impact on its decision.[2] The Ninth Circuit declined to review the substantive merits of the clemency proceeding. (Dkt. 27, pg. 11). The Commission has documented the basis for its decision. Creech cannot establish a legitimate basis to undermine the official record of the clemency proceeding.

Accordingly, dismissal will not result in manifest injustice because the claim fails as a matter of law. Based on the law of this case, Creech fails to raise sufficient facts to support his due process claim beyond a speculative level warranting dismissal pursuant to Rule 12(b)(6). This claim must be dismissed.

B. Any error was harmless beyond a reasonable doubt.

There is a general presumption that harmless-error analysis applies to constitutional violations. (Dkt. 27, pg. 9). Creech argues courts have not held the harmless error standard applies

---

[1] "In its motion, the Commission does not even defend the truthfulness of the statements Ms. Longhurst made about the Walker case." (Dkt. 33, pg. 14).
[2] Creech is also asking this Court to speculate that the Ada County prosecutor and the Commission conspired to introduce this evidence without putting him on notice and then fabricate the record to avoid this litigation. There is no evidence to suggest any of these wild accusations.

REPLY IN SUPPORT OF DEFENDANT IDAHO COMMISSION OF PARDONS AND PAROLE'S MOTION TO DISMISS AMENDED COMPLAINT - 5

**115**

and cites to the Ninth Circuit's decision in this case. (Dkt. 33, pg. 11). Creech has misconstrued the Ninth Circuit's opinion. The Ninth Circuit did not question whether harmless error applied to clemency proceedings but rather pointed out the uncertainty surrounding **which** harmlessness standard applies. (Dkt. 27, pg. 9). The Ninth Circuit "assume[d] without deciding" that *Chapman v. California*'s more onerous standard - that the State bears the burden of demonstrating that any error is harmless beyond a reasonable doubt - was the appropriate rubric. While the Ninth Circuit made it clear that it was assuming, without deciding, that the *Chapman* harmless error standard would apply may be reconsidered in some other case, the holding is the law of this case.

Creech explains he is prevented from deciding whether the harmless-error analysis presumption applies to his constitutional violation claim because the record from the commutation proceeding is somehow inadequate. (Dkt. 33, pg. 11-12). Creech bases his argument on a case assessing the adequacy of a record in a *criminal appeal*. (Dkt. 33, pg. 11-12). *See United States v. Samaniego*, 187 F.3d 1222, 1225-26 (10th Cir. 1999) (the Appellate Court declined to engage in "an unsolicited, unassisted, and undirected harmless-error review of an incomplete record to search for and evaluate independent evidence to support [the defendant's] thirty-one separate convictions"). Creech is not entitled to the same record in this case, where due process only guarantees minimal due process. This is an argument Creech continues to raise, but one neither court has afforded any consideration. The Ninth Circuit acknowledged records of a clemency proceeding are generally inadequate "to conduct a substantive judicial review of the merits." (Dkt. 27, pg. 9). There is no suggestion by this Court or the Ninth Circuit that the record of Creech's commutation proceeding was inadequate to determine whether Creech's due process rights were violated.

REPLY IN SUPPORT OF DEFENDANT IDAHO COMMISSION OF PARDONS AND
PAROLE'S MOTION TO DISMISS AMENDED COMPLAINT - 6

Applying the generous *Chapman* standard and presuming that the Ada County prosecutor made false statements to the Commission, the Ninth Circuit was convinced any error was harmless beyond a reasonable doubt. Speaking to the Walker Murder, "Creech's alleged violations do not call into doubt the stated rationales for the Commissioners' votes" and the "[o]verwhelming evidence supports those conclusions." (Dkt. 27, pg. 12). The Ninth Circuit also found overwhelming evidence to support the Commissioners' votes as to the "reprehensible nature of Jensen's murder" and Creech's "lack of candor", regardless of the assertions made by the prosecutor about the name on the sock. (*Id.* at 14-15).

These purely legal conclusions constitute binding law of the case. *See Ranchers Cattlemen*, 499 F.3d at 1114. This Court and the Ninth Circuit have reviewed the facts Creech continues to assert in his Amended Complaint, presumed them true, and determined any error is harmless beyond a reasonable doubt. Creech's Amended Complaint has no chance of success on its merits and must be dismissed.

## II.     Creech Cannot Prove a Set of Facts that Would Entitle Him to Relief.

"Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008). Factual allegations must be enough to "raise a right to relief above a speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

The Amended Complaint alleges only that his due process rights were violated when the Ada County prosecutor lied, where he did not have advance notice to permit him to rebut the alleged misrepresentations. (Dkt. 30, pp. 30-33). Both this Court and the Ninth Circuit found that Creech does not have a due process right to "advance notice of the evidence to be presented at [the] commutation hearing". (Dkt. 21, pg. 7; *see also* Dkt. 18).

REPLY IN SUPPORT OF DEFENDANT IDAHO COMMISSION OF PARDONS AND PAROLE'S MOTION TO DISMISS AMENDED COMPLAINT - 7

Creech argues that there is a fundamental dispute over the evidence that must be explored, such as investigating the veracity of the statements by the Ada County Prosecutor, reviewing information about the Walker murder, and deposing relevant actors about what was said at the hearing about the sock. (Dkt. 33, pp. 10-11). The Ninth Circuit presumed Creech's assertion that the Ada County prosecutor lied as true and found whatever error to be harmless. (Dkt. 21, pp. 10-12). Creech sought an injunction, which was denied. If the courts felt that they needed additional evidence, they could have granted the stay and initiated discovery. At no point did either this Court or the Ninth Circuit deem it necessary to issue a stay and further develop the evidentiary record and that was when there was an active death warrant. Therefore, whatever factual dispute may exist is immaterial.

**III.** <u>**Conclusion**</u>

For the forgoing reasons, the Commission respectfully requests this Court dismiss this case.

Respectfully submitted this 1st day of May 2024.

OFFICE OF THE ATTORNEY GENERAL

*/s/ Karin Magnelli*_____
Karin Magnelli
Deputy Attorney General
Attorney for Commission

*/s/ Rebecca Strauss*_____
Rebecca Strauss
Deputy Attorney General
Attorney for Commission

REPLY IN SUPPORT OF DEFENDANT IDAHO COMMISSION OF PARDONS AND PAROLE'S MOTION TO DISMISS AMENDED COMPLAINT - 8

**118**

**CERTIFICATE OF SERVICE**

I certify that on May 1, 2024, I caused to be served a true and correct copy of the foregoing via CM/ECF Electronic Notification:

Jonah Horwitz: Jonah_Horwitz@fd.org
Christopher M. Sanchez: Christopher_M_Sanchez@fd.org
*Counsel for Plaintiff*

Dayton Reed: dreed@adacounty.id.gov
*Counsel for Defendant Bennetts*

/s/ Rebecca Strauss
Rebecca Strauss
Deputy Attorney General

REPLY IN SUPPORT OF DEFENDANT IDAHO COMMISSION OF PARDONS AND PAROLE'S MOTION TO DISMISS AMENDED COMPLAINT - 9

**119**

# EXHIBIT 11

**JAN M. BENNETTS**
ADA COUNTY PROSECUTING ATTORNEY

**DAYTON P. REED**
**HEATHER M. McCARTHY**
**SHERRY A. MORGAN**
Deputy Prosecuting Attorneys
Civil Division
200 W. Front Street, Room 3191
Boise, ID  83702
Telephone:  (208) 287-7700
Facsimile:  (208) 287-7719
Idaho State Bar Nos. 10775, 6404, & 5296
Email:  civilpafiles@adacounty.id.gov

*Attorneys for Ada County Prosecutor Jan M. Bennetts*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| THOMAS EUGENE CREECH,<br><br>                              Plaintiff,<br><br>vs.<br><br>IDAHO COMMISSION OF PARDONS AND PAROLE; JAN M. BENNETTS, Ada County Prosecuting Attorney, in her official capacity,<br><br>                              Defendant. | **Case No. 1:24-cv-066-AKB**<br><br>**PROSECUTOR BENNETTS' REPLY IN SUPPORT OF JOINDER TO MOTION TO DISMISS AMENDED COMPLAINT AND MOTION TO DISMISS AMENDED COMPLAINT [DKTS. 31 AND 32]** |

### REPLY ARGUMENT

Nothing in Creech's amended complaint, Dkt. 30, refutes the core holdings of either this Court or the Ninth Circuit in denying the motion for preliminary injunction—Creech was provided more than the *minimal* due process required. In responding to the motion to dismiss the amended complaint, Creech asks this Court to ignore its earlier analysis and the Ninth Circuit's decision.

PROSECUTOR BENNETTS' REPLY IN SUPPORT OF JOINDER TO MOTION TO DISMISS AMENDED COMPLAINT AND MOTION TO DISMISS AMENDED COMPLAINT [DKTS. 31 AND 32] – PAGE 1

**121**

But both this Court and the Ninth Circuit made reasoned conclusions about Plaintiffs' claims that are entirely consistent with, and supported by, the allegations in the amended complaint.

This Court can additionally rely on its earlier ruling that, as a matter of law, it may not review the substantive merits of the commutation hearing. This Court's rationale, as well as the rationale found in *Workman*—a case directly on point—remain valid and unchanged by the amended complaint.

### A. The amended complaint supports this Court's finding that the Commission provided Creech more than minimal due process in conducting the hearing.

In denying Creech's motion for preliminary injunction, the Court found that the allegations in Creech's complaint supported a finding that Creech was provided "more than minimal due process":

> In this case, the Court has carefully and thoroughly reviewed the record, considered the procedures for Creech's clemency hearing, and finds the Commission provided Creech more than minimal due process in conducting the hearing. For example, Creech was granted a commutation hearing. He had notice of that hearing. The Commissioner's executive director met several times with the parties about the hearing before it occurred. The director provided the parties with information regarding "the rules and logistical details for the hearing." (Dkt. 1 at ¶¶ 34–38). The Commission required the ACPO to submit materials and provided Creech with copies of those materials before the hearing. (*Id.* ¶ 41). The Commission allowed Creech to present information at the hearing and gave him an opportunity to speak on his behalf. Finally, the Commission deliberated and issued a written decision explaining the commissioners' reasoning.

*Creech v. Idaho Comm'n of Pardons & Parole*, No. 1:24-CV-00066-AKB, 2024 WL 756308, at *6 (D. Idaho Feb. 23, 2024), aff'd, 94 F.4th 851 (9th Cir. 2024), cert. denied, No. (23A783), 2024 WL 821441 (U.S. Feb. 28, 2024).

While Creech asks the Court to ignore its previous ruling because he disputes specifics about what happened at the commutation hearing, he does not dispute the facts the Court identifies

PROSECUTOR BENNETTS' REPLY IN SUPPORT OF JOINDER TO MOTION TO DISMISS AMENDED COMPLAINT AND MOTION TO DISMISS AMENDED COMPLAINT [DKTS. 31 AND 32] – PAGE 2

above in concluding that Creech was provided "more than minimal due process." In fact, these facts are supported by Creech's own allegations in the amended complaint:

- Creech was granted a commutation hearing. (*See* dkt. 30 at ¶¶ 31–32.)

- He had notice of that hearing. (*See* dkt. 30 at ¶¶ 32–36.)

- The Commissioner's executive director met several times with the parties about the hearing before it occurred. (*See* dkt. 30 at ¶¶ 34–35.)

- The director provided the parties with information regarding "the rules and logistical details for the hearing." (*See* dkt. 30 at ¶¶ 34–38; *accord* dkt. 1 at ¶¶ 34–38; dkt. 5-7 referenced therein.[1])

- The Commission required the ACPO to submit materials and provided Creech with copies of those materials before the hearing. (*See* dkt. 30 at ¶ 41; *accord* dkt. 1 at ¶ 41.)

- The Commission allowed Creech to present information at the hearing and gave him an opportunity to speak on his behalf. (*See* dkt. 5-7, p. 3, referenced in dkt. 30, ¶¶ 35–38.)

- Finally, the Commission deliberated and issued a written decision explaining the commissioners' reasoning. (*See* dkt. 30 at ¶¶ 164–67, 254–55, 263; dkt. 12-3, pp. 42–43.[2])

These undisputed indicia of sufficient due process support the same conclusion on this motion to dismiss that they did on the motion for preliminary injunction: Creech was provided more than the required minimal due process.

---

[1] As Creech correctly points out, the Court may consider on a 12(b)(6) motion "documents referenced in the complaint." Dkt. 33, pp. 6–7 (quoting *Kim v. United States*, 664 F. Supp 3d 1062, 1068 (C.D. Cal. 2023). The amended complaint relies on the letter from Executive Directly Ashley Dowell, filed as dkt. 5-7, and its authenticity is not contested—Creech himself submitted it into the record.

[2] While Creech disputes the accuracy of the minutes of the hearing, he does not dispute the written decision the Commission issued. In fact, Creech's allegations refer to the reasoning explained in that written decision, as cited. The written decision, filed as pages 42 and 43 of dkt. 12-3, is referenced in the complaint and should be considered in deciding the motion to dismiss. *See* dkt. 33, pp. 6–7 (quoting *Kim*, 664 F. Supp 3d at 1068).

PROSECUTOR BENNETTS' REPLY IN SUPPORT OF JOINDER TO MOTION TO DISMISS AMENDED COMPLAINT AND MOTION TO DISMISS AMENDED COMPLAINT [DKTS. 31 AND 32] – PAGE 3

**B. The amended complaint supports the Ninth Circuit's findings that (1) Creech received required notice, (2) suggesting that Creech murdered Daniel Walker and got away with it did not violate Creech's rights, and (3) as a settled matter of law, the murder weapon sock belonged to Creech.**

Just as the amended complaint supports this Court's conclusion that Creech received more than minimal due process, the amended complaint also supports the Ninth Circuit's findings that Creech was not deprived due process.

First, the Ninth Circuit found that Creech received all required notice when he received notice of the hearing itself and the types of issues the Commission would consider. *Creech v. Idaho Comm'n of Pardons & Parole*, 94 F.4th 851, 856 (9th Cir. 2024), *cert. denied,* No. (23A783), 2024 WL 821441 (U.S. Feb. 28, 2024). The specific facts the Ninth Circuit relied upon are consistent with Creech's allegations in the amended complaint:

- Creech received notice of the hearing itself. (*See* dkt. 30 at ¶¶ 32–36.)

- And Creech was not misled as to the issues that would be considered by the Commission. (*See* dkt. 30 at ¶¶ 34–41; dkt. 5-7 referenced therein.)

- The State gave Creech considerable information about the logistics and substance of his hearing well in advance thereof. (*See id.*)

- The Commission's Executive Director met with Creech's counsel three times before the hearing to discuss the agenda and types of evidence that would be presented. (*See id.*)

- More than three weeks before the hearing, Creech received from the State a copy of the investigation packet that the Commission would be reviewing. (*See* dkt. 30 at ¶ 41.)

Citing these facts alone, the Ninth Circuit held that "the State satisfied the minimal notice requirements contemplated in *Woodard* and *Wilson*." *Id.*

Creech attempts to dodge Ninth Circuit law regarding required notice by claiming that his due process theory is not based on (1) a lack of notice *or* (2) the presentation of false evidence, but instead is based on a *sui generis*, heretofore unrecognized combination of the two—and he scolds

PROSECUTOR BENNETTS' REPLY IN SUPPORT OF JOINDER TO MOTION TO DISMISS AMENDED COMPLAINT AND MOTION TO DISMISS AMENDED COMPLAINT [DKTS. 31 AND 32] – PAGE 4

**124**

Defendants for "isolat[ing] the legal question of what notice Mr. Creech was due from the supposedly separate legal question of whether the presentation of false evidence at a clemency proceeding is unconstitutional." Dkt. 33, p. 15. Creech's argument effectively admits that he is intentionally shotgun pleading to avoid "present[ing] his claims discretely and succinctly, so that his adversary can discern what he is claiming and frame a responsive pleading." *Tuinstra v. Bonner Cnty.*, No. 2:21-CV-00074-DCN, 2021 WL 2534983, at *2 (D. Idaho June 21, 2021) (quoting *Barmapov v. Amuial*, 986 F.3d 1321, 1324 (11th Cir. 2021)). Creech's claim is that he should have received advance notice as to evidence—"The question teed up here is whether it violates due process for a prosecutor to use *false* evidence without any advance notice (or any opportunity to cure it after the hearing)," dkt. 33, p. 15—and the Ninth Circuit has already held that such a due process right does not exist: "Neither we nor the Supreme Court have read the Due Process Clause to require advance notice of the evidence to be presented at a commutation hearing, and Idaho law does not confer a right to receive such notice." *Creech*, 94 F.4th at 856.

Next,[3] the Ninth Circuit found that even if Daniel Walker's murder had not been discussed at the commutation hearing, this wouldn't change the Commission's stated reasoning for recommending against commutation. *Id.* at 857. As Creech alleges, the Commissioners who voted to deny commutation cited "the number of victims." Dkt. 30 at ¶ 166. Indeed, the document Creech was referencing in that allegation—the Commission's written decision—states that the Commission based its decision in part on "the sheer number of victims that Mr. Creech has created over his lifetime." Dkt. 12-3, p. 43; *Creech*, 94 F.4th at 857. The Ninth Circuit concluded that

---

[3] The second argument that the Ninth Circuit analyzed concerned Creech's contention that the Commission was constitutionally required to appoint a replacement commissioner for the one that recused himself. Creech has abandoned this argument in the amended complaint.

PROSECUTOR BENNETTS' REPLY IN SUPPORT OF JOINDER TO MOTION TO DISMISS AMENDED COMPLAINT AND MOTION TO DISMISS AMENDED COMPLAINT [DKTS. 31 AND 32] – PAGE 5

**125**

"[e]ven if the Commission had not been presented with any information regarding the status of the Walker investigation, it would have still had ample evidence that Creech had killed many people, [and had] been implicated or suspected in other deaths . . . ." *Creech*, 94 F.4th at 857 (quoting *Arave v. Creech*, 507 U.S. 463, 465–66 (1993) ("Creech has admitted to killing or participating in the killing of at least 26 people. The bodies of 11 of his victims—who were shot, stabbed, beaten, or strangled to death—have been recovered in seven States.")). This finding is consistent with and supported by the amended complaint. Dkt. 30 at ¶ 166. "Creech's alleged violations," consisting of false information presented to the Commission about Creech's involvement in Daniel Walker's murder, "do not call into doubt the stated rationales for the Commissioners' votes." *Id.*

Finally, the Ninth Circuit rejected "Creech's argument that ACPA violated his due process rights by introducing misleading or fabricated evidence when it displayed a slide of a sock labeled with Creech's name." *Id.* at 858. The Ninth Circuit relied on a judicial finding that the sock used to murder David Jensen belonged to Creech. The Ninth Circuit explained,

> In 1995, the sentencing judge found "beyond a reasonable doubt .... [that] [a]ll the weapons which were used in this murder were made by Tom Creech. Jensen was egged on to attack Creech so the justification of self defense could be used.... Jensen approached Creech holding a weapon made up of batteries in a sock. *The sock was later determined to be Creech's.*" Findings of the Court in Considering the Death Penalty Under Section 19-2515, Idaho Code, at 3–4, *State v. Creech*, No. HCR-10252 (Idaho Dist. Ct. Apr. 17, 1995) (emphasis added).

*Id.* Creech references this same judicial finding in his amended complaint. Dkt. 30, ¶ 259.

The Ninth Circuit also relied on the fact that "[t]he Commissioners who voted to deny commutation did not mention the sock, nor did they even discuss Creech's unwillingness to accept the 1995 factual findings that the murder weapon belonged to him." *Id.* Creech's amended complaint, which references the Commission's final decision, supports the Ninth Circuit's

PROSECUTOR BENNETTS' REPLY IN SUPPORT OF JOINDER TO MOTION TO DISMISS AMENDED COMPLAINT AND MOTION TO DISMISS AMENDED COMPLAINT [DKTS. 31 AND 32] – PAGE 6

reasoning. *See* dkt. 12-3, pp. 42–43, referenced in dkt. 30 at ¶¶ 164–67, 254–55,[4] 263. Creech cannot avoid that he is bound by the judicial finding that the sock belongs to him, as the Ninth Circuit recognized.

Creech insists that this Court must make its determinations on the motion to dismiss based on the allegations in the amended complaint. This Court can do just that and still rely on the Ninth Circuit's decision denying the preliminary injunction because the amended complaint—along with the documents it references—supports the Ninth Circuit's findings and conclusions on appeal.

### C. The Court's holding that it is inappropriate to review the substantive merits of the commutation hearing is still applicable, and *Workman* is persuasive.

The Court's conclusion that it would not be appropriate to review the substantive merits of the proceeding is just as valid now as when it was made while denying the motion for preliminary injunction. In making that conclusion, the Court gave its own rationale and also relied on *Workman v. Bell*, 245 F.3d 849 (6th Cir. 2001). The Court explained,

> First, *Woodard* at most authorizes only limited judicial review for some minimal procedural due process safeguards. 523 U.S. at 289; *see also Anderson*, 279 F.3d at 676 (relying on *Woodard*). Second, generally the record of the clemency hearing is inadequate—as in this case—to conduct a substantive judicial review of the merits. For example, in this case, the parties' written submissions to the Commission are not in the record, and their oral presentations were not recorded and officially transcribed. Rather, apparently only "minutes" were recorded. (Dkt. 11-1 at pp. 8-21).

---

[4] The allegations in paragraphs 254 and 255—asserting that the mere use of the word "coldblooded" is somehow sufficient to show that commissioners relied on the name written on a sock—are completely unfounded. As the Ninth Circuit's decision shows, and as common sense demands, no such extreme leap is warranted: all that is needed to is read the Commission's own words in its own written decision, which Creech references in his amended complaint. No Commissioner mentions a sock.

PROSECUTOR BENNETTS' REPLY IN SUPPORT OF JOINDER TO MOTION TO DISMISS AMENDED COMPLAINT AND MOTION TO DISMISS AMENDED COMPLAINT [DKTS. 31 AND 32] – PAGE 7

Dkt. 18, pp. 9–10. Creech's response to the motion to dismiss cites allegations in the amended complaint that support the Court's rationale: "Mr. Creech has alleged in his amended complaint that there is no transcript and that his counsel were not allowed to record the proceedings. *See* dkt. 30 at 5, 27." Dkt. 33, p. 12. *See also* dkt. 33, p. 7 ("As for the minutes, the amended complaint states that they 'do not accurately reflect what the prosecutor said to the Commission.' [Dkt. 30] at 27.") The Court should again deny Creech's request for a substantive review of the commutation hearing.

The Court also cited *Workman*, stating, "A federal appellate court, however, is not authorized 'to review the substantive merits of a clemency proceeding.'" Dkt. 18, p. 9. (quoting *Workman*, 245 F.3d at 852). Creech argues that *Workman* is not binding and does not apply to a 12(b)(6) motion. Dkt. 33, p. 18. *Workman* is a Sixth Circuit case, so it is not binding—but it is directly on point and highly persuasive, in that it deals with the same claims Creech makes regarding false evidence at a commutation hearing, and it rejects those claims. *Workman*, 245 F.3d at 852–53. The death row inmate in *Workman* subsequently brought a civil lawsuit much like Creech's, and the court applied the Sixth Circuit's reasoning in *Workman* to grant a motion to dismiss that lawsuit. *Workman v. Summers*, No. 3:01-0290, 2001 WL 1782877 (M.D. Tenn. Oct. 31, 2001), aff'd, 111 F. App'x 369 (6th Cir. 2004). *See* dkt. 11, pp. 11–12 (explaining the history of the multiple *Workman* cases). The Ninth Circuit has yet to decide a case on this issue, and it did not take up the question in denying the motion for preliminary injunction.

Creech is simply wrong in his assertion that Justice Stevens' dissent in *Woodard*—joined by no other Justice—is controlling. Dkt. 33, p. 19. In *Woodard*, Justice Stevens and Justice O'Connor both reject the lead opinion's "conclusion" that "a clemency proceeding could *never* violate the Due Process Clause," *Ohio Adult Parole Auth. v. Woodard*, 523 U.S. 272, 290 (1998),

PROSECUTOR BENNETTS' REPLY IN SUPPORT OF JOINDER TO MOTION TO DISMISS AMENDED COMPLAINT AND MOTION TO DISMISS AMENDED COMPLAINT [DKTS. 31 AND 32] – PAGE 8

and both agree that a prisoner has not been deprived of all interest in his life before his execution, *id.* at 289. Justice Stevens never claimed that his view regarding "deliberate fabrication of false evidence" at a clemency proceeding "was shared by Justice O'Connor"; and Justice Stevens' dissent—joined by no other Justice—was never "incorporated into Justice O'Connor's controlling writing" and it never "became the law." Dkt. 33, p. 19.

The Court was correct in holding that it would not review the substantive merits of the commutation proceeding, in addition to holding that Creech was provided more than the required *minimal* due process.

## I.    CONCLUSION

The motion to dismiss should be granted.

**DATED** this 1st day of May, 2024.

**JAN M. BENNETTS**
Ada County Prosecuting Attorney

By:     */s/ Dayton P. Reed*
        Dayton P. Reed
        Deputy Prosecuting Attorney

PROSECUTOR BENNETTS' REPLY IN SUPPORT OF JOINDER TO MOTION TO DISMISS AMENDED COMPLAINT AND MOTION TO DISMISS AMENDED COMPLAINT [DKTS. 31 AND 32] – PAGE 9

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 1st day of May, 2024, I filed the foregoing PROSECUTOR BENNETTS' REPLY IN SUPPORT OF JOINDER TO MOTION TO DISMISS AMENDED COMPLAINT AND MOTION TO DISMISS AMENDED COMPLAINT electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

> Christopher Sanchez
> Jonah J. Horwitz
> FEDERAL DEFENDER SERVICES OF IDAHO
>
> Karin Magnelli
> Rebecca Strauss
> OFFICE OF THE ATTORNEY GENERAL OF IDAHO

AND I FURTHER CERTIFY that on such date I served the foregoing on the following non-CM/ECF Registered Participants in the manner indicated as follows:

N/A

> By:     /s/ Chyvonne Tiedemann
>         Legal Assistant

PROSECUTOR BENNETTS' REPLY IN SUPPORT OF JOINDER TO MOTION TO DISMISS AMENDED COMPLAINT AND MOTION TO DISMISS AMENDED COMPLAINT [DKTS. 31 AND 32] – PAGE 10

130

# EXHIBIT 12

**JAN M. BENNETTS**
ADA COUNTY PROSECUTING ATTORNEY

**DAYTON P. REED**
**HEATHER M. McCARTHY**
**SHERRY A. MORGAN**
Deputy Prosecuting Attorneys
Civil Division
200 W. Front Street, Room 3191
Boise, ID  83702
Telephone:  (208) 287-7700
Facsimile:  (208) 287-7719
Idaho State Bar Nos. 10775, 6404, & 5296
Email:  civilpafiles@adacounty.id.gov

*Attorneys for Ada County Prosecutor Jan M. Bennetts*

### IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| THOMAS EUGENE CREECH,<br><br>                              Plaintiff,<br><br>vs.<br><br>IDAHO COMMISSION OF PARDONS AND PAROLE; JAN M. BENNETTS, Ada County Prosecuting Attorney, in her official capacity,<br><br>                              Defendant. | **Case No. 1:24-cv-00066-AKB**<br><br>**JAN M. BENNETTS' MOTION TO DISMISS AND JOINDER IN DEFENDANT IDAHO COMMISSION OF PARDONS AND PAROLE'S MOTION TO DISMISS AMENDED COMPLAINT (Dkt. 31)** |

Defendant Jan M. Bennetts, by and through her attorneys of record, and pursuant to Federal Rule of Civil Procedure 12(b)(6), moves to dismiss Plaintiff's Amended Complaint [Dkt. 30].

JAN M. BENNETTS' MOTION TO DISMISS AND JOINDER IN DEFENDANT IDAHO COMMISSION OF PARDONS AND PAROLE'S MOTION TO DISMISS AMENDED COMPLAINT - PAGE 1

**132**

As Creech does not add any additional claims or relevant facts in his Amended Complaint [Dkt. 30], in the interest of judicial economy, Ms. Bennetts joins in the Idaho Commission of Pardons and Parole's ("Commission") Motion to Dismiss and supporting Memorandum [Dkt. 31-1]. Additionally, as the claims and arguments have been previously and exhaustively briefed, argued, and ruled on in this case, Ms. Bennetts also relies on the arguments made previously by the Defendants and the Orders issued by this Court, the Ninth Circuit, and the United States Supreme Court. *See* Dkt. 11, 12, 18, 20, 21, 25, 26, 27, 31. *See also* Exhibit A attached hereto.

**DATED** this 29th day of March, 2024.

**JAN M. BENNETTS**
Ada County Prosecuting Attorney


By:     /s/ Dayton P. Reed
        Dayton P. Reed
        Deputy Prosecuting Attorney

JAN M. BENNETTS' MOTION TO DISMISS AND JOINDER IN DEFENDANT IDAHO COMMISSION OF PARDONS AND PAROLE'S MOTION TO DISMISS AMENDED COMPLAINT - PAGE 2

**133**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 29th day of March, 2024, I filed the foregoing JAN M. BENNETTS' MOTION TO DISMISS AND JOINDER IN DEFENDANT IDAHO COMMISSION OF PARDONS AND PAROLE'S MOTION TO DISMISS AMENDED COMPLAINT electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

> Christopher Sanchez
> Jonah J. Horwitz
> FEDERAL DEFENDER SERVICES OF IDAHO
>
> Karin Magnelli
> Rebecca Strauss
> OFFICE OF THE ATTORNEY GENERAL OF IDAHO

AND I FURTHER CERTIFY that on such date I served the foregoing on the following non-CM/ECF Registered Participants in the manner indicated as follows:

N/A

> By:   /s/ Chyvonne Tiedemann
>        Legal Assistant

JAN M. BENNETTS' MOTION TO DISMISS AND JOINDER IN DEFENDANT IDAHO COMMISSION OF PARDONS AND PAROLE'S MOTION TO DISMISS AMENDED COMPLAINT - PAGE 3

**134**

# EXHIBIT 13

**RAÚL LABRADOR**
**ATTORNEY GENERAL OF IDAHO**

**KARIN MAGNELLI, ISB #6929**
Lead Deputy Attorney General, Idaho Department of Correction
**REBECCA STRAUSS, ISB #11285**
Deputy Attorneys General, Idaho Department of Correction
1299 North Orchard St., Suite 110
Boise, Idaho 83706
Telephone: (208) 658-2095
Facsimile: (208) 327-7485
E-mail: kmagnell@idoc.idaho.gov; rstrauss@idoc.idaho.gov

*Attorneys for Idaho Commission of Pardons and Parole*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| **THOMAS EUGENE CREECH**,<br>     Plaintiff,<br><br>v.<br><br>**IDAHO COMMISSION OF PARDONS AND PAROLE; JAN M. BENNETTS,** Ada County Prosecuting Attorney, in her official capacity,<br><br>     Defendants. | Case No. **1:24-cv-00066-AKB**<br><br>**DEFENDANT IDAHO COMMISSION OF PARDONS AND PAROLE'S MOTION TO DISMISS AMENDED COMPLAINT [DKT. 30]** |

Defendant Idaho Commission of Pardons and Parole, by and through undersigned counsel, pursuant to Fed. Civ. P. R. 12(b)(6), respectfully moves to dismiss Plaintiff's Amended Complaint for Equitable, Declaratory, and Injunctive Relief (Dkt. 30) for the reasons stated, and under the conditions described, in the accompanying memorandum.

DEFENDANT IDAHO COMMISSION OF PARDONS AND PAROLE'S
MOTION TO DISMISS AMENDED COMPLAINT [DKT. 30] – 1

**136**

Respectfully submitted this 29th day of March 2024.

OFFICE OF THE ATTORNEY GENERAL

*/s/ Karin Magnelli*
Karin Magnelli
Deputy Attorney General
Attorney for Commission

*/s/ Rebecca Strauss*
Rebecca Strauss
Deputy Attorney General
Attorney for Commission

DEFENDANT IDAHO COMMISSION OF PARDONS AND PAROLE'S
MOTION TO DISMISS AMENDED COMPLAINT [DKT. 30] – 2

**137**

**CERTIFICATE OF SERVICE**

I certify that on March 29, 2024, I caused to be served a true and correct copy of the foregoing via CM/ECF Electronic Notification:

Jonah Horwitz: Jonah_Horwitz@fd.org
Christopher M. Sanchez: Christopher_M_Sanchez@fd.org
*Counsel for Plaintiff*

Dayton Reed: dreed@adacounty.id.gov
*Counsel for Defendant Bennetts*

                              */s/ Karin Magnelli*          
                              Karin Magnelli
                              Deputy Attorney General
                              Attorney for Commission

DEFENDANT IDAHO COMMISSION OF PARDONS AND PAROLE'S
MOTION TO DISMISS AMENDED COMPLAINT [DKT. 30] – 3

**138**

# EXHIBIT 14

RAÚL LABRADOR
ATTORNEY GENERAL OF IDAHO

KARIN MAGNELLI, ISB #6929
Lead Deputy Attorney General, Idaho Department of Correction
REBECCA STRAUSS, ISB #11285
Deputy Attorneys General, Idaho Department of Correction
1299 North Orchard St., Suite 110
Boise, Idaho 83706
Telephone: (208) 658-2095
Facsimile: (208) 327-7485
E-mail: kmagnell@idoc.idaho.gov; rstrauss@idoc.idaho.gov

*Attorneys for Idaho Commission of Pardons and Parole*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| **THOMAS EUGENE CREECH**,<br>        Plaintiff,<br><br>v.<br><br>**IDAHO COMMISSION OF PARDONS AND PAROLE; JAN M. BENNETTS**, Ada County Prosecuting Attorney, in her official capacity,<br><br>        Defendants. | **Case No. 1:24-cv-00066-AKB**<br><br>**MEMORANDUM IN SUPPORT OF DEFENDANT IDAHO COMMISSION OF PARDONS AND PAROLE'S MOTION TO DISMISS AMENDED COMPLAINT** |

Defendant Idaho Commission of Pardons and Parole ("Commission"), by and through undersigned counsel, and pursuant to Dist. Idaho Loc. Civ. R. 7.1, hereby submits its factual and legal arguments in support of its Motion to Dismiss Amended Complaint as follows:

### BACKGROUND AND PROCEDURAL HISTORY

Thomas Creech ("Creech") was serving a life sentence for two counts of first-degree murder at the Idaho State Correctional Institution when he murdered another inmate, twenty-three-year-old David Jensen, by beating him with a battery-filled sock until Jensen's skull shattered, caved in, and blood was splashed on the floors and walls. *State v. Creech* ("Creech I"), 105 Idaho

MEMORANDUM IN SUPPORT OF DEFENDANT IDAHO COMMISSION OF PARDONS AND PAROLE'S MOTION TO DISMISS AMENDED COMPLAINT - 1

362, 364, 670 P.2d 463, 465 (1983). Creech pleaded guilty to first-degree murder for killing Jensen and was sentenced to death. *Id.* at 465-66. The Ninth Circuit granted Creech habeas relief concerning the case of Jensen's murder and remanded the case for sentencing. *Creech v. Arave* ("Creech II"), 947 F.2d 873 (9th Cir. 1991), *rev'd in part sub nom Arave v. Creech*, 507 U.S. 463 (1993) (remanded for resentencing). The trial court resentenced Creech to death in 1995. *State v. Creech* ("Creech III"), 132 Idaho 1, 6, 966 P.2d 1, 6 (1998). Creech's death sentence was upheld by the Idaho Supreme Court in 1998. *Id.* at 23.

Creech submitted a petition for commutation to the Idaho Commission on Pardons and Parole ("Commission") and the Commission held a commutation hearing on January 19, 2024. It voted 3-3 not to recommend commutation and issued its decision on January 29, 2024. The State then obtained a death warrant, which expired on its own terms on February 28, 2024. Creech subsequently filed a Complaint with this Court, pursuant to 42 U.S.C. § 1983, requesting injunctive relief to prevent his execution as well as a Motion for Preliminary Injunction and Motion to Expedite Discovery. (Dkts. 1, 4, 10). This Court denied Plaintiff's Motion for Preliminary Injunction and Plaintiff's Motion to Expedite Discovery on February 23, 2024. (Dkt. 18). Creech then filed a Notice of Appeal. (Dkt. 19). The Ninth Circuit affirmed the district court's decision the following day, on February 24, 2024, and issued a Mandate effective February 25, 2024. (Dkt. 21-22). Creech filed a petition for writ of certiorari with the United States Supreme Court on February 26, 2024, which was denied on February 28, 2024. (Dkts. 23, 25).

The execution of Creech was unsuccessful, and the death warrant expired on February 28, 2024. The Commission then filed its Motion to Dismiss Creech's Complaint. (Dkt. 20). In response to the State's initial Motion to Dismiss, Creech filed an Amended Complaint on March 15, 2024,

MEMORANDUM IN SUPPORT OF DEFENDANT IDAHO COMMISSION OF PARDONS AND PAROLE'S MOTION TO DISMISS AMENDED COMPLAINT - 2

per Federal Rule of Civil Procedure 15(a)(1)(B) and argues the Motion to Dismiss is moot. (Dkts. 29-30).

## APPLICABLE LEGAL STANDARD

Although Creech requests that the State's Motion to Dismiss be denied as moot, "[a] defendant is not required to file a new answer to an amended complaint, so as to avoid waiver of affirmative defenses, when the allegations in the amended complaint do not change the theory or scope of the case." *KST Data, Inc. v. DXC Tech. Co.*, 980 F.3d 709, 715 (9th Cir. 2020).

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the claims asserted in a complaint. Generally, "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Cruz v. Beto*, 405 U.S. 319, 322 (1972). In other words, "[d]ismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008). Factual allegations must be enough to "raise a right to relief above a speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

Additionally, "[t]he law-of-the-case doctrine generally provides that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Askins v. U.S. Dep't of Homeland Sec.*, 899 F.3d 1035, 1042 (9th Cir. 2018) (internal quotation and citation omitted). "The doctrine applies most clearly where an issue has been decided by a higher court; in that case, the lower court is precluded from reconsidering the issue and abuses its discretion in doing so…" *Id.*; *see also United States v. Miller*, 822 F.2d 828, 832 (9th Cir. 1987) ("[t]he rule is that the mandate of an appeals court precludes the district court

MEMORANDUM IN SUPPORT OF DEFENDANT IDAHO COMMISSION OF PARDONS AND PAROLE'S MOTION TO DISMISS AMENDED COMPLAINT - 3

on remand from reconsidering matters which were either expressly or implicitly disposed of upon appeal").

Although the standards for a motion for preliminary injunctive relief and dismissal under Rule 12(b)(6) are not conterminous, they overlap, particularly where a court determines that the plaintiff has no chance of success on the merits. *See Arc of California v. Douglas*, 757 F.3d 975, 993 (9th Cir. 2014). "The irreducible minimum for a preliminary injunction is that the moving party demonstrate a fair chance of success on the merits or questions serious enough to require litigation. No chance of success at all will not suffice." *E. & J. Gallo Winery v. Andina Licores S.A.,* 446 F.3d 984, 990 (9th Cir. 2006) (internal quotation and citation omitted). So, too, for a motion to dismiss: if there is "no chance of success" on the merits, *E. & J. Gallo,* 446 F.3d at 990, then the complaint does not "state a claim to relief that is plausible on its face," *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell,* 550 U.S. at 570), and must be dismissed.

## ARGUMENT

Here, the District Court denied Plaintiff's Motion for Preliminary Injunction because "Creech fail[ed] to make a clear showing of a likelihood of success on the merits of [his] claim that the Commission and ACPO [Ada County Prosecutor's Office] violated his due process rights". (Dkt. 18, pg. 16). The Ninth Circuit Court affirmed the District Court's denial of Creech's request for a preliminary injunction, finding, "Creech has failed to establish a likelihood of success on the merits". (Dkt. 27, pg. 4). Although both courts reached this conclusion while undergoing a preliminary injunction analysis, the factual and legal bases they relied upon still apply. *See Askins*, 899 F.3d at 1042; *Arc of California*, 757 F.3d at 993–94. Based on the previous findings of facts and conclusions of law, Creech has likewise failed to "state a claim to relief that is plausible on its

MEMORANDUM IN SUPPORT OF DEFENDANT IDAHO COMMISSION OF PARDONS AND PAROLE'S MOTION TO DISMISS AMENDED COMPLAINT - 4

**143**

face," *see Iqbal,* 556 U.S. at 678, as he has failed to provide "sufficient facts to support a cognizable legal theory". *See Mendiondo* 521 F.3d at 1104.

Although Creech amended his complaint, the new claims substantially conform to those alleged in his initial complaint related to the requirements of minimal due process and the allegation of false evidence presented by the prosecutor. The only substantive change in Creech's Amended Complaint is the removal of the due process claim regarding the number of commissioners present for the hearing. Creech's failure to re-allege this claim renders it waived. *See Rhodes v. Robinson*, 621 F.3d 1002, 1005 (9th Cir. 2010) ("As a general rule, when a plaintiff files an amended complaint, the amended complaint supersedes the original, the latter being treated thereafter as non-existent.").

Creech continues to claim that the Defendants violated his constitutional right to due process during his clemency proceeding in two ways: (1) by not providing him notice of all the evidence that the Commission would consider and (2) by the presentation of false and misleading information by the prosecution. Although Creech has raised additional facts to support these claims, he has not addressed the defects in his Complaint. Additionally, he fails to assert any new facts to alter the analysis that this court and the Ninth Circuit have already undergone in denying his motion for preliminary injunction. Both courts already concluded that the Commission provided Creech more than the minimal due process that is required. (Dkt. 18, pg. 13; Dkt. 27, pg. 10). The Ninth Circuit also provided Creech the benefit of the doubt, applied the strictest harmless error standard, and found any error was harmless beyond a reasonable doubt. (Dkt. 27, pg. 13, 14).

1. Creech received all required notice that he was due.

Creech bases this claim solely upon the prosecution's failure to give any notice of its intent to present "either the false image of the sock or making the false statement about the Walker murder

MEMORANDUM IN SUPPORT OF DEFENDANT IDAHO COMMISSION OF PARDONS AND PAROLE'S MOTION TO DISMISS AMENDED COMPLAINT - 5

to the Commission." (Dkt. 30, ¶ 245). Interestingly, Creech again relies upon *Swarthout v. Cooke*, 562 U.S. 216, 220 (2011), and *Wilson v. U.S. Dist. Court*, 161 F.3d 1185, 1187 (9th Cir. 1998), in support of his argument that due process in a clemency proceeding requires notice and the opportunity to respond. (Dkt. 30, ¶ 243). As this court previously determined, *Swarthout* is not applicable as that case applied to due process during a parole hearing, not due process in a clemency hearing. (Dkt. 18, pg. 11). And *Wilson* was deemed distinguishable as the decisionmaker (the Commission) in this case did not mislead Creech. (*Id.* at 12). As to any requirements in *Wilson*, the Ninth Circuit found the minimal notice requirements were satisfied. (Dkt. 27, pg. 10).

As this court has already found,

Creech has cited no authority that the ACPO was required to provide him with notice of *all* the information it intended to show or discuss during the clemency hearing. That the Commission permitted the parties to view most of the information before the hearing did not create a protectable interest in a right to receive the ACPO's presentation in its entirety before the hearing. Further, because Creech does not have a constitutional right to a clemency hearing, it necessarily follows he does not have a due process right to post-hearing proceedings including, for example, discovery regarding the clemency proceeding.

(Dkt. 18, pg. 12). In its decision to affirm, the Ninth Circuit agreed, "Neither we nor the Supreme Court have read the Due Process Clause to require advance notice of the evidence to be presented at a commutation hearing, and Idaho law does not confer a right to receive such notice." (Dkt. 27, pg. 10). The courts agreed that the Commission provided Creech with minimal due process as required by the Supreme Court.

Similarly, Creech claims the Commission was obligated to allow him the opportunity to respond to the false information he identified. (Dkt. 30, ¶ 245). This argument was rejected by the Ninth Circuit. When addressing Creech's claim that his due process rights were violated when the Commission voted not to postpone its decision, the Ninth Circuit found that "[t]he Commission

MEMORANDUM IN SUPPORT OF DEFENDANT IDAHO COMMISSION OF PARDONS AND PAROLE'S MOTION TO DISMISS AMENDED COMPLAINT - 6

**145**

had no obligation to consider Creech's request (which it did), let alone grant it." (Dkt. 27, pg. 15, ¶ 5).

Creech cannot establish that the requisite minimal due process during a clemency proceeding necessitates notice of all information to be presented at the proceeding or an opportunity to respond to all information presented during the proceeding. Creech has not provided any information or presented a new argument that would change the prior analysis of this court or that of the Ninth Circuit. This claim must be dismissed.

2. <u>The prosecution did not violate Creech's due process rights.</u>

The remaining claim – that the Ada County Prosecutor deliberately fabricated evidence during the commutation hearing thereby giving rise to a due process claim – has also been litigated and found unsubstantiated. The Ninth Circuit thoroughly considered, explored, and rejected Creech's allegation that the ACPO violated his right to due process by introducing potentially misleading or fabricated evidence. (Dkt. 27, pg. 11-15). Still, in his Amended Complaint, Creech continues to focus on the same information presented by the prosecution regarding Creech's involvement in the murder of Mr. Walker and the sock used by Creech during the murder of Mr. Jensen.

Creech claims the prosecution's reference to the murder of Mr. Walker "was the most dramatic of the prior offenses" discussed during the commutation proceeding. (Dkt. 30, ¶ 264). It is unclear what made the discussion the "most dramatic" or how that renders the information fabricated or false. Creech wants this court to believe that Mr. Walker's murder was the tipping point, and had that information not been presented, his petition would have resulted in a different outcome - the Commission would have recommended that the Governor grant his commutation request. Creech rests his argument on the commissioners' reference to the number of Creech's

MEMORANDUM IN SUPPORT OF DEFENDANT IDAHO COMMISSION OF PARDONS AND PAROLE'S MOTION TO DISMISS AMENDED COMPLAINT - 7

**146**

victims in its decision. (Dkt. 30, ¶ 166). The record in this case clearly establishes that argument has been rejected. This court previously found, "the Commission's decision does not appear to have been unduly influenced by either the Walker murder or the sock photograph." (Dkt. 18, pg. 14). Likewise, the Ninth Circuit addressed the references to the number of Creech's victims and his untruthfulness about his crimes as noted in the Commission's decisions and found, "But even taking Daniel Walker's murder out of the equation would not materially change the record's support for both of those observations." (Dkt. 27, pg. 12).

Relying primarily on the minutes from the commutation hearing, both this court and the Ninth Circuit have rejected Creech's due process violations based on the presentation of the picture of the sock. (Dkt.18, pg. 13; Dkt. 27, pg. 13-14). As the Ninth Circuit stated, "It strains credulity to suppose that the reference to the matching sock made the difference in the Commission's denial of commutation." (Dkt. 27, pg. 15). To overcome the analysis by this court and the Ninth Circuit, Creech is inviting the court to conduct a substantive review of the Commission's decision and reasoning. Unable to present facts that could possibly overcome the prior analysis of this court and the Ninth Circuit, Creech resorts to making more baseless accusations of deceitful efforts by the Defendants and others to "rob Mr. Creech of what was clearly a strong bid for clemency." (Dkt. 30, ¶ 181). Creech asserts the Commission tampered with the minutes to move on from the proceeding rather than "faithfully determining the facts"; and therefore, the minutes are unreliable. (*Id*., at ¶ 216-217, 222). Aside from Creech's own "information and belief", the only error Creech concretely identifies is that the minute taker confused the Ada County prosecutor who was presenting (Jill Longhurst) with the elected Ada County Prosecutor (Jan Bennetts) in one place in the minutes.[1] (*Id*., at ¶ 220). Regardless of Creech's baseless implication, this confusion over

---

[1] Prosecuting Attorney Bennetts was personally present at the Commutation Hearing. Deputy Prosecutor Longhurst represented the State of Idaho during the proceedings.

MEMORANDUM IN SUPPORT OF DEFENDANT IDAHO COMMISSION OF PARDONS AND PAROLE'S MOTION TO DISMISS AMENDED COMPLAINT - 8

names does not relate to the substance of the hearing or call into question the validity of the minutes as a whole.

Although the Ninth Circuit would have preferred a recording to determine what context the Ada County Prosecutor provided when claiming that Creech murdered Daniel Walker and got away with it and whether she claimed that the sock bearing Creech's name was the murder weapon, the Commission is not required to provide a recording or a transcript. The official record remains the minutes. As both courts found, the record of the proceedings, i.e. the minutes, support the decision reached. "[T[he Commission's decision does not appear to have been unduly influenced by either the Walker murder or the sock photograph." (Dkt. 18, pg. 14). "Creech's alleged violations do not call into doubt the stated rationales for the Commissioners' votes." (Dkt. 27, p. 12).

Creech cannot establish a legitimate basis to undermine the official record. Nor has Creech provided any information or presented a new argument that would change the prior analysis of this court or that of the Ninth Circuit. This claim must be dismissed.

3. <u>Any error was harmless beyond a reasonable doubt.</u>

The Ninth Circuit considered that even if the Ada County prosecutor gave false information to the Commission, it was harmless error utilizing the highest standard of harmless error review in *Chapman v. California*, 386 U.S. 18, 24 (1967). (Dkt. 27, pg. 12). In his Amended Complaint, Creech claims he is not required to make a showing of prejudice as applied by the Ninth Circuit. *Id.* Creech then provides five (5) reasons why prejudice exists. (Dkt. 30, ¶¶ 246-65). These assertions of prejudice are baseless and is not information that would change the Ninth Circuit's conclusion. It is undisputed that the Commission was made aware of Creech's concerns, the very same due process concerns raised in this Amended Complaint, and unanimously declined to

MEMORANDUM IN SUPPORT OF DEFENDANT IDAHO COMMISSION OF PARDONS AND PAROLE'S MOTION TO DISMISS AMENDED COMPLAINT - 9

postpone its decision "suggesting that the Commissioners did not consider either issue relevant to the denial of commutation." (Dkt. 27, pg. 15). Any error was harmless beyond a reasonable doubt.

## <u>CONCLUSION</u>

For the forgoing reasons, the Commission hereby requests this Court to dismiss Creech's Amended Complaint with prejudice.

Respectfully submitted this 29th day of March 2024.

OFFICE OF THE ATTORNEY GENERAL

*/s/ Karin Magnelli*_____
Karin Magnelli
Deputy Attorney General
Attorney for Commission

*/s/ Rebecca Strauss*_____
Rebecca Strauss
Deputy Attorney General
Attorney for Commission

MEMORANDUM IN SUPPORT OF DEFENDANT IDAHO COMMISSION OF PARDONS AND PAROLE'S MOTION TO DISMISS AMENDED COMPLAINT - 10

## CERTIFICATE OF SERVICE

I certify that on March 29, 2024, I caused to be served a true and correct copy of the foregoing via CM/ECF Electronic Notification:

Jonah Horwitz: Jonah_Horwitz@fd.org
Christopher M. Sanchez: Christopher_M_Sanchez@fd.org
*Counsel for Plaintiff*

Dayton Reed: dreed@adacounty.id.gov
*Counsel for Defendant Bennetts*

<u>/s/ Karin Magnelli</u>
Karin Magnelli
Deputy Attorney General

MEMORANDUM IN SUPPORT OF DEFENDANT IDAHO COMMISSION OF PARDONS AND PAROLE'S MOTION TO DISMISS AMENDED COMPLAINT - 11

# EXHIBIT 15

Nicole Owens
EXECUTIVE DIRECTOR
Christopher M. Sanchez, Idaho Bar No. 12070
Jonah J. Horwitz, Idaho Bar No. 10494
Assistant Federal Defenders
FEDERAL DEFENDER SERVICES OF IDAHO
702 W. Idaho Street, Suite 900, Boise, ID 83702-8929
Telephone: (208) 331-5530; Facsimile: (208) 331-5559
ECF:  Jonah_Horwitz@fd.org
          Christopher_M_Sanchez@fd.org

*Attorneys for Plaintiff Thomas Eugene Creech*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| **THOMAS EUGENE CREECH,** ) | **CASE NO. 1:24-CV-066-AKB** |
| ) | |
| Plaintiff, ) | |
| v. ) | **AMENDED COMPLAINT** |
| ) | |
| **IDAHO COMMISSION OF PARDONS** ) | |
| **AND PAROLE**; **JAN M. BENNETTS**, ) | |
| Ada County Prosecuting Attorney, in her ) | |
| official capacity, ) | |
| ) | |
| Defendants. ) | |
| ) | |
| ) | |

## I.    Nature of the Action

1.      Plaintiff Thomas Eugene Creech is a death-row inmate in Idaho who

brings this action pursuant to 42 U.S.C. § 1983 for violations of his constitutional

right to due process of law in his clemency proceeding because the prosecution[1]

---

[1] Mr. Creech will refer to the prosecution as "Idaho," "the State of Idaho," "the State," the "prosecutor," and so forth. The use of these expressions does not limit the scope of the claims, which are brought against both named defendants.

AMENDED COMPLAINT – Page 1

**152**

presented false evidence without notice at the commutation hearing before the Idaho Commission of Pardons and Parole (hereinafter "the Commission").

2.      This amended complaint is filed as of right without need to seek leave.

## II.     Justiciable Case or Controversy

3.      Mr. Creech is seeking remedies for the constitutional violations committed by the defendants.

4.      There is a real and justiciable case or controversy between the parties.

## III.    Jurisdiction and Venue

5.      This action arises under 42 U.S.C. § 1983.

6.      The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 (federal question), 1343 (civil rights violations), 2201(a) (declaratory relief), and 2202 (further relief).

7.      The Court has personal jurisdiction over the defendants as they are residents of the State of Idaho and are presently located in the State of Idaho, or are elected or appointed officials of the State of Idaho or otherwise acting on behalf of the State of Idaho.

8.      Venue in this Court is proper under 28 U.S.C. § 1391 because most of the events giving rise to the claims—including the clemency proceedings and Mr. Creech's impending execution—have occurred, are occurring, or will occur in the District of Idaho.

9.      Venue is further proper because, upon information and belief, the defendants all reside in the District of Idaho.

AMENDED COMPLAINT – Page 2

## IV.   Parties

10.    Mr. Creech is a person within the jurisdiction of the State of Idaho.

11.    Mr. Creech is an inmate under the supervision of the Idaho Department of Correction ("IDOC").

12.    Mr. Creech is confined at the Idaho Maximum Security Institution ("IMSI").

13.    Mr. Creech is under sentence of death.

14.    As set forth in greater detail below, the defendants are state officials responsible for overseeing Mr. Creech's clemency proceeding and/or prosecuting and representing the interests of the State in executing Mr. Creech in Idaho.

15.    The Commission is the agency responsible for making the initial determination with respect to petitions for commutation by death-row inmates.

16.    The Commission was responsible for deciding what information to consider in Mr. Creech's commutation proceedings, notifying the parties of the nature of that information, and providing the parties with an opportunity to respond to that information.

17.    Defendant Jan M. Bennetts is the elected Ada County Prosecuting Attorney.

18.    As such, Ms. Bennetts is the head of the Ada County Prosecutor's Office ("ACPO").

19.    The ACPO was given the primary responsibility in advocating against Mr. Creech at the commutation proceedings.

AMENDED COMPLAINT – Page 3

**154**

20.     Upon information and belief, the plaintiff and the defendants are all United States citizens.

21.     The defendants are all officials or representatives of the State of Idaho.

22.     All of the actions that have been and will be taken by the defendants towards executing Mr. Creech and any other actions at issue in this complaint were or will be taken under color of state law.

23.     The defendants are all sued in their official capacities.

**V.   General Factual Allegations**

24.     Mr. Creech incorporates each and every statement and allegation set forth throughout this complaint as if fully rewritten.

25.     Mr. Creech was convicted of first-degree murder for the killing of David Jensen and sentenced to death for that offense in Ada County District Court.

26.     Mr. Creech's murder conviction and death sentence were upheld on direct appeal in 1983.

27.     After Mr. Creech obtained federal habeas relief, he was resentenced to death.

28.     The new death sentence was upheld on direct appeal in 1998.

29.     Mr. Creech brings this action because the prosecutors presented false evidence at his commutation hearing and he was deprived of any meaningful ability to contest it before his commutation petition was denied.

AMENDED COMPLAINT – Page 4

### A.   Clemency Proceedings and the Failure to Notify Mr. Creech of False Evidence the Commission Would Consider and the Prosecution Would Raise

30.   The State obtained a warrant on October 12, 2023, setting Mr. Creech's execution for November 8, 2023.

31.   Mr. Creech filed his petition for commutation with the Commission the next day, on October 13, 2023, asking for his death sentence to be reduced to life in prison without the possibility of parole.

32.   On October 18, 2023, the Commission voted in favor of granting Mr. Creech a commutation hearing.

33.   The Commission scheduled the commutation hearing for January 19, 2024.

34.   The parties met with the Commission's Executive Director Ashley Dowell on November 7, 2023, to discuss the hearing.

35.   Director Dowell sent a letter to the parties on November 13, 2023, to memorialize the November 7 meeting.

36.   This letter outlined the rules and logistical details for the hearing and noted that the ACPO, rather than the Attorney General's Office, would be the "primary point of contact for the State's case."

37.   The Commission told Mr. Creech's counsel they were not allowed to record the commutation hearing.

38.   The Commission told the parties that neither side could object to anything that was said at the commutation hearing.

AMENDED COMPLAINT – Page 5

39.     The Commission's investigators interviewed Mr. Creech on November 8, 2023.

40.     The Commission's investigators filed a report with the Commission on December 19, 2023.

41.     After the parties had submitted materials for the Commission's consideration, the Commission made all materials provided by the State, Mr. Creech, and the Commission's investigators available to both sides in a "hearing packet" on December 20, 2023.

42.     The State's section of the hearing packet consisted of 2,952 pages of documents.

43.     The first 27 pages of the State's materials, however, were removed from the copy given to counsel for Mr. Creech with the following text: "THIS PAGE REMOVED DUE TO EXTRACTION OF VICTIM RELATED DOCUMENTS."

44.     Counsel for Mr. Creech have never seen these first 27 pages.

45.     When Mr. Creech refers to the packet here, he is referencing the pages that were made available to him.

46.     Among all the State's 2,952 pages that were provided to Mr. Creech, there was no reference to Daniel Walker ("Mr. Walker").

47.     Mr. Walker's name was also absent from the report prepared by the Commission's investigators.

48.     The hearing packet included Mr. Creech's 1994 presentence investigation report.

AMENDED COMPLAINT – Page 6

**157**

49.     Mr. Walker's name is not in Mr. Creech's 1994 presentence investigation report.

50.     Additionally absent from the State's materials were any photographs of socks.

51.     To undersigned counsel's knowledge, the State did not supplement any of its materials between December 20, 2023, and the day of the hearing on January 19, 2024.

**B.     The Prosecution Falsely Told the Commission Mr. Walker's Murder Had Been Solved and the Killer was Mr. Creech.**

52.     At the commutation hearing on January 19, 2024, the ACPO took the position that the Commission should not commute Mr. Creech's death sentence.

53.     To support its position that Mr. Creech should be executed, the prosecution told the Commission that just a week before the hearing, authorities in San Bernardino, California had solved Daniel Walker's murder and that Mr. Creech was responsible for it.

54.     The prosecutor noted as well that Mr. Creech had always been a suspect in the case.

55.     The prosecutor added that the San Bernardino District Attorney ("SBDA") wouldn't charge Mr. Creech with the Walker murder and that, as a result, he would get away with it if granted a commutation.

56.     Undersigned counsel are attorneys with the Capital Habeas Unit for Federal Defender Services of Idaho ("CHU").

AMENDED COMPLAINT – Page 7

**158**

57.     The CHU has represented Mr. Creech since 1999 and has had primary responsibility over the last twenty-five years for handling his federal habeas and state post-conviction litigation.

58.     In connection with its representation, the CHU has maintained an exhaustive file on every document it has obtained from Mr. Creech's prior attorneys as well as from public record requests, court filings, and so forth.

59.     The CHU's file did not contain any reference to Mr. Walker by name until the commutation hearing occurred.

60.     To undersigned counsel's knowledge, until the commutation hearing, no prosecutor from the ACPO had ever suggested publicly that Mr. Creech was involved in the murder of Mr. Walker.

61.     To undersigned counsel's knowledge, until the commutation hearing, no prosecutor from the ACPO had ever suggested to Mr. Creech's attorneys that he was involved in the Walker murder.

62.     No charges have ever been filed against Mr. Creech in connection with the Walker case.

63.     At the commutation hearing, the ACPO told the Commission that Mr. Creech was guilty of the 1974 Walker murder.

64.     At the commutation hearing, the ACPO told the Commission that the Walker murder case was closed a week before the hearing.

AMENDED COMPLAINT – Page 8

**159**

65.     On information and belief, the prosecutor's slides included an image of
the book Doug Walker wrote about the murder case, which is described below, and
the slides also included the date of his brother's death.

66.     One of the slides the prosecutor showed regarding the Walker case
was:

67.



AMENDED COMPLAINT – Page 9

68.     The ACPO further indicated that the Commission should consider this new information in support of a decision to deny Mr. Creech's clemency petition.

69.     The same day as the commutation hearing, the ACPO issued a press release, which included the following statement: "Earlier this week, a cold case was solved in San Bernardino, California when after law enforcement's thorough investigation, they determined Mr. Creech had murdered Daniel A. Walker in October 1974."

70.     The press release was untrue.

71.     The prosecutor's statement to the Commission about the Walker case was untrue.

72.     In fact, the case was not "solved."

73.     When the San Bernardino Sheriff's Department ("SBSD") issued a press release on January 24, 2024, it announced that Mr. Creech had been "identified as the *suspect* in the 1974 murder of Daniel Walker along Interstate 40."

74.     The SBSD release elaborated that its Cold Case Team "resumed the investigation" into the murder on November 15, 2023.

75.      It was, the release went on, only after "working with the Ada County District Attorney's Office [sic] in Idaho, [that] Cold Case Detectives were able to corroborate intimate details from statements Creech made regarding Daniel's murder."

AMENDED COMPLAINT – Page 10

76.     To undersigned counsel's knowledge, there has been no public explanation as to what these intimate details were, when they were made, and what changed in SBSD's investigation from the mid-1970s to the present.

77.     What is clear from the SBSD release is that the case has not been conclusively solved.

78.     Mr. Creech was named only as a "suspect," and the SBSD release ended by requesting that people contact the Cold Case Team if they have any additional information.

79.     The SBSD's release suggests the case remains open.

80.     As of today's date, the SBSD had not removed the Walker case from the published list of homicide cold cases on its website.

81.     The ACPO presented false evidence when it stated to the Commission that the Walker case was closed.

82.     The ACPO's additional claim that the case had been solved after a "thorough investigation" is also a misrepresentation.

83.     There is no new evidence tying Mr. Creech to the murder of Daniel Walker.

84.     To the contrary, the only evidence supposedly linking Mr. Creech to the Walker murder was a single statement rejected by law enforcement as incredible fifty years ago.

AMENDED COMPLAINT – Page 11

85. Records that have been in Mr. Creech's file for decades indicate that SBSD had sent an investigator to Idaho in 1975 to question Mr. Creech about possible killings Mr. Creech had done in San Bernardino back in 1975.

86. On April 28, 1975, Detective Dykes from SBSD questioned Mr. Creech alongside Ada County Sheriff Eldon "Chuck" Palmer.

87. The questioning on April 28, 1975 was recorded and transcribed.

88. Mr. Walker's name is never mentioned in the transcript.

89. Only Sheriff Palmer and Detective Dykes are noted as being present with Mr. Creech during the interview in the transcript.

90. During the interview there are references to what appears to have been an interview of Mr. Creech involving Detective Dykes the day before, April 27, 1975.

91. There are several references in the April 28, 1975, transcript that indicate both Detective Dykes and Sheriff Palmer had discussed the killings with Mr. Creech the day before.

92. Undersigned counsel have been unable to locate a recording or transcription of the April 27, 1975, interview.

93. In the transcript of the April 28, 1975, interview, Mr. Creech tells Detective Dykes and Sheriff Palmer elaborate stories about six people he claimed either he or his 17-year-old girlfriend Carol Spaulding killed in San Bernardino.

94. For many of these victims, Mr. Creech gives very specific directions to where he hid the bodies in the local mines.

AMENDED COMPLAINT – Page 12

**163**

95.     One of the six victims includes a young man in a van.

96.     Mr. Creech gives Detective Dykes and Sheriff Palmer various details about the killing of this man in a van: Mr. Creech tells them he was driving a "goldish" colored van; this van got stuck on the side of the freeway earlier and a truck driver helped them; they first encountered the victim when Ms. Spaulding was shopping for groceries by herself and the victim made a pass at her; they ended up running into the victim later on their trip; Mr. Creech used a shotgun in the killing; and he stole a few traveler's checks from the victim.

97.     By the time of the April 28, 1975 interview, all of the details that overlap between Mr. Creech's account and the Walker case were already widely publicized on television news programs, in newspaper stories, and paid advertisements as investigators and Mr. Walker's family sought the public's help in solving the crime.

98.     These details included the presence of a gold van, a shotgun as the weapon, and the theft of traveler's checks.

99.     It is therefore clear, under the circumstances, that Detective Dykes had in mind the Walker case when he was questioning Mr. Creech.

100.    The fact that Mr. Creech was not charged or publicly named as the suspect after the 1975 interview shows that law enforcement did not believe they had sufficient evidence.

101.    Mr. Creech was not named or pursued as a suspect because his account and the surrounding circumstances showed his confession was incredible.

AMENDED COMPLAINT – Page 13

**164**

102.    At the commutation hearing, the prosecutor noted that Daniel Walker's brother Doug Walker recently published a book about the unsolved murder entitled *Daniel, My Brother: Mystery in the Mojave*, in October 2023.

103.    According to Doug Walker's book, Daniel Walker was driving a Volkswagen van when he was killed.

104.    The book further reports that a hitchhiker named Ken Robinson was in Mr. Walker's van when the killing occurred, and he described two men in a gold GMC or Chevy van as the murderers. Mr. Robinson also got the impression that Mr. Walker knew the killers.

105.    As Doug Walker's book recounts, police later spoke with a beer truck driver who believed he had helped the murderers with their stuck vehicle an hour before the killing. This driver also described two men, one of whom was named "Sam." The truck driver further recalled the men told him they were heading to Indiana to meet up with an ex-wife or child of one of the men.

106.    Mr. Creech, in the April 28, 1975, interview, does not say he and Carol Spaulding were traveling with another man, and he is unable to remember what type of van the victim was driving despite the unique design of a Volkswagen van in comparison to others.

107.    During the same period of time, on June 17, 1975, Ms. Spaulding was questioned by law enforcement under circumstances that make clear that law enforcement were exploring the Walker crime.

AMENDED COMPLAINT – Page 14

**165**

108.    At those two interviews, Ms. Spaulding denied the allegations and informed the officers that it sounded to her like Mr. Creech was fabricating his involvement in the crime.

109.    Other aspects of the April 28, 1975 interview reveal how lacking in credibility Mr. Creech's statements were.

110.    For example, immediately after talking about the van murder, Mr. Creech launches into telling Detective Dykes and Sheriff Plamer about a ranch in Malibu, California owned by vegetarian Satanists who had a practice of advertising in the newspaper for hitchhikers that would unwittingly be used for human sacrifices.

111.    In early May 1975, Sheriff Palmer, Ada County Deputy Sheriff Tom Taylor, and Idaho State Police Investigator Bud Mason all flew to San Bernardino with Mr. Creech.

112.    The purpose of this trip was to aid the SBSD in locating the several bodies Mr. Creech claimed to have hidden in the area.

113.    There may have been further questioning about the Walker murder during this trip as well.

114.    Upon information and belief, the Sheriff gave Mr. Creech special treatment in exchange for helping law enforcement.

115.    For example, Mr. Creech was provided with beer while he and law enforcement officers drove around looking for bodies that Mr. Creech claimed to have hidden in the local mines.

AMENDED COMPLAINT – Page 15

116.    In addition, money was given to Mr. Creech for the same purpose.

117.    Mr. Creech was also given cigarettes.

118.    Mr. Creech therefore had an incentive to tell law enforcement about bodies that did not exist.

119.    The May 1975 trip to San Bernardino was unsuccessful and not a single body was recovered.

120.    At the ranch, only a cow bone was recovered.

121.    As one officer said, "it was the only $40,000 cow bone in existence."

122.    During the April 28, 1975 interview, Mr. Creech also claimed to have killed a couple who he referred to as Jerry and Donna Sage.

123.    The people that Mr. Creech referred to as the Sages were not murdered in the 1970s, or ever.

124.    The couple in fact lived for many years thereafter.

125.    In that April 28, 1975 interview, as well, Mr. Creech tells the police both he and Carol Spaulding committed various killings.

126.    Later, on September 30, 1975, Special Assistant Prosecutor Lynn Thomas, a Deputy Attorney General, filed an affidavit with the Valley County District Court stating that the State of Idaho did not believe any of Mr. Creech's statements about how he and Carol Spaulding had participated in these San Bernardino killings.

127.    After all this, Detective Dykes and SBSD appear to have ruled Mr. Creech out as a suspect in Mr. Walker's murder despite his confession.

AMENDED COMPLAINT – Page 16

**167**

128.    That is because Mr. Creech was never charged, prosecuted, or convicted for any killings in San Bernardino, or even publicly named as a suspect at the time.

129.    During the same period of time, law enforcement officials publicly linked Mr. Creech to dozens of murders, some real and others of people who seem to never have existed or who were found in good health.

130.    So far as undersigned counsel are aware, there is only one hint suggesting the existence of any information supposedly linking Mr. Creech to the Walker murder separate from the April 28, 1975 interview.

131.    That hint comes from former Ada County Deputy Sheriff Tom Taylor's letter to the Commission, which was included in the ACPO's submissions that were made part of the hearing packet.

132.    In his letter dated December 14, 2023, Mr. Taylor claims that he was present for interviews where Mr. Creech described killing a man in a van in the Barstow, California area who had a diamond ring.

133.    The April 28 transcript does not refer to a diamond ring.

134.    On information and belief, Mr. Walker did not have a diamond ring when he was killed.

135.    Counsel conducted a thorough and extensive search of their file and found no reports by Mr. Taylor or any references to one.

AMENDED COMPLAINT – Page 17

**168**

136.    The only transcript of an interview on the subject of San Bernardino murders in counsel's file is the April 28 transcript and Mr. Taylor is not recorded as being present.

137.    In his letter, Mr. Taylor also asks the Commission to deny Mr. Creech's commutation petition.

138.    The fact that the letter comes from someone actively seeking Mr. Creech's execution further undermines its credibility.

139.    On information and belief, there are only two pieces of information allegedly tying Mr. Creech to the Walker case.

140.    One is the interview conducted nearly fifty years ago.

141.    The other is the supposed fact that Mr. Taylor suddenly recalled details of a conversation that took place decades earlier.

142.    The prosecution and Mr. Taylor provided nothing to show that any such conversations were documented contemporaneously.

143.    Consequently, the "thorough investigation," referred to by the prosecutor in her press release, appears to have been reminding the SBSD about what Mr. Creech told Detective Dykes in 1975, perhaps supplemented by Mr. Taylor's new memory.

144.    According to the SBSD press release, the SBDA has been in close contact with the authorities in Ada County.

145.    There has been no word that the SBDA will seek to prosecute Mr. Creech.

AMENDED COMPLAINT – Page 18

**169**

146.    On February 22, 2024—six days before Mr. Creech's scheduled execution—the SBDA announced it would not charge Mr. Creech with the murder of Mr. Walker for "jurisdictional" reasons.

147.    The SBDA did not explain what these jurisdictional reasons were.

148.    There is nothing preventing the SBDA from charging Mr. Creech with the murder of Mr. Walker if it genuinely does believe, as it has claimed, that it can prove him guilty beyond a reasonable doubt.

149.    Both the SBDA and the SBSD plan and have planned to be spared the burden of offering any proof to the public or to a court once Mr. Creech has been executed.

150.    Here, the prosecutor at Mr. Creech's clemency hearing offered no new evidence and did not share the fruits of any thorough investigation with the Commission.

151.    Nevertheless, the prosecutor declared before the Commission that the Walker case had been closed.

152.    The prosecutor told the Commission the case had been solved.

153.    The prosecutor told the Commission that Mr. Creech was guilty of murdering Mr. Walker.

154.    The Commission considered the prosecution's claims about the Walker case when it rendered its decision.

AMENDED COMPLAINT – Page 19

**170**

155.    Undersigned counsel made several requests that the Commission postpone its decision until Mr. Creech could gather information about the Walker case.

156.    On January 22, 2024, counsel notified the Commission about the issues surrounding the State's claims regarding the Walker case and asked that it wait two months before reaching a decision so counsel could conduct an investigation into the State's new accusation.

157.    Then, on January 25, 2024, counsel updated the Commission on the discrepancy between the prosecution's statements and the SBSD press release as to whether the case was "closed."

158.    Counsel also informed the Commission that his office had timely sent out public records requests related to the Walker investigation.

159.    For both of these reasons, counsel renewed the request for two months to complete an investigation and respond to these new allegations.

160.    On January 26, 2024, Deputy Attorney General L. LaMont Anderson ("DAG Anderson") stated in a letter to the Commission that there is additional information linking Mr. Creech to the Walker murder that was undisclosed in the public statements referenced above.

161.    This additional information has, to date, never been turned over to Mr. Creech, the public, or—on information and belief—the Commission.

162.    Finally, on January 29, 2024, counsel provided the Commission with a letter and attachments further demonstrating the need for a short period of time to gather more information about the San Bernardino allegation.

163.    These requests were denied.

164.    The Commission made a final decision on Mr. Creech's commutation petition on January 29, 2024, after receiving the last letter from undersigned counsel.

165.    Three Commissioners voted in favor of commutation and three voted against.

166.    The three Commissioners who voted for denial of commutation cited the number of victims, which would have included Mr. Walker, as a reason for their decision.

167.    The Commission considered the tie vote to be a denial of the commutation petition.

168.    The prosecution obtained a death warrant the day after the Commission's decision, on January 30, 2024, setting Mr. Creech's execution for February 28, 2024.

169.    On February 22, 2024, the San Bernardino District Attorney Jason Anderson ("DA Anderson") was quoted in the press as indicating that he was not planning on charging Mr. Creech for Daniel Walker's murder.

170.    DA Anderson suggested that Mr. Creech's imminent execution presented an impediment to pursuing charges against him.

AMENDED COMPLAINT – Page 21

**172**

171.    Nevertheless, DA Anderson claimed that Mr. Creech was only named as a suspect for the Walker murder because the SBDA had evidence showing that he was guilty beyond a reasonable doubt.

172.    DA Anderson did not describe what that evidence was.

173.    On February 28, 2024, IDOC tried and failed to execute Mr. Creech.

174.    DA Anderson's office has still not filed charges against Mr. Creech for the Walker murder.

175.    There is no statute of limitations for murder.

176.    Law enforcement authorities in Idaho and in San Bernardino have therefore colluded to use the Walker case to facilitate Mr. Creech's execution while keeping all of the supposed evidence secret.

177.    In the United States, everyone has the right to jury of one's peers if facing criminal accusations by the government.

178.    In the United States, everyone has a right to a public trial.

179.    In the United States, everyone has a right to the presumption of innocence that is only overcome by proof beyond a reasonable doubt.

180.    The prosecution here stole these rights from Mr. Creech in a matter of minutes when it charged him, tried him, and convicted him of killing Daniel Walker in the mere moments it took to change a slide in their PowerPoint presentation, based on claims about secret evidence when the same accusations had been rejected by law enforcement fifty years earlier.

AMENDED COMPLAINT – Page 22

181.   This irresponsible and unfair abuse of power was intentionally designed to rob Mr. Creech of what was clearly a strong bid for clemency.

**C.     The Prosecution Falsely Told the Commission That the Murder Weapon Bore Mr. Creech's Name.**

182.   The fight that led to the death of David Jensen began when Mr. Jensen attacked Mr. Creech with a battery-filled sock.

183.   Mr. Creech took the weapon away from Mr. Jensen.

184.   Mr. Jensen then returned to his cell and brought back a toothbrush with a razor blade attached.

185.   The fight continued until Mr. Creech hit Mr. Jensen with the battery-filled sock several times.

186.   The sock broke open and some of the batteries fell out.

187.   Over the last forty-three years, there have been two principal theories for where the sock originated.

188.   Under one account, Mr. Creech provided Mr. Jensen with the sock.

189.   And under a different account it was another inmate who provided the sock.

190.   The answer would have been of great importance throughout the case because it would have either helped the State show Mr. Creech planned the whole assault in advance, as the prosecution posited, or it would have shown that some other inmate set the scheme in motion, which was one of Mr. Creech's main arguments.

191.    This dispute was particularly critical in the yearslong litigation over whether Mr. Creech was entitled to withdraw his guilty plea on the ground that his trial attorney never advised him properly about the nature of self defense.

192.    During the entire history of Mr. Creech's case, to undersigned counsel's knowledge, no one until the commutation hearing had ever maintained or even suggested the battery-filled sock had Mr. Creech's name written on it.

193.    To undersigned counsel's knowledge, none of the police reports surrounding the murder note that Mr. Creech's name is written on the sock.

194.    Detective Dan Douthit was responsible for collecting evidence at the crime scene.

195.    The official police report states that police collected "a white sock with five D cell batteries in it. There was a small amount of blood on the sock."

196.    The police were looking for evidence that the sock had belonged to Mr. Creech.

197.    The official police report states the following: "Prior to our departure, R/O along with Lt. Carr, went in and searched suspect Creech's belongings. We were looking for a matching sock to the one that was used to carry the batteries, since we could not find one in the victim's cell. We came up with three white socks, two matching, one odd. The odd one looked, to this officer, to be the matching sock to the one that was used to carry batteries."

AMENDED COMPLAINT – Page 24

198.   Even though there was a clear incentive to prove the sock belonged to Mr. Creech, no report states that the sock collected from the crime scene had his name written on it.

199.   The commutation hearing on January 19, 2024, was the first time that changed when the prosecutor clearly conveyed to the Commission that the murder-weapon sock bore Mr. Creech's name on it.

200.   The prosecutor did so by presenting the following slide:

201.



202.   The circled sock in the slide was plainly intended to represent the murder weapon.

203.    That is because the sock was meant to undermine the statement in the text on the left by Mr. Creech, which was that the *murder weapon* had the name Garza on it.

204.    The appearance of the circled sock further conveyed to the Commission that it was supposed to show the murder weapon.

205.    That is because the circled sock had discoloration on it potentially suggestive of blood.

206.    It is also because the circled sock had a hole near the toe.

207.    The hole near the toe would have suggested to the viewer that it was caused by the batteries breaking open the murder weapon.

208.    The prosecutor reminded the Commission at the hearing about how the batteries broke through the murder weapon.

209.    Nevertheless, in this Court and weeks after the commutation hearing, the ACPO later asserted that the circled sock was not meant to be the murder weapon, but rather the "odd" sock found in Mr. Creech's cell that matched the murder weapon.

210.    However, the ACPO continued to maintain that the circled sock was designed to refute Mr. Creech's statement to the Commission investigators that the murder weapon said Garza on it.

211.    The ACPO did not explain how it would refute a statement about the murder weapon having a name on it to show a sock that was not the murder weapon.

AMENDED COMPLAINT – Page 26

**177**

212.    The ACPO also did not explain what significance it would have to the offense that Mr. Creech's name was on a sock found in his own cell.

213.    In taking its new position, the ACPO relied upon the minutes produced by the Commission for the commutation hearing.

214.    The minutes seem to suggest that the prosecutor described the circled sock as the one that matched the murder weapon rather than being the murder weapon itself.

215.    On information and belief, the minutes do not accurately reflect what the prosecutor said to the Commission.

216.    On information and belief, the minutes were finalized after the Commission had been sued in this case.

217.    By that time, the Commission's interest was in closing the matter and moving on rather than faithfully determining the facts.

218.    The minutes are not a transcript.

219.    The minutes include other errors.

220.    For example, the minutes indicate that the prosecutor stated at the hearing that "she [i.e., the speaker, Jill Longhurst] has been the prosecutor of Ada County for much longer than [Jim] Harris was, and she is here in support of the death penalty today."

221.    However, what Ms. Longhurst actually referenced was *Jan Bennett*s' tenure as prosecuting attorney and her presence at the hearing.

AMENDED COMPLAINT – Page 27

222.    Thus, the minutes are not a reliable record of the words spoken at the hearing.

223.    At the Ninth Circuit, eleven days after its filing in this Court, the ACPO changed its position and told the panel during oral argument for the first time that the circled sock and the un-circled sock were *matching* socks, both found in Mr. Creech's cell.

224.    The ACPO did not explain at that time how a pair of matching socks would contradict the statement by Mr. Creech about the murder weapon that the slide was ostensibly presented to refute.

225.    The ACPO also did not explain at that time what significance it would have to the offense that Mr. Creech's name was found on one of two socks found in his cell.

226.    The two socks in the slide do not match.

227.    At the U.S. Supreme Court, three days after the Ninth Circuit oral argument, the ACPO changed its position again and described the sock as the odd one found in Mr. Creech's cell.

228.    The ACPO at that time still did not explain how the odd sock would have refuted the statement next to it on the slide or been relevant to the offense.

229.    The sock image was not included in the State's section of the hearing packet that was made available in advance to undersigned counsel.

230.    During the oral argument at the Ninth Circuit, the ACPO told the panel that it still had access to the murder weapon.

AMENDED COMPLAINT – Page 28

231.    Nonetheless, the ACPO has not produced any images of that sock to any court, to Mr. Creech's counsel, or—on information and belief—to the Commission.

232.    Previous attempts by undersigned counsel's office to access the sock and related materials have been denied over the years, including when, on July 7, 1999, the Ada County Sheriff's Office refused to make any evidence available to the CHU.

233.    Undersigned counsel sent the Commission letters on January 22, 2024, January 25, 2024, and January 29, 2024, notifying it of the facts above regarding the prosecutor's image, including that he had filed a motion with the state district court for access to the sock.

234.    As a result, counsel asked the Commission for two months so counsel could review the new evidence presented by the prosecutor on the day of the commutation hearing.

235.    Counsel's request was denied.

236.    The Commission considered the sock evidence in reaching its decision.

237.    DAG Anderson responded to two of undersigned counsel's letters regarding the sock in correspondence that was sent to the Commission on behalf of both his own office and the ACPO.

238.    In those letters, DAG Anderson continued to claim that the sock refuted Mr. Creech's statement about the name on the murder weapon.

AMENDED COMPLAINT – Page 29

**180**

239.    However, DAG Anderson did not assert in his letters that undersigned counsel was wrong in assuming that the photograph of the sock was meant to depict the murder weapon.

240.    DAG Anderson consequently left the Commission with the impression that undersigned counsel's assumption was correct and that the photograph of the sock was meant to depict the murder weapon.

241.    That is the impression the Commission had when it rendered its decision on Mr. Creech's commutation petition.

## VI.    Claim 1—The Defendants Violated Due Process.

242.    Mr. Creech incorporates each and every statement and allegation set forth throughout this complaint as if fully rewritten.

243.    The Due Process Clause of the Fourteenth Amendment applies to clemency proceedings. *See Ohio Adult Parole Auth. v. Woodard*, 523 U.S. 272, 288 (1988) (O'Connor, J., concurring); *see also id.* at 290–91 (Stevens, J., concurring in part). At a minimum, due process in clemency proceedings requires advance notice and a chance to contest evidence that will be presented against a petitioner. *Swarthout v. Cooke*, 562 U.S. 216, 220 (2011). Similarly, in the clemency context, "a lack of adequate notice of the issues to be considered implicates a fundamental right of due process." *Wilson v. U.S. Dist. Court*, 161 F.3d 1185, 1187 (9th Cir. 1998). Furthermore, "the deliberate fabrication of false evidence" is unacceptable in clemency proceedings under the Due Process Clause. *Woodard*, 523 U.S. at 291

AMENDED COMPLAINT – Page 30

**181**

(Stevens, J., concurring in part); *accord Anderson v. Davis*, 279 F.3d 674, 676 (9th Cir. 2002).

244.    The defendants violated Mr. Creech's due process rights by presenting false evidence about the Walker case and the murder weapon at Mr. Creech's commutation hearing without any prior notice to his counsel and without allowing him any opportunity after the hearing to adequately contest the misrepresentations before the Commission rendered its decision.

245.    In sum, the prosecution created the illusion of a new murder conviction as it prepared for the commutation hearing. Then, for the first time at the hearing, the prosecution revealed never-before-seen images of the murder weapon that mysteriously appeared as the prosecution prepared for the commutation hearing. The prosecution gave no notice before presenting either the false image of the sock or making the false statement about the Walker murder to the Commission. Then, the Commission, once on notice of the prosecution's due process violations, refused to allow Mr. Creech time to respond to the false information from the prosecution.

246.    Mr. Creech asserts that he is not required to make any prejudice showing in order to prevail.

247.    In the alternative, Mr. Creech alleges that any prejudice test that applies is satisfied.

248.    The reasons why prejudice is present include but are not limited to the following.

AMENDED COMPLAINT – Page 31

**182**

249.   First, the prosecution's claims about the Walker case were sensationalistic and memorable.

250.   Second, the prosecution's claims about the murder weapon were sensationalist and memorable.

251.   Third, the prosecution emphasized the Walker case to the public, which includes the Parole Commission.

252.   Specifically, Defendant Jan Bennetts put out a press release the same day as the commutation hearing, in which she mentioned only two of Mr. Creech's supposed crimes: the Jensen offense and the Walker case.

253.   The press release succeeded in generating a substantial amount of media coverage suggesting that Mr. Creech had been definitively tied to the Walker murder.

254.   Fourth, the three Commissioners who voted against commutation included in their explanation reasons that went to both the Walker case and the murder weapon.

255.   In particular, the three Commissioners in that explanation described the Jensen offense as "coldblooded."

256.   The prosecution's use of the murder weapon was a central component of its argument for why the offense was coldblooded, because it supposedly showed that Mr. Creech orchestrated the altercation rather than being attacked in an unprovoked fashion.

AMENDED COMPLAINT – Page 32

**183**

257.   This was an important issue in part as a result of the conflicting statements made by the district court regarding whether the murder weapon originated with Mr. Creech or not.

258.   In 1982, Judge Newhouse wrote that Mr. Creech "did not instigate the fight with the victim, but the victim, without provocation, attacked him."

259.   However, in 1995, Judge Newhouse found that the sock belonged to Mr. Creech.

260.   There was nothing binding the Parole Commission to the 1995 finding.

261.   Rather, the Commission was free to choose between the 1982 description and the 1995 characterization.

262.   It was therefore especially critical for each side to support its own perspective, and equally damaging for the prosecution to do so with false evidence.

263.   The three Commissioners also relied in their statement on Mr. Creech's prior offenses.

264.   As noted, the Walker case was the most dramatic of the prior offenses the prosecution accused Mr. Creech of committing at the commutation hearing.

265.   Fifth and finally, the fact that the Commission tied three-three is itself a strong indication of how close the case was, and therefore points to prejudice.

## VII.   Prayer for Relief

266.   In light of the above, Mr. Creech respectfully requests that the Court:

a)   Order the Commission to provide Mr. Creech with a new hearing where false evidence will not be presented by the prosecution.

AMENDED COMPLAINT – Page 33

**184**

b)  Alternatively, order the Commission to withdraw its decision and render a new one based only on true evidence.

c)  Enjoin the defendants from attempting to execute Mr. Creech until this Court orders otherwise.

d)  Declare that Mr. Creech's commutation proceedings were unconstitutional and that the Commission's denial of his petition was therefore legally invalid.

e)  Award damages to Mr. Creech for the harms the defendants have inflicted upon him.

f)  Authorize appropriate and necessary discovery and an evidentiary hearing to permit Mr. Creech to prove his claim.

g)  Afford Mr. Creech a jury trial on his claim.

h)  Grant any such other relief that is just and proper.

DATED this 15th day of March 2024.

/s/ *Christopher M. Sanchez*
Christopher M. Sanchez
Jonah J. Horwitz

AMENDED COMPLAINT – Page 34

**185**

## CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of March 2024, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which is designed to send a Notice of Electronic Filing to persons including the following:

Dayton P. Reed
dreed@adacounty.id.gov
Counsel for Defendant Bennetts

Karin Magnelli
kmagnell@idoc.idaho.gov
Rebecca Strauss
rstrauss@idoc.idaho.gov
Counsel for Defendant Parole Commission

/s/ Julie Hill
Julie Hill

AMENDED COMPLAINT – Page 35

**186**

# EXHIBIT 16

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| THOMAS EUGENE CREECH,<br><br>                    Plaintiff,<br><br>         v.<br><br>IDAHO COMMISSION OF PARDONS<br>AND PAROLE and JAN BENNETTS, Ada<br>County Prosecuting Attorney, in her<br>official capacity,<br><br>                    Defendants. | Case No. 1:24-cv-00066-AKB<br><br>**MEMORANDUM DECISION AND<br>ORDER DENYING PLAINTIFF'S<br>MOTION FOR PRELIMINARY<br>INJUNCTION**<br><br>FOR IMMEDIATE FILING |

Plaintiff Thomas Eugene Creech is a death-row inmate in the custody of the Idaho Department of Correction (IDOC). In 1995, Creech was sentenced to death for beating another inmate to death with a sock filled with batteries. On October 16, 2023, a state district court issued a death warrant for Creech's execution. That court subsequently stayed the warrant pending the Idaho Commission of Pardons and Parole's consideration of Creech's petition for clemency. The Commission held a hearing on that petition on January 19, 2024, and on January 29, it issued a decision denying commutation. The next day, January 30, the state district court again issued a death warrant for Creech's execution. That execution is presently scheduled for February 28.

On February 5, 2024, Creech filed this action under 42 U.S.C. § 1983, alleging the Commission and the Ada County Prosecutor's Office (ACPO) violated his due process rights during his clemency hearing. Creech requests this Court enjoin his execution during this case's pendency. Specifically, pending before the Court in this case are Creech's Motion for Preliminary Injunction (Dkt. 4), his Motion to Expedite Discovery (Dkt. 10), and Plaintiff's Motion for Leave to Submit Notice of Factual Development. (Dkt. 17).

In support of his preliminary injunction motion, Creech presents the Declaration of Christopher M. Sanchez, counsel for Creech, discussing the absence of certain evidence in Creech's litigation case files. (Dkt. 4-2). The remaining information Creech offers, including numerous newspaper articles, is not accompanied by an affidavit either authenticating or describing the information. Rather, the information is simply attached as "exhibits" to Creech's memorandum in support of his preliminary injunction motion. *See K-2 Ski Co. v. Head Ski Co.*, 467 F.2d 1087, 1088 (9th Cir. 1972) (noting basis for preliminary injunction should be supported by affidavits or verified complaint); 11A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2949 (3d ed. 2023) (noting preliminary injunction request should be supported by affidavits).

The Court finds oral argument will not significantly aid its decision-making process and decides the motions on the parties' briefing. Dist. Idaho Loc. Civ. R. 7.1(d)(1)(B). *See also* Fed. R. Civ. P. 78(b) ("By rule or order, the court may provide for submitting and determining motions on briefs, without oral hearings."). For the reasons discussed, the Court denies Creech's motions for discovery and a preliminary injunction. Although Creech will suffer irreparable harm in the absence of a preliminary injunction, he has not clearly shown a likelihood of success on the merits of his due process claim. Further, the balance of equities and the public interest weigh against granting an injunction.

## BACKGROUND

In October 2023, the Commission granted Creech a clemency hearing to decide whether to recommend that Idaho's Governor commute Creech's death sentence to a sentence of fixed life imprisonment. The Commission is generally comprised of seven commissioners. In October,

MEMORANDUM DECISION AND ORDER DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION - 2

however, one of the commissioners recused himself from participating in the hearing. (Dkt. 12-1 at ¶ 10).

The ACPO was designated to present on the State's behalf at the clemency hearing. Before the hearing, the Commission's executive director met with the parties several times and sent the parties at least two memoranda discussing in detail the procedures and process for the hearing. (Dkt. 12-2 at p. 3 (November 13, 2023 memo); Dkt. 12-2 at p. 7 (December 20, 2023 memo)). For example, these memoranda stated that:

> [C]ommutations are a matter of clemency, and the hearing is not an adversarial proceeding. As such, the parties will make presentations to the Commission, with only identified supporter(s), identified victim(s), and attorneys speaking, and will not be allowed to call witnesses for questioning, cross examine the other party, or object to what is being said during the parties' presentation time.

(Dkt. 12-2 at pp. 4, 8). Further, another memorandum stated:

> Each party will get a copy of the entire hearing packet, with all attachments and party submissions, on December 20, 2023. Victim statements have been removed from the investigative packet and will be submitted separately to the Commission. The parties agree to not make or retain any copy of the hearing packet and return their copy of the hearing packet, including all attachments and party submissions, at the conclusion of the hearing. Any further distribution of the hearing packet will be pursuant to the Idaho Public Records Act.

(*Id.* at p. 9). The record does not reflect that Creech objected to these or any of the Commission's proposed procedures or processes, including proceeding to hearing with only six commissioners. (Dkt. 12-1 at p. 10).

Per the Commission's outlined procedures, Creech, the State, and the Commission's investigators all presented materials for the Commission to consider at the hearing. On December 20, 2023, the Commission provided those materials to both parties in a "hearing packet." According to Creech, the State's materials consisted of 2,952 pages of documents, although the first twenty-seven pages were removed with the notation that they were "victim

MEMORANDUM DECISION AND ORDER DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION - 3

related documents." (Dkt. 1 at ¶¶ 41-43). Nothing in the record indicates Creech objected to not receiving these redacted materials.

The State's materials, which Creech did receive, did not contain any reference to Daniel Walker, a 1974 murder victim in San Bernardino County, California. (*Id*. at ¶¶ 47-48). At the hearing, however, the ACPO—as part of its argument against clemency—claimed that San Bernardino authorities had "solved" Walker's murder; Creech was responsible for it; and the case was "closed." (*Id*. at ¶ 52, 60). Also, on the day of the hearing, the ACPO issued a press release informing the public that Creech had murdered Walker. (*Id.* at ¶ 63). The San Bernardino Sheriff's Department also issued a press release stating Creech had been "identified as the *suspect*" in Walker's murder. (*Id*. at ¶ 66).

Creech alleges, however, that the ACPO had never publicly accused Creech of the San Bernardino murder. (*Id*. at ¶¶ 58, 121-24). Further, Creech alleges the ACPO's statements to the Commission and its press release claiming Walker's murder had been "solved" after a "thorough investigation" were false. (*Id*. at ¶¶ 64-70). It appears, however, that Creech was at least a suspect in the crime. In 1975, Creech confessed to a murder with significant similarities to Walker's murder. (*Id*. at ¶ 82-87).

Additionally, Creech alleges the ACPO revealed for the first time at the clemency hearing a photograph of a sock with Creech's name written on it in marker. This photograph was not contained in the materials provided to Creech before the hearing. (*Id.* at ¶ 49). According to Creech, there are "discrepancies" between the image of the sock presented to the Commission and the images of the crime scene. (*Id.* at ¶ 172). He suggests the photograph was compromised or fabricated. (*Id*. at ¶¶ 172-75). After the commutation hearing, Creech's counsel "made several

MEMORANDUM DECISION AND ORDER DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION - 4

requests that the Commission postpone its decision" until Creech could investigate the Walker murder and the sock photograph. (*Id.* at ¶ 126). The Commission denied these requests, however.

On January 29, 2024, the Commission issued its decision denying Creech's clemency petition and declining to recommend that the Governor commute his death-sentence. The vote was split: three commissioners voted to deny clemency, and three voted to grant clemency. Because Idaho law requires a majority of the commissioners to recommend commutations, the Commission did not recommend that the Governor commute Creech's sentence.[1]

The Commission articulated the reasoning for its decision in writing. The three Commissioners who voted in favor of a clemency recommendation explained:

> This decision was not based on any doubt or question about Mr. Creech's guilt or the horrific nature of his crime. The Commissioners do not believe Mr. Creech is worthy of mercy, but that the discretion of the Commission allows for grace to be given even when undeserved. While the Commissioners noted a possibility that Mr. Creech has changed in the years since his crime and considered his current age and health, this decision was not based on the actions and conduct of Mr. Creech. The Commissioner's decision to recommend a commutation was based on the time that has elapsed since Mr. Creech committed this horrific crime. In addition, the Commissioners were influenced by commentary from Judge Newhouse, the sentencing judge, and former Ada County deputy prosecutor Mr. Jim Harris, who no longer believe that a sentence of death is appropriate for Mr. Creech's conviction. Finally, the change in law requiring that a death sentence be decided by a jury rather than a judge also influenced the recommendation to commute Mr. Creech's sentence to life in prison without parole.

(Dkt. 12-3 at p. 42).

Meanwhile, the three Commissioners who voted against clemency reasoned:

> We do not believe Mr. Creech is worthy of grace or mercy. This decision was based on the coldblooded nature of David Dale Jensen's murder and the sheer number of

---

[1]      The Idaho Constitution grants a majority of the Commission the "power to remit fines and forfeitures, and, only as provided by statute, to grant commutations and pardons after conviction and judgment." Idaho Const., Art. IV, § 7. In cases like Creech's, where the maximum sentence is death (or life imprisonment), the Commission's decision on a clemency petition is not final; rather, a majority vote for commutation constitutes only a recommendation to the Governor, who then makes the final clemency decision. Idaho Code § 20-1016(2).

MEMORANDUM DECISION AND ORDER DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION - 5

victims that Mr. Creech has created over his lifetime, which shows that he does not place value on human life, other than his own. Mr. Creech was not interested in telling the truth about his additional crimes and violent history and was reluctant and unwilling to completely disclose the number of people he has killed. Further, the Commission believes that Mr. Creech is not capable of true remorse and would take another life if it benefitted [sic] him. He has shown he can still manipulate others to get what he wants. The Commission believes that the Jensen family would not receive justice if Mr. Creech received clemency, and above all else that they deserve closure in this case. If the Commission cannot uphold the death penalty in this case, then the death penalty means nothing in the state of Idaho.

(*Id*. at p. 43).

Following the Commission's denial of clemency, Creech filed this action alleging a single claim of relief for violation of his due process rights. Specifically, Creech alleges the Commission and ACPO violated his due process rights by:

(1) failing to give him adequate notice of the allegations and evidence the prosecution would present; (2) presenting false evidence against him regarding the murder of Daniel Walker and the status of San Bernardino's investigation into the crime; (3) presenting potentially tampered with evidence in the form of an image of a sock with Mr. Creech's name written on it; (4) failing to give notice that the prosecution would be using the image of the sock in its presentation and failing to make examination of the sock available to Mr. Creech prior to the hearing; (5) failing to allow Mr. Creech the chance to contest the evidence against him once he had informed the Commission of the issues with the prosecution's presentation; and (6) denying Mr. Creech's petition on the basis of a tie vote when he had a reasonable expectation that each side would be required to persuade the same name of Commissioners to secure a favorable outcome.

(Dkt. 1 at ¶ 180).

Creech requests a preliminary injunction prohibiting his execution "while the instant case is being litigated." (Dkt. 4 at p. 1). Ultimately, Creech seeks a new clemency hearing in which "(1) the [State] is forbidden from using false evidence against him; (2) [he] is given notice of what the [Commission] will consider in its decision; (3) he is given notice of the evidence to be used against him by the [State], and (4) he is given a reasonable amount of time to investigate the [State's] new claims raised for the first time at his clemency hearing." (Dkt. 1 at ¶ 2).

MEMORANDUM DECISION AND ORDER DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION - 6

**193**

## LEGAL STANDARD

Under Rule 65 of the Federal Rules of Civil Procedure, a party may obtain injunctive relief before final judgment in certain limited circumstances. "A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 24 (2008). A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits; he is likely to suffer irreparable harm in the absence of preliminary relief; the balance of equities tips in his favor; and an injunction is in the public interest." *Id.* at 20. The movant must carry his burden "*by a clear showing.*" *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012). "In each case, courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24.

"Under the 'serious questions' version of the test, a preliminary injunction is appropriate when a plaintiff demonstrates that 'serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor.'" *Towery v. Brewer*, 672 F.3d 650, 657 (9th Cir. 2012) (quoting *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir.2011)). "This approach requires that the elements of the preliminary injunction test be balanced, so that a stronger showing of one element may offset a weaker showing of another." *Id.* "Serious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Id.* (brackets and quotations omitted).

"[T]hese principles apply even in the context of an impending execution." *Lopez*, 680 F.3d at 1072. In applying them, the Court considers the facts in the light most favorable to Creech,

MEMORANDUM DECISION AND ORDER DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION - 7

unless a fact is "blatantly contradicted by the record[] so that no reasonable jury could believe it." *See Scott v. Harris*, 550 U.S. 372, 380 (2007) (summary judgment context).

## ANALYSIS

### 1. Clemency and Due Process

Death row inmates have no constitutional right to clemency proceedings. *See Herrera v. Collins*, 506 U.S. 390, 414 (1993).The Supreme Court has held that "pardon and commutation decisions have not traditionally been the business of courts; as such, they are rarely, if ever, appropriate subjects for judicial review." *Ohio Adult Parole Authority v. Woodard*, 523 U.S. 272, 276 (1998) (plurality) (quoting *Connecticut Bd. of Pardons v. Dumschat*, 452 U.S. 458, 464 (1981)). Because commutations are matters within the authority of a state's executive branch, clemency proceedings "are rarely, if ever, appropriate for judicial review." *Id.*; *see also Dumschat*, 452 U.S. at 464 ("A decision whether to commute a long-term sentence generally depends not simply on objective factfinding, but also on purely subjective evaluations and on predictions of future behavior by those entrusted with the decision."). In *Woodard*, the Court addressed the due process rights to which death-row inmates are entitled in a clemency proceeding. *Woodard*, however, is a plurality decision. Chief Justice Rehnquist wrote the primary decision and concluded death-row inmates have no due process rights in a clemency hearing because they received all the process to which they were entitled during trial and sentencing. *Id.* at 281 (plurality).

Justice O'Connor, however, wrote a concurring opinion rejecting the notion that "the Due Process Clause provides no constitutional safeguards" in clemency proceedings. *Id.* at 288. Rather, she concluded "some *minimal* procedural safeguards apply to clemency proceedings." *Id.* at 289. By way of example, she stated that "judicial intervention might . . . be warranted in the face of a scheme whereby a state official flipped a coin to determine whether to grant clemency, or in a case

MEMORANDUM DECISION AND ORDER DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION - 8

where the State arbitrarily denied a prisoner any access to his clemency process." *Id.* at 289. By contrast, she rejected Woodard's claim that his due process rights were violated because he did not have adequate notice; he did not have a meaningful opportunity to prepare his petition; his counsel was improperly excluded from an interview and the clemency hearing; and he was precluded from testifying or submitting documentary evidence at the hearing. *Id.* at 289-90.

Three other Justices joined in Justice O'Connor's concurrence, and another Justice agreed with her rejection of Chief Justice Rehnquist's conclusion that an inmate has no due process rights in a clemency hearing. *Id.* at 288 (noting Justices Souter, Ginsburg, and Breyer joining); *id.* at 291 (noting Justice Stevens writing separately and rejecting conclusion that no due process rights exist in clemency hearing). Accordingly, Justice O'Connor's concurring opinion concluding some minimal procedural safeguards apply in clemency proceedings is the controlling law. *See Marks v. United States*, 430 U.S. 188, 193 (1977) (noting in fractured opinions "the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds") (internal quotation marks omitted); *see also Anderson v. Davis*, 279 F.3d 674, 676 (9th Cir. 2002) (ruling inmate failed to demonstrate substantial likelihood of success on merits in challenging Governor's blanket denial of clemency applications).

A federal appellate court, however, is not authorized "to review the substantive merits of a clemency proceeding." *Workman v. Bell*, 245 F.3d 849, 852 (6th Cir. 2001). The reason for this rule is twofold. First, *Woodard* at most authorizes only limited judicial review for some minimal procedural due process safeguards. 523 U.S. at 289; *see also Anderson*, 279 F.3d at 676 (relying on *Woodard*). Second, generally the record of the clemency hearing is inadequate—as in this case—to conduct a substantive judicial review of the merits. For example, in this case, the parties' written submissions to the Commission are not in the record, and their oral presentations were not

recorded and officially transcribed. Rather, apparently only "minutes" were recorded. (Dkt. 11-1 at pp. 8-21).

In resolving Creech's preliminary injunction motion, the Court relies on Justice O'Connor's decision in *Woodard* and considers whether Creech has clearly shown a substantial likelihood of success of demonstrating Defendants violated his due process rights because they deprived him of minimal due process safeguards. The Court declines, however, to address Creech's allegations regarding the substantive merits of the proceeding, including the validity of the evidence. A review of the merits is beyond this Court's authority.

**2.      Likelihood of Success on the Merits**

Creech fails to clearly show he is likely to succeed on the merits of his due process claim. Due process is a flexible concept, and the determination of what procedural protections are required in any given situation depends on the nature of the proceeding. *Wolff v. McDonnell*, 418 U.S. 539, 560 (1974). For example, the Due Process Clause requires fewer procedural protections for a parole hearing versus a criminal trial. *See Morrissey v. Brewer*, 408 U.S. 471, 480 (1972) ("[T]he revocation of parole is not part of a criminal prosecution and thus the full panoply of rights due a defendant in such a proceeding does not apply to parole revocations.").

By the same token, a parolee has a right to more procedural due process in a revocation hearing than a clemency petitioner has in a clemency proceeding. *Compare id.* at 488-89 ("[T]he minimum requirements of due process [in a parole revocation proceeding] include (a) written notice of the claimed violations of parole; (b) disclosure to the parolee of evidence against him; (c) opportunity to be heard in person and to present witnesses and documentary evidence; (d) the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation); (e) a neutral and detached hearing

MEMORANDUM DECISION AND ORDER DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION - 10

body such as a traditional parole board, members of which need not be judicial officers or lawyers; and (f) a written statement by the factfinders as to the evidence relied on and reasons for revoking parole.") (internal quotation marks omitted), *with Woodard*, 523 U.S. at 289 (O'Connor, J., concurring) (concluding that only "*minimal*" due process protections are required in the clemency context).

In this case, the Court has carefully and thoroughly reviewed the record, considered the procedures for Creech's clemency hearing, and finds the Commission provided Creech more than minimal due process in conducting the hearing. For example, Creech was granted a commutation hearing. He had notice of that hearing. The Commissioner's executive director met several times with the parties about the hearing before it occurred. The director provided the parties with information regarding "the rules and logistical details for the hearing." (Dkt. 1 at ¶¶ 34-38). The Commission required the ACPO to submit materials and provided Creech with copies of those materials before the hearing. (*Id*. ¶ 41). The Commission allowed Creech to present information at the hearing and gave him an opportunity to speak on his behalf. Finally, the Commission deliberated and issued a written decision explaining the commissioners' reasoning.

Creech challenges these procedures by eliding the distinction between the amount and type of due process afforded parolees and inmates seeking parole versus clemency petitioners. He relies on *Swarthout v. Cooke*, 562 U.S. 216, 220 (2011) (per curiam), for the proposition that "[a]t a minimum, due process in clemency proceedings requires advance notice and a chance to contest evidence that will be presented against a petitioner." (Dkt. at ¶ 179). *Swarthout* addresses the due process requirement in the context of parole hearing, however. *Swarthout*, 562 U.S. at 216-17. It does not establish that this same due process is required in a clemency hearing. Moreover, the procedures the Commission provided Creech during the clemency hearing likely would have

satisfied the due process requirements even for a parole hearing. *See id.* at 220 (noting prisoner subject to parole statute "received adequate process when he was allowed an opportunity to be heard and was provided a statement of reasons why parole was denied.").

Creech's reliance on *Lankford v. Idaho*, 500 U.S. 110 (1991), and *Wilson v. U.S. Dist. Court*, 161 F.3d 1185 (9th Cir. 1998), to argue that he had a right to notice of the ACPO's intention to refer to Walker's murder and show the sock photograph is also misplaced. *Lankford* is distinguishable because it did not involve a clemency proceeding; rather, in that case the defendant challenged the prosecution's failure to notify him that it intended to seek the death penalty. *Id.* at 500 U.S. at 119. A defendant's due process rights in that context are greater than in a clemency proceeding.

Similarly, *Wilson* is distinguishable, even though it involved a clemency proceeding. In *Wilson*, the governor informed the petitioner that the governor would not consider exculpatory evidence but then denied clemency specifically because the petitioner failed to present exculpatory evidence. *Wilson*, 161 F.3d at 1186-87. Based on this fact, the Ninth Circuit concluded the petitioner had stated "a claim of a violation of due process." *Id.* Contrary to *Wilson*, Creech does not allege the decisionmaker in his case—the Commission—misled him in any respect.

Creech has cited no authority that the ACPO was required to provide him with notice of *all* the information it intended to show or discuss during the clemency hearing. That the Commission permitted the parties to view most of the information before the hearing did not create a protectable interest in a right to receive the ACPO's presentation in its entirety before the hearing. Further, because Creech does not have a constitutional right to a clemency hearing, it necessarily follows he does not have a due process right to post-hearing proceedings including, for example, discovery regarding the clemency proceeding.

MEMORANDUM DECISION AND ORDER DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION - 12

Creech also does not cite any authority in support of his assertion that the Commission violated his due process rights by proceeding to the clemency hearing with only six commissioners. Creech does not contend he was surprised by this fact; he was on notice that Idaho law required a majority vote of the Commission for a recommendation of clemency; and he, notably, did not object to the lack of a seventh commissioner.

As Creech acknowledges, "[t]he Commission went to a great deal of trouble and expense to organize a lengthy and complex commutation hearing in a capital case, after months of preparation and logistics involving a large number of people." (Dkt. 15 at p. 8). Based on a review of the procedures the Commission provided Creech, the Court finds Creech fails to show a substantial likelihood of success on the merits of his claim that his due process rights were violated. The record shows Creech received more than the constitutionally required minimum procedural protections.

Finally, although the Court declines to review the merits of Creech's claim, it notes that Creech alleges in his complaint that "the prosecution reveal[ed] a photo of the murder weapon for the first time" at the clemency hearing. (Dkt. 1 at § V(C)). The minutes, however, contradict this allegation. Rather than showing the murder weapon—namely the sock containing batteries—the ACPO apparently showed a photograph of the sock purportedly matching the murder weapon. (Dkt. 11-1 at p. 20 ("[The prosecutor] displayed a photograph of the matching sock that was found in [Creech's] cell.  The name on the sock is 'Creech.'")).

Further, although the ACPO did apparently state during the hearing that "Creech was positively identified as [Walker's] murderer" (Dkt. 11-1 at p. 14), the minutes show the ACPO discussed numerous other murders Creech allegedly committed. Creech, however, does not dispute

those murders, and it is already an established fact that Creech has committed multiple murders.

As Justice O'Connor stated:

> The facts underlying this case could not be more chilling. Thomas Creech has admitted to killing or participating in the killing of at least 26 people. The bodies of 11 of his victims—who were shot, stabbed, beaten, or strangled to death—have been recovered in seven States. Creech has said repeatedly that, unless he is completely isolated from humanity, he likely will continue killing. And he has identified by name three people outside prison walls he intends to kill if given the opportunity.

*Arave v. Creech*, 507 U.S. 463, 465-66 (1993). Finally, the Commission's decision does not appear to have been unduly influenced by either the Walker murder or the sock photograph. The Commission did not mention either when explaining its decision.

**3.    Irreparable Harm**

The Commission argues Creech will not suffer irreparable injury if denied injunctive relief, citing *Powell v. Thomas*, 784 F. Supp. 2d 1070 (M.D. Ala. 2011). In that case, the court ruled the petitioner failed to show irreparable harm because he failed to establish a substantial likelihood of success on the merits of his claim. *Id.* at 1283. *Powell*, however, is contrary to Ninth Circuit law. The Ninth Circuit has recognized that "every § 1983 plaintiff in an injunction appeal involving an upcoming execution" demonstrates irreparable harm. *Towery*, 672 F.3d at 661. Moreover, this Court has previously rejected the argument that irreparable harm requires something more than the plaintiff's death and the inability to continue litigation. *Rhoades v. Reinke*, 830 F. Supp. 2d 1046, 1070-71 (D. Idaho) ("[T]he harm in this instance is Rhoades's death [from execution] and his inability to continue with the litigation, and . . . this harm is irreparable if a stay is not granted."), *aff'd*, 671 F.3d 856 (9th Cir. 2011). Accordingly, the Court concludes Creech has made a clear showing he will likely suffer irreparable harm in the absence of preliminary relief if IDOC proceeds with the execution.

**4.      Balance of Equities and Public Interest**

As noted above, "[u]nder the 'serious questions' version of the test, a preliminary injunction is appropriate when a plaintiff demonstrates that 'serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor.'" *Id.* at 657. Creech, however, has failed to demonstrate "serious questions going to the merits" because he fails to clearly show a likelihood of success on the merits of his claim. Moreover, the balance of equities and public interest do not weigh sharply in Creech's favor.

The Supreme Court has stated a State has a "strong interest in enforcing its criminal judgments without undue interference from federal courts." *Hill v. McDonough*, 547 U.S. 573, 584 (2006). Likewise, crime victims "have an important interest in the timely enforcement of a sentence." *Id.* These interests are especially strong in cases in which the legal proceedings have continued for many years. *Bible v. Schriro,* 651 F.3d 1060, 1066 (9th Cir.2011) ("[T]he further delay from a stay [of execution] would cause hardship and prejudice to the State and victims, given that the appellate process in this case has already spanned more than two decades."). Further, the Supreme Court has held a State has a compelling interest in finality and is entitled to the assurance of finality after years of lengthy proceedings have run their course and once a mandate has issued denying habeas relief. *Calderon v. Thompson*, 523 U.S. 538, 556 (1998). "Only with real finality can the victims of crime move forward . . . ." *Id.* "To unsettle these expectations is to inflict a profound injury to the powerful and legitimate interest in punishing the guilty." *Id.* (quotation omitted).

The history of Creech's federal proceedings is too long and complicated to recount here. In brief, Creech has sought relief from his death sentence in the federal courts since the reimposition of his death penalty in 1995—almost thirty years of litigation. Recently, the Supreme

MEMORANDUM DECISION AND ORDER DENYING PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION - 15

Court denied Creech's petition for certiorari challenging the Ninth Circuit's denial of his second amended habeas petition. *Creech v. Richardson*, 59 F.4th 372 (9th Cir. 2023) *cert. denied* 114 S. Ct. 291 (Oct. 10, 2023). A few days later, on October 13, 2023, Creech filed his third federal habeas petition alleging that evolving standards of decency render his death sentence unconstitutional. *Creech v. Richardson*, No. 1:23-cv-00463-AKB. This Court concluded it lacked jurisdiction over Creech's unauthorized successive petition under 28 U.S.C. § 2244(b), and that decision is now on emergency appeal. *Creech*, No. 1:23-cv-00463-AKB at Dkts. 15, 17.

A few days after Creech filed his third federal habeas petition, the Ninth Circuit issued the mandate on its decision remanding another of Creech's civil rights cases to this Court, in which Creech has attempted under § 1983 to challenge the State's execution protocol since March 2020. *See Creech v. Tewalt*, 84 F.4th 777, 783 (9th Cir. 2023). Although the Court allowed Creech to amend his complaint—for a third time—to attempt to allege viable claims, his less than clear showing in support of his preliminary injunction motion demonstrates he is unlikely to succeed on the merits of any of his claims. Finally, Creech filed this action on February 5, 2024, challenging the Commission's denial of his clemency petition. This litigation history demonstrates an instance in which the State's and the victims' interests in finality are especially strong given the lengthy legal proceedings that have delayed the State's timely enforcement of Creech's sentence. Accordingly, the Court concludes the balance of equities and public interest are not in Creech's favor.

Because Creech fails to make a clear showing of a likelihood of success on the merits of claim that the Commission and ACPO violated his due process rights and because the balance of equities and the public interest weigh against granting a preliminary injunction, the Court denies Creech's request for an injunction, even though he will suffer irreparable harm as a result.

MEMORANDUM DECISION AND ORDER DENYING PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION - 16

**5.      Evidentiary Hearing**

The Court disagrees it must hold an evidentiary hearing before denying Creech's request for injunctive relief, as Creech asserts. The Ninth Circuit has ruled that a court does not need to have a hearing on a motion for a preliminary injunction where the essential facts are not in dispute. *Charlton v. Est. of Charlton*, 841 F.2d 988, 989 (9th Cir. 1988). Further, a hearing is unnecessary when "the movant has not presented a colorable factual basis to support the claim on the merits or the contention of irreparable harm." *Bradley v. Pittsburgh Bd. of Educ.*, 910 F.2d 1172, 1176 (3rd Cir. 1990). The Court finds that in this case, Creech has failed to present a colorable factual basis to support his claim that the clemency hearing violated his due process rights.

Further, the Court declines to grant Creech's Motion to Expedite Discovery. As stated above, Creech has no constitutional right to a clemency hearing; he likewise has no constitutional right to conduct discovery to challenge that hearing. The Court concludes Creech has failed to show good cause to conduct discovery.

## ORDER

**IT IS ORDERED:**

1.      Plaintiff's Motion for Preliminary Injunction (Dkt. 4) is **DENIED**.

2.      Plaintiff's Motion to Expedite Discovery (Dkt. 10) is **DENIED**.

3.      Plaintiff's Motion for Leave to Submit Notice of Factual Development (Dkt. 17) is **GRANTED**.

DATED: February 23, 2024

Amanda K. Brailsford
U.S. District Court Judge

MEMORANDUM DECISION AND ORDER DENYING PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION - 17

# EXHIBIT 17

2024 WL 756308
Only the Westlaw citation is currently available.
United States District Court, D. Idaho.

Thomas Eugene CREECH, Plaintiff,

v.

IDAHO COMMISSION OF PARDONS AND
PAROLE and Jan Bennetts, Ada County Prosecuting
Attorney, in her official capacity, Defendants.

Case No. 1:24-cv-00066-AKB
|
Signed February 23, 2024

**Attorneys and Law Firms**

Deborah A. Czuba, Jonah J. Horwitz, Mary Elizabeth Spears, Nicole R. Gabriel, Jonah Horwitz, Christopher Sanchez, Federal Defender Services of Idaho Inc., Boise, ID, for Plaintiff.

Mary Karin Magnelli, Rebecca Strauss, Office of the Attorney General, Boise, ID, for Defendant Idaho Commission of Pardons and Parole.

Dayton Patrick Reed, Ada County Prosecutor's Office, Boise, ID, for Defendant Jan M. Bennetts.

## MEMORANDUM DECISION AND ORDER DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

Amanda K. Brailsford, United States District Court Judge

**\*1** Plaintiff Thomas Eugene Creech is a death-row inmate in the custody of the Idaho Department of Correction (IDOC). In 1995, Creech was sentenced to death for beating another inmate to death with a sock filled with batteries. On October 16, 2023, a state district court issued a death warrant for Creech's execution. That court subsequently stayed the warrant pending the Idaho Commission of Pardons and Parole's consideration of Creech's petition for clemency. The Commission held a hearing on that petition on January 19, 2024, and on January 29, it issued a decision denying commutation. The next day, January 30, the state district court again issued a death warrant for Creech's execution. That execution is presently scheduled for February 28.

On February 5, 2024, Creech filed this action under 42 U.S.C. § 1983, alleging the Commission and the Ada County Prosecutor's Office (ACPO) violated his due process rights during his clemency hearing. Creech requests this Court enjoin his execution during this case's pendency. Specifically, pending before the Court in this case are Creech's Motion for Preliminary Injunction (Dkt. 4), his Motion to Expedite Discovery (Dkt. 10), and Plaintiff's Motion for Leave to Submit Notice of Factual Development. (Dkt. 17).

In support of his preliminary injunction motion, Creech presents the Declaration of Christopher M. Sanchez, counsel for Creech, discussing the absence of certain evidence in Creech's litigation case files. (Dkt. 4-2). The remaining information Creech offers, including numerous newspaper articles, is not accompanied by an affidavit either authenticating or describing the information. Rather, the information is simply attached as "exhibits" to Creech's memorandum in support of his preliminary injunction motion. *See* K-2 Ski Co. v. Head Ski Co., 467 F.2d 1087, 1088 (9th Cir. 1972) (noting basis for preliminary injunction should be supported by affidavits or verified complaint); 11A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2949 (3d ed. 2023) (noting preliminary injunction request should be supported by affidavits).

The Court finds oral argument will not significantly aid its decision-making process and decides the motions on the parties' briefing. Dist. Idaho Loc. Civ. R. 7.1(d)(1)(B). *See also* Fed. R. Civ. P. 78(b) ("By rule or order, the court may provide for submitting and determining motions on briefs, without oral hearings."). For the reasons discussed, the Court denies Creech's motions for discovery and a preliminary injunction. Although Creech will suffer irreparable harm in the absence of a preliminary injunction, he has not clearly shown a likelihood of success on the merits of his due process claim. Further, the balance of equities and the public interest weigh against granting an injunction.

## BACKGROUND

In October 2023, the Commission granted Creech a clemency hearing to decide whether to recommend that Idaho's Governor commute Creech's death sentence to a sentence of fixed life imprisonment. The Commission is generally comprised of seven commissioners. In October, however, one

of the commissioners recused himself from participating in the hearing. (Dkt. 12-1 at ¶ 10).

 **\*2**  The ACPO was designated to present on the State's behalf at the clemency hearing. Before the hearing, the Commission's executive director met with the parties several times and sent the parties at least two memoranda discussing in detail the procedures and process for the hearing. (Dkt. 12-2 at p. 3 (November 13, 2023 memo); Dkt. 12-2 at p. 7 (December 20, 2023 memo)). For example, these memoranda stated that:

> [C]ommutations are a matter of clemency, and the hearing is not an adversarial proceeding. As such, the parties will make presentations to the Commission, with only identified supporter(s), identified victim(s), and attorneys speaking, and will not be allowed to call witnesses for questioning, cross examine the other party, or object to what is being said during the parties' presentation time.

(Dkt. 12-2 at pp. 4, 8). Further, another memorandum stated:

> Each party will get a copy of the entire hearing packet, with all attachments and party submissions, on December 20, 2023. Victim statements have been removed from the investigative packet and will be submitted separately to the Commission. The parties agree to not make or retain any copy of the hearing packet and return their copy of the hearing packet, including all attachments and party submissions, at the conclusion of the hearing. Any further distribution of the hearing packet will be pursuant to the Idaho Public Records Act.

(*Id.* at p. 9). The record does not reflect that Creech objected to these or any of the Commission's proposed procedures

or processes, including proceeding to hearing with only six commissioners. (Dkt. 12-1 at p. 10).

Per the Commission's outlined procedures, Creech, the State, and the Commission's investigators all presented materials for the Commission to consider at the hearing. On December 20, 2023, the Commission provided those materials to both parties in a "hearing packet." According to Creech, the State's materials consisted of 2,952 pages of documents, although the first twenty-seven pages were removed with the notation that they were "victim related documents." (Dkt. 1 at ¶¶ 41-43). Nothing in the record indicates Creech objected to not receiving these redacted materials.

The State's materials, which Creech did receive, did not contain any reference to Daniel Walker, a 1974 murder victim in San Bernardino County, California. (*Id.* at ¶¶ 47-48). At the hearing, however, the ACPO—as part of its argument against clemency—claimed that San Bernardino authorities had "solved" Walker's murder; Creech was responsible for it; and the case was "closed." (*Id.* at ¶ 52, 60). Also, on the day of the hearing, the ACPO issued a press release informing the public that Creech had murdered Walker. (*Id.* at ¶ 63). The San Bernardino Sheriff's Department also issued a press release stating Creech had been "identified as the *suspect*" in Walker's murder. (*Id.* at ¶ 66).

Creech alleges, however, that the ACPO had never publicly accused Creech of the San Bernardino murder. (*Id.* at ¶¶ 58, 121-131). Further, Creech alleges the ACPO's statements to the Commission and its press release claiming Walker's murder had been "solved" after a "thorough investigation" were false. (*Id.* at ¶¶ 64-70). It appears, however, that Creech was at least a suspect in the crime. In 1975, Creech confessed to a murder with significant similarities to Walker's murder. (*Id.* at ¶ 82-87).

Additionally, Creech alleges the ACPO revealed for the first time at the clemency hearing a photograph of a sock with Creech's name written on it in marker. This photograph was not contained in the materials provided to Creech before the hearing. (*Id.* at ¶ 49). According to Creech, there are "discrepancies" between the image of the sock presented to the Commission and the images of the crime scene. (*Id.* at ¶ 172). He suggests the photograph was compromised or fabricated. (*Id.* at ¶¶ 172-75). After the commutation hearing, Creech's counsel "made several requests that the Commission postpone its decision" until Creech could investigate the

Walker murder and the sock photograph. (*Id.* at ¶ 126). The Commission denied these requests, however.

 **\*3** On January 29, 2024, the Commission issued its decision denying Creech's clemency petition and declining to recommend that the Governor commute his death-sentence. The vote was split: three commissioners voted to deny clemency, and three voted to grant clemency. Because Idaho law requires a majority of the commissioners to recommend commutations, the Commission did not recommend that the Governor commute Creech's sentence. [1]

The Commission articulated the reasoning for its decision in writing. The three Commissioners who voted in favor of a clemency recommendation explained:

> This decision was not based on any doubt or question about Mr. Creech's guilt or the horrific nature of his crime. The Commissioners do not believe Mr. Creech is worthy of mercy, but that the discretion of the Commission allows for grace to be given even when undeserved. While the Commissioners noted a possibility that Mr. Creech has changed in the years since his crime and considered his current age and health, this decision was not based on the actions and conduct of Mr. Creech. The Commissioner's decision to recommend a commutation was based on the time that has elapsed since Mr. Creech committed this horrific crime. In addition, the Commissioners were influenced by commentary from Judge Newhouse, the sentencing judge, and former Ada County deputy prosecutor Mr. Jim Harris, who no longer believe that a sentence of death is appropriate for Mr. Creech's conviction. Finally, the change in law requiring that a death sentence be decided by a jury rather than a judge also influenced the recommendation to commute Mr.

Creech's sentence to life in prison without parole.

(Dkt. 12-3 at p. 42).

Meanwhile, the three Commissioners who voted against clemency reasoned:

> We do not believe Mr. Creech is worthy of grace or mercy. This decision was based on the coldblooded nature of David Dale Jensen's murder and the sheer number of victims that Mr. Creech has created over his lifetime, which shows that he does not place value on human life, other than his own. Mr. Creech was not interested in telling the truth about his additional crimes and violent history and was reluctant and unwilling to completely disclose the number of people he has killed. Further, the Commission believes that Mr. Creech is not capable of true remorse and would take another life if it benefitted [sic] him. He has shown he can still manipulate others to get what he wants. The Commission believes that the Jensen family would not receive justice if Mr. Creech received clemency, and above all else that they deserve closure in this case. If the Commission cannot uphold the death penalty in this case, then the death penalty means nothing in the state of Idaho.

(*Id.* at p. 43).

Following the Commission's denial of clemency, Creech filed this action alleging a single claim of relief for violation of his due process rights. Specifically, Creech alleges the Commission and ACPO violated his due process rights by:

> **\*4** (1) failing to give him adequate notice of the allegations and evidence

Creech v. Idaho Commission of Pardons and Parole, Slip Copy (2024)

the prosecution would present; (2) presenting false evidence against him regarding the murder of Daniel Walker and the status of San Bernardino's investigation into the crime; (3) presenting potentially tampered with evidence in the form of an image of a sock with Mr. Creech's name written on it; (4) failing to give notice that the prosecution would be using the image of the sock in its presentation and failing to make examination of the sock available to Mr. Creech prior to the hearing; (5) failing to allow Mr. Creech the chance to contest the evidence against him once he had informed the Commission of the issues with the prosecution's presentation; and (6) denying Mr. Creech's petition on the basis of a tie vote when he had a reasonable expectation that each side would be required to persuade the same name of Commissioners to secure a favorable outcome.

(Dkt. 1 at ¶ 180).

Creech requests a preliminary injunction prohibiting his execution "while the instant case is being litigated." (Dkt. 4 at p. 1). Ultimately, Creech seeks a new clemency hearing in which "(1) the [State] is forbidden from using false evidence against him; (2) [he] is given notice of what the [Commission] will consider in its decision; (3) he is given notice of the evidence to be used against him by the [State], and (4) he is given a reasonable amount of time to investigate the [State's] new claims raised for the first time at his clemency hearing." (Dkt. 1 at ¶ 2).

## LEGAL STANDARD

Under Rule 65 of the Federal Rules of Civil Procedure, a party may obtain injunctive relief before final judgment in certain limited circumstances. "A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 24 (2008). A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits; he is likely to suffer irreparable harm in the absence of preliminary relief; the balance of equities tips in his favor; and an injunction is in the public interest." *Id.* at 20. The movant must carry his burden "*by a clear showing.*" *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012). "In each case, courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24.

"Under the 'serious questions' version of the test, a preliminary injunction is appropriate when a plaintiff demonstrates that 'serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor.' " *Towery v. Brewer*, 672 F.3d 650, 657 (9th Cir. 2012) (quoting *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir.2011)). "This approach requires that the elements of the preliminary injunction test be balanced, so that a stronger showing of one element may offset a weaker showing of another." *Id.* "Serious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Id.* (brackets and quotations omitted).

"[T]hese principles apply even in the context of an impending execution." *Lopez*, 680 F.3d at 1072. In applying them, the Court considers the facts in the light most favorable to Creech, unless a fact is "blatantly contradicted by the record[] so that no reasonable jury could believe it." *See Scott v. Harris*, 550 U.S. 372, 380 (2007) (summary judgment context).

## ANALYSIS

### 1. Clemency and Due Process

Death row inmates have no constitutional right to clemency proceedings. *See Herrera v. Collins*, 506 U.S. 390, 414 (1993).The Supreme Court has held that "pardon and commutation decisions have not traditionally been the business of courts; as such, they are rarely, if ever, appropriate subjects for judicial review." *Ohio Adult Parole Authority v. Woodard*, 523 U.S. 272, 276 (1998) (plurality) (quoting *Connecticut Bd. of Pardons v. Dumschat*, 452 U.S. 458, 464 (1981)). Because commutations are matters within the authority of a state's executive branch, clemency proceedings "are rarely, if ever, appropriate for judicial review." *Id.*; *see also Dumschat*, 452 U.S. at 464 ("A decision whether to commute a long-term sentence generally depends not

simply on objective factfinding, but also on purely subjective evaluations and on predictions of future behavior by those entrusted with the decision."). In *Woodard*, the Court addressed the due process rights to which death-row inmates are entitled in a clemency proceeding. *Woodard*, however, is a plurality decision. Chief Justice Rehnquist wrote the primary decision and concluded death-row inmates have no due process rights in a clemency hearing because they received all the process to which they were entitled during trial and sentencing. *Id.* at 281 (plurality).

**\*5** Justice O'Connor, however, wrote a concurring opinion rejecting the notion that "the Due Process Clause provides no constitutional safeguards" in clemency proceedings. *Id.* at 288. Rather, she concluded "some *minimal* procedural safeguards apply to clemency proceedings." *Id.* at 289. By way of example, she stated that "judicial intervention might ... be warranted in the face of a scheme whereby a state official flipped a coin to determine whether to grant clemency, or in a case where the State arbitrarily denied a prisoner any access to his clemency process." *Id.* at 289. By contrast, she rejected Woodard's claim that his due process rights were violated because he did not have adequate notice; he did not have a meaningful opportunity to prepare his petition; his counsel was improperly excluded from an interview and the clemency hearing; and he was precluded from testifying or submitting documentary evidence at the hearing. *Id.* at 289-90.

Three other Justices joined in Justice O'Connor's concurrence, and another Justice agreed with her rejection of Chief Justice Rehnquist's conclusion that an inmate has no due process rights in a clemency hearing. *Id.* at 288 (noting Justices Souter, Ginsburg, and Breyer joining); *id.* at 291 (noting Justice Stevens writing separately and rejecting conclusion that no due process rights exist in clemency hearing). Accordingly, Justice O'Connor's concurring opinion concluding some minimal procedural safeguards apply in clemency proceedings is the controlling law. *See Marks v. United States*, 430 U.S. 188, 193 (1977) (noting in fractured opinions "the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds") (internal quotation marks omitted); *see also Anderson v. Davis*, 279 F.3d 674, 676 (9th Cir. 2002) (ruling inmate failed to demonstrate substantial likelihood of success on merits in challenging Governor's blanket denial of clemency applications).

A federal appellate court, however, is not authorized "to review the substantive merits of a clemency proceeding."

*Workman v. Bell*, 245 F.3d 849, 852 (6th Cir. 2001). The reason for this rule is twofold. First, *Woodard* at most authorizes only limited judicial review for some minimal procedural due process safeguards. 523 U.S. at 289; *see also Anderson*, 279 F.3d at 676 (relying on *Woodard*). Second, generally the record of the clemency hearing is inadequate —as in this case—to conduct a substantive judicial review of the merits. For example, in this case, the parties' written submissions to the Commission are not in the record, and their oral presentations were not recorded and officially transcribed. Rather, apparently only "minutes" were recorded. (Dkt. 11-1 at pp. 8-21).

In resolving Creech's preliminary injunction motion, the Court relies on Justice O'Connor's decision in *Woodard* and considers whether Creech has clearly shown a substantial likelihood of success of demonstrating Defendants violated his due process rights because they deprived him of minimal due process safeguards. The Court declines, however, to address Creech's allegations regarding the substantive merits of the proceeding, including the validity of the evidence. A review of the merits is beyond this Court's authority.

**2. Likelihood of Success on the Merits**

Creech fails to clearly show he is likely to succeed on the merits of his due process claim. Due process is a flexible concept, and the determination of what procedural protections are required in any given situation depends on the nature of the proceeding. *Wolff v. McDonnell*, 418 U.S. 539, 560 (1974). For example, the Due Process Clause requires fewer procedural protections for a parole hearing versus a criminal trial. *See Morrissey v. Brewer*, 408 U.S. 471, 480 (1972) ("[T]he revocation of parole is not part of a criminal prosecution and thus the full panoply of rights due a defendant in such a proceeding does not apply to parole revocations.").

**\*6** By the same token, a parolee has a right to more procedural due process in a revocation hearing than a clemency petitioner has in a clemency proceeding. *Compare id.* at 488-89 ("[T]he minimum requirements of due process [in a parole revocation proceeding] include (a) written notice of the claimed violations of parole; (b) disclosure to the parolee of evidence against him; (c) opportunity to be heard in person and to present witnesses and documentary evidence; (d) the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation); (e) a neutral and detached hearing body such as a traditional parole board, members of which need not be judicial officers or lawyers; and (f) a

Creech v. Idaho Commission of Pardons and Parole, Slip Copy (2024)

written statement by the factfinders as to the evidence relied on and reasons for revoking parole.") (internal quotation marks omitted), with *Woodard*, 523 U.S. at 289 (O'Connor, J., concurring) (concluding that only "*minimal*" due process protections are required in the clemency context).

In this case, the Court has carefully and thoroughly reviewed the record, considered the procedures for Creech's clemency hearing, and finds the Commission provided Creech more than minimal due process in conducting the hearing. For example, Creech was granted a commutation hearing. He had notice of that hearing. The Commissioner's executive director met several times with the parties about the hearing before it occurred. The director provided the parties with information regarding "the rules and logistical details for the hearing." (Dkt. 1 at ¶¶ 34-38). The Commission required the ACPO to submit materials and provided Creech with copies of those materials before the hearing. (*Id.* ¶ 41). The Commission allowed Creech to present information at the hearing and gave him an opportunity to speak on his behalf. Finally, the Commission deliberated and issued a written decision explaining the commissioners' reasoning.

Creech challenges these procedures by eliding the distinction between the amount and type of due process afforded parolees and inmates seeking parole versus clemency petitioners. He relies on *Swarthout v. Cooke*, 562 U.S. 216, 220 (2011) (per curiam), for the proposition that "[a]t a minimum, due process in clemency proceedings requires advance notice and a chance to contest evidence that will be presented against a petitioner." (Dkt. at ¶ 179). *Swarthout* addresses the due process requirement in the context of parole hearing, however. *Swarthout*, 562 U.S. at 216-17. It does not establish that this same due process is required in a clemency hearing. Moreover, the procedures the Commission provided Creech during the clemency hearing likely would have satisfied the due process requirements even for a parole hearing. *See id.* at 220 (noting prisoner subject to parole statute "received adequate process when he was allowed an opportunity to be heard and was provided a statement of reasons why parole was denied.").

Creech's reliance on *Lankford v. Idaho*, 500 U.S. 110 (1991), and *Wilson v. U.S. Dist. Court*, 161 F.3d 1185 (9th Cir. 1998), to argue that he had a right to notice of the ACPO's intention to refer to Walker's murder and show the sock photograph is also misplaced. *Lankford* is distinguishable because it did not involve a clemency proceeding; rather, in that case the defendant challenged the prosecution's failure to notify him

that it intended to seek the death penalty. *Id.* at 500 U.S. at 119. A defendant's due process rights in that context are greater than in a clemency proceeding.

Similarly, *Wilson* is distinguishable, even though it involved a clemency proceeding. In *Wilson*, the governor informed the petitioner that the governor would not consider exculpatory evidence but then denied clemency specifically because the petitioner failed to present exculpatory evidence. *Wilson*, 161 F.3d at 1186-87. Based on this fact, the Ninth Circuit concluded the petitioner had stated "a claim of a violation of due process." *Id.* Contrary to *Wilson*, Creech does not allege the decisionmaker in his case—the Commission—misled him in any respect.

**\*7** Creech has cited no authority that the ACPO was required to provide him with notice of *all* the information it intended to show or discuss during the clemency hearing. That the Commission permitted the parties to view most of the information before the hearing did not create a protectable interest in a right to receive the ACPO's presentation in its entirety before the hearing. Further, because Creech does not have a constitutional right to a clemency hearing, it necessarily follows he does not have a due process right to post-hearing proceedings including, for example, discovery regarding the clemency proceeding.

Creech also does not cite any authority in support of his assertion that the Commission violated his due process rights by proceeding to the clemency hearing with only six commissioners. Creech does not contend he was surprised by this fact; he was on notice that Idaho law required a majority vote of the Commission for a recommendation of clemency; and he, notably, did not object to the lack of a seventh commissioner.

As Creech acknowledges, "[t]he Commission went to a great deal of trouble and expense to organize a lengthy and complex commutation hearing in a capital case, after months of preparation and logistics involving a large number of people." (Dkt. 15 at p. 8). Based on a review of the procedures the Commission provided Creech, the Court finds Creech fails to show a substantial likelihood of success on the merits of his claim that his due process rights were violated. The record shows Creech received more than the constitutionally required minimum procedural protections.

Finally, although the Court declines to review the merits of Creech's claim, it notes that Creech alleges in his complaint

Creech v. Idaho Commission of Pardons and Parole, Slip Copy (2024)

that "the prosecution reveal[ed] a photo of the murder weapon for the first time" at the clemency hearing. (Dkt. 1 at § V(C)). The minutes, however, contradict this allegation. Rather than showing the murder weapon—namely the sock containing batteries—the ACPO apparently showed a photograph of the sock purportedly matching the murder weapon. (Dkt. 11-1 at p. 20 ("[The prosecutor] displayed a photograph of the matching sock that was found in [Creech's] cell. The name on the sock is 'Creech.' ").

Further, although the ACPO did apparently state during the hearing that "Creech was positively identified as [Walker's] murderer" (Dkt. 11-1 at p. 14), the minutes show the ACPO discussed numerous other murders Creech allegedly committed. Creech, however, does not dispute those murders, and it is already an established fact that Creech has committed multiple murders. As Justice O'Connor stated:

> The facts underlying this case could not be more chilling. Thomas Creech has admitted to killing or participating in the killing of at least 26 people. The bodies of 11 of his victims—who were shot, stabbed, beaten, or strangled to death—have been recovered in seven States. Creech has said repeatedly that, unless he is completely isolated from humanity, he likely will continue killing. And he has identified by name three people outside prison walls he intends to kill if given the opportunity.

*Arave v. Creech*, 507 U.S. 463, 465-66 (1993). Finally, the Commission's decision does not appear to have been unduly influenced by either the Walker murder or the sock photograph. The Commission did not mention either when explaining its decision.

### 3. Irreparable Harm

The Commission argues Creech will not suffer irreparable injury if denied injunctive relief, citing *Powell v. Thomas*, 784 F. Supp. 2d 1070 (M.D. Ala. 2011). In that case, the court ruled the petitioner failed to show irreparable harm because he failed to establish a substantial likelihood of success on the merits of his claim. *Id.* at 1283. *Powell*, however, is contrary to Ninth Circuit law. The Ninth Circuit has recognized that

"every § 1983 plaintiff in an injunction appeal involving an upcoming execution" demonstrates irreparable harm. *Towery, 672 F.3d at 661*. Moreover, this Court has previously rejected the argument that irreparable harm requires something more than the plaintiff's death and the inability to continue litigation. *Rhoades v. Reinke*, 830 F. Supp. 2d 1046, 1070-71 (D. Idaho) ("[T]he harm in this instance is Rhoades's death [from execution] and his inability to continue with the litigation, and ... this harm is irreparable if a stay is not granted."), *aff'd*, 671 F.3d 856 (9th Cir. 2011). Accordingly, the Court concludes Creech has made a clear showing he will likely suffer irreparable harm in the absence of preliminary relief if IDOC proceeds with the execution.

### 4. Balance of Equities and Public Interest

**\*8** As noted above, "[u]nder the 'serious questions' version of the test, a preliminary injunction is appropriate when a plaintiff demonstrates that 'serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor.' " *Id.* at 657. Creech, however, has failed to demonstrate "serious questions going to the merits" because he fails to clearly show a likelihood of success on the merits of his claim. Moreover, the balance of equities and public interest do not weigh sharply in Creech's favor.

The Supreme Court has stated a State has a "strong interest in enforcing its criminal judgments without undue interference from federal courts." *Hill v. McDonough*, 547 U.S. 573, 584 (2006). Likewise, crime victims "have an important interest in the timely enforcement of a sentence." *Id.* These interests are especially strong in cases in which the legal proceedings have continued for many years. *Bible v. Schriro*, 651 F.3d 1060, 1066 (9th Cir.2011) ("[T]he further delay from a stay [of execution] would cause hardship and prejudice to the State and victims, given that the appellate process in this case has already spanned more than two decades."). Further, the Supreme Court has held a State has a compelling interest in finality and is entitled to the assurance of finality after years of lengthy proceedings have run their course and once a mandate has issued denying habeas relief. *Calderon v. Thompson*, 523 U.S. 538, 556 (1998). "Only with real finality can the victims of crime move forward ...." *Id.* "To unsettle these expectations is to inflict a profound injury to the powerful and legitimate interest in punishing the guilty." *Id.* (quotation omitted).

The history of Creech's federal proceedings is too long and complicated to recount here. In brief, Creech has sought relief from his death sentence in the federal courts since the reimposition of his death penalty in 1995—almost thirty years

Creech v. Idaho Commission of Pardons and Parole, Slip Copy (2024)

of litigation. Recently, the Supreme Court denied Creech's petition for certiorari challenging the Ninth Circuit's denial of his second amended habeas petition. *Creech v. Richardson*, 59 F.4th 372 (9th Cir. 2023) *cert. denied* 114 S. Ct. 291 (Oct. 10, 2023). A few days later, on October 13, 2023, Creech filed his third federal habeas petition alleging that evolving standards of decency render his death sentence unconstitutional. *Creech v. Richardson*, No. 1:23-cv-00463-AKB. This Court concluded it lacked jurisdiction over Creech's unauthorized successive petition under 28 U.S.C. § 2244(b), and that decision is now on emergency appeal. *Creech*, No. 1:23-cv-00463-AKB at Dkts. 15, 17.

A few days after Creech filed his third federal habeas petition, the Ninth Circuit issued the mandate on its decision remanding another of Creech's civil rights cases to this Court, in which Creech has attempted under § 1983 to challenge the State's execution protocol since March 2020. *See Creech v. Tewalt*, 84 F.4th 777, 783 (9th Cir. 2023). Although the Court allowed Creech to amend his complaint—for a third time—to attempt to allege viable claims, his less than clear showing in support of his preliminary injunction motion demonstrates he is unlikely to succeed on the merits of any of his claims. Finally, Creech filed this action on February 5, 2024, challenging the Commission's denial of his clemency petition. This litigation history demonstrates an instance in which the State's and the victims' interests in finality are especially strong given the lengthy legal proceedings that have delayed the State's timely enforcement of Creech's sentence. Accordingly, the Court concludes the balance of equities and public interest are not in Creech's favor.

**\*9** Because Creech fails to make a clear showing of a likelihood of success on the merits of claim that the Commission and ACPO violated his due process rights and because the balance of equities and the public interest weigh against granting a preliminary injunction, the Court denies Creech's request for an injunction, even though he will suffer irreparable harm as a result.

**5. Evidentiary Hearing**

The Court disagrees it must hold an evidentiary hearing before denying Creech's request for injunctive relief, as Creech asserts. The Ninth Circuit has ruled that a court does not need to have a hearing on a motion for a preliminary injunction where the essential facts are not in dispute. *Charlton v. Est. of Charlton*, 841 F.2d 988, 989 (9th Cir. 1988). Further, a hearing is unnecessary when "the movant has not presented a colorable factual basis to support the claim on the merits or the contention of irreparable harm." *Bradley v. Pittsburgh Bd. of Educ.*, 910 F.2d 1172, 1176 (3rd Cir. 1990). The Court finds that in this case, Creech has failed to present a colorable factual basis to support his claim that the clemency hearing violated his due process rights.

Further, the Court declines to grant Creech's Motion to Expedite Discovery. As stated above, Creech has no constitutional right to a clemency hearing; he likewise has no constitutional right to conduct discovery to challenge that hearing. The Court concludes Creech has failed to show good cause to conduct discovery.

### ORDER

**IT IS ORDERED:**

1. Plaintiff's Motion for Preliminary Injunction (Dkt. 4) is **DENIED**.

2. Plaintiff's Motion to Expedite Discovery (Dkt. 10) is **DENIED**.

3. Plaintiff's Motion for Leave to Submit Notice of Factual Development (Dkt. 17) is **GRANTED**.

**All Citations**

Slip Copy, 2024 WL 756308

### Footnotes

| 1 | The Idaho Constitution grants a majority of the Commission the "power to remit fines and forfeitures, and, only as provided by statute, to grant commutations and pardons after conviction and judgment." Idaho Const., Art. IV, § 7. In cases like Creech's, where the maximum sentence is death (or life imprisonment), the Commission's |
|---|---|

Creech v. Idaho Commission of Pardons and Parole, Slip Copy (2024)

decision on a clemency petition is not final; rather, a majority vote for commutation constitutes only a recommendation to the Governor, who then makes the final clemency decision. Idaho Code § 20-1016(2).

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

 © 2024 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 18

Nicole Owens
EXECUTIVE DIRECTOR
Christopher M. Sanchez, Idaho Bar No. 12070
Jonah J. Horwitz, Idaho Bar No. 10494
Assistant Federal Defenders
FEDERAL DEFENDER SERVICES OF IDAHO
702 W. Idaho Street, Suite 900, Boise, ID 83702-8929
Telephone: (208) 331-5530; Facsimile: (208) 331-5559
ECF:   Jonah_Horwitz@fd.org
            Christopher_M_Sanchez@fd.org

*Attorneys for Plaintiff Thomas Eugene Creech*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| **THOMAS EUGENE CREECH,** )<br>)<br>Plaintiff, )<br>v. )<br>)<br>**IDAHO COMMISSION OF PARDONS** )<br>**AND PAROLE; JAN M. BENNETTS,** )<br>Ada County Prosecuting Attorney, in her )<br>official capacity, )<br>)<br>Defendants. )<br>_____ ) | **CASE NO. 1:24-cv-00066-AKB**<br><br>**CAPITAL CASE**<br><br>**NOTICE OF FACTUAL**<br>**DEVELOPMENT**<br><br>**EXECUTION SCHEDULED**<br>**FOR FEBRUARY 28, 2024** |

Early this morning, the Mercury News published an article about Plaintiff

Thomas Eugene Creech and his supposed connection to Daniel Walker's murder in

San Bernardino in 1974.  *See* Ex. 1.  The lawsuit here is based in part on the fact

that the Ada County Prosecuting Attorney (ACPA) falsely declared at the

commutation hearing that the Walker case was closed and that Mr. Creech had

been conclusively determined to be guilty.  *See* Dkt. 1 at 7–18.  The Mercury News

article reports on a statement by Jason Anderson, the District Attorney of San

Bernardino County.  *See* Ex. 1.  Specifically, Mr. Anderson is quoted as announcing

Notice of Factual Development - 1

that he has made a decision not to charge Mr. Creech in the Walker case. *See id.* Although Mr. Anderson appears in his statement to justify the decision with reference to Mr. Creech's scheduled execution, he does not suggest that he will consider charges in the event a stay is granted. *See id.* Mr. Anderson is also described as telling the journalist that Mr. "Creech would not have been named as a suspect without evidence that he believed prosecutors could prove beyond a reasonable doubt." *Id.* However, Mr. Anderson does not offer any account of what that evidence might be.

The new article supports undersigned counsel's position that the ACPA worked in concert with San Bernardino authorities to improperly use the Walker case to oppose the commutation petition by making false and sensationalistic accusations at the Parole Commission hearing that no prosecutor is willing to prove or defend in any court. Mr. Creech therefore respectfully asks the Court to take the article into consideration when ruling on his motion for a preliminary injunction, so that these troubling facts—and the other improprieties committed by the ACPA—can be fully and fairly reviewed before they are forever mooted by an execution. *See* Dkt. 4.

DATED this 22nd day of February 2024.

/s/ *Jonah J. Horwitz*
Jonah J. Horwitz

Attorney for Petitioner

Notice of Factual Development - 2

**217**

## CERTIFICATE OF SERVICE

I hereby certify that on this 22nd day of February 2024, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which is designed to send a Notice of Electronic Filing to persons including the following:

Dayton P. Reed
Heather McCarthy
Sherry A. Morgan
civilpafiles@adacounty.id.gov
Counsel for Defendant Bennetts

Karin Magnelli
kmagnell@idoc.idaho.gov
Counsel for Defendant Parole Commission

*/s/ L. Hollis Ruggieri*
L. Hollis Ruggieri

Notice of Factual Development - 3

# EXHIBIT 19

Nicole Owens
EXECUTIVE DIRECTOR
Christopher M. Sanchez, Idaho Bar No. 12070
Jonah J. Horwitz, Idaho Bar No. 10494
Assistant Federal Defenders
FEDERAL DEFENDER SERVICES OF IDAHO
702 W. Idaho Street, Suite 900, Boise, ID 83702-8929
Telephone: (208) 331-5530; Facsimile: (208) 331-5559
ECF:   Jonah_Horwitz@fd.org
           Christopher_M_Sanchez@fd.org

*Attorneys for Plaintiff Thomas Eugene Creech*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| **THOMAS EUGENE CREECH,** ) | **CASE NO. 1:24-cv-00066-AKB** |
| ) | |
| Plaintiff, ) | |
| v. ) | **REPLY IN SUPPORT OF MOTION** |
| ) | **FOR PRELIMINARY INJUNCTION** |
| **IDAHO COMMISSION OF PARDONS** ) | **[DKT. 4]** |
| **AND PAROLE**; **JAN M. BENNETTS**, Ada ) | |
| County Prosecuting Attorney, in her official ) | |
| capacity, ) | **EXECUTION SCHEDULED FOR** |
| ) | **FEBRUARY 28, 2024** |
| Defendants. ) | |
| ) | |

Through its silence, the Ada County Prosecuting Attorney's Office (ACPA) has admitted

the most damaging facts. *See* Dkt. 11. It admits that the sock clearly presented to the Parole

Commission as a damning photograph of the murder weapon was in fact a completely different

sock with no evidentiary value whatsoever. And it admits that the prosecutor's bombshell claim

to the Commission that Mr. Creech had just been proven guilty of a fifty-year-old open murder

case based on new information was entirely false. There was no new information—only the

recovered and undocumented memory of an officer actively advocating for an execution and a

preposterous "confession" in which Mr. Creech also admitted to killing multiple people that in

Reply in Support of Preliminary Injunction – Page 1

fact lived for decades longer.  Reading between the lines of its response, *see id.*, it is clear that the ACPA made a calculated gamble in deceiving the Commission.  The ACPA thought it could get away with lying by creating just enough ambiguity and mixing in just enough reality that no court would step in, Mr. Creech would be executed, and any meaningful scrutiny of the prosecutor's misconduct would be buried along with him.  Mr. Creech respectfully asks the Court to prove the ACPA's gamble wrong.  While the Constitution affords states broad latitude in how they conduct clemency proceedings, it should not allow prosecutors to send a man to his death based on such an extraordinary degree of malfeasance.  Due process would be reduced from minimal to non-existent if Mr. Creech were executed in twelve days, and a modest stay is needed to fully examine the serious questions raised here about the integrity of the clemency hearing.

I.     **Mr. Creech has a viable due process claim on the sock and Walker.**

There are two general due-process points that apply to both the Daniel Walker case and the sock issue, so Mr. Creech will deal with them collectively.  The first is that the presentation of false evidence by a prosecutor at a clemency hearing violates the Due Process Clause.  And the second is that Mr. Creech's theory regarding notice and the ability to contest the evidence used against him is far more fact-bound and specific to his case than the defendants say.

Before establishing the rule of law about false evidence, however, it is necessary to clarify a factual matter.  To wit, the ACPA's response leaves no doubt that it presented false evidence at the commutation hearing with respect to both the Walker case and the sock.

As to the Walker case, undersigned counsel alleged in their complaint and in their motion for a preliminary injunction that the ACPA told the Commission at the commutation hearing that

the investigation was closed and the case had been solved.  Dkt. 1 at 9, 17; Dkt. 4-1 at 5, 15.[1]

The same documents asserted that in reality all of the "evidence" linking Mr. Creech to the crime

had been fully vetted fifty years earlier, when he was ruled out as a suspect, apart from a

recovered memory of former deputy sheriff Tom Taylor that was apparently never documented

in any form at the time.  Dkt. 1 at 12, 16; Dkt. 4-1 at 9, 14–15.  The ACPA disputes none of

those particulars.  It offers general denials of misconduct, but they are long on adverbs and short

on details.  *See* Dkt. 12 at 10 (dismissing Mr. Creech's "spurious allegations" and chiding him

for "recklessly casting aspersions"); *id.* at 10 n.5 ("The ACPA vehemently denies Creech's

baseless allegations that it fabricated and falsified evidence.").  In the absence of any concrete

factual quarrels from the ACPA, the allegations must be accepted as true.  *See Planned*

*Parenthood Assoc. of Utah v. Herbert*, 828 F.3d 1245, 1261 n.7 (10th Cir. 2016) (accepting as

true allegations that the plaintiff made and the defendant did not dispute in his opposition to a

motion for a preliminary injunction).

      Based on those undisputed facts, the ACPA lied at the commutation hearing.  The Walker

case hasn't been solved.  Rather, the ACPA dusted off a dubious interview that had been rightly

rejected as incredible by law enforcement fifty years earlier and decided it had become a

smoking gun.

      The ACPA also lied about the sock at the commutation hearing.  Undersigned counsel's

filings state that the ACPA showed the Commission a sock with the name "Creech" written on it

next to text that quoted Mr. Creech as claiming that "the weapon" had another inmate's name on

it, when in actuality there were good reasons to doubt that the circled sock was the murder

---

[1] All citations to filings in this Court use the ECF pagination.

weapon. *See* Dkt. 1 at 25; Dkt. 4-1 at 22–23; Dkt. 5-5. Again, the ACPA doesn't disagree—it admits the circled sock wasn't the murder weapon. *See* Dkt. 11 at 12 n.6. Thus, the ACPA conveyed a falsehood when it unambiguously communicated to the Commission through its slide that the murder weapon had Mr. Creech's name on it. Those facts, too, must be accepted as correct for preliminary-injunction purposes.

Because the undisputed facts reveal that the ACPA lied twice to the Commission, the central legal question in the case is whether the Due Process Clause prohibits state actors from lying during clemency proceedings. The ACPA is aware of how crucial that question is. Tellingly, the ACPA devotes only a handful of lines to dealing with Mr. Creech's factual allegations, yet spends three full pages attempting to establish that it is constitutional for a prosecutor to submit false evidence to a clemency decision-maker. *See* Dkt. 11 at 10–13. It is understandable that the ACPA would strive so mightily to persuade the Court that it is allowed to deceive the Commission. Nonetheless, while strategically sound, the ACPA's maneuver is legally infirm. The ACPA relies entirely on out-of-circuit authority for its point of view. *See id.* There is no need to search beyond the Ninth Circuit, though. In *Anderson v. Davis*, 279 F.3d 674, 676 (9th Cir. 2002), the court listed the kinds of events in a clemency proceeding "that would offend the Constitution."[2] One such event was "the deliberate fabrication of false evidence." *Id.* That is the binding rule of law here, no matter what the Sixth Circuit has held. In short, it does violate due process in the Ninth Circuit for the state to deceive a clemency tribunal, and that is what occurred here in light of the undisputed facts.

---

[2] Unless otherwise noted, all internal quotation marks and citations are omitted and all emphasis is added.

Reply in Support of Preliminary Injunction – Page 4

**223**

The second overarching point that pertains to both the sock issue and the Walker case is the uniqueness of the problems in this action relating to notice and the ability to contest the evidence.  Both of the defendants oversimplify Mr. Creech's theory as asserting a right to be given in advance every piece of information that will be presented at a clemency hearing.  *See* Dkt. 11 at 13; Dkt. 12 at 14.  Obviously there is no such constitutional right, and Mr. Creech has never maintained otherwise.  What Mr. Creech is instead positing is that under the unusual circumstances of his case, two *particular* allegations made at the hearing did implicate the rights to notice and to effectively respond.  Specifically, the ACPA claimed at the hearing for the first time in fifty years that Mr. Creech had been proven guilty of the Walker murder.  And it signaled for the first time in forty years that the murder weapon from the Jensen crime had Mr. Creech's name on it.  Neither the ACPA nor the Commission provide any reason why Mr. Creech should have known prior to the hearing that these enormously consequential accusations would be factors in the commutation decision.

Similarly, Mr. Creech is not contending that in every case a commutation petitioner has a right to a delay by the Commission to conduct further investigation.  He is contending that when a prosecutor injects highly damaging new material into a clemency proceeding at a hearing for the first time, then such a postponement is at least one potential remedy for the constitutional problem—and one that was rejected here without any real justification now being offered by the Commission.

We know from precedent that there is some kind of due process right in clemency to "notice of the issues to be considered."  *Wilson v. U.S. Dist. Court*, 161 F.3d 1185, 1187 (9th Cir. 1998).  Although both of the defendants distinguish *Wilson* on its facts, *see* Dkt. 11 at 13; Dkt. 12 at 14, Mr. Creech does not pretend that it implicated an identical scenario.  At the same time,

Reply in Support of Preliminary Injunction – Page 5

*Wilson* does not say that a notice issue in clemency only arises when it is the governor who creates the problem, as the ACPA seemingly believes.  Dkt. 11 at 13.  The question under *Wilson* is simply whether the facts here give rise to a similar notice violation.  Ultimately, that comes down to whether the behavior by state actors in Mr. Creech's case made the clemency proceeding "fundamentally unfair."  *Young v. Hayes*, 218 F.3d 850, 853 (8th Cir. 2000).

The ACPA made a considered tactical decision to withhold from Mr. Creech two massively important new allegations, despite a ready mechanism for disclosure in the form of the documentary submissions for the hearing packet.  *See* Dkt. 12 at 14.  It then exploited that lack of notice to effectively introduce the allegations at a hearing with no real chance for Mr. Creech to respond.  Afterwards, the Commission likewise declined to give Mr. Creech that opportunity in any genuine fashion.  Under those rare facts, the high but not insurmountable bar for a notice claim is satisfied, at least for preliminary-injunction purposes until the claim can be fully and fairly resolved.

## II.    The Governor's statements do not undermine the claim.

Both of the defendants make the extraordinary argument that relief should be denied based on the assumption that the Governor would have declined to do his lawful duty, disregarded the Commission's favorable recommendation, and reflexively rejected a commutation petition that he never received, no matter what facts were presented to him.  *See* Dkt. 11 at 16; Dkt. 12 at 16–17.  There is no foundation in either the facts or in the law for the defendants' view.

As a factual matter, the defendants are mistaken that the Governor announced that he was determined to deny a commutation even if Mr. Creech convinced four Commissioners to recommend clemency.  *See* Dkt. 12 at 17.  The statements by the Governor about the clemency

Reply in Support of Preliminary Injunction – Page 6

**225**

process do not address whatsoever a hypothetical world in which the Commission had forwarded to him a favorable recommendation.  What the Governor declared was: "I have zero intention of taking any action that would halt or delay Creech's execution."  *Id.* at 17.  The Governor made that announcement after the Commission denied Mr. Creech's commutation petition.  Thus, the Governor was communicating to the public that, in light of the adverse decision by the Commission, he would not be intervening on Mr. Creech's behalf.  The Governor lived up to his word—he denied a reprieve, *see id.* at 25, which is the constitutional means by which he could have postponed the execution after the Commission's decision, *see* Idaho Const., Art. IV, § 7.

But the Governor never made the claim that he would have refused to weigh the Commissioner's views had they voted to recommend a commutation, which is what the defendants are essentially suggesting now.  A commutation petition only reaches the Governor's desk in the event of a favorable recommendation by the Commission.  *See* Idaho Code § 20-1016(2).  The Governor then has a statutory duty to evaluate the Commissioner's recommendation and make a determination.  *See* Idaho Code § 20-1016.  "Government officials are presumed to act in good faith."  *Bridge v. U.S. Parole Comm.*, 981 F.2d 97, 106 (3d Cir. 1992).  The defendants' stance presumes the opposite—that the Governor is so indifferent to the opinions of the Commissioners, who he appoints, that it would make no difference to him what they recommended.  Such a world would itself be blatantly unconstitutional, as the Governor would then be "arbitrarily den[ing] a prisoner any access to its clemency process."  *Ohio Adult Parole Auth. v. Woodard*, 523 U.S. 272, 289 (1998) (O'Connor, J., concurring).  The Governor himself has confirmed that he would not act so irresponsibly.  He was described in the media as having "pledged . . . to allow the process to play out before making any decisions about Creech" and quoted as follows: "[U]ntil that hearing takes place – I have no idea, because what were their

Reply in Support of Preliminary Injunction – Page 7

**226**

[i.e., the Commission's] grounds for doing that?  And that's what will help me make my determination."  Ex. 1 at 12–13.

It is particularly remarkable to see the Commission draw such an uncharitable picture of its own place in the constitutional scheme.  The Commission went to a great deal of trouble and expense to organize a lengthy and complex commutation hearing in a capital case, after months of preparation and logistics involving a large number of people.  Evidently, the Commission believed then that the whole thing was not, as the ACPA puts it now, an "exercise in futility." Dkt. 11 at 2.  The contrast between the Commission's work before and its current portrayal of its function as meaningless suggests that its briefing is motivated less by its own interests and more by the outlook of the Attorney General who represents it and who has aggressively and openly politicized the death penalty in Idaho.  *See*  https://www.ag.idaho.gov/newsroom/media-advisory-attorney-general-raul-labrador-obtains-new-death-warrant/ (reflecting Raul Labrador's admission in a press release that he obtained a death warrant for another death-row inmate purely as a political stunt to push for the firing squad and with no means of carrying out an execution).

At any rate, whatever is animating the Commission's litigation strategy, its position is meritless, and the Court should cursorily reject the defendants' assumption that due process violations can be waved away because of what the Governor might have done with a commutation petition that never reached his desk.

**III.    The defendants' fact-specific points miss the mark.**

Mr. Creech now addresses the factual posture of the sock and the Walker issues in the wake of the defendants' filings, starting with the former.  Given how interrelated the issues are, every part of this reply is incorporated into every other part.

Reply in Support of Preliminary Injunction – Page 8

**A. The defendants' new position on the sock does not change the result.**

Apparently recognizing now, for the first time, that it will no longer be able to continue perpetrating the falsehood that it communicated to the Commission about the murder weapon, the ACPA has decided it never communicated anything at all.  But the ACPA's self-serving new explanation makes no sense and is utterly lacking in credibility.  It does not undermine Mr. Creech's motion, or erase the need for further investigation and an associated preliminary injunction.

One need only glance at the prosecutor's PowerPoint to understand its message, notwithstanding the ACPA's creative stab at revisionist history:



The unmistakable message of this slide was that the murder weapon bore Mr. Creech's name.  There is only one conceivable purpose to the juxtaposition between the quote and the circled sock—to suggest that Mr. Creech was lying to the investigators, and that the weapon was in fact not labeled Garza but instead had the name Creech written on it.  That same

Reply in Support of Preliminary Injunction – Page 9

straightforward interpretation of the purpose for which the slide was intended is bolstered by the next line from the investigators' report, right after the passage quoted above. It is: "There is no mention in the incident reports or police reports, regarding Mr. Jensen's homicide, of a name or other distinctive marking on the sock used as a weapon." Ex. 2 at 1. The slide was plainly designed to answer that question. Through the slide, the prosecutor visually told the Commission: yes, the weapon did have a name on it, and it was Mr. Creech's.

For twenty-two days and over the course of multiple exchanges, the ACPA did not dispute the obvious truth about what the prosecutor meant to express through her slide. Undersigned counsel wrote to the Commission on January 22, 2024, and noted that Mr. Creech's team "understood" the prosecutor as having communicated to the Commission that she had "recently inspected the murder-weapon sock from the David Jensen offense and discovered that it had Mr. Creech's name written on it." Dkt. 12-3 at 1. That first letter expressed concern about "the legitimacy of the prosecutor's statement" that the murder weapon had Mr. Creech's name on it. *Id.*

Deputy Attorney General L. LaMont Anderson responded the same day, on behalf of both his office and the ACPA. *See id.* at 3. In Mr. Anderson's detailed letter, he addressed the sock issue. *See id.* at 4. Specifically, Mr. Anderson claimed that the sock "refute[d]" Mr. Creech's claim of "self-defense." *Id.* According to Mr. Anderson, the sock was shown by the State to "debunk" Mr. Creech's "lie" to the Commission's investigators. Mr. Anderson expressed great umbrage at undersigned counsel's "wild accusations" and "patently false allegations." *Id.* at 4. One notable thing he did not correct, however, was the assumption in undersigned counsel's letter that the photograph of the sock was meant to depict the murder

Reply in Support of Preliminary Injunction – Page 10

weapon.  Presumably, that would have been the first "false allegation" on Mr. Anderson's list, had he disagreed with the assumption.

Also on January 22, undersigned counsel sent an email to the prosecutor, requesting access to various evidence "relating to the murder-weapon sock," including material concerning "the PowerPoint slide [the ACPA] presented that purported to show a photograph of the sock." Ex. 3.  The ACPA later responded to the request, sending the slide, and acknowledging that it was transmitting "a picture of the sock."  Dkt. 5-5.  Again, the ACPA did not suggest that the photograph was actually not of "the murder-weapon sock" at all.  *See id.*

The next exchange began on January 25.  That day, undersigned counsel sent another letter to the Commission.  In it, counsel updated the Commission on the inquiries his office was making "into the claim [the prosecutor] made at last Friday's commutation hearing to the effect that the murder-weapon sock from the David Jensen offense had Mr. Creech's name written on it."  Dkt. 12-3 at 6.  The letter advised the Commission that Mr. Creech had filed a motion in Ada County District Court seeking access to various images of the sock.  *See id.*  In the motion itself, which was appended to the letter, counsel stated: "[The prosecutor] told the Commission that the sock was the one that was filled with batteries and then used in the murder of the victim."  *See id.* at 13.  The State responded to these averments in two separate documents.  One was a letter by Mr. Anderson to the Commission, dated January 26.  Mr. Anderson lamented there how his colleague, ACPA prosecutor Jill Longhurst, had been "besmirch[ed]."  *Id.* at 39.  In defending her, Mr. Anderson criticized the motion for access as meritless.  *See id.*  As before, though, Mr. Anderson did not inform the Commission that the premise of undersigned counsel's letter was mistaken—i.e., the photograph was not of the murder weapon.

Reply in Support of Preliminary Injunction – Page 11

The other form in which the State engaged with the events of January 25 was through a response to Mr. Creech's motion for access.  In that response, Ms. Longhurst remarked that, "[p]rior to the Commutation hearing," Mr. Creech informed the Commission that he struck Mr. Jensen out of "self defense and specifically claimed that the victim had 'attacked' him and that someone else's name was on the sock." Ex. 4 at 2.  The remainder of the response contains various generic statements to the effect of how "[t]here is no issue with the sock." *Id.* at 4. Notably, Ms. Longhurst's response does not take exception to the idea that the photograph depicted the murder weapon.

Over the course of these three weeks and the extensive dialogue that took place during them, the State seems to have made every possible argument about the sock photo except the one the ACPA makes now: it was not the murder weapon.  On February 13, with an execution fifteen days away, the ACPA had a revelation.  The photograph wasn't of the murder weapon after all. It was, it turns out, of "the matching sock that was found in Creech's cell." Dkt. 11 at 7.  The ACPA's change of heart incidentally emerged only when it was forced to address the matter head-on in a court of law, where it ostensibly has a duty of candor.

The ACPA's about-face is difficult to credit.  For one thing, it has been known for more than forty years that a sock matching the murder weapon was found in Mr. Creech's cell.  *See, e.g.*, Dkt. 5-4 at 8.  That has never been a particularly compelling fact.  Socks in a prison all come from the same source and socks are famously lost all the time.  It's hardly surprising that Mr. Creech (and likely plenty of other inmates) would have an unmatched sock in his cell that looked like the one used in the assault.  And it adds nothing to the case that the sock found in Mr. Creech's cell had his name on it.  Why would a sock in Mr. Creech's cell have any other name on it?  The ACPA's current account also makes no sense in light of the image on the slide and

Reply in Support of Preliminary Injunction – Page 12

**231**

the explanation the prosecution has given for its purpose.  As described earlier, the slide contrasted Mr. Creech's statement that "the *weapon* was labeled Garza" with a circled sock that bore the name "Creech."  Dkt. 5-5.  That visual is incoherent if the ACPA's current story is the right one.  What would the point be of placing Mr. Creech's statement about the name on the *weapon* next to a completely different sock found in his cell?  There is nothing criminal about labeling one's socks.

Even more problematic, the ACPA's latest telling cannot be squared with its own current characterization of the purpose of the image.  The ACPA justifies the use of the sock image as "rebuttal as to Creech's statement to the investigator."  Dkt. 11 at 7.  That is likewise how Mr. Anderson defended the slide in correspondence to the Commission.  *See* Dkt. 12-3 at 4 (maintaining that the sock "debunk[ed]" Mr. Creech's "lie" to the Commission's investigators).  What Mr. Creech said to the investigator was that "the *weapon* was labeled 'Garza.'"  Dkt. 5-5 at 3.  It doesn't "rebut" or "debunk" that statement to show a completely different sock that was found in Mr. Creech's cell.  The only thing that can refute a claim that the weapon had the name "Garza" on it is to show how the *weapon* had a different name on it.

Notably, the Parole Commission itself does not appear to share the ACPA's newfound perspective on the slide.  The Commission makes several remarks about the sock in its opposition to Mr. Creech's motion for a preliminary injunction.  Nowhere among them is an assertion that the image in the sock was not portrayed by the ACPA at the hearing as the murder weapon.  Instead, the Commission comments only that the photograph "rebut[ted] Creech's statements to the investigator," Dkt. 12 at 15, a rebuttal that would not have been accomplished if the sock was anything other than the murder weapon.  The agency that was the target of the ACPA's gambit is not supporting the prosecutor's whitewashing of the incident.

Reply in Support of Preliminary Injunction – Page 13

One potential reason why the Commission may be incapable of joining the ACPA's new take on the photograph is that the prosecutors themselves were responsible for the fact that the Commissioners were left with the opposite impression. As outlined earlier, during the exchange of letters between the undersigned and Mr. Anderson, the prosecutors repeatedly declined to correct the description being offered of the sock photograph by the undersigned—namely, that it depicted the murder weapon. The Commission was of course copied on all of that correspondence. There would have been no impetus for a Commissioner reading the letters to leap to the ACPA's newfound view when both parties seemingly agreed on what was in the photograph. That would constitute a deception in its own right.

Mr. Creech can only imagine one scenario in which it might potentially have been logical for the circled sock to not represent the murder weapon. Although it is far from the most likely set of facts, it is possible to dream up a hypothetical in which the viewer is told that the sock with Mr. Creech's name on it was found in his cell and the sock *next to it* in the photograph was the murder weapon. *See* Dkt. 5-5. Then, arguably, one could say that the photograph is focused on establishing that the weapon matches the sock with the name, and thus that both belonged to Mr. Creech. But the ACPA doesn't make that claim. In fact, it isn't clear even now what significance the ACPA is ascribing to the un-circled sock without a name on it. The ACPA observes in passing that the photograph in question was "of two of the socks that were collected as evidence." Dkt. 11 at 6–7. What does that make the un-circled sock? Was it the murder weapon? Presumably, the State would say so if it were. And if it isn't the murder weapon, how could it show any relevant match?

What is more, as a visual matter, the images do not immediately convey to the viewer that the un-circled sock is the murder weapon. It is the circled sock that has discoloration on it

Reply in Support of Preliminary Injunction – Page 14

potentially suggestive of blood and a hole near the toe that one might assume was caused by the batteries breaking open the material, *see* Dkt. 5-5, a fact the prosecutor reminded the Commission of, *see* Dkt. 11-1 at 16 (reflecting that the ACPA emphasized at the hearing how "the batteries broke through the sock").

The ACPA relies heavily on the Commission's minutes, but they hardly dictate a denial of the preliminary-injunction motion. In the passage seized upon by the ACPA, the minutes indicate: "Ms. Longhurst displayed a photograph of the matching sock that was found in Mr. Creech's cell. The name on the sock is 'Creech.'" Dkt. 11-1 at 20. To begin, the minutes are not a transcript and should not be treated as such. *See Iadevaia v. Town of Scituate Zoning Bd. of Rev.*, 80 A.3d 864, 872 (R.I. 2013) (declining to rely on the precise words in minutes in part because they "do not purport to contain a verbatim transcription"). They are certainly not free of mistakes. For instance, the minutes indicate that Ms. Longhurst stated at the hearing that "she has been the prosecutor of Ada County for much longer than [Jim] Harris was, and she is here in support of the death penalty today." Dkt. 11-1 at 19. What Ms. Longhurst actually referenced was *Jan Bennett*s' tenure as prosecuting attorney and her presence at the hearing. *See* Ex. 2 at 1–2.

It would be especially problematic for the Court to rely on the minutes under the circumstances here, where the defendants are collectively exploiting the informality of the hearing process to ensure that there is as little meaningful judicial fact-finding as possible. The Commission told the parties prior to the hearing that they could not record it, which Mr. Creech's counsel would have done had it been permitted. *See id.* at 1. It is unclear why the Commission issued this prohibition—its own rules authorize the Executive Director to allow recording. *See* IDAPA 50.01.01.104.01(b). The hearing was also livestreamed to the public, *see* Ex. 2 at 1, so it

Reply in Support of Preliminary Injunction – Page 15

is not as though the proceedings were held in secret.  Additionally, there was without question great public interest in the hearing and a publicly accessible recording would have been a commendable step toward transparency.

In any event, at present, Mr. Creech doesn't know whether the Commission itself recorded the hearing.  Undersigned counsel asked the Commission for any recordings of the hearing.  *See* Dkt. 5-9 at 3.  When the Commission provided the minutes to counsel, it did so pursuant to the Public Records Act.  *See* Ex. 5.  However, the Commission did not clarify whether it was withholding a recording or whether none exists.  *See id.*  The Commission's rules make such a recording accessible under the Public Records Act.  *See* IDAPA 50.01.01.104.01(b).  A recording would plainly represent superior evidence to the minutes, which were prepared by an unknown person using unknown methods.

Another reason why it would be inappropriate to deny an injunction based entirely on the minutes is the contrast between the precise words the prosecutor spoke, which are essentially unknown at present, and the image she presented, about which there is no dispute.  Most people "are visual learners who rely on their sense of sight to understand and process information."  Jules Epstein, *The 'Ohlbaum Paper,' and Advocacy Scholarship—Why Now?*, 88 Temp. L. Rev. 507, 511 n.24 (2016).  The visual message to the Commissioners was unambiguous—Mr. Creech told the investigators that the murder weapon had the name "Garza" on it, but he was lying, and the proof is this sock that says "Creech."  *See* Dkt. 5-5.  Whatever phraseology the prosecutor used, the argument she made visually was unquestionably that the murder weapon had the name "Creech" on it.  The ACPA is now admitting the argument was false, and the sock that said "Creech" was not the murder weapon.  That constitutes the presentation of false evidence.

Reply in Support of Preliminary Injunction – Page 16

To the extent the Court feels it can't yet authoritatively reach such a determination, that is why discovery is warranted, along with the stay necessary to conduct it.  With interrogatories and depositions, Mr. Creech could ask the ACPA where the second, un-circled sock in the photograph comes from—something the prosecutors have shed no light on despite their sudden reliance on that aspect of the image.  If the ACPA's new version of facts is that the un-circled sock is the murder weapon, that would raise other factual matters Mr. Creech would have to explore through discovery, like confirming that it does in fact match the circled sock in some informative sense, verifying its authenticity, and so on.  Mr. Creech could also pursue a recording of the hearing and depose other people who were present about what they recall Ms. Longhurst saying.  Such proceedings would not be endless, since the issue is discrete, is already moving forward on the basis of a narrow and well-defined discovery motion, *see* Dkt. 10-1, and could be greatly expedited if the prosecutors approach it in a forthcoming manner.  But there is still no way it could wrap up in twelve days, which is when Mr. Creech is scheduled to be executed.  It would be inequitable in the extreme for Mr. Creech to be executed on the basis of the factual ambiguity the defendants have manufactured in their effort to insulate the life-and-death decision made by the Commission from any meaningful judicial review.

**B.  The defendants' arguments on the Walker case are unconvincing.**

After the filing of the ACPA's response, the falsity of the prosecutor's statements at the commutation hearing on the Walker case is even more certain than with the sock issue.  The case wasn't solved and the ACPA lied to the Commission in asserting otherwise.

In this section, Mr. Creech will reply to both the defendants' positions on the use of the Walker murder.  Below, Mr. Creech will discuss the only evidence the prosecution cites to support the allegation that Mr. Creech murdered Mr. Walker.  Then, Mr. Creech will discuss how

Reply in Support of Preliminary Injunction – Page 17

**236**

the San Bernardino investigation only serves to further support the fact that the prosecutor was presenting false evidence when she told the Commission Mr. Creech was guilty of killing Mr. Walker and the case had been solved.

When it comes to the misrepresentations the prosecutor made to the Commission, neither of the defendants challenge the factual allegations as articulated in Mr. Creech's complaint or in his motion for a preliminary injunction.  Mr. Creech explained the general import of this concession above, *see supra* at Part I, but it is worth exploring the specifics.  The concession means, for instance, that the prosecutor has effectively admitted she made a false statement when she told the Commissioners the San Bernardino Sheriff's Department ("SBSD") had closed their investigation into the Walker murder.  It also means there was in fact no "thorough investigation," Dkt. 4-3, that led to SBSD considering Mr. Creech a suspect.  Instead, the same information that Detective Dykes obtained about the case fifty years ago—the same information he must have used to rule out proceeding with Mr. Creech as a suspect—is all they are relying on.  *See* Dkt. 11 at 5.

Detective Dykes and SBSD acted reasonably when they ruled Mr. Creech out as a suspect in the Walker murder back in the mid-1970s because in context Mr. Creech was giving many false confessions.  But the ACPA has found an easy way to avoid any inconveniences arising from the weakness of its case against Mr. Creech for the Walker murder: it will execute him.  Then, there will be little incentive to look into the misconduct that the prosecution chose to engage in at the commutation hearing.  This choice included stating to the tribunal, the Commission, that not only should the Commissioners consider it a fact that Mr. Creech murdered Mr. Walker, but they should vote for execution because otherwise, as the ACPA's slide said, Mr. "Creech got away with this murder."  Dkt. 4-1 at 5.

Reply in Support of Preliminary Injunction – Page 18

**237**

To put it plainly, the prosecutor's statement was based on a false confession without any support. Even after the prosecutor's response, there remains no evidence other than what was available in 1975. And all the information undersigned have been able to gather thus far, including the interview that the prosecution relies on, *see* Dkt. 11 at 5, shows Mr. Creech was not the perpetrator. Given that there is no dispute of fact, the Court should assume the prosecution based its decision to state Mr. Creech was guilty of first-degree murder on the evidence provided to the Commission—which consisted solely of Mr. Creech's false confession and Tom Taylor's questionable new memories.

Because the ACPA is almost exclusively relying on a single conversation to claim it has solved a murder case, *see id.* at 5, it is worth looking more closely at what Mr. Creech said during that interview. Simply put, Mr. Creech's statements during the interview were manifestly absurd and the authorities were right to rule him out as the murderer in the 1970s.

The more closely one reads the interview conducted on April 28, 1975, the easier it is to see why San Bernardino had never announced Mr. Creech as a suspect until the Ada County Prosecutor's Office contacted them: because Mr. Creech was "confessing" to many killings that never happened.

As covered previously, Mr. Creech was interviewed by Ada County Sheriff Chuck Palmer and Detective Ted Dykes of the SBSD. *See* Dkt. 4-5; *see also* Dkt. 1 at 8–16. As the San Bernardino authorities would find after the interview, several people Mr. Creech had claimed he'd killed and hidden in the area were still alive. Counsel have found even more. The first couple Mr. Creech claims he killed during the interview are Jerry and Donna Sage. *See* Dkt. 4-5 at 3. Mr. Creech says in the interview that he killed them both because Carol Spaulding wanted him to and he had been ordered to do so by his biker gang bosses. *See id.* Then Mr.

Reply in Support of Preliminary Injunction – Page 19

Creech gives them a detailed account of how he and Ms. Spaulding killed the Sages and how they disposed of the bodies in a mine shaft. *See id.* at 4–6. The only problem is the Sages were never killed—they never even went missing. Undersigned's investigator, Beryl Price, was able to locate "Donna" Sage in a single afternoon. As explained in her declaration, Ms. Price determined from another transcript, *see* Ex. 6, that Ms. Sage's real first name was Cathy and her husband was Tom rather than "Jerry" Sage, *see* Ex. 7 at 2. Ms. Sage, now Jenkins after remarrying, was pleased to inform Ms. Price that she is very much alive, did have interactions with bikers in the 1970s, but she and "Jerry" both survived the 1970s. *See* Ex. 8.

In an interview with Ms. Spaulding, she appears to be describing the same incident Mr. Creech describes when he talks about killing a couple and taking their car in San Bernardino, only Ms. Spaulding identifies the couple as Rosemary and "Lee" Wert. *See* Dkt. 4-8 at 33. To the extent that Ms. Spaulding's comments suggest that the Werts were the murdered couple instead of the Sages, they survived the 1970s as well according to their daughter Christina. *See* Exs. 7, 9. The demonstrably false murder "confessions" from Mr. Creech explains why law enforcement found no bodies on their trip to San Bernardino. *See* Dkt. 4-1 at 12. But even more certainly, it shows what a misrepresentation it is on the part of the prosecutor to rely on the false confession in declaring the Walker case closed and Mr. Creech the murderer.

There are also problems in the interview where law enforcement appear to be feeding Mr. Creech details about the crimes. For example, early on they provide Mr. Creech with a description of what one of the victims was wearing. *See* Dkt. 4-5 at 6. And then when Mr. Creech appears to forget a detail about the clothing, Sheriff Palmer reminds him there was some writing on the victim's vest. *See id.* at 7. It is unclear if the officers in instances like this are providing Mr. Creech this information or if it is from an earlier interview. If counsel had access

Reply in Support of Preliminary Injunction – Page 20

to a transcript or recording of the April 27, 1975 interview, the discussion with the same individuals that took place the day before and of which Mr. Creech has no documentation, it would be possible to tell for certain.  *See* Dkt. 10-1 at 11.

And then there's the ranch in Malibu, California that Mr. Creech wants to talk about at the end of the interview.  This is the McCoy Ranch, the one with the devil worshipping vegetarian cult leader who advertises in newspapers to attract hitchhikers for human sacrifice. *See* Dkt. 4-1 at 11–12.  After Mr. Creech's confession, there was a large-scale and expensive search of the property at McCoy Ranch for all the human remains, the hidden weapons, and whatever else Mr. Creech had confessed to burying there.  *See* Ex. 10.  Only a cow bone was recovered.  *See id.*  As one officer said, "it was the only $40,000 cow bone in existence. We really did a complete job of ripping the place up, even with a backhoe."  *Id.*  The same officer also opined on why Mr. Creech was making all this up: "He's trying to make himself bigger than Charles Manson, in our opinion." *Id.*

As competent officers became more aware of what Mr. Creech was up to, it makes sense that the San Bernardino authorities grew less likely to believe his confessions—especially when all the evidence was pointing to someone other than Mr. Creech committing the crime.  In addition to extravagant Malibu property searches, unfruitful trips to San Bernardino to locate all the hidden bodies, and the fact that the bodies were still very much alive and well, nothing in the SBSD investigation suggests Mr. Creech is a viable suspect.  The case is far from closed.

How does the prosecution explain, for instance, every eyewitness seeing two men when Mr. Creech was traveling with Ms. Spaulding at the time?  Doug Walker, Daniel Walker's brother, *see* Dkt. 4-1 at 10, has posted online police documents he's obtained from the SBSD. *See* https://danielmybrother.com.  On this site, Doug Walker includes a three-page timeline that

Reply in Support of Preliminary Injunction – Page 21

appears to be an official SBSD case document.  *See* Ex. 11 at 10–12.  This timeline confirms that every witness reported seeing two men—not a man and a woman.

The hitchhiker who was in the Volkswagen van with Mr. Walker when he was shot saw two white men in their 20s.  *Id.* at 10.  One of the men had "sandy blonde hair with a red bandana or with handkerchief tied around his head."  *Id.*  Later two waitresses in Ludlow, California reported two customers who matched the description.  *Id.* at 11.  The truck driver witness referred to in Doug Walker's book, *see* Dkt. 4-1 at 11, also gave a confident report that the two people he identified were both males, *see* Ex. 11 at 11.  Like the hitchhiker, this driver reported one was wearing a bandana.  *See id.*  The measurements the newspaper gave at the time for these same men were: first white male was about 5 feet 10 inches, 185 pounds, and with sandy blond shoulder length hair with a red bandana; the second white male was 5 feet 5 inches, 150 pounds, and with dark brown hair.  *See* Dkt. 4-6 at 3.  Neither of these describes Mr. Creech, and they certainly do not describe what we know about Ms. Spaulding, who was 5'2", 120 pounds, and—of course—a woman.  *See* Ex. 12.

These key reasons SBSD would have ruled Mr. Creech out as a suspect come from four pages of police records published on the victim's brother's website.  Mr. Creech is still without SBSD's actual records.  For present purposes, records undersigned counsel do have show Mr. Creech gave a false confession.  This is the only evidence the prosecutor has to support its position that the case is solved and Mr. Creech is the killer.  That is objectively not enough to stand before the Commissioners and ask them to support execution because if they didn't Mr. Creech would get away with Mr. Walker's murder.  It would be unconscionable to allow the ACPA to use its false statements about the Walker murder to secure Mr. Creech's execution

Reply in Support of Preliminary Injunction – Page 22

while the prosecutor simultaneously avoids any accountability or judicial fact-finding by putting to death the plaintiff.

**IV.    Mr. Creech is likely to succeed on his challenge to the three-three tie.**

The Commission criticizes Mr. Creech's "subjective belief that he would gain clemency if he convinced four of seven commissioners to recommend relief or the State failed to convince four of seven commissioners to deny relief." Dkt. 12 at 9. That "subjective" belief was rooted in objective Idaho state law. It is Idaho state law that provides for seven Commissioners, *see* Idaho Code § 20-1002(2), and it is Idaho state law that establishes that four votes for the prisoner means a life recommendation and four votes against means a denial, *see* Idaho Code § 20-1016(2); Idaho Const., Art. IV, § 7. There is nothing subjective about Mr. Creech's expectation that the law would be followed.

It is also misleading for the Commission to focus on the four-vote-number in a vacuum. The problem is not that the number four has some special constitutional significance. The problem is that under these mandatory statutory provisions four is the number that *both* sides must reach. In other words, Mr. Creech's reasonable expectation was to a level playing field, and that is what the recusal took from him.

The Commission decries as "grossly misplaced" Mr. Creech's reliance on *Stiesberg v. California*, 80 F.3d 353 (9th Cir. 1996). Dkt. 12 at 9. It is true, as the Commission observes, that *Stiesberg* dealt with property interests. *See id.* But Mr. Creech included *Stiesberg* in his preliminary-injunction motion only to stand for the general notion that state law gives rise to reasonable expectations that are then protected by the Due Process Clause. *See* Dkt. 4-1 at 27. That principle does extend to the clemency context. *See Greenholtz v. Inmates of Neb. Penal & Corr. Complex*, 442 U.S. 1, 11–12 (1979) (concluding that a state parole statute that made

Reply in Support of Preliminary Injunction – Page 23

release mandatory under certain circumstances led to a reasonable "expectancy of release" that was "entitled to some measure of constitutional protection").

## V.    Irreparable harm will occur in the absence of an injunction.

While acknowledging that its version of irreparable harm is at odds with this Court's, the Commission nevertheless insists that the factor is unsatisfied.  *See* Dkt. 12 at 17.  The Commission's interpretation of the prong is that it compels the plaintiff to "demonstrate the [c]onstitutional violation itself."  *Id.*  For support, the Commission calls the Court's attention to a single case from the Middle District of Alabama.  *See id.* at 18 (citing *Powell v. Thomas*, 784 F. Supp. 2d 1270 (M.D. Ala. 2011)).  To its credit, the Commission concedes that this Court has rejected *Powell*'s formulation.  *See id.* (recognizing that, in *Rhoades v. Reinke*, 830 F. Supp. 2d 1046, 1070–71 (D. Idaho 2011), this Court found "irreparable harm based on death and inability to continue litigation").  More importantly, after the *Rhoades* decision the Ninth Circuit vindicated this Court's approach, holding that irreparable harm is present for "every § 1983 plaintiff in an injunction appeal involving an upcoming execution."  *Towery v. Brewer*, 672 F.3d 650, 661 (9th Cir. 2012).  *Towery* is good law, it was relied upon in Mr. Creech's preliminary-injunction motion, *see* Dkt. 4-1 at 30, and it controls.  The Commission is entitled to argue for its abrogation before the en banc Ninth Circuit or at the U.S. Supreme Court, but until it does so, the factor is satisfied.

## VI.    The balance of equities and the public interest favor an injunction.

Many of the points Mr. Creech has already made go to the balance of the equities, such as the fact that both the ACPA and the Commission declined easy opportunities to remedy the due process violations either by providing the information at issue in advance of the hearing or

Reply in Support of Preliminary Injunction – Page 24

**243**

granting a modest deferment afterwards.  Mr. Creech will not repeat those arguments, and will only add one additional consideration.

At every possible opportunity, the prosecution in this case has perpetuated the fiction that it is acting on behalf of the victims.  That includes the prosecution's responses to undersigned counsel's request that the Commission postpone its decision for a brief time to allow a full examination of the new Walker allegations.  In lobbying forcefully against such a delay, Deputy Attorney General Anderson claimed that he was speaking on behalf of all of "the many victims in this case" and their families.  Dkt. 5-12 at 2.

What about Mr. Walker's family?  Mr. Walker's brother Doug has publicly made it clear that his chief desire, like that of anyone whose loved one is taken from them, is to know the truth about what happened.  In his book, Doug Walker chronicles his search for the truth and the importance of being able to tell his brother's full story, including "the aligning of events surrounding his death."  Douglas Walker, *Daniel My Brother: Mystery in the Mojave* (2023) (Kindle Ed.), at "The Trip to Abilene and Buffalo Gap" (describing the importance of being able to share his brother's story with other family members and his own need to learn more before he could tell it).[3]  The only way to get to the truth of what happened to Mr. Walker would be to have Mr. Creech charged for his death.  That is how the American people have decided to settle facts about crimes: through public trials in court with a full adversarial process where evidence is screened by a judge and then weighed by a jury of one's peers that must vote unanimously to convict under the reasonable-doubt standard.  In the absence of a trial, there are also tools for fact-finding in a civil case like this one, such as the discovery Mr. Creech has sought.

---

[3] Because the Kindle edition lacks conventional pagination, Mr. Creech cites to the chapter title.

Reply in Support of Preliminary Injunction – Page 25

But the prosecutors do not want a trial or discovery or any fact-finding, because the prosecutors' interest is not in determining what happened.  The prosecutors want Mr. Creech killed and they saw in the Walker case a tragedy to exploit to that end.  They could casually announce on the spot at a hearing that Mr. Creech was guilty of the Walker murder with nothing to point to but a PowerPoint slide.  They could reap all the benefits such a sensationalistic announcement would bring.  And they could avoid anyone seriously looking into the matter because they knew that the day after clemency was denied they would ask a judge to schedule Mr. Creech's death for four weeks in the future.  The prosecutors' attempt to charge, convict, and execute Mr. Creech for the Walker murder within the space of three months on the basis of bogus stale evidence and with no process whatsoever is entirely a product of their desire to put the plaintiff to death.  They do not speak for Doug Walker in that crusade, or for anyone who actually wishes to uncover the truth of what happened to Daniel Walker.  The State here is pursuing death here solely because a single elected prosecutor made a decision thirty years ago that Mr. Creech should be executed and the Attorney General and Ada County now consider it the only outcome for which they get a "win."

To be clear, undersigned counsel likewise do not speak for Doug Walker, who speaks eloquently for himself.  *See* Ex. 11 at 3 (Doug Walker writing: "A twist of fate story of a life cut short, and an attempt to set the record straight.").  But unlike the prosecutors, the undersigned have never claimed to speak for anyone other than their client.  The fact that the prosecutors have so disingenuously taken up the mantle of victims while simultaneously exploiting their loss and preventing them from learning what happened to their loved one is a powerful factor cutting against the defendants in the equitable balancing.

Reply in Support of Preliminary Injunction – Page 26

**VII.    The error was not harmless and proximate causation is present.**

Seeking to avoid any searching judicial scrutiny over the egregious improprieties in the commutation proceedings, the defendants offer two related technical arguments.  The ACPA invokes the requirement under 42 U.S.C. § 1983 that a defendant's conduct be the proximate cause of the plaintiff's injury.  *See* Dkt. 11 at 15.  And the Commission makes an appeal to the harmless-error doctrine. *See* Dkt. 12 at 16–17.  Neither tack succeeds in shielding the ACPA's misconduct from federal review.

As to the first, § 1983 calls for a showing that the defendant's conduct was the proximate cause "of the injury."  *Spencer v. Peters*, 857 F.3d 789, 798 (9th Cir. 2017).  The ACPA contends that it is not the proximate cause for Mr. Creech's injury because the Governor would never have granted a commutation and the Commission wasn't interested in uncovering the truth about the prosecutor's misrepresentations.  *See* Dkt. 11 at 16.  Mr. Creech has already dealt with the gubernatorial issue above and won't repeat the discussion here.  *See supra* at Part II.  For present purposes, what matters is that the ACPA misunderstands the nature of Mr. Creech's injury.  Mr. Creech's claim is that his due process rights were violated.  *See generally* Dkt. 1. His injury, therefore, is that he did not receive the process to which he was entitled—for instance, the chance to contest false evidence used against him.  *See id.*  The ACPA is directly responsible for that injury, as it presented the false evidence.

In that regard, the situation is comparable to the criminal context, where "there is a clearly established constitutional due process right not to be subjected to criminal charges on the basis of false evidence that was deliberately fabricated by the government."  *Devereaux v. Abbey*, 263 F.3d 1070, 1074–75 (9th Cir. 2001).  It follows that a due process claim stemming from a criminal case involving false evidence need not point to a conviction and can instead flow

Reply in Support of Preliminary Injunction – Page 27

solely from "the bringing of criminal charges." *Id.* at 1075.  The overlap between that concept and Mr. Creech's commutation proceedings is especially apparent with respect to the Walker issue.  For there, the ACPA effectively did accuse Mr. Creech of committing a crime by inaccurately advising the Commission that the case had been solved when it hadn't.  The ACPA's wrongful conduct accordingly led directly to the due process injury and there is proximate causation.

Furthermore, it is unconvincing for the ACPA to rely on the Commission's decision to rush its decision without affording Mr. Creech the modest investigatory time he requested.  Mr. Creech agrees with the ACPA that this decision by the Commission is one of the unconstitutional acts he is alleging.  That is why he named the Commission as a defendant.  Nevertheless, the existence of an additional defendant that committed a separate constitutional violation does nothing to erase the fact that the ACPA also violated Mr. Creech's due process rights with its false statements—a distinct injury for which there plainly is proximate causation.

Moving on to harmless error, the Commission is wrong to say it applies and wrong in its application.  The only authority the Commission puts forward for the former proposition is *United States v. Havier*, 155 F.3d 1090 (9th Cir. 1998).  *See* Dkt. 12 at 16.  Critically, though, *Havier* did not involve a challenge to a clemency proceeding that took place within the executive branch.  Rather, *Havier* was an appeal from the revocation of supervised release by a federal district court.  *See* 155 F.3d at 1091.  In cases that come from a clemency proceeding before an executive agency, as Mr. Creech's does, the courts have granted relief to inmates without demanding any harmless-error showing, like in the *Wilson* and *Young* cases referred to earlier.

The differences between these two settings explains why harmless error would apply in one and not the other.  Because they take place in federal court, supervised-release-revocation

Reply in Support of Preliminary Injunction – Page 28

**247**

hearings carry with them all of the formalities of judicial proceedings, including a transcript, exhibits, a docket, briefing, the chance to make objections, and so forth. *See, e.g.*, *United States v. Manuel*, 732 F.3d 283, 289, 291–92 (3rd Cir. 2013). With those trappings, it is reasonable to expect the parties to discuss how the error affected the outcome, since the events and decision-making process are discernable. Mr. Creech's commutation proceedings took place on a different plane. There is no transcript, no objections were allowed, *see* Dkt. 5-7 at 3, and there were almost no rules whatsoever. Such an informal process doesn't allow for proper harmless-error review. *See United States v. Samaniego*, 187 F.3d 1222, 1225 (10th Cir. 1999) (calling a record "abysmally inadequate for harmless-error review" because a number of documents were missing, even though a transcript and several exhibits were available). As with so many aspects of this case, the defendants are improperly attempting to use the very shortcomings that created the due process violations in the first place as a reason for the Court not to review them.

If harmless error does have a place in the case, a preliminary injunction remains merited. As an initial matter, the Commission errs in imposing the burden on Mr. Creech to prove the error harmful. The first case the Commission itself cites for the harmless-error doctrine applying is *Chapman v. California*, 386 U.S. 18 (1967). Under *Chapman*, the burden is on "the State to prove that the defendant was not prejudiced by the error." *Kimmelman v. Morrison*, 477 U.S. 365, 382 n.7 (1986). The Commission was right to look to *Chapman* for the relevant formulation of the test, since it was a criminal case. By contrast, the cases the Commission turns to when it tries to switch the burden to Mr. Creech involve agency decisions and administrative law. *See generally Al Haramain Islamic Found. v. U.S. Dept. of Treasury*, 686 F.3d 965, 989 (9th Cir. 2012); *Cal. Wilderness Coal. v. U.S. Dept. of Energy*, 631 F.3d 1072, 1092 (9th Cir. 2011). The criminal context is much closer to Mr. Creech's, given that the Commission's

Reply in Support of Preliminary Injunction – Page 29

decision effectively sent him to his death pursuant to a first-degree murder conviction, rather than, say, freezing his assets.  As a consequence, the burden is on the defendants to "prove beyond a reasonable doubt that the . . . error complained of did not contribute to the" result. *Deck v. Missouri*, 544 U.S. 622, 635 (2005).

The defendants cannot remotely clear that hurdle, and would in fact lose even if the burdens were reversed.  On the facts, the Commission's basic contention is that it had no concern whether or not the evidence was fabricated.  *See* Dkt. 12 at 17.  That is not how harmless error works.  The question is whether the Commission can prove that the false evidence had no impact on the outcome.  That is a challenging assignment the Commission does not even try to take on in its section on harmless error.  The mere fact that the vote was tied also cuts strongly against a finding of harmlessness.  *Cf. United States v. Beckman*, 222 F.3d 512, 525 (8th Cir. 2000) (deeming an error harmful where a previous trial without the violation resulted in a hung jury).

Elsewhere in its response (though not in its discussion of harmless error), the Commission does opine that the Walker and sock issues were not "factors upon which" the commutation decision rested.  Dkt. 12 at 13.  Preliminarily, Mr. Creech questions whether it is appropriate for the Court to rely on a self-serving assertion about the decision-making process by a defendant, not to mention one represented by an Attorney General determined to carry out an execution.  *Cf. Hurles v. Ryan*, 752 F.3d 768, 790–91 (9th Cir. 2014) (declining to rely on a judge's findings about her own decision-making for federal habeas purposes).

Insofar as the Court gives the Commission the benefit of the doubt and takes that statement as going to harmless error, it doesn't move the ball for the defendants.  The Commission points to the explanations given for the negative votes, but if anything they do suggest a harmful impact.  In announcing their votes, the very first consideration identified by

Reply in Support of Preliminary Injunction – Page 30

the three Commissioners against clemency was "the coldblooded nature" of the Jensen murder. Dkt. 12-3 at 43. That is precisely why the sock photograph is so significant. The relevance of the sock to the ACPA is that it supposedly proves that Mr. Creech was part of the scheme to induce Mr. Jensen to start the fight and then kill him. *See* Dkt. 4-1 at 16; *see also* Dkt. 11-1 at 15 (summarizing the ACPA as telling the Commission that the account of Mr. Jensen "as the aggressor" was untrue). Using the sock, the ACPA convinced the Commission that Mr. Creech was the instigator and that the murder was "coldblooded" rather than an excessive reaction to an unprompted attack. Having successfully deployed the fraudulent evidence in this way, the ACPA should not escape accountability for their actions now.

Regarding the Walker case, the Commission submits that because the decision denying a commutation did not mention the matter, it must not have been a consideration. *See* Dkt. 12 at 13. To begin with, that is the opposite of how harmless error works. The Commission is essentially underscoring an absence of information—i.e., a doubt—and under *Chapman* doubt "must be resolved in favor of the" inmate. *McNeil v. Cuyler*, 782 F.2d 443, 447 (3d Cir. 1986).

In any event, there is evidence the Commission was influenced by the Walker material. The Commission pointed in its decision to the "sheer number of victims," Dkt. 12-3 at 43, which would certainly include Mr. Walker—especially when Doug Walker filed a late letter with the Commission on January 18, 2024. *See* Dkt. 12-1 at 5. Moreover, the prosecutor told the Commission the case had just been solved a week ago, Mr. Creech was the murderer, and if he wasn't executed he would be getting away with it. *See* Dkt. 4-1 at 5. This false statement suggested the Commission was the last avenue for making sure Mr. Creech was punished for Mr. Walker's death. Even more so because, as the Commission points out in its response, the prosecutor informed the Commission that the San Bernardino District Attorney ("SBDA") would

Reply in Support of Preliminary Injunction – Page 31

not charge Mr. Creech for the murder of Mr. Walker because of what was happening in Idaho. *See* Dkt. 12 at 12. In this context, the prosecutor's false statement that the case was closed and that Mr. Creech was the murderer meant the SBDA was also counting on the Commission to punish Mr. Creech for the murder of Mr. Walker.

There is no greater evidence of the impact of the Walker material than the ACPA's own public relations outreach. *Cf. Hendrix v. Palmer*, 893 F.3d 906, 920 (6th Cir. 2018) (finding an evidentiary error prejudicial and stressing the prosecutor's statements about the facts at issue in his closing argument). The press release issued by the ACPA immediately after the commutation hearing refers by name to only two victims: David Jensen and Daniel Walker. *See* Dkt. 4-3. In the release, the ACPA proudly touts the fact that it has "solved" a fifty-year-old cold case. *See id.* The release achieved its intended goal—outlets from around the country picked up on the story. *See, e.g.*, Ex. 13. Many of them echoed the ACPA's message, explicitly or implicitly, that it was already settled that Mr. Creech was guilty. *See, e.g.*, *id.* at 17 ("After 50 years, investigators ID suspect who killed Good Samaritan in the Mojave Desert"); *id.* at 23 ("Infamous Serial Killer Tied To 1974 Cold Case Killing In SoCal Desert"); *id.* at 35 ("Infamous serial killer Thomas Creech connected to 1974 shooting on I-40."). This was the publicity the ACPA wanted: stories that uncritically told readers that Mr. Creech was guilty of Mr. Walker's murder.

Unsurprisingly, and by the ACPA's design, the Walker angle generated far more publicity than any other theme in the commutation hearing. The ACPA deftly generated a tidal wave of coverage to convince the public—of which the Commission is a part—that Mr. Creech was guilty of the Walker murder, and that it was one important reason why he should be executed. Now that the ACPA got its wish and Mr. Creech is headed to the lethal-injection

Reply in Support of Preliminary Injunction – Page 32

chamber, it is convenient for the defendants to downplay the part of the commutation process that the prosecutors themselves sensationalized most effectively.  In clemency proceedings, as in conventional criminal cases, a prosecutor's lawful aim is to not "win a case" at all costs but to ensure that "justice shall be done."  *Berger v. United States*, 295 U.S. 78, 88 (1935).  It would be perverse if the prosecutors here were allowed to falsely claim they "solved" a murder, walk away from their own lie, and prevent the truth from being ascertained by executing the accused without anyone being able to ask a single question about it.  The defendants cannot come remotely close to proving this deception harmless.

Finally, there is some irony to the defendants' reliance upon aggravating evidence distinct from the sock and the Walker case.  Mr. Creech does not—and cannot deny—the presence of serious aggravation, including five murder convictions.  But it was the ACPA's decision to pull out all the stops and introduce into the hearing false claims that went well beyond the supported aggravation.  Had the ACPA acted responsibly and limited itself to the many legitimate points it could have made against clemency, we would not be here today.  No one forced the ACPA to present a false image of the murder weapon or to wrongly claim that the Walker case was solved.  And no one forced the ACPA to withhold those facts from their 3,000 pages of documentary submissions in order to gain the benefit of an ambush.  The ACPA made those decisions, and it should deal with the inevitable ramifications, which include a short stay now.

## VIII.   If no relief is granted, discovery and a hearing are necessary.

The ACPA's decision to dispute almost no material facts makes it appropriate for this Court to grant an injunction on the papers alone.  Failing that, discovery is certainly in order, and potentially an evidentiary hearing as well.  There are important questions that the ACPA has

Reply in Support of Preliminary Injunction – Page 33

refused to answer in its filings, like whether it is claiming the un-circled sock in the PowerPoint slide is the murder weapon. *See supra* at Part III.A. Apparently only the obligatory discovery process will force responses from the ACPA to such questions. And there are important records that the ACPA has not provided, such as the communications it made to the San Bernardino authorities that led to the supposed closure of the Walker case, any reports by Tom Taylor that are contemporaneous with his alleged interview with Mr. Creech if they exist, and records of any other interviews with Mr. Creech about the Walker case. Mr. Creech has been diligently seeking such information through whatever avenues are open to him, such as public record requests, but the relevant agencies have not supplied responsive material yet, *see* Ex. 2 at 2, making expedited discovery necessary.

**IX.   Conclusion**

Mr. Creech has raised a serious claim about egregious misconduct by the State of Idaho at a proceeding where a man's life hung in the balance, supported by copious evidence. If the claim asserted here is eventually denied on the merits, so be it. But it would be an irrevocable injustice if Mr. Creech is executed while substantial allegations are pending about how his fate was decided and before those allegations can be fully and fairly adjudicated. The preliminary injunction should be granted.

DATED this 16th day of February 2024.

*/s/ Christopher M. Sanchez*
Christopher M. Sanchez
Jonah J. Horwitz

Federal Defender Services of Idaho

*Attorneys for Plaintiff Thomas Eugene Creech*

Reply in Support of Preliminary Injunction – Page 34

**253**

## CERTIFICATE OF SERVICE

I hereby certify that on this 16th day of February 2024, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which is designed to send a Notice of Electronic Filing to persons including the following:

Dayton P. Reed
Heather McCarthy
Sherry A. Morgan
civilpafiles@adacounty.id.gov
Counsel for Defendant Bennetts

Karin Magnelli
kmagnell@idoc.idaho.gov
Counsel for Defendant Parole Commission


/s/ Heidi Thomas
Heidi Thomas

Reply in Support of Preliminary Injunction – Page 35

# EXHIBIT 20

*Thomas Eugene Creech v. Idaho Commission of Pardons and Parole, et al.*

Case No. 1:24-cv-00066-AKB  Filed in support of Reply in Support of
Motion for Preliminary Injunction

# EXHIBIT 2

## DECLARATION OF CHRISTOPHER M. SANCHEZ

I, Christopher M. Sanchez, mindful of the penalties of perjury, declare as follows:

1.     I am a person over eighteen (18) years of age and competent to testify.

2.     I represent Plaintiff Thomas Eugene Creech in this action.

3.     I am an attorney with the Capital Habeas Unit for Federal Defender Services of Idaho ("CHU").

4.     I am one of the two attorneys who represented Mr. Creech in connection with his commutation proceedings.

5.     As such, I had access to the report prepared by the Parole Commission investigators.

6.     Our office would have filed this Parole Commission report with the Court, but it is considered part of the "hearing packet" and the Attorney General and the Ada County Prosecuting Attorney have objected to us providing any of these documents to the Court, *see* Dkt. 4-2 at 3–4, so I will quote the report below.

7.     The report includes the following passage: "Mr. Creech said, 'There were names on all the socks . . . the weapon was labeled "Garza."'  There is no mention in the incident reports or police reports, regarding Mr. Jensen's homicide, of a name or other distinctive marking on the sock used as a weapon." (omission in original).

8.     The parties were informed by the Commission prior to the hearing that no one would be permitted to record the proceedings.  Had my office been allowed to do so, we would have recorded the hearing.

9.     I participated in Mr. Creech's commutation hearing on January 19, 2024, appearing remotely from the Idaho Maximum Security Institution.

10.    The hearing was also livestreamed for the public to view at the Idaho State Police Headquarters in Meridian, Idaho.

11.    During the hearing, I recall Jill Longhurst saying that Jan Bennetts had been the Ada County Prosecuting Attorney for longer than Jim Harris had

DECLARATION OF CHRISTOPHER M. SANCHEZ - 1

**257**

been and commenting on Ms. Bennetts's presence at the hearing.  Ms. Longhurst did not make a similar comment about her own tenure compared to Mr. Harris's.

12.     Our office has filed public records requests with the Ada County Prosecutor's Office, the San Bernardino Sheriff's Department, and the San Bernardino District Attorney's Office. When any of these agencies ask that we narrow or clarify our requests, we respond promptly to make sure our requests are targeted and expedited.

13.     I declare under penalty of perjury that the foregoing is true and correct. Executed on this 16th day of February 2024, at Boise, Idaho.

/s/ Christopher M. Sanchez_____
Christopher M. Sanchez

DECLARATION OF CHRISTOPHER M. SANCHEZ - 2

**258**

# EXHIBIT 21

COMMUTATION HEARING MINUTES



State of Idaho
Commission of Pardons & Parole

| COMMISSIONERS: | Matthews, Mike; Dressen, Janie; Kirkham, Terry; Parker, Shelly; Ross, Michael; Smith, Scott | EXECUTIVE DIRECTOR: | Dowell, Ashley |
|---|---|---|---|
| OFFENDER: | Creech, Thomas Eugene | IDOC #: | 14984 |
| DOC LOCATION: | Idaho Maximum Security Institution | DATE: | 1/19/2024 |

### CASES

| Case Number | Offense | Sentence Type | Max. | Min. | PED | FTRD |
|---|---|---|---|---|---|---|
| 10252 | Murder I | Concurrent | DEATH | DEATH | N/A | DEATH |
| 2165 | Murder I | Independent | LIFE | LIFE | N/A | LIFE |
| 2165 | Murder I | Consecutive | LIFE | LIFE | N/A | LIFE |

### PRIOR HEARINGS

| Date | Type | Decision |
|---|---|---|
| 10/18/2023 | Commutation Review | Schedule Hearing |

### CURRENT DETAILS

| Hearing Started | Executive Session At | Hearing Resumed | Hearing Ended |
|---|---|---|---|
| 08:48 AM | 02:33 PM | 02:39 PM | 05:10 PM |
| | 04:25 PM | 05:10 PM | |

## Minutes

### Welcome & Introduction

The Commission welcomed those in attendance at the Commission office, including supporters, victims, Thomas Creech's legal counsel, and Ada County Prosecutors. The Commission greeted Thomas Creech, who is attending this hearing from Idaho Maximum Security Institution, via WebEx. Due to limited space at the Commission office, the public can view this hearing from the Idaho State Police District 3 Headquarters, via WebEx.

Thomas Creech submitted a petition for commutation of his sentence, from death to life without parole. On October 18, 2023, the Commission reviewed Mr. Creech's petition and elected to schedule this commutation hearing. The Commission explained that the purpose of this hearing is not to retry this case, but to consider commuting Mr. Creech's death sentence to a life sentence without the possibility of parole.

If the Commission elects to recommend commutation, the Governor will have thirty days to respond. If the Commission elects to deny commutation, then this process will end today.

The Commission reviewed the order of events for this hearing: supporter testimony, Federal Defenders of Idaho presentation, Ada County Prosecutor presentation, Commissioner questions for Mr. Creech and his responses, Federal Defenders closing, Prosecutor closing, and then victim statements.

### Supporter Testimony

Brian Thom – Retired bishop. Mr. Thom stated that he is Mr. Creech's spiritual advisor, and at his request, would be in present in the chamber with him. He believes hope has been achieved in Mr. Creech 's incarceration at IMSI. This time has allowed Mr. Creech to amend his attitudes and behaviors, and other residents now look up to him, as a mentor. Clemency will ensure Mr. Creech is held responsible for his crimes for the rest of his life, will ensure public safety, and will allow Mr. Creech to remain the positive and calming influence that he has become.

Gary Hartgrove – Has worked in law enforcement for forty years; he worked for the Idaho Department of Corrections from 2015 to 2020, retiring as Deputy Warden at IMSI. He walked death row regularly, got to know the residents there. He is fully aware of what Mr. Creech has been convicted of. He stated that Mr. Creech always appropriately addressed staff, followed the rules, and never displayed any threatening behavior. Officers and staff, including himself, appreciated Mr. Creech's cooperative attitude.

Mr. Hartgrove was tasked with reestablishing the program that allowed residents to spend time together, in the common area of the tier. Residents initially spent time in pairs, at a table with their legs restrained, and throughout his time at IMSI, the guidelines loosened up significantly, eventually allowing more than two inmates to walk the tier together. Mr. Creech made many suggestions to improve the program and provided input about possible incompatibility issues that the staff greatly appreciated and used to ensure safety.

Mr. Creech was always friendly and upbeat. Even when he was doing poorly, though he looked sick and became withdrawn, he did not cause any problems. In 2019, Mr. Creech was dealing with some serious health issues, and as deputy warden, Mr. Hartgrove ensured Mr. Creech received the medical attention and treatment that he needed. During that time, Mr. Creech told him, "I'm sorry for what I did to that kid," and he asked for a Catholic priest to come to the facility to take his confession. Mr. Hartgrove arranged for Father Evarist Shiyo to come to IMSI and visit Mr. Creech. He stated that no other inmate, in his entire career, had ever made such a request.

Mr. Hartgrove asked the Commission to consider allowing Mr. Creech to spend the rest of his life in prison. He stated that residents in their 60s-70s, like Mr. Creech, are extremely old in prison, compared to the others, and most of them realize life is much less stressful when they do not struggle with authority. He believes Mr. Creech is a minimal threat, and staff would suffer if he were executed.

Kathy Niecko – Director of Nursing at IMSI from 2001 to 2006, and Health Services Administrator of IMSI from 2006 to 2014. Mrs. Niecko stated that she is not some old softy with a bleeding heart for the condemned. She is a military veteran, and she made it through nursing school while raising six children, including one with a disability, who she stills cares for today. She is no pushover. She has tremendous respect for law and order, chain of command, and the justice system. She believes in the death penalty, but she does not believe Thomas Creech should be executed.

Mrs. Niecko explained that she did not always feel that way. Her initial impressions of Mr. Creech were shaped by descriptions of him in the news, in the late 1980s. Her now late husband was a correctional officer at that time, and she was afraid for him. She asked her husband if he ever had to watch Thomas Creech, and he said yes. He quickly reassured her that Mr. Creech is not a problem or a danger but in fact, quite the opposite. She wondered if her husband was only trying to ease her fears, until twenty years later, when she found herself working at IMSI.

Mrs. Niecko was surprised by Mr. Creech's respectful and polite communication. She stated that the inmates did not usually treat her staff nicely. Some inmates threw feces at them. Mr. Creech, on the other hand, was always thankful, and throughout her entire career in IDOC, she watched Mr. Creech treat every other staff member in the same manner. No other inmate, she said, has ever shown her such heartfelt gratitude. Mr. Creech wrote her a letter of thanks, which she has kept to this day.

Mrs. Niecko recalled a situation where Mr. Creech needed to be treated at an outside hospital, but he did not want to go. She brought him into an exam room to speak to him in private, but against her instructions, there was a CO in the room. She told the CO to leave, and he initially refused because he was concerned for her safety. She told the CO that she was absolutely sure, and he did leave the room so that they could have a conversation. Mr. Creech expressed that he did not want to go to the hospital because he was afraid of being outside of the prison. She explained to him that if he went, then she would be able to get the proper medications for him to be more comfortable, and he eventually agreed to go and thanked her again. She stated that he never missed one chance to show his gratefulness to her and her staff.

Mr. Creech was also protective of everyone on Mrs. Niecko's team. Mrs. Niecko recalled a pharmacy technician being harassed by a shot caller of a prison gang. He scared the pharm tech by yelling and making inappropriate comments at her. Mr. Creech yelled at the shot caller to mind his manners and be respectful. The shot caller went silent and later apologized to the tech.

Mrs. Niecko stated that she never had any complaints about Mr. Creech from her staff. On the contrary, most of the staff expressed that they did not want to be around on the day of Mr. Creech's execution; they wanted to call in sick or simply not show up. Mrs. Niecko stated that one staff member told her that she may be the only one that shows up for work that day.

Mrs. Niecko believes in the death penalty if two conditions are met: hard evidence of the crime, and execution being carried out in a reasonable amount of time. She stated that getting to be 70-80 years old when a death warrant is finally issued is cruel and unusual punishment, and an execution at this point in Mr. Creech's life is pointless. She believes this is punishment enough. She stated that Mr. Creech did terrible things, but she truly believes he is not that person anymore. She explained that when the doors were malfunctioning on J Block, where the most dangerous inmates are housed, she told others that if a riot popped off because those doors malfunctioned, she would immediately go to Mr. Creech's cell, because that is where she would be safe.

Mrs. Niecko thanked Mr. Creech for his respect and gratitude toward her and her staff. She thanked the Commission for allowing her to make a statement.

Melissa Hurley – Has been working in death row for six and a half years. She experiences interruptions in her life, schoolwork, social interactions, and every other aspect of her life whenever executions are carried out. It is especially difficult because family, friends, loved ones never understand what she is going through. She knows she is not the only one who is affected in these ways. She stated that even while she faces death every day, Mr. Creech's presence is comfortable; his character is the exact opposite of what you'd expect, and she has never heard one story to contradict her experiences with him. In 2018, she said, Mr. Creech gave her a signed copy of his poem, and she was granted permission from her superiors to keep it and take it home. She commented that something that is usually seen as potential manipulation was deemed genuine because it came from Mr. Creech.

Ms. Hurley believes the day of Mr. Creech's execution will be extremely difficult for everyone in the facility, especially the higher ups who are more involved in the process and have known him for so long. She cannot even begin to understand the suffering dealt at his hands, she does not know who he was before, but she knows he continues to make positive contributions to his community today. She supports commutation to a life sentence without parole.

**Federal Defenders of Idaho Presentation**

Jonah Horwitz, attorney with the Federal Defenders of Idaho, asked the Commission to show mercy and recommend reducing Thomas Creech's death sentence to life without parole. He believes Mr. Creech's story proves the power of redemption, and that is why he should not be executed. He thanked the Commissioners, Executive Director, and Commission staff.

Mr. Horwitz explained that the entire penalty, the heart of the death penalty is that it should be reserved for the worst of the worst, when there is no other option. He asked the Commission whether they believe the Thomas Creech of 2024 is among the worst people of society, because that is who would be executed today.

Mr. Creech committed serious crimes and deserves punishment for them. Mr. Horwitz asked the Commission to keep in mind when those crimes occurred, because the last thirty years tells a different story. In 1998, Mr. Creech married his wife, LeAnn. In 2010, the director of IDOC chose Mr. Creech to serve as ambassador, to meet with a group from the Methodist Church. In 2019, the prosecutor who originally wanted to seek death spoke against it. In 2020, Mr. Creech was observed to be a model inmate for decades. In 2023, the judge who sentenced Mr. Creech to death publicly spoke against his execution. Mr. Creech has excellent disciplinary records and has established real, positive relationships. This is what paints the picture of the Thomas Creech of 2024. This is not about whether Tom of 1981 deserves to die, he said, but whether Tom of 2024 deserves to live.

Mr. Horwitz stated that Thomas Creech was justly convicted and punished for the death of David Jensen, but the question is whether this crime requires an execution, and they believe the answer is no. There are many interpretations of what happened on that day. Two officers wrote that they believe there is no way Mr. Jensen initiated the assault, but when Judge Robert Newhouse sentenced Mr. Creech to death in 1982, he noted that Mr. Creech was attacked by the victim without provocation. Judge Newhouse knew more about the case than anyone, reviewed all of the evidence.

*9:33 a.m. – BREAK*
*9:41 a.m. – RESUME HEARING (Federal Defenders of Idaho Presentation)*

Mr. Horwitz asked the Commission to compare this case to similar crimes. Santos-Quintero is accused of beating a fellow inmate to death, and prosecutors in his case elected not to pursue the death penalty. The idea that execution is necessary for closure in any situation comes from the prosecutor's decision to seek the death penalty in the first place. When that decision is not made, then victims are able to find closure from life in prison without the possibility of parole, which is what they are asking for today.

Thomas Creech has been described by IDOC staff as a caring, thoughtful, compassionate person. Ronald Gus, who worked for IDOC for twenty-three years, wrote about Mr. Creech, "of all the men upon the row, only you will get a tear to flow." In 2012, when Mr. Gus' wife passed away, Mr. Creech wrote a touching poem for him, to express his condolences. Brandi Barclay, who worked at IMSI until 2004, wrote that Mr. Creech is incredibly talented, and that staff members who kept his poems did so because they truly treasured them.

Mr. Horwitz explained that Mr. Creech has used his poetry skills to comfort, honor, and respect IDOC staff. Regarding his poem "Unsung Heroes," Mr. Creech said he saw what the officers were going through, and many residents were down on them, spitting on them, threatening their families, and he never understood why others were so angry at the guards when the guards are not the ones that put them there. Mr. Creech previously stated that whether people realize it or not, the officers are putting their lives on the line every day.

Mr. Horwitz added that Billy Braseth, who retired from IDOC in 2011, believes Thomas Creech's personality is not compatible with a death sentence. Jeanette Griggs, who worked for IDOC for twenty-seven years, believes in the death penalty but also believes Thomas Creech is entitled to clemency; she believes he already has and continues to receive serious punishment for his crimes.

Mr. Horwitz played clips of interviews with Roger and Donna Boe, Bishop Bob Hoshibata of the United Methodist Church, Thomas Creech's wife, his sister, and his brother-in-law.

During her interview, Donna Boe recalled that she met Thomas Creech with Bishop Hoshibata in 2010. Mrs. Boe stated that Mr. Creech was remarkably relaxed, given his situation, and he answered their questions as best as he could. Bishop Hoshibata explained that he wanted to know what was going through Mr. Creech's mind; he was interested in his history, what brought him to that place, and how he was doing on death row.

When it came time for them to leave, Mrs. Boe said, Mr. Creech held hands with them and allowed Bishop Hoshibata to lead them in prayer. Bishop Hoshibata stated that he felt the presence of God there; he felt a strong spiritual connection, not with someone who was evil but with a human being that God had placed upon this earth. Bishop Hoshibata felt that this person is not someone who should die. Brent Reinke, Director of IDOC at that time, wrote about how thankful he was for that meeting.

Thomas Creech's sister, Virginia Plageman, and her husband, Michael, explained that Tom has a lot of wisdom now, and he has made them stronger, too. She stated that visiting her brother after he was sentenced to death was one of the most difficult times of her life. They are close, and her children love him.

*10:05 a.m. – BREAK*
*10:10 a.m. – RESUME HEARING (Federal Defenders of Idaho Presentation)*

Mr. Horwitz told the Commission about Thomas Creech's wife, LeAnn Creech. She is the most important person in Mr. Creech's life, his motivating force on his path to becoming a decent, honorable person. During her interview, Mrs. Creech explained how they met in 1996, when her son was a correctional officer at IMSI. Her son would come home and talk about Tom, about how he liked him and thought he was a good guy. They got married in 1998 and have been best friends ever since.

Mrs. Creech stated that Tom understands and cares so deeply, she does not know how anybody could not love him. She wondered how she could end up married to someone on death row. She explained that Tom is on death row for things that he did when he was young, but that is not who she married. Her family loves him, especially her nieces who are always laughing when they talk to him on the phone; her family has become his family. She stated that Tom touched something in her soul that nobody had ever reached before. She added that Tom's poetry is what truly showed her his heart, because there is no way anybody could write like he does, and not have a good soul and spirit. His sister believes he will be a well-known author one day.

Mr. Horwitz reviewed Mr. Creech's disciplinary record. Starting in 1992, Mr. Creech went twenty-eight years without a single DOR, and he is treated appropriately as no risk by IMSI staff. Mr. Horwitz showed a timeline of Mr. Creech's DORs, and he admitted that there were some serious, inexcusable incidents. He stated that those are from a distant era, many years ago, and they do not describe who he is today.

Thomas Creech received a DOR in 2022. The other resident involved, Azad Abdullah, later explained that it was just a misunderstanding over a card game that unfortunately got heated, but they immediately made amends and have been close ever since. Mr. Abdullah described Mr. Creech as a close friend and brother to him, and he would be devastated if Mr. Creech was executed.

Attorney Horwitz explained this incident a lapse in judgment, and Mr. Creech was appropriately disciplined for it. Mr. Creech lost his temper, but this does not reflect deliberate planning or intention to do harm. Mr. Creech ended up on the floor, unresponsive, as a result of that exchange. He was taken to the emergency room, where doctors detected a large abdominal aneurysm that required major surgery, which indicates how frail he has become. Mr. Horwitz stated that Mr. Creech is no longer capable of engaging in such conduct. He added that after this incident, other residents showed great concern for Mr. Creech, proving that he is held in great esteem and remains a model inmate. He noted that prosecutors included a report about drugs being detected on an envelope, but the envelope was tested by Idaho State Police, and it turned out to be a false positive and Mr. Creech did nothing wrong.

Mr. Horwitz reiterated that Judge Newhouse imposed the death penalty because he knew of no other way to protect society at the time, but even he has recognized that Thomas Creech has changed, grown, evolved, and is no longer a threat.

Mr. Horwitz understood that there are different accounts on whether Thomas Creech poses a threat today. Former Senior Deputy District Attorney of Multnomah County, Oregon, Baron Sheldahl wrote that he is sure those advocating for Creech's clemency would not want to spend one minute alone with him in his cell. Mr. Horwitz responded that Mr. Creech is a different person than what Sheldahl believes, and he reiterated that Mrs. Niecko said she would go to Mr. Creech's cell for safety in the event of a disruption in the facility. He added that Mr. Creech was unrestrained during his meeting with Dr. Campbell, which proves that staff does not perceive him as a threat. He stated that he has spent hundreds of hours alone with him, himself, and he has never felt apprehension, even for a moment.

Some have explained Mr. Creech's exceptional record by pointing out that he has been in lockdown throughout his entire incarceration. Mr. Horwitz reiterated that IDOC started giving death row inmates more time to socialize amongst themselves without restraints in 2018. He stated that they are now allowed eight hours per day, every day, to socialize without restraints for a substantial length of time, and Mr. Creech has only benefitted from that.

Mr. Horwitz stated that Thomas Creech is not a threat, and IDOC is more than capable of doing its job and keeping other residents safe, as they have for the last thirty years. On the contrary, Mr. Creech's execution would deprive other residents of his positive impact for no good reason. Mr. Creech has given sound advice to younger inmates, to help them stay out of trouble, and he encourages them to give up their criminal lifestyles.

Mr. Horwitz believes it is important to consider these statements and think about what Mr. Creech's execution would say to other inmates. It could show them that rehabilitation is impossible, or that it does not matter whether they turn their lives around. He stated that that is the worst possible message that they could send.

Mr. Horwitz explained that Thomas Creech's childhood does not excuse any of his crimes, but it does explain how he got to that point. When Mr. Creech was five years old, he was pushed off of a flight of stairs, onto a cement floor. He was found unconscious and bleeding from his eyes, ears, and mouth. He was being treated for a cerebral concussion, until his mother pulled him out of the hospital against the doctor's orders. Mr. Creech's siblings have reported that he was different and strange after that, and he has never been the same since.

Mr. Creech's brain injury was compacted by the fact that he grew up in an abusive, neglectful home. His mother essentially abandoned them, and his father was a violent alcoholic. One year, his cousin attempted to shoot his mother on Christmas Day. He experienced trauma throughout his childhood and has spent the vast majority of his adult life in prison. Until 2018, he was isolated for twenty-hour per day, with almost no human contact. That is a serious punishment that he deserved, and he did serve.

Mr. Creech also continues to live with the knowledge of what he did, the horrible price that he exacted from the victims of his crimes. Attorney Horwitz believes living with the understanding of the consequences of his actions is punishment itself. Mr. Creech's wife,

IDOC Data Sensitivity Classification - L3 Restricted

LeAnn previously stated that he does not deserve death for things that he did in his 20s, things that he knows he shouldn't have done and have haunted him ever since. She believes he has suffered for everything he did, not only because he is in prison but because of what it did to him as a person, what he has had to come to terms with. She stated that Tom looks back and cannot believe he was ever that person, and he struggles to understand how he got to that point.

Mr. Horwitz turned the Commission's attention to the allegation that Thomas Creech is the worst serial killer in Idaho history. He believes this is a myth. He explained that there is no denying Mr. Creech committed many serious crimes, and it is important for the Commission to take his convictions into account, but there are other stories about 28 or 32 or 42 murders that are completely false, and it is also important for the Commission to not base their decision on those myths.

Mr. Horwitz explained that the myths started with Bruce Robinson's desire to line his pockets by distorting his client's case. Bruce Robinson has acquired rights to Thomas Creech's life story, which Horwitz called an extremely unethical maneuver for any attorney. Mr. Robinson's goal was to use the trial to create a spectacle and then sell the story to others, which he made clear in his letter to Vince Bugliosi, the author of "Helter Skelter."

Mr. Creech was subject to truth serum interviews and hypnotization, which is where the stories about 42 murders and satanic motorcycle gangs originated. These interviews came from a doctor who also required rights to Mr. Creech's story, which is extremely unethical of a doctor, as well as an attorney. Interviews involving truth serum, or sodium amytal, have since been ruled unconstitutional.

In court, Mr. Robinson explained that his goal of the trial was to realize the existence of God and Satan, and he tried to call Anton LaVey, founder of the Church of Satan, to testify for Mr. Creech's case. Mr. Horwitz stated that one of Robinson's only investigative steps was to travel to Ohio in search of buried money that did not even exist. He concluded that the origins of these stories are clearly not reliable and should not be taken into consideration. He asked the Commission to limit their consideration to the crimes that Thomas Creech has been convicted of.

Mr. Horwitz reiterated that the judge that sentenced Thomas Creech to death, Judge Newhouse, has since spoken against his execution. Judge Newhouse wrote that an execution at this point would only be an act of vengeance, and no other purpose would be served. Mr. Horwitz added that in most states, Mr. Creech would have been sentenced by a jury of his peers, but in Idaho, Judge Newhouse is the solitary man responsible for his death sentence, and that man now believes the death penalty is no longer necessary in this case. Mr. Horwitz said many people feel there is a role for vengeance to play in the justice system, but we have learned and grown as a society, and now, we give the justice system a higher purpose of rehabilitation and redemption, and that is exactly how Thomas Creech has lived his life in prison.

Mr. Horwitz continued the video of Donna Boe's interview, where she reminded everyone that Thomas Creech is not the person that she read about in the news. Mrs. Boe believes every person deserves the right to repent of their sin. In her interview, LeAnn Creech said Thomas Creech knows what he did wrong, and as much as he wishes he could, he cannot change it. She stated that he can only do his best with what life he has left, and he does whatever he can to be there for others, help them, and make them feel good. Virginia Plageman stated that commuting Tom's sentence from death to life in prison is simply the right thing to do, not because Tom is her brother but because he is a different person today. Michael Plageman added that he believes everyone is a little selfish, except Tom, who does not have a selfish bone in his body. Mr. Boe said it would be disastrous to see Tom's life taken away, and he is going to die soon anyway, so to do it this way is pointless.

Attorney Horwitz asked the Commission to vote for life, against more death, and thanked them.

*10:49 a.m. – BREAK*
*11:12 a.m. – RESUME HEARING*

**Ada County Prosecutor Presentation**

Ada County Deputy Prosecutor Jill Longhurst stated that Thomas Creech is a serial killer. In 1981, she said, Thomas Creech said he would kill again, and two months later, he did. Thomas Creech brutally beat and stomped David Jensen to death. Ms. Longhurst stated that Thomas Creech is the most prolific serial killer in Idaho history.

Ms. Longhurst explained that the biggest lie Thomas Creech ever told was that the brutal beating of David Jensen was self-defense. Mr. Creech wanted to go into isolation, and in order to get what he wanted, he used violence, and it worked. He has always used violence or threats of it to get what he wants.

Thomas Creech has been convicted of murder five times, in three states. Two other states have holds on him for other murders. He has confessed to more than fifty murders in at least five states. To put those numbers in perspective, Ms. Longhurst explained that in the case of Jack the Ripper, five bodies were found. Charles Manson was responsible for the murders of seven people. David Berkowitz, also known as the Son of Sam, committed six murders. Ted Bundy was convicted of seven murders and confessed to thirty. The court has ruled that Thomas Creech used excessive violence in the murder of David Jensen, he was beyond rehabilitation, and he has a propensity to commit murder. Ms. Longhurst explained that today, they will focus on ten people that Thomas Creech murdered, in addition to David Jensen. She stated that there are other victims, but they selected ten particular cases to review for this hearing.

In September of 1974, Thomas Creech met an underaged girl in Fresno, California, who was trying to find a way home to her mother.

Mr. Creech told the girl, Carol Spaulding, that he would take her to her mother in Idaho, but instead, they traveled around the country, hijacked cars, and committed robberies, until they finally ended up in Lewiston, Idaho around Halloween of 1974. Mr. Creech and Ms. Spaulding stayed with her mother for a few days and then began traveling again. While hitchhiking, they were picked up by two men in a Buick, Thomas Arnold and John Bradford.

The four of them drove until Ms. Spaulding asked to stop to use the restroom. They stopped, Mr. Creech got out of the vehicle, and after Ms. Spaulding got out, Mr. Creech pushed her to the ground, shot Thomas Arnold in the face and neck, and shot John Bradford in the temple. Mr. Creech and Ms. Spaulding stole the Buick and drove until they ran out of gas. After that, they hitchhiked and committed armed robberies until they got to Glenns Ferry, where someone recognized them and called police.

After he was apprehended, Ms. Longhurst said, Mr. Creech could not wait to tell everyone about what he did; he said he killed those two guys and needed help. Ms. Longhurst noted that this was well before Mr. Creech hired Attorney Bruce Robinson. Mr. Creech confessed to numerous murders, was ready to spend the rest of his life in prison for them, and was even flown out to help investigators locate the bodies of his victims.

Thomas Creech's confessions began on November 8, 1974, and he retained Mr. Bruce Robinson in July of 1975.

As Idaho State Police received more and more information from Thomas Creech, they contacted the jurisdictions where numerous other murders occurred. The US Supreme Court previously reported that Thomas Creech has participated in twenty-six murders across seven states, and eleven of the victims' bodies have been located. Due to the way that the Idaho statute was written at the time, the death penalty was the only option. Mr. Creech was placed on death row in IDOC custody, and as a result, the other states struggled to extradite him. Ms. Longhurst added that the statute as written was eventually ruled unconstitutional, and Mr. Creech's two death sentences were commuted. After that, in 1979, Mr. Creech was being extradited to other states to be tried for the murders that he committed under their jurisdictions.

Deputy Prosecutor Longhurst explained that Paul Schrader was an automotive mechanic from Detroit, Michigan, who'd decided to move to Tucson, Arizona for his retirement. When he arrived in Tucson, he rented a room in a hotel downtown, and unfortunately, the man staying next door to him was a serial killer. The man was knocking door to door, trying to get people to give him money, as he was in a bad way. Mr. Schrader, on the other hand, was well-off. When Mr. Schrader answered his door, Thomas Creech forced himself into the room and then used a pair of scissors to slash Mr. Schrader's throat and stab him multiple times. Mr. Creech pushed the body off to the side, out of view, and then took off in Mr. Schrader's El Camino.

Ms. Longhurst displayed a photograph of Thomas Creech's signature on a credit card receipt, for a credit card that belonged to Paul Schrader. Investigators knew Mr. Creech was using Mr. Schrader's credit cards, though he was ultimately acquitted of this crime. Afterwards, he told everyone in the Ada County Jail that he did kill Paul Schrader. One of Mr. Creech's autobiographies detailed Mr. Schrader's murder. Mr. Creech wrote that he immediately headed for Portland in Schrader's El Camino.

While incarcerated in Idaho, Thomas Creech confessed that while in the Oregon State Hospital after a suicide attempt, he earned a weekend pass, murdered someone in Sacramento, and then returned to the treatment center in Portland. Ms. Longhurst stated that this was an outlandish, doubtful story, but it turns out that he really did it. In November 1974, California law enforcement was contacted and notified that Mr. Creech confessed to the murder of Vivian Grant Robinson. Mr. Creech provided a diagram, method of murder, and other detailed information about the crime. California law enforcement was not even aware of Mr. Creech's existence until they got the call from Idaho, but they retested fingerprints found at the scene in Mr. Robinson's home and discovered that they did match Mr. Creech. Investigators also found that shortly after Mr. Creech killed Mr. Robinson, he called the treatment center from the victim's home telephone, to let them know he would be back a day late. The state of California had to wait for Idaho and other states to try Mr. Creech for his crimes there, but in September 1980, Mr. Creech was finally convicted of the murder of Vivian Grant Robinson.

In 1974, Thomas Creech got a job at St. Mark's Episcopal Church in Portland. Mr. Creech called his then-girlfriend, Linda, and asked her to come to the church and bring a rifle. Gene Hilby, who Linda lived with at the time, brought his rifle to the church. Mr. Creech came out and retrieved the rifle, went back into the church, came outside again, and told Mr. Hilby that he'd just killed a man and needed help hiding the body then a ride to the bus station.

William Joseph Dean was just a kid. He'd recently gotten married, and he was on his way to Alaska to work with his father. Thomas Creech shot William Joseph Dean in the chest with a high powered rifle at close range. After Mr. Creech and Mr. Hilby hid Mr. Dean's body in the church, they proceeded to the Greyhound bus station to raid Mr. Dean's locker.

William Joseph Dean's body was discovered days later, after staff noticed a foul smell coming from the sexton's quarters. They contacted police, and police contacted Gene Hilby, who admitted that Thomas Creech killed William Joseph Dean, and he helped him move the body. Mr. Hilby also told police that Mr. Creech told him about another murder, in Salem. Oregon authorities could not locate Mr. Creech until they received a phone call from Idaho. Portland investigators arrived in Idaho to talk to Mr. Creech the next day, and at that time, Thomas Creech confessed to the murder of William Joseph Dean, as well as the murder of a grocery store clerk in Salem.

Deputy Prosecutor Longhurst stated that these are not myths. This is reality.

After being convicted of the murder of William Joseph Dean, Thomas Creech wrote to the judge about the horrible conditions that he was facing while incarcerated. He asked for compassion and understanding, and he wrote that his situation was not justice. He was

not concerned about his victims or their families.

Two days after Thomas Creech killed William Joseph Dean, he entered a Circle K in Salem, where he found a grocery store clerk working, alone. Ms. Longhurst explained that the store clerk's father got her a job, as he was the regional manager, and that should have been a safe place for her, especially in broad daylight. Thomas Creech chased Sandra Jane Ramsamooj to the back of the store, shot her in the back, turned her around, shot her through her wrist and into her lungs, and then shot her pointblank in the abdomen, severing her intestines. Mr. Creech stole a whopping $81.29 from the cash registers. Mr. Creech confessed to this crime on November 9, 1974.

Ms. Longhurst added that Bruce Robinson was not even a figment of Thomas Creech's imagination at this point. She stated that this is not a myth, this is a murder.

Ms. Longhurst explained that the Oregon prosecutor decided another conviction would not serve any justice, as Thomas Creech was already facing multiple life sentences, so the case was dismissed.

Deputy Prosecutor Longhurst stated that Thomas Creech got away with the murder of Sandra Jane Ramsamooj. He has devastated families, left holes in their lives. Now, per his interview with the Parole Hearing Investigator, he will not even admit it. He was sentenced to death because he is a serial killer with a propensity to commit murder.

Gordon Stanton was on his way to Montana, where he intended to help and care for his mother. Thomas Creech contacted Mr. Stanton and asked him for a ride. Mr. Stanton did not know he was letting a serial killer into his car, and he never made it home to his mother. His mother had no idea where he was or how to find him. Just a few years after Gordon Stanton was murdered, his mother passed away. While in jail, Thomas Creech confessed to this murder, and he told investigators where they would find the body. Mr. Stanton's body was found, after Mr. Creech told them exactly where it would be, but because he already had multiple holds on him by 1983, he was never prosecuted for this crime.

Deputy Prosecutor Longhurst stated that Thomas Creech got away with the murder of Gordon Stanton, and that is not a myth.

Rick McKenzie had recently arrived home in Baltimore and took a relative's vehicle without their permission, resulting in a warrant on him and the vehicle. While driving the stolen car, Mr. McKenzie picked up a hitchhiker, that he did not know was a serial killer. Thomas Creech walked Rick McKenzie into a ravine and shot him, so that he could take his vehicle and credit cards.

After Thomas Creech confessed to the murder of Rick McKenzie in November 1974, Idaho law enforcement contacted authorities in Wyoming, who then attempted to locate Mr. McKenzie's body. They made three attempts before they called Ada County back for help. They flew Thomas Creech out to the area, Thomas Creech told them where the body was, and Rick McKenzie's body was found within a day.

Ms. Longhurst stated that Mr. Creech did not kill Mr. McKenzie for some outlaw biker gang; he killed him because he wanted his vehicle and money. Mr. Creech was arrested when someone recognized the vehicle that Mr. McKenzie stole. Mr. Creech was also found in possession of eighty-eight receipts, which indicated he'd been using Mr. McKenzie's credit cards. Mr. Creech was charged for the murder of Mr. McKenzie, he did three days in a California jail, and then, he got away with another murder. At one point, there was a hold for Mr. Creech to be extradited to Wyoming, but it is unclear what ever happened to it. The vehicle was returned to its rightful owner, and the police held onto the credit card receipts.

Daniel Ashton Walker was shot and killed while sleeping in his van at along Interstate 40. One version of events is that Thomas Creech's then-girlfriend, Carol Spaulding, entered a café for a Coke and a coffee, and when she came out, she told Tom that a man in the store was inappropriate with her. Thomas Creech previously reported that they went on their way, until their vehicle got stuck in the desert. He stated that a truck driver stopped and helped them, but shortly after that, they ran into the man that Carol pointed out at the store, so he decided to rob him. He pulled up behind the victim, pointed his shotgun through his window, and demanded his money. He then shot him with the shotgun three times at pointblank range. Unfortunately, Ms. Longhurst said, Daniel Ashton Walker's family was told that the case went cold, but it was recently reopened, and Thomas Creech was positively identified as the murderer. Ms. Longhurst stated that Thomas Creech committed this murder and confessed to it repeatedly.

Deputy Prosecutor Longhurst added that Thomas Creech has also gotten away with the murder of Daniel Ashton Walker. She stated that San Bernardino County sent them a letter stating that they will not try Thomas Creech for the murder, based on what is going on here in Idaho.

Daniel Ashton Walker's brother submitted a letter of concern, where he wrote that his 21-year-old brother was robbed of his adventurous life. He never got to build his boat and pursue his dream of sailing the world. He never had a chance to travel with his brother, never got to share a cold beer with him. He added that his brother's murder sent their father into an early grave.

Dwayne DiCicco, known by loved ones as Dago, had been in the military as a large equipment operator in Montana, until he disappeared in August 1974. Thomas Creech confessed to killing Dago and explained details of the crime to a room full of law enforcement officers. He stated that he kidnapped Dago, weighed him down, and threw him into a lake in Washington. He drew diagrams of where Mr. DiCicco's body could be found, but authorities were unable to locate him. Mr. DiCicco's mother, desperate to find her son, wrote letters to Thomas Creech, begging him for the diagrams and any other information that could help her find her son.

IDOC Data Sensitivity Classification - L3 Restricted

Dwayne DiCicco's body was never found, and Ms. Longhurst believes Thomas Creech knew his body would never be found when he confessed to this murder. However, Mr. Creech continued to write to Mr. DiCicco's mother, and Mr. DiCicco's mother went as far as putting money on Mr. Creech's books. Ms. Longhurst asked what kind of person kills someone's son and then uses the information to get money out of them. She added that, if we believe what Mr. Creech is claiming now, that he did not kill Dwayne DiCicco, then he took credit for the murder and bragged about it to the victim's own mother.

In 1979, Thomas Creech was transferred into Oregon DOC custody to be adjudicated for his crimes there. In 1980, he was moved to California for the same reason. Deputy Prosecutor Longhurst explained that, also in 1980, a huge riot broke out at the Idaho State Penitentiary. It was so big that it made the news, it lasted for days, authorities had to break into the facility. Thomas Creech was not in Idaho when this occurred, but he was convinced that when he returned, there would be another riot, where he would be killed. Inmates were moving from maximum security into general population at that time. He requested to be transferred to wherever he possibly could. He repeatedly told staff and other inmates that he would be killed in a riot if he stayed there.

IDOC did write to Oregon, expressing concerns that they did not have enough security to hold someone as dangerous as Thomas Creech. Oregon DOC did not want to keep him, stating that he was a violent and vengeful individual who showed no remorse, and they sent him back to Idaho after his adjudication. Mr. Creech was placed in general population, rather than where he felt safe on death row.

In January 1981, Mr. Creech repeatedly wrote to staff that he wanted to be put in isolation. He stated that he was not like the other inmates. He attacked a 20-year-old kid, sliced him in the abdomen, neck, and arm in a desperate attempt to be transferred. Mr. Creech got what he wanted, and he was transferred to Ada County Jail while prosecutors decided whether they wanted to prosecute him for the assault on the other inmate. Although there was substantial evidence, prosecutors decided there was not much that they could do, since Mr. Creech was already serving four life sentences anyway.

Ms. Longhurst stated that Thomas Creech assaulted Terry Downard because he wanted out, and he got what he wanted. Mr. Creech told a lieutenant where to find the weapon that he used, and later, he bluntly told an officer that he did it because Mr. Downard was an asshole and he wanted out of the penitentiary because he feared he'd be killed in the next riot.

After prosecutors decided not to pursue charges, Mr. Creech worried about going back to the penitentiary, and in an effort to stay out, he repeatedly said he would kill again. He stated that if Ohio would not take him, then they should put him in a hospital for the criminally insane. He repeatedly wrote letters to every authority that he could think of, begging them not to move him.

Three months before Thomas Creech murdered David Jensen, he wrote to Sherriff Palmer, "If I have to go back there, I will kill the first person that messes with me." Shortly after he killed David Jensen, he wrote to the Attorney General that he would kill again. He asked for the death penalty, instead of a life sentence, because he wanted to stay in the jail, instead of going back to prison. He wrote that last time, he told them that he would kill again, they didn't listen, and it costed a life.

David Jensen grew up with his father and stepbrother. His father was a biologist for Idaho Fish & Game, and his grandfather was the director of Fish & Game. He had a good life and upbringing, but when his mother passed away, it was a big hit on him, and he started getting into some trouble. As a teenager, he and some friends played a game of Russian roulette. He put the gun to his left nostril, pulled the trigger, and shot himself in the face. He was in severely critical condition; he severed his left optical nerve and was given a craniotomy. After that, he was essentially missing one third of his brain. He was in a coma for a substantial period of time, and he was diagnosed with an organic brain injury. When he finally woke up, he was unable to speak or walk, and he was experiencing grand mal seizures. He suffered a persistent disability to his right side, but eventually, he was able to walk with a cane. He wore a helmet to protect the rest of his brain, struggled with speech, and functioned at the level of a 12 to 14-year-old child, and none of that ever improved.

David Jensen underwent countless surgeries, and in 1977, he had a metal plate put in his skull. David Jensen talked about how difficult it was for him to function in society. He ended up in the state hospital, and he continued to experience seizures, as well as memory loss, vision impairment, a limp, and difficulties using his right arm. Staff would tell each other not to approach Mr. Jensen on his right side, because he will not be able to see you. He could not even hold a job as a dishwasher, and he was just marginally making it in society. He got into some more trouble, and he was sent on a 90-day Rider.

Thomas Creech knew that in order to get his way, he needed to do more harm than what he did to Terry Downard. Mr. Creech persuaded the warden to allow him an opportunity to work as the custodian of maximum security. Unlike others in maximum security who were only let out of their cells for an hour every day, Thomas Creech now had access to every inmate, all day long.

Deputy Prosecutor Longhurst explained that David Jensen was the weakest, most vulnerable person in that facility. She added that although he was put in maximum security, David Jensen was never classified. Staff described him as non-aggressive.

Ms. Longhurst reiterated that Thomas Creech wrote that he would do the same things until they listened to him, and that is exactly what he did. Mr. Creech initially volunteered to plead guilty, but instead, in 1982, he took the stand and claimed self-defense. The state never had a chance to present evidence, but this was absolutely not self-defense, and the story about Mr. Jensen being the aggressor was based solely on Mr. Creech's own testimony.

Deputy Prosecutor Longhurst reviewed different accounts of the murder of David Jensen. When David Jensen was given a chance to get out of his cell that day, Thomas Creech initiated a physical altercation and punched him. Mr. Jensen told Mr. Creech that he did not want any trouble, and he went back to his cell. Mr. Creech followed and attacked Mr. Jensen.

IDOC Data Sensitivity Classification - L3 Restricted

In assessing whether this was self-defense, Mr. Longhurst said, it should be noted that Mr. Creech not only began attacking Mr. Jensen from his back, but Mr. Creech retrieved his radio from his own cell, brought it to Mr. Jensen's cell, and turned it up to drown out the noise of the beating.

With a sock holding three batteries, Thomas Creech beat David Jensen so brutally that the batteries broke through the sock. After that, Mr. Creech began stomping on Mr. Jensen. Mr. Creech went back to his cell, cleaned himself up, and then returned to Mr. Jensen's cell to stomp him some more. Ms. Longhurst stated that Mr. Creech did not have one mark on him, and Mr. Jensen was laying, bleeding on the ground. Mr. Creech proceeded to tell everyone who would listen, to tell the officers that Jensen came after him. The other residents were forced to listen to Mr. Creech beating that kid to death, and they could not do anything about it.

Detectives interviewed one resident who discussed the radio, used to mask the sound of what Thomas Creech was doing to David Jensen. When he heard Mr. Creech going in again, he remembered thinking to himself, "God damn, he is beating that boy's brains out." Mr. Creech started out of Mr. Jensen's cell again, he said, but then, he heard the kid let out another groan, and Mr. Creech heart him, turned around, and started stomping him again.

Another young inmate reported that Jensen would never pick a fight. He also talked about Thomas Creech plugging the radio in and turning the volume up. Deputy Prosecutor Longhurst stated that that was premeditated murder, and Thomas Creech still, to this day, lies about it and claims he was attacked.

The other inmates reported that every time David Jensen gurgled and groaned, Creech went back into his cell, at least four or five times, to continue beating a kid that had been down from the start.

Ms. Longhurst explained that another inmate, who was housed in protective custody, was in a romantic relationship with Thomas Creech. Ms. Miller stated that when the warden let Tom become custodian, she was scared, because she knew Tom was up to something. Ms. Miller thought Mr. Creech was plotting to kill himself, but then, he started talking about killing a kid. Ms. Miller did not feel she could say anything because she was afraid, but she discussed it with him through writing, days before Mr. Creech attacked Mr. Jensen. Mr. Creech wrote that he would cut himself to make it look like self-defense, and that is exactly what he did.

Ms. Longhurst stated that Thomas Creech wanted isolation, and he did whatever he thought he had to do to get there.

Deputy Prosecutor Longhurst showed photographs of David Jensen's grievous injuries. She noted that Thomas Creech stomped the victim's metal plate in, causing a large depression in his head, and he continued to stomp him over and over again. Mr. Jensen suffered contusions, bruising on his brain. Ms. Longhurst stated that she has only seen one other contusion of the brain in her entire career.

Self-defense, Ms. Longhurst said, is part of the lie that Thomas Creech has been trying to tell them. Ms. Longhurst asked how Thomas Creech can claim he is remorseful if he cannot accept any wrongdoing. Mr. Creech did not care about the guards who were forced to come in and handle what he'd done. Mr. Creech stomped on Mr. Jensen's head with so much force that he crushed his skull. Mr. Jensen suffered bruising on the back of his neck, indicating that he was curling up and turning away from the beating.

Ms. Longhurst showed photographs of David Jensen's cell. There was a razor attached to a toothbrush and a large pool of blood on the floor, as well as blood covering the entire wall. Ms. Longhurst stated that this is what self-defense means for Thomas Creech. Mr. Jensen never had a chance of getting away or defending himself. Mr. Creech attacked him from behind. She stated that this is the scene that Mr. Creech left for the COs to clean up; that is how much he really cares about them.

Thomas Creech later stated that David Jensen was not much of a fighter to begin with, because he "had a fucked up arm and leg." Mr. Creech detailed "kicking him in the neck, all over." He told detectives that he continued to beat Mr. Jensen for 15 to 30 minutes. When asked if he thought Mr. Jensen was dead, Mr. Creech said no, "because he was blowing bubbles and shit." Mr. Creech was still more concerned about being transferred. Mr. Jensen was worth more than a ticket to isolation for him.

Ms. Longhurst added that in Thomas Creech's cell, officers discovered a sock that matched the one used with the batteries, and a toothbrush identical to the one attached to a razor blade, pictured in David Jensen's cell.

Deputy Prosecutor Longhurst concluded that Thomas Creech is a serial killer. He murdered David Jensen brutally and intentionally. Ms. Longhurst asked the Commission to not commute Thomas Creech's sentence, to let the death penalty stand.

*12:58 p.m. – BREAK*
*2:32 p.m. – RESUME HEARING*

*2:33 p.m. – EXECUTIVE SESSION*
*2:39 p.m. – RESUME HEARING*

**Commissioner Questions**

The Commission told Mr. Creech that they have reviewed a lot of material for this hearing, including police reports, criminal history, social history, psychological reports, institutional disciplinary reports, victim statements, letters of support, and more. The Commission commented that Mr. Creech's criminal history is ugly and concerning, and Mr. Creech agreed. Mr. Creech stated that he

is sorry for everything he's done, and he wishes he could go back and change it. He stated that he is responsible for what he did, he takes the blame, and no one made him do any of it. He added that that was a different person than who he is today.

The Commission asked subject how many murders he has actually committed, and he said he does not know. He stated that he got so mixed up with lying and telling law enforcement that he did things he didn't do. He explained that he started killing people in 1974, and he committed all of his murders in just a matter of months. He confirmed that there are five known victims for sure, for which he has been convicted of.

The Commission reviewed a DOR for violence, from 10/23/2022. The Commission read Mr. Creech's explanation of that situation, and a letter from the other resident involved. The Commission reviewed video footage of the incident. The Commission asked Mr. Creech what he has to say about it. Mr. Creech replied that they were playing Pinocle, and Azad Abdullah became irate because he thought the other two residents were shorting him and giving Mr. Creech better hands. Mr. Creech stated that Mr. Abdullah started coming back and forth, using aggressive language, and then, he threw the cards on the table.

Mr. Creech explained that at that point, he got up and asked Mr. Abdullah what he was so mad about. He believes he swung on Mr. Abdullah first, and then, Mr. Abdullah kicked him. He stated that he hit Abdullah with a shower shoe, Abdullah kicked him in the genitals and then the chest, and then, he fell down and hit his head on the wall, which "kind of knocked me out." Mr. Creech stated that he did not know it at the time, but he was suffering from an aortic abdominal aneurysm, which is why he was in such bad shape.

Mr. Creech answered that he'd already made the decision to never fight again, so it was especially disappointing when he and Abdullah, who is a friend of his, got into it. He stated that his daughter, Shelly, asked him to change his ways, because she's been waiting for him to come home since she was five years old. He never wanted to be like the other people there, the gang members and violent people who threaten the officers; he did not want to be who he was ever again.

Mr. Creech previously wrote that "I regret killing David Jensen more than anything I've done in my life." The Commission asked Mr. Creech if he does not regret the others, and he said no. He stated that he regrets everything. He explained that when he was served with his death warrant, he was taken to the death house, and that experience slapped him in the face with everything he has ever done wrong. He thought back to when he stole candy from the corner store as a child. He stated that it was an old, family owned country store, and they did not have much money. He realized even that hurt people, like the employees of the store. He said that made him want to change who he was.

The Commission read that Mr. Creech has great remorse for the crimes that he has committed. The Commission told Mr. Creech that they hear that word, "remorse" often, and it has almost lost its meaning. The Commission asked him what remorse means to him. Mr. Creech answered that remorse is heartfelt suffering for what you've done, for the people that you've hurt; you genuinely regret doing those things. He stated that he has thought about what he did to David Jensen more than anything, because they were friendly before he killed him. He said it is not that he does not care about his other victims, but he and David Jensen shared food, coffee, and talks about their daughters. He used to tell Mr. Jensen not to waste his life in prison, like he did, by getting wrapped up in all of the madness there.

The Commission asked subject about his physical health. He replied that he still has the aneurysm, and he had stents put on each side of it to keep him from bleeding. He stated that he suffers from arthritis, an umbilical hernia, degenerative bone disease, and bulging discs. He answered that his mental health is not as good as it was. He does take a psychiatric medication, for his depression and bipolar disorder. He stated that when he went to the death house and came back, he left a piece of himself in there. He said they would take him down there to practice executing him, and it showed him how precious life really is.

Mr. Creech stated that no one has the right to take anyone's life. He stated that his old self probably did deserve the death penalty, and maybe he still does, but he is asking for mercy today.

The Commission noted that subject murdered David Jensen to avoid being transferred. The Commission asked him if he sees a commutation changing his current status. He does not believe it would change much. He stated that the staff has asked him what he would prefer. He explained that at the main yard, he would probably be a target for many people, as a trophy. He is 73 years old, his health is bad, and he does not want to be put in the position where something bad could happen. He reiterated that he will never fight again, so if anything did happen, he would just let it happen. He added that he does think about how much it would hurt his wife, though. He believes he could stay in J Block, or he could move to medium security in G Block, where he could get a job. He stated that he is happy staying where he is now.

The Commission asked Mr. Creech why he believes they should recommend life without parole, instead of leaving the death penalty in place. Mr. Creech replied that he has something to offer to younger inmates, especially kids who are thinking of dropping out of gangs and turning their lives around. He stated that he sat and talked to one youngster just three days before he went back to gen pop. When he got back, he said, the youngster returned to the same gang that broke his leg just months prior, and then, they beat him to death.

The Commission asked Mr. Creech what he would say to those who believe he has shown no grace or mercy to his victims, so it should not be shown to him. Mr. Creech stated that the person he was did not deserve mercy, but that is not who he is anymore, and he has a lot to offer the world. He has built close relationships with staff and officers, and he tried to remind the other residents that the officers are not to blame for them being there, that they need to put that blame on themselves.

The Commission asked Mr. Creech how he has changed. He replied that he is not as impulsive as he used to be. He stated that

impulsivity was one of his main problems when he was younger. He said every time something would happen, he would think, "why me?" but today, he thinks, "why not me?"

The Commission asked Mr. Creech what he would like to say to the Jensen family. Mr. Creech stated that he would get on his hands and knees and pray for forgiveness. He stated that he talked to Mr. Jensen's girlfriend last night, as she came to the prison to visit him, for closure. He said he told her the same thing. He stated that if he could bring David back and take his place, he would.

The Commission read that during his interview with the Parole Hearing Investigator, in November 2023, Mr. Creech reported that his girlfriend, Ms. White, was brutally attacked by eleven people, and he killed nine of them. Mr. Creech responded that he did go after them but does not remember how many he killed. The Commission replied that that is not what he said in November 2023. Mr. Creech stated that he thinks he did get nine of them. He explained that there were two left; one of them lives in Oregon, and the other lives in Utah. He added that they wrote to him, to beg for his forgiveness, many years ago. He answered that that was probably around 1996. He confirmed that he demanded their addresses after they wrote to him. He stated that he did not mean it as a threat; he just asked for their addresses because they wrote him from a PO Box. The Commission asked him if he would have killed them in 1996, if he could have found them, and he said no.

The Commission asked Mr. Creech if they can settle on at least ten people, that he has killed. He said no. He stated that one of the men included in the prosecutor's presentation, he has never even heard of, and he did not kill Dago. The Commission replied that he is serving time for five murder convictions, and he just admitted to nine more, so he has killed at least fourteen people. The Commission asked him if fourteen victims is accurate then, and he said no.

The Commission reviewed a PSI, where subject stated, multiple times, that he wanted to die for his crimes, and he planned to advise the court of that when he was sentenced. The Commission asked him if he did advise the court of that, and he said yes. He stated that that is why he pled guilty, because he wanted to die.

The Commission asked Mr. Creech when he began to change his mind about wanting to die. Mr. Creech replied that he changed his mind when his daughter visited him and asked him to fight, not die. The Commission noted that he then chose to live, and now, he is in a fight for his life, and he agreed. The Commission asked him if he believes his victims would have chosen to live, and he said he thinks everyone would choose to live. He stated that that is why he feels so bad. He said his victims could have grown up to be anything, anyone.

Regarding the DOR from 2022, Mr. Creech answered that he did get angry at Mr. Abdullah, and he thinks he hit Mr. Abdullah with a shower shoe, as that is what he has been told. The Commission asked Mr. Creech how he is a positive influence and mentor if he gets angry just because someone threw some cards. Mr. Creech explained that Mr. Abdullah was threatening his family, verbally assaulting the three of them. He confirmed that he hit Mr. Abdullah after the verbal altercation began. The Commission noted that the other two men at that table were setting a better example than him in that situation, and he agreed. He added that after he fell, Mr. Abdullah was helping him and comforting him, and they made up as soon as he got back from the hospital.

Mr. Creech confirmed that he usually prefers being alone. The Commission told Mr. Creech that he may be moved to a larger population if his sentence is commuted, and they asked him how he would handle that. He replied that he wrote a poem, "I Will Fight No More Forever," and that is what he has chosen to live by.

The Commission expressed concern about the DOR from 2022.

The Commission told Mr. Creech that he was extremely fortunate to have this hearing at all. The Commission told him that this is his last chance to speak and asked him if he had anything to add. Mr. Creech thanked them for allowing him to come before them and say what he had to say. He is sorry something that he did brought all of us here today, and made the Commissioners the ones that must decide whether he lives or dies. He stated that he hates to put anyone in such a position, and he believes God Almighty is the only one that should be able to do that. He apologized to everyone in attendance, for bringing them here today.

Mr. Creech recited a poem that he wrote about going back and talking to his younger self, "Old Man and the Boy." "…and if I could go back and talk to the little boy that I was… I would tell him no matter what road you travel, sooner or later, you must pay your dues."

## Federal Defenders Closing Statement

Chris Sanchez, attorney with the Federal Defenders of Idaho, stated that it is an honor to be next to Thomas Creech today, asking for their mercy. He added that Executive Director Ashley Dowell told both parties that this would not be a trial or litigation but instead, a hearing for mercy. Without a chance for mercy, he said, the world would be full of blood and cruelty.

Attorney reiterated that Thomas Creech is nothing like the man that he was in 1981. As we heard earlier, Mr. Sanchez said, his wife, LeAnn Creech said, "He is just a very caring, kind-hearted person. I just think he's actually the person that he was meant to be, to begin with. He explained that as a child, Tom had so much potential; Tom was clever, talented at music and writing. Unfortunately, there was violence in his home, he was kicked down a flight of stairs, there was the shooting on Christmas. All of this trauma came together to create the Tom Creech of 1981, which is who the prosecutor focused on today.

Mr. Sanchez stated that Thomas Creech was able to get back on track and begin to fulfill some of that little boy's potential. He is a kindhearted musician and poet, and a mentor and friend to many. He is so much closer to that potential today. He is no longer who

he was in 1981, or even 1991. There is no excuse for the harm that Mr. Creech caused, but he started on a path of redemption in the 1990s. Mr. Sanchez believes the best proof of this is the many amazing relationships that he has. He shows genuine interest in the wellbeing of others. He really listens because he really cares, which was evident when an officer's wife passed away, and Tom wrote a poem to express his condolences. Mr. Sanchez stated that there is a reason Director Reinke knew Tom was the right person to meet with Donna and Roger Boe, and today, Tom cares deeply about them and what is going on in their lives.

Thomas Creech has been a positive role model to other inmates. Regarding the altercation with Mr. Abdullah, Mr. Sanchez explained that Mr. Abdullah has a pattern of instigating fights, and he no longer lives on that tier because of it. Mr. Sanchez asked the Commission to refer to the prison's policies. Mr. Creech has been disciplined for the altercation with Abdullah, but he has not been taken away from other residents, because he does not pose a threat to them.

Mr. Sanchez noted the substantial support from IDOC staff. It is well-documented that Mr. Creech has been a model inmate for decades. Mr. Creech also has strong support in extremely unlikely areas, like the judge who sentenced him to death and one of the original prosecutors of this case. They do not believe Mr. Creech should be executed; they believe it would serve absolutely no purpose at this point.

Mr. Sanchez added that the prosecution were incorrect about a few facts of this case, and every fact that they presented was information from before 1981. He stated that the investigators of this case only knew Thomas Creech in the 70s and 80s. He believes the prosecution's request for execution is based on vengeance. He admitted that Mr. Creech's actions were appalling in 1981, but he is concerned about consideration of the myths. He stated that in the 3,000 pages of evidence submitted by the prosecutor, there is not one mention of Mr. Daniel Ashton Walker. He added that the Schrader case resulted in a solid jury acquittal, and that is not a basis to execute a man.

Attorney Sanchez clarified that they are not claiming self-defense in David Jensen's case, and they do believe Mr. Creech should be sentenced to life without the possibility of parole. Mr. Sanchez stated that the judge ruled that Creech did not instigate a fight with David Jensen, but that does not mean it was self-defense.

That day in 1981 was a terrible and unimaginable loss for David Jensen's family. Mr. Sanchez stressed that they are not making light of that, but the information coming from the prosecution has nothing to do with who Mr. Creech is now. Mr. Creech believes the only path toward forgiveness is seeking redemption and changing your ways. If executed, Mr. Creech would be stopped on his path toward redemption, before he can fully reconcile himself with God. If the Commission grants him mercy, then they will also grant mercy to his family, friends, fellow inmates, and IDOC staff. Mr. Sanchez concluded with a short video clip of Mr. Creech playing guitar and singing "Amazing Grace."

*3:32 p.m. – BREAK*
*3:44 p.m. – RESUME HEARING*

### Ada County Prosecutor Closing Statement

Deputy Prosecutor Longhurst explained that they know Judge Robert Newhouse well, they like and respect him, and they now understand he does not support the death penalty for Thomas Creech, due to the passage of time. Apparently, Ms. Longhurst said, Judge Newhouse forgot about some of the worst details of this case, and she wishes she could forget about them, too. Ms. Longhurst asked if Mr. Creech's lawyers reminded Judge Newhouse of the violent incident in 2022, or the fact that Mr. Creech pled guilty for the murder of David Jensen but then took the stand to claim self-defense.

Ms. Longhurst reiterated that the judge ruled that Thomas Creech exhibited excessive violence, was beyond rehabilitation, kills almost on a whim with little regard of the consequences, and has a propensity for murder. The judge wrote that Thomas Creech's plea and death sentence will stand, that a sentence of death must be followed by an execution.

Prosecutor Jim Harris also supported the death penalty for Thomas Creech. On January 11, 2024, Ms. Longhurst said, they reviewed the same statements from Jim Harris, and they did not pick up on the implication that he no longer supports the death penalty. Ms. Longhurst added that she has been the prosecutor of Ada County for much longer than Mr. Harris was, and she is here in support of the death penalty today.

Deputy Prosecutor Longhurst explained that every time Thomas Creech chose to kill a person, he knew he could get caught and sentenced to life, or even death. He knew he was causing a vicious ripple of pain throughout his victim's families, as well as his own family. He has been convicted of murder five times. He has faced the death penalty before. This was no surprise to him. The only surprise is that it has taken this long to get to this point, but none of us can feel guilty when Thomas Creech is the one who brought us here.

Ms. Longhurst noted that some IDOC staff members reported that Mr. Creech was friendly to them. Ms. Longhurst stated that Mr. Creech may have been friendly to many people, but he still murdered an innocent kid. In 1974, Carol Spaulding told law enforcement that Tom was always nice to everybody that he met; she said he was even nice the guys he killed. Ms. Longhurst stated that Mr. Creech has always been a nice, charming sociopath.

Mr. Creech has professed Christianity for years; Mr. Creech played guitar and wrote letters, songs, and poetry in the 70s, too. Mr. Creech stabbed and injured a handful of other inmates, and he brutally murdered David Jensen. None of those positive traits kept

him from violence. He has still repeatedly chosen violence to get what he wants, such as being isolated from other inmates in 1981. He specifically threatened to kill if he did not get what he wanted in 1981. He wrote that he had nothing to lose, that nothing could be done to him because he was already serving four life sentences. He followed through with his threat and got what he wanted.

After he stomped David Jensen to death, Thomas Creech was perfectly nice and polite to the guards. Ms. Longhurst stated that Thomas Creech is able to be Dr. Jekyll and Mr. Hyde at the same time. She stated that Thomas Creech was not sentenced to death because he is friendly but because he is a psychopath.

Thomas Creech has been diagnosed with average intelligence and psychopathic traits, such as no remorse, no empathy, and being charming and likable. In 1974, Lieutenant Taylor reported that Thomas Creech was charming, likable, and personable, but without a doubt, one of the deadliest men that he has ever witnessed in his career.

Deputy Prosecutor Longhurst noted that Mr. Creech told PHI Maddox that he is comfortable on death row; Mr. Creech does not want the death sentence but wants to stay in maximum security. Ms. Longhurst stated that we have been in this situation before. Mr. Creech's two death sentences were commuted in 1973, he was put somewhere that he did not want to be, and he killed David Jensen because of it.

Mr. Creech claims he is remorseful, but just months ago, Mr. Creech told Mr. Maddox that he killed David Jensen in self-defense. Mr. Creech blamed Mr. Jensen for being murdered. When asked if he believes he deserves the death penalty, Mr. Creech said he did not know, because Jensen attacked him. During his interview with Mr. Maddox, Mr. Creech explained that the socks had their names written on them, and the sock that he used as a weapon was labeled "Garza." Ms. Longhurst displayed a photograph of the matching sock that was found in Mr. Creech's cell. The name on the sock is "Creech."

Ms. Longhurst stated that Thomas Creech has no remorse. She added that he does not seem to have much for the other murders that he committed, either. She reiterated that he killed David Jensen simply because he did not want a roommate, and he got what he wanted. She asked the Commission not to give him what he wants again, and not to let him get away with murder again.

### Victim Statements

1. David Jensen's younger sister – Stated that she was the second child born, just under two years after David. David was her best friend, they were inseparable, he was the peanut butter to her jelly. They spent days knee deep in the creek, catching rainbow trout. David was happiest with a rifle or a fighting pole in his hands. He had an accident with a pistol, and he was not supposed to live, let alone walk again. He was left partially paralyzed with a plate implanted in his skull. He walked with a cane and had no balance; she could knock him over with a feather. He was a mentally and physically disable person who fell through the cracks of the system. He spent nine months staying with her, prior to his incarceration, and despite his obstacles, he had a productive future that was stolen from him. His daughter, grandson, father, mother, brother, sisters, nieces, and nephews were robbed of precious family events, holidays, births, and natural deaths. There has always been a "what if" lingering in their minds, about what he could have become, what could have been had, what love, laughter, and wisdom this generation missed out on.

     Thomas Creech has lived his life on the path of his choosing. David has no such choice; his family did not have a choice. They have waited more than forty years for this, and whatever the Commission's ruling is today, justice will finally be served. David's story has finally been told. She thanked Jill and the others, for putting the pieces of this case together. She thanked the Commission for finally letting her, a victim, have her say. She stated that she is not here for vengeance, but for justice.

2. David Jensen's niece – Stated that the absence of Uncle David's beautiful soul, that she never had the privilege to meet, is a constant, aching void that has echoed through every gathering for the last four decades. It is an indescribable pain that lingers like a dark shadow. The absence of the wisdom and guidance that he could have provided is an injustice that echoes through every generation. Her burning desire for justice is not driven by vengeance, but to honor her uncle and his memory, and to ensure his life is not defined by the circumstances of his death. She sees David when he looks into her youngest child's eyes; they have the same smile and nose. David lives on through all of them.

     Thomas Creech might have taken him away, but she is here to assert that Thomas Creech will not take away David's existence. Like Thomas Creech has haunted their family, she is here to haunt Mr. Creech. Mr. Creech has played guitar written poetry, visited with family, as they have continued to grieve and fight, year after year. Mr. Creech may have forgotten, but they have not. Every generation will continue to fight, until they finally see justice served by the state of Idaho.

3. David Jensen's niece (statement read by Victim Coordinator, Brittney Thorndyke) – Stated that Uncle David was murdered just four months before her birth, and she has carried the trauma ever since. David's murder and the effects of it have haunted and bled throughout their family, her childhood. Her cousin never got to know her father. They have been impacted by David's murder for forty years. Four generations, so far, have been burdened by the trauma and pain, and knowing no accountability or justice has ever followed through, they wonder if that day will ever come. Every time there is movement, their wounds are reopened. They have navigated the pain that Creech has created for forty-two years. They have helped each other heal from the fear, heartache, pain, despair, depression, strain, stress, dysfunction, addiction, anger, confusion, sadness, and hopelessness. They continue to grow, but they are very clearly still haunted by Thomas Creech, especially every time their wounds are reopened against in court.

     Earlier generations knew David and hoped for a somewhat food life for him, until he was murdered, and they have never been able to lay this long and painful memory to rest. With every family gathering, they maneuver these pains, burdens, and truths about his murder. Many of these moments become sad and complicated, especially when sharing David's memory with the younger ones. They ask who Uncle David is, where he is, how he died, what murder is. As they grow into adolescence, the system, the community, themselves, they come back with even more difficult questions. They want to know why things happened, how they

happened, why the system failed, why David's murderer is still alive forty-two years after being sentenced to death, why they have continued to carry this trauma for so long. It just continues to unfold. They wish it would just finally be done.

The state of Idaho and Department of Corrections failed her uncle, instead of helping him find the care that he needed. He never should have been put in a maximum security prison, with the most dangerous murderers. He never should have been left alone with a murderer. He deserved so much better. She just wants to lay this horrific situation to rest.

4. David's daughter – Stated that David Dale Jensen was a handsome, kind, respectful, fun-loving young man. He adored his family and friends, especially his father and grandfather. He enjoyed hiking, fishing, hunting. He loved to feed his family by hunting and was very proud to do so. He was a gentle soul; he could easily get wildlife to eat from his hands. She has had to piece together everything that she knows about him. She was only four years old when he was murdered. Her father never saw her first day of kindergarten, her high school graduation, her wedding, the births of her children.

David was known for playing pranks on his mother and sisters. He was a typical boy who was always smiling in every photo, always willing to lend a helping hand. They are a family of good people—leaders, community board members, blue collar workers, military veterans, contributing members of society who are carrying a tragedy that they have been waiting, for forty-two years, for justice to be served. She has accomplished a lot, but she has always had to explain why she does not have a father. How unfair that Thomas Creech is still here, and her father is not. Her adult and juvenile children are still affected by this crime, and not knowing their grandfather.

Thomas Creech is worried about never writing another poem, worried his last meal won't be prepared to his liking, worried he won't see the sun or rain or snow again. Thomas Creech might miss the chance to interact with people that he cares about. He is worried about his future, that is based entirely on his own actions, that he chose. He wants them to ignore the consequences of his actions that have not only impacted her but multiple generations.

Sociopaths are charming and will mimic emotions and behaviors to fain the trust of people like Kathy Niecko and even his wife, LeAnn. Sociopaths usually come across as likable and pleasant, like Ted Bundy, Jeffrey Dahmer, and Richard Ramirez. The state allowed an inmate to hook up with a guard's mother, and she seems to be the only one thinking that is crazy. This behavior compromises the safety and security of the facility, and all of those who are employed and housed at IDOC. Going to bat for Thomas Creech causes a liability that Idaho cannot afford, and if you are willing to vouch for a man who has taken maybe forty, maybe thirty, or even ten lives, then she questions your sanity and where her tax dollars are going. If he kills again, then their blood will be on his supporters' hands. Thomas Creech clearly stated that if they put him back, then he will kill again, and there is still no doubt about it.

She stated that her family name ended with her father. She told Mr. Creech to stop making excuses for murdering her father and have some respect for him. Accept the justice that David and his family deserve. It is the result of Mr. Creech's own actions and decisions. She thanked the Commission for allowing them to speak on behalf of David Jensen, their family, and the other victims' families.

*EXECUTIVE SESSION: 4:35 p.m.*
*RESUME HEARING: 5:10 p.m.*

The Commission thanked everyone who participated in this hearing. The Commission elected to continue this hearing to January 29, 2024, at 8:30 a.m.

Commissioner Parker motioned to adjourn. Commissioner Kirkham seconded. All voted aye, and this hearing adjourned at 5:10 p.m.

## Decision

Continue

## Comment

Commission elected to continue this hearing on 1/29/2024.

IDOC Data Sensitivity Classification - L3 Restricted

# EXHIBIT 22



**STATE OF IDAHO**
COMMISSION OF PARDONS AND PAROLE

**Brad Little**
*Governor*
**Ashley Dowell**
*Executive Director*

### IN THE MATTER OF THOMAS EUGENE CREECH
### PETITION FOR COMMUTATION
Ada County Case No. CR-FE-0000-10252

This matter came before the Commission on January 19, 2024, to consider the request by Mr. Creech to commute his imposed sentence of death to life without possibility of parole. Mr. Creech was convicted of one (1) count of Murder I in 1982 for the murder of David Dale Jensen.

The Commission received an investigation packet completed by Commission staff prior to the hearing. The investigation packet included an interview with Mr. Creech, the presentence investigation report, psychological and risk assessments, information related to Mr. Creech's behavior while in prison, victim statements, and information submitted by the attorneys for Mr. Creech and by the Ada County Prosecutor's office. During the hearing, the Commission listened to in-person statements from four (4) supporters of Mr. Creech and five (5) representatives of the victim's family. Mr. Creech's attorneys and attorneys with the Ada County Prosecutor's also presented in support of or against commutation.

### DECISION TO DENY COMMUTATION
At the conclusion of the hearing, the Commissioners deliberated in executive session. On January 19, 2024, the Commissioners voted three (3) for commutation and three (3) against commutation. The commutation petition of Thomas Eugene Creech is hereby denied.

### VOTES TO RECOMMEND COMMUTATION
Three Commissioners voted to recommend Governor Little grant the commutation of Thomas Eugene Creech's death sentence in Ada County Case No. CR-FE-0000-10252 to life in prison without the possibility of parole. This decision was not based on any doubt or question about Mr. Creech's guilt or the horrific nature of his crime. The Commissioners do not believe Mr. Creech is worthy of mercy, but that the discretion of the Commission allows for grace to be given even when undeserved. While the Commissioners noted a possibility that Mr. Creech has changed in the years since his crime and considered his current age and health, this decision was not based on the actions and conduct of Mr. Creech. The Commissioner's decision to recommend a commutation was based on the time that has elapsed since Mr. Creech committed this horrific crime. In addition, the Commissioners were influenced by commentary from Judge Newhouse, the sentencing judge, and former Ada County deputy prosecutor Mr. Jim Harris, who no longer believe that a sentence of death is appropriate for Mr. Creech's conviction. Finally, the change in law requiring that a death sentence be decided by a jury rather than a judge also influenced the recommendation to commute Mr. Creech's sentence to life in prison without parole. The Commissioners expressed concern for the family of David Dale Jensen and their continued pain from this crime.

| COMMISSIONER | January 29, 2024 DATE |
| COMMISSIONER | January 29, 2024 DATE |
| COMMISSIONER | January 29, 2024 DATE |

IDOC Data Sensitivity Classification - L3 Restricted

Dowell Decl.
Exhibit L - Page 1

**275**

Commutation Decision of Mr. Creech
Page 2

### VOTES TO DENY COMMUTATION

Three members of the Commission voted to deny the commutation of Thomas Eugene Creech's death sentence in Ada County Case No. 10252 to life in prison without the possibility of parole. We do not believe Mr. Creech is worthy of grace or mercy. This decision was based on the coldblooded nature of David Dale Jensen's murder and the sheer number of victims that Mr. Creech has created over his lifetime, which shows that he does not place value on human life, other than his own. Mr. Creech was not interested in telling the truth about his additional crimes and violent history and was reluctant and unwilling to completely disclose the number of people he has killed. Further, the Commission believes that Mr. Creech is not capable of true remorse and would take another life if it benefitted him. He has shown he can still manipulate others to get what he wants. The Commission believes that the Jensen family would not receive justice if Mr. Creech received clemency, and above all else that they deserve closure in this case. If the Commission cannot uphold the death penalty in this case, then the death penalty means nothing in the state of Idaho.

████████████                                    January 29, 2024
_____                   _____
COMMISSIONER                                    DATE

████████████████                                January 29, 2024
_____                   _____
COMMISSIONER                                    DATE

███████████                                     January 29, 2024
_____                   _____
COMMISSIONER                                    DATE

3056 ELDER STREET  P.O. BOX  83720  STATEHOUSE MAIL  BOISE, ID  83720-1807  (208) 334-2520

IDOC Data Sensitivity Classification - L3 Restricted

Dowell Decl.
Exhibit L - Page 2

# EXHIBIT 23

**JAN M. BENNETTS**
ADA COUNTY PROSECUTING ATTORNEY

**DAYTON P. REED**
**HEATHER M. McCARTHY**
**SHERRY A. MORGAN**
Deputy Prosecuting Attorneys
Civil Division
200 W. Front Street, Room 3191
Boise, ID  83702
Telephone:  (208) 287-7700
Facsimile:  (208) 287-7719
Idaho State Bar Nos. 10775, 6404, & 5296
Email:  civilpafiles@adacounty.id.gov

*Attorneys for Ada County Prosecutor Jan M. Bennetts*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| THOMAS EUGENE CREECH,<br><br>      Plaintiff,<br><br>vs.<br><br>IDAHO COMMISSION OF PARDONS AND PAROLE; JAN M. BENNETTS, Ada County Prosecuting Attorney, in her official capacity,<br><br>      Defendant. | **Case No. 1:24-cv-066-AKB**<br><br>**PROSECUTOR BENNETTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION [DKT. 4]** |

The overriding factor concerning Creech's Commutation Hearing is that Idaho law places

the final decision regarding death sentence clemency with the Governor of Idaho.[1] On Monday,

---

[1] "The commission shall have authority to grant commutations and pardons after conviction and judgment for offenses, or conspiracies to commit any offense, for which the maximum punishment allowed by law at the time of sentencing is death or life imprisonment only after first presenting a recommendation to the governor. If the governor approves the commission's recommendation within thirty (30) days of presentment, the commission's pardon or commutation shall issue. If the governor rejects the commission's recommendation within thirty (30) days of presentment or takes

(cont.)

PROSECUTOR BENNETTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION [DKT. 4]  – PAGE 1

**278**

January 29, 2024, following the Idaho Commission of Pardons and Parole's ("Commission")

decision denying Creech's request for clemency, Governor Brad Little issued the following

statement:

> As Governor, my job is to follow the law and ensure that lawful criminal sentences
> are carried out. Thomas Creech is a convicted serial killer responsible for acts of
> extreme violence. Our court system convicted Creech, and he was lawfully
> sentenced to death. As Governor, **I have zero intention of taking any action that**
> **would halt or delay Creech's execution**. His lawful and just sentence must be
> carried out as ordered by the court. Justice has been delayed long enough.[2]

This lawsuit is therefore an exercise in futility for Creech, given this strong statement

issued by the Governor two weeks ago. Creech's arguments must be viewed through this lens.

After receiving decades of due process through the judicial system, Creech requested an

act of grace from the executive branch whose prerogative is to exercise discretion in granting it.

After hearing and considering Creech's evidence, witnesses, information, and arguments—

including the same arguments about the quality of evidence presented that he brings in this case—

the Commission exercised its discretion and declined to recommend a commutation. And the final

decisionmaker in the executive branch, the Governor, concurs. A preliminary injunction based on

Creech's hope for a second chance at a hearing—with no chance of receiving a commutation—

should be denied.

---

no action on the recommendation before the passage of thirty (30) days from presentment, no
pardon or commutation shall issue from the commission, and the commission's recommendation
shall be of no force or effect." Idaho Code § 20–1016(2).

[2] "Gov. Little comments on Creech execution moving forward," OFFICE OF THE GOVERNOR,
January 29, 2024, https://gov.idaho.gov/pressrelease/gov-little-comments-on-creech-execution-
moving-forward/. (emphasis added).

PROSECUTOR BENNETTS' OPPOSITION TO MOTION FOR PRELIMINARY
INJUNCTION [DKT. 4] – PAGE 2

# I.    FACTS & PROCEDURAL HISTORY

## A. David Jensen Murder

The facts of this case began on May 13, 1981, when Creech brutally murdered fellow inmate David Jensen ("Jensen") by beating him with a sock full of batteries, and then kicking him in the throat.[3] *Creech v. Richardson*, 59 F.4th 372, 376–77 (9th Cir. 2023), *cert. denied,* 144 S. Ct. 291, 217 L. Ed. 2d 132 (2023). Creech attacked Jensen by repeatedly hitting him in the head with the sock full of batteries until the plate embedded in Jensen's skull shattered, causing his skull to cave in and blood to splash on the walls and floor. *Id*. Creech took breaks during the beating, and after the sock broke and the batteries fell out, he kicked Jensen in the throat while Jensen lay sprawled on the floor.[4] *Id*.

Creech pled guilty to the Jensen murder, and on January 25, 1982, in a written decision, Fourth Judicial District Judge Robert Newhouse sentenced Creech to death. *Id*. at 378. Creech filed multiple appeals which resulted in two resentencings. The final resentencing hearing lasted for five days and was held before Judge Newhouse in March and April of 1995. *Id*. at 379. Judge Newhouse found that, "The protection of society demands that Thomas Eugene Creech receive the death penalty." *Id*. at 380.

As echoed by the United States Supreme Court:

> The facts underlying this case could not be more chilling. Thomas Creech has admitted to killing or participating in the killing of at least 26 people. The bodies of 11 of his victims—who were shot, stabbed, beaten, or strangled to death—have been recovered in seven States. Creech has said repeatedly that, unless he is

---

[3] Jensen, who was in prison for stealing a car, was twenty-three years old at the time of his murder. He suffered from physical and mental disabilities, was partially paralyzed, and a plastic plate had been surgically embedded in his skull. *Creech v. Richardson*, 59 F.4th at 376.

[4] At the time of the murder, Creech was serving two life sentences for the murders of Edward Thomas Arnold and John Wayne Bradford in 1974 in Valley County, Idaho. He had also been convicted of murdering Vivian Grant Robinson in 1974 in Sacramento, California, and William Joseph Dean in 1974 in Portland, Oregon. [Dkt. 5-3, p. 6, ll. 8-11]

PROSECUTOR   BENNETTS'   OPPOSITION   TO   MOTION   FOR   PRELIMINARY INJUNCTION [DKT. 4]  – PAGE 3

completely isolated from humanity, he likely will continue killing. And he has identified by name three people outside prison walls he intends to kill if given the opportunity.

*Arave v. Creech*, 507 U.S. 463, 465–66 (1993).

Procedurally, Creech's guilty plea and conviction for the Jensen murder has woven in and out of both state and federal courts for more than 40 years. For a detailed discussion of the complex procedural history, please see *Creech v. Richardson*, 59 F.4th at 376, and *Creech v. State*, No. 50336, 2024 WL 510105 (Idaho Feb. 9, 2024).

### B. January 19, 2024 Commutation Hearing

On October 18, 2023, the Commission granted Creech's request for a clemency hearing ("Hearing") relating to his death sentence for the Jensen murder, and scheduled the Hearing for January 19, 2024. [Dkt. 4-2, ¶ 9] Ashley Dowell, the Executive Director for the Commission, issued a memo dated November 13, 2023, outlining the Hearing procedures to be followed. [Dkt. 5-7] Following additional communications between the Ada County Prosecuting Attorney's Office ("ACPA") and Creech's attorneys from the Federal Defenders of Idaho ("FDI"), Ms. Dowell issued another memo on December 20, 2023. Dec. of T. Smith, Ex. A.

These memos from Ms. Dowell ("Memos") outlined the exact procedures to be followed by the parties. Importantly, the Memos reminded the ACPA and FDI:

> As discussed in the meeting, commutations are a matter of clemency, and the hearing is not an adversarial proceeding. As such, the parties will make presentations to the Commission, with only previously identified supporter(s), identified victim(s), and attorneys speaking, and will not be allowed to call witnesses for questioning, cross examine the other party, or object to what is being said during the parties' presentation time.

> \*       \*       \*

> Each party will be provided a table in the hearing room and will have the ability to run their own PowerPoint presentation.

PROSECUTOR BENNETTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION [DKT. 4] – PAGE 4

**281**

*      *      *

The investigation report and attached documents ("hearing packet") has been sent to the Commission for review on December 20, 2023.

*Id*.

The Memos do not provide that the ACPA and FDI were to share their respective PowerPoint presentations with the Commission or the other side. At the Hearing, the ACPA presented its PowerPoint presentation in accordance with the Commission's rules, and the FDI also "delivered a lengthy PowerPoint presentation." [Dkt. 4-2, ¶ 39] Pursuant to the Commission's Hearing rules, the ACPA did not provide its PowerPoint presentation to the Commission or FDI prior to the Hearing, and the FDI did not provide its PowerPoint to the ACPA prior to the Hearing. Dec. of T. Smith, ¶ 7.

### 1.   Daniel Walker Murder

During the Closing Arguments section of the ACPA's PowerPoint presentation, Deputy Prosecutor Jill Longhurst referred to eleven (11) murders in which Creech was convicted of, plead guilty to, or admitted to, including the murder of Daniel Walker. *Id*., Ex. B, p. 5. In 1975, Creech admitted to killing a man in San Bernadino County, California, which facts mirror the facts involved in the Walker murder. [Dkt. 4-5, pp. 22-29]

The Declaration of Christopher M. Sanchez, counsel for Creech, recognizes as much: "The ACPA [Hearing] exhibits do contain a transcript of an interview [with Creech] that took place on April 28, 1975. At that interview, Creech claimed to have killed a man under circumstances that resemble the facts in the Walker case." [Dkt. 4-2 ¶ 33]

## 2. Rebuttal of Creech's False Statements

In his presentation to the Commission, Creech's attorney asserted that Creech takes

responsibility for his actions:

> Mr. Creech also continues to live with the knowledge of what he did, the horrible
> price that he exacted from the victims of his crimes. Attorney Horwitz believes
> living with the understanding of the consequences of his actions is punishment
> itself. Mr. Creech's wife, LeAnn previously stated that she does not deserve death
> for things that he did in his 20s, things that he knows he shouldn't have done and
> have haunted him ever since. She believes he has suffered for everything he did,
> not only because he is in prison but because of what it did to him as a person, what
> he has had to come to terms with. She stated that Tom looks back and cannot believe
> he was ever that person, and he struggles to understand how he got to that point.

Dec. of T. Smith, Ex. B, pp. 4–5.

In her main presentation, Prosecutor Longhurst addressed Creech's continued blaming of

Jensen for his murder:

> Ms. Longhurst explained that the biggest lie Thomas Creech ever told was that the
> brutal beating of [redacted] was self-defense. Mr. Creech wanted to go into
> isolation, and in order to get what he wanted, he used violence, and it worked. He
> has always used violence or threats of it to get what he wants.
>
> *       *       *
>
> Self-defense, Ms. Longhurst said, is part of the lie that Thomas Creech has been
> trying to tell them. Ms. Longhurst asked how Thomas Creech can claim he is
> remorseful if he cannot accept any wrongdoing.

*Id.*, Ex. B, pp. 5, 9 (redactions supplied by the Commission). She also referenced socks that were

collected as evidence from the Jensen murder scene:

> Ms. Longhurst added that in Thomas Creech's cell, officers discovered a sock that
> matched the one used with the batteries, and a toothbrush identical to the one
> attached to a razor blade, pictured in [redacted] cell.

*Id.*, p. 9 (redactions supplied by the Commission).

During the Closing Arguments section of the ACPA's PowerPoint presentation, Prosecutor

Longhurst rebutted Creech's statements to the investigator, and as part of that showed a photo of

PROSECUTOR BENNETTS' OPPOSITION TO MOTION FOR PRELIMINARY
INJUNCTION [DKT. 4] – PAGE 6

two of the socks that were collected as evidence from the Jensen murder scene for demonstrative purposes. [Dkt. 5-5] As reflected in the Hearing Minutes, Prosecutor Longhurst offered rebuttal as to Creech's statements to the investigator:

> Mr. Creech claims he is remorseful, but just months ago, Creech told Mr. Maddox [the investigator] that he killed [redacted] in self-defense. Creech blamed [redacted] for being murdered. When asked if he believes he deserves the death penalty, Creech said he did not know, because [redacted] attacked him. During his interview with Mr. Maddox, Creech explained that the socks had their names written on them, and the sock that he used as a weapon was labeled "Garza." Ms. Longhurst displayed a photograph of the matching sock that was found in Creech's cell. The name on the sock is "Creech."

Dec. of T. Smith, Ex. B, p. 13 (redaction supplied by the Commission).

### C. Creech's Post-Hearing Communications to the Commission

On January 22, 2024, three days after the Hearing concluded and before the Commission made its decision, the FDI sent the Commission a letter asking for it to delay its commutation decision "for at least two months so that further investigation can be done into two significant assertions that were made for the first time by the prosecutor, Jill Longhurst, at last Friday's hearing." [Dkt. 5-8] The letter describes at length the same issues it has presented to this Court— the Daniel Walker murder and the photograph of the sock. *Id.*

On January 25, 2024, the FDI sent a follow-up letter to the Commission, and provided further arguments in support of its request to delay the Commission's commutation decision while the FDI "further investigates" claims related to Creech's criminal case. [Dkt. 5-9]

On January 29, 2024, the FDI sent yet another lengthy letter to the Commission, with even more arguments as to why the need to delay the decision was necessary. [Dkt. 5-10]

On January 22, 2024, the Idaho Attorney General's Office issued its own letter to the Commission, in which it responded to and refuted the post-Hearing claims made by the FDI. [Dkt. 5-12]

PROSECUTOR BENNETTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION [DKT. 4] – PAGE 7

**284**

Despite Creech's "further investigation" arguments and request to delay the decision, on January 29, 2024, the Commission denied Creech's petition for clemency. This civil lawsuit and request for a preliminary injunction was subsequently filed by Creech.

## II.   STANDARD

This Court has explained the preliminary injunction standard:

> Federal Rule of Civil Procedure 65 governs the entry of a preliminary injunction. "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). Preliminary injunctive relief "is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (citation omitted). To obtain relief, the party seeking a preliminary injunction must establish that: (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in its favor; and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The first factor "is the most important—likely success on the merits." *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015). Further, the "possibility" of irreparable harm is insufficient; irreparable injury must be "likely" in the absence of an injunction. *Winter*, 555 U.S. at 22.

*BigRentz, Inc. v. KGM Enterprises*, LLC, No. 1:22-CV-00430-AKB, 2023 WL 7496726, at *1 (D. Idaho Nov. 13, 2023).

## III.   ARGUMENT

For the following reasons, Creech fails to meet his heavy burden to show that the extraordinary and drastic remedy of a preliminary injunction should be granted to halt his execution. He fails to make the most important showing, a likelihood of success on the merits.

**A. Judicial review of clemency hearings is rarely, if ever, appropriate and only minimal due process is applicable to these discretionary, executive decisions.**

There is no constitutional or inherent right to commutation of a sentence, and a petition for commutation "is simply a unilateral hope." *Ohio Adult Parole Auth. v. Woodard*, 523 U.S. 272, 280 (1998) (quoting *Connecticut Bd. of Pardons v. Dumschat*, 452 U.S. 458, 465 (1981)). Such petitions are the purview of the executive branch, rather than the judicial. *Id.* at 276. Because "pardon and commutation decisions have not traditionally been the business of courts," the Supreme Court has recognized that "they are rarely, if ever, appropriate subjects for judicial review." *Dumschat*, 452 U.S. at 464. This is not one of those rare cases.

Justice O'Connor gave the definitive explanation as to what those rare cases are in her concurrence in *Ohio Adult Parole Authority. v. Woodard*, 523 U.S. 272 (1998). The principal opinion in *Woodard*, authored by Chief Justice Rehnquist, recognized the nature of clemency as a "matter of grace" within the "broad discretion" of the "ultimate decisionmaker, the Governor." *Id.* at 280–81, 282. These principles of executive discretion stand in contrast to the strictures and procedures of the judicial system that adjudicates the guilt or innocence of a criminal defendant. *Id.* at 284–85. And unlike the judicial system, Due Process did not require regimented procedural protections regarding commutation proceedings. *Id.* at 285. The Chief Justice and seven other Justices concluded that Ohio's clemency procedures did not violate due process. *Id.* at 282, 288.

While Justice O'Connor agreed that Ohio's procedures did not violate due process, she and three other Justices desired to clarify that they did not believe in a complete absence of "constitutional safeguards" in clemency proceedings, but that there must be some kind of "*minimal procedural safeguards*" that apply. *Id.* at 288–89 (O'Connor, J., concurring in part). The only examples this concurrence provided of sufficiently egregious situations to justify judicial intervention were "a scheme whereby a state official flipped a coin to determine whether to grant

clemency, or in a case where the State arbitrarily denied a prisoner any access to its clemency process." *Id.* at 289. Justice O'Connor identified multiple alleged deficiencies that fail to amount to a due process violation, including an allegation that the death row inmate "was precluded from testifying or submitting documentary evidence at the hearing." *Id.* at 289–90.

Justice Stevens wrote a separate concurrence in which no other Justice joined. He explained that he agreed with Justice O'Connor that there must be some kind of "minimal, perhaps even barely perceptible, procedural safeguards" regarding clemency proceedings. *Id.* at 290 (Stevens, J., concurring in part and dissenting in part) (internal quotation marks omitted). The opinion that some minimal safeguards must exist was therefore held by five Justices. But Justice Stevens' suggestion that "procedures infected by bribery, personal or political animosity, or the deliberate fabrication of false evidence" could potentially state a due process violation in the right case, *Id.* at 290–91, was not joined by any other justice.

### B. The 14th Amendment Due Process Clause does not allow Creech to challenge the substance of information presented at his clemency hearing.

Creech cites Justice Stevens' concurrence and directly accuses the ACPA of violating due process by deliberately fabricating and submitting false evidence to the Commission. But these spurious allegations, aside from recklessly casting aspersions, amount to an improper attempt to expand judicial review into the substance of the executive's discretionary decision-making.[5]

Justice Stevens' concurrence in *Woodard*—joined by no other Justice—is not the law. And the reasoning of his dicta about "deliberate fabrication of false evidence" has not been followed. The Sixth Circuit was confronted with the allegation that the state presented fabricated expert

---

[5] The ACPA vehemently denies Creech's baseless allegations that it fabricated and falsified evidence.

testimony during clemency proceedings when a death row inmate sought to re-open a petition for

writ of habeas corpus. *Workman v. Bell*, 245 F.3d 849, 851–52 (6th Cir. 2001). The court first

observed that it does not "sit as super appeals courts over state commutation proceedings," and

that "pardon and commutation decisions have not traditionally been the business of courts; as such,

they are rarely, if ever, appropriate subjects for judicial review." *Id.* at 852 (cleaned up). The court

relied upon Justice O'Connor's concurrence in *Woodard* concluding that minimal procedural

safeguards apply to clemency proceedings and recounted the clarification that "Judicial

intervention might, for example, be warranted in the face of a scheme whereby a state official

flipped a coin to determine whether to grant clemency, or in a case where the State arbitrarily

denied a prisoner any access to its clemency process." *Id.* (quoting *Woodard*, 523 U.S. at 289).

The court found that the allegations failed to meet the *Woodard* standard for minimal due process,

explaining,

> He attacks the evidence presented at his clemency proceeding by saying that it was erroneous or false. Thus, he attacks the proceedings' substantive merits. *We are not authorized to review the substantive merits of a clemency proceeding.* Our only review is to see that there are some minimal procedural safeguards. It is not our duty to determine the quality of the evidence considered by the governor or his board.

*Id.* at 852–53 (6th Cir. 2001) (emphasis added) (cleaned up) (citing *Faulder v. Texas Board of*

*Pardons and Paroles*, 178 F.3d 343, 344 (5th Cir.1999); *Duvall v. Keating*, 162 F.3d 1058, 1061

(10th Cir.1998)). On this basis, the court denied the motion to re-open. *Id.* at 853.

Workman subsequently filed a lawsuit much like Creech's, seeking a temporary restraining

order to stay his execution until his claims—including "the use of false testimony against him" at

the clemency hearing—could be adjudicated, *Workman v. Summers*, 136 F. Supp. 2d 896, 897

(M.D. Tenn.), aff'd, 8 F. App'x 371 (6th Cir. 2001). Citing Justice O'Connor's concurrence, the

court determined that "some minimal level of procedural due process applies to clemency

PROSECUTOR BENNETTS' OPPOSITION TO MOTION FOR PRELIMINARY
INJUNCTION [DKT. 4] – PAGE 11

**288**

proceedings," although the ultimate decision to grant or deny clemency is within the Governor's discretion. *Id.* at 898. The court also cited Justice O'Connor's explanation of what constitutes minimal due process, as courts applying *Woodard* routinely do: "Judicial intervention might, for example, be warranted in the face of a scheme whereby a state official flipped a coin to determine whether to grant clemency, or in a case where the State arbitrarily denied a prisoner any access to its clemency process." *Id.* (quoting *Woodard*, 523 U.S. at 289). The court concluded that, even when viewing the facts in the light most favorable to Workman, that he received the minimal due process required for a clemency proceeding, and that "No Court has required the level of due process requested by Workman for clemency proceedings." *Id.* at 899.

After that TRO was denied (which was upheld by the Sixth Circuit in an unpublished opinion), the defendants in *Workman* filed a motion to dismiss. *Workman v. Summers*, No. 3:01-0290, 2001 WL 1782877 (M.D. Tenn. Oct. 31, 2001), aff'd, 111 F. App'x 369 (6th Cir. 2004). In opposing the motion, Workman relied on *Woodard* and *Young v. Hayes*, 218 F.3d 850 (8th Cir.2000), just as Creech does. *Id.* at *4. Workman argued that "allegations that State actors rigged clemency proceedings so that the Governor would receive false and misleading evidence state claims for relief." *Id.* The court rejected Workman's arguments and granted the motion to dismiss on the same grounds as the denial of the TRO. *Id.*

Just like Workman, Creech attempts to challenge the substantive merits of the clemency proceeding by alleging that the ACPA deliberately fabricated false evidence regarding both the murder of Walker and the sock Creech used to murder Jensen.[6] He attempts to steer the Court's

---

[6] The Hearing Minutes reflect that Prosecutor Longhurst never stated the sock shown in a picture was the murder weapon. Dec. of T. Smith, Ex. B, p. 9 ("Ms. Longhurst added that in Thomas Creech's cell, officers discovered a sock that matched the one used with the batteries"), p. 13 ("Ms. Longhurst displayed a photograph of the matching sock that was found in Creech's cell.").

PROSECUTOR BENNETTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION [DKT. 4] – PAGE 12

attention away from the central issue: whether Creech's clemency determination was an arbitrary "coin flip" and whether he was arbitrarily denied the ability to petition for clemency. The answer to both is no. Creech, represented by counsel, presented hours of information to the Commission in a hearing that the Commission, in its discretion, allowed him to have. The Commission made a determination that it would not recommend commutation after a lengthy hearing at which Creech was free to present any information he believed was relevant. Subsequently, the Governor, who is the ultimate decision-maker, communicated that he would use his discretion to deny clemency. Creech was afforded more than the minimal safeguards required, and his allegations challenging the quality of the information presented do not state a due process claim, even if he is not satisfied with the outcome of his petition. The discretionary decisions of the executive branch did not arise in the rare situations that might subject them to judicial interference.

### C. Creech has no due process right to preview the information to be presented at his clemency hearing.

Creech cites *Wilson v. U.S. District Court for Northern District of California*, 161 F.3d 1185 (9th Cir. 1998), for the proposition that a prosecutor who presents information in a clemency hearing is required by the U.S. Constitution to provide all the evidence she intends to present to the inmate in advance of the hearing. But there is no such constitutional due process right, and *Wilson* did not hold there was.

*Wilson* was about the executive branch, who makes the clemency determination, misleading the inmate about what information it would rely upon in making that determination. It had nothing to do with a prosecutor failing to allow the inmate to preview her presentation to the executive decision-maker. In *Wilson*, the plaintiff sought a TRO, alleging that the defendants (the governor and a prison warden were named) sent a letter that defined the scope of information that

would be relevant to the clemency decision, that this scope excluded evidence that questioned the inmate's guilt, but the governor ultimately denied clemency based on the absence of information that questioned the inmate's guilt. *Id.* at 1186. In other words, the party responsible for making the clemency determination told the inmate not to submit the very evidence it sought when making the clemency determination. The Ninth Circuit held that these allegations were sufficient to state a claim of violation of due process. *Id.* at 1187.

Creech's allegations against the ACPA are distinguishable from those in *Wilson*. The ACPA did not prescribe the scope of evidence or procedures of the clemency hearing. As demonstrated by the Commission's Memos, procedures were worked out in advance between the FDI and the ACPA. Creech was well aware of the scope of the hearing, his attorneys having been involved in defining it, and the ACPA did not issue the official communication about it, the Commission did. While the written submissions from both parties and the investigator would be shared, nothing in this procedure discussed the parties being required to share their presentations with each other. Creech was free to present information that the ACPA had not seen, and the ACPA was free to present evidence that Creech had not seen.

Nothing about this mutually agreed-upon procedure violates due process. The Commission still made its determination based on reason, rather than arbitrarily, such as with a coin flip. *See Woodard*, 523 U.S. at 289 (1998) (O'Connor, J., concurring in part). Creech was given access to the procedure above and beyond what minimal due process requires, in that he had the opportunity not only to petition for commutation, but also to participate in a hearing, be represented by counsel at that hearing, and see the ACPA's written submissions in advance. When minimal due process does not even require a party have the opportunity to testify or submit evidence at the hearing, *Id.* at 289–90, Creech received all that minimal due process requires, and more.

**D. The ACPA did not deprive Creech of due process because he was able to present his concerns to the Commission post-Hearing, which did not find the concerns sufficient to defer deciding on the commutation petition.**

Creech cannot show that the ACPA deprived him of any liberty or life interest because the executive branch—the Governor and the Commission—have the prerogative to make clemency recommendations and decisions, not the ACPA. After the clemency hearing, Creech submitted his concerns about the quality of evidence to these decision-makers, and these decision-makers chose not to defer the commutation petition despite those concerns. This implies that they did not feel these concerns merited further discussion or changed their view. And it's the Commission's and Governor's view that ultimately matter on the question of whether Creech's sentence is commuted or not.

Creech brought his claims against the ACPA under § 1983. A § 1983 cause of action requires the plaintiff to show that "(1) a person acting under color of State law; (2) subjects or causes to be subjected to deprivation; (3) a U.S. citizen or person in the jurisdiction of the United States; (4) of a right, privilege, or immunity secured by the Constitution and laws." *Chaudhry v. Aragon*, 68 F.4th 1161, 1169 (9th Cir. 2023). To establish the second element, the plaintiff must demonstrate that the defendant's conduct was the actionable cause of the claimed injury; the defendant's action must be both the cause-in-fact and the proximate cause, or else there is no liability. *Id.* at 1169–70 (citing *Harper v. City of Los Angeles*, 533 F.3d 1010, 1026 (9th Cir. 2008); *Van Ort v. Est. of Stanewich*, 92 F.3d 831, 837 (9th Cir. 1996)).

The ACPA is neither the proximate cause nor the cause-in-fact of Creech not receiving a commutation. That decision is the prerogative of the Governor to make, in conjunction with a recommendation from the Commission. Creech made the Commission aware of his concerns about the quality of evidence and prior notice of what the ACPA would present at the Hearing. [Dkts. 5-8. 5-9, 5-10] Creech requested that the Commission defer issuing its recommendation until he had

the opportunity to present further information on these issues, but the Commission chose not to defer the petition. By opting not to defer the petition in light of Creech's concerns, the Commission impliedly determined that the concerns did not merit looking into further. The concerns did not move the needle for the Commission, which determines in its own discretion what information it will base its determinations on. Ultimately, the Governor has the role to grant or deny commutation of a death sentence. *State v. Pizzuto*, 171 Idaho 100, 518 P.3d 796, 807–08 (2022), reh'g denied (Oct. 28, 2022). The Governor has communicated that he does not intend to grant a commutation or any other clemency to Creech.

Thus, given that the clemency application process is complete, given that the Commission recommended denial despite Creech's concerns about the quality of evidence at the hearing, and given that the Governor has already expressed his intention to grant Creech no commutation, Creech cannot show that the ACPA is the proximate cause of any deprivation of a life or liberty interest. Any deprivation of those interests will occur because all due process has been afforded through decades of litigation and a proper clemency application process that meets *minimal* due process requirements, and because the executive to whom the discretion over clemency belongs will have exercised that prerogative to deny it.

## IV.   CONCLUSION

The Court should deny the motion for preliminary injunction because Creech does not state a claim for due process violation and therefore has no chance of success on the merits. This is not one of the rare cases of an arbitrary, coin-flip decision that justify judicial interference with an executive function. Creech was provided more than the *minimal* due process required. And in the end, after Creech had decades of judicial due process and the opportunity to present to the Commission, the Governor—who is the ultimate decisionmaker regarding commutations—has

PROSECUTOR BENNETTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION [DKT. 4]  – PAGE 16

**293**

made his determination that Creech's request is denied. The preliminary injunction should likewise

be denied.

**DATED** this 13th day of February, 2024.

**JAN M. BENNETTS**
Ada County Prosecuting Attorney

By:   _/s/ Dayton P. Reed_
Dayton P. Reed
Deputy Prosecuting Attorney

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 13th day of February, 2024, I served a true and correct copy of the foregoing *Prosecutor Bennetts' Opposition to Motion for Preliminary Injunction [Dkt. 4]* to the following person(s) by the following method:

| | |
|---|---|
| Christopher Sanchez | christopher_m_sanchez@fd.org |
| Jonah J. Horwitz | jonah_horwitz@fd.org |
| Deborah A. Czuba | deborah_a_czuba@fd.org |
| Mary E. Spears | mary_spears@fd.org |
| Nicole R. Gabriel | nicole_gabriel@fd.org |
| FEDERAL DEFENDER SERVICES OF IDAHO | |

AND I FURTHER CERTIFY that on such date I served the foregoing on the following non-CM/ECF Registered Participants in the manner indicated as follows:

N/A

By:   /s/ Chyvonne Tiedemann
      Legal Assistant

# EXHIBIT 24

Nicole Owens
EXECUTIVE DIRECTOR
Christopher M. Sanchez, Idaho Bar No. 12070
Jonah J. Horwitz, Idaho Bar No. 10494
Assistant Federal Defenders
FEDERAL DEFENDER SERVICES OF IDAHO
702 W. Idaho Street, Suite 900, Boise, ID 83702-8929
Telephone: (208) 331-5530; Facsimile: (208) 331-5559
ECF:  Jonah_Horwitz@fd.org
        Christopher_M_Sanchez@fd.org

*Attorneys for Plaintiff Thomas Eugene Creech*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| **THOMAS EUGENE CREECH,** ) | **CASE NO. 1:24-cv-00066-AKB** |
| ) | |
| Plaintiff, ) | |
| v. ) | **MEMORANDUM IN SUPPORT** |
| ) | **OF MOTION TO EXPEDITE** |
| ) | **DISCOVERY** |
| **IDAHO COMMISSION OF PARDONS** ) | |
| **AND PAROLE**; **JAN M. BENNETTS**, ) | |
| Ada County Prosecuting Attorney, in her ) | |
| official capacity, ) | **EXECUTION SCHEDULED** |
| ) | **FOR FEBRUARY 28, 2024** |
| Defendants. ) | |
| ) | |
| ) | |
| ) | |

For the reasons that follow, Plaintiff Thomas Eugene Creech respectfully

moves to expedite discovery. Federal Rule of Civil Procedure 26(d)(1) empowers

courts to permit expedited discovery, before a rule 26(f) conference, upon a showing

of "good cause." *Allcare Dental Mgmt., LLC v. Zrinyi*, No. CV-08-407-S-BLW, 2008

WL 4649131, *1 (D. Idaho Oct. 20, 2008); *see Am. LegalNet, Inc. v. Davis*, 673 F.

Supp. 2d 1063, 1066 (C.D. Cal. 2009) (applying good-cause standard); *see also St.*

*Louis Group, Inc. v. Metals & Additives Corp.*, 275 F.R.D. 236, 239 (S.D. Tex. 2011)

Memorandum in Support of Motion to Expedite Discovery – Page 1

**297**

("An increasing majority of district courts have . . . adopted a 'good cause' standard to determine whether to authorize expedited discovery."). Good cause exists "where the need for expedited discovery, in consideration of the administration of justice, outweighs the prejudice to the responding party." *Allcare Dental Mgmt., LLC*, 2008 WL 4649131, at *1. To determine whether good cause exists, courts commonly consider factors including, but not limited to: "(1) whether a preliminary injunction is pending; (2) the breadth of the discovery requests; (3) the purpose for requesting the expedited discovery; (4) the burden on the defendants to comply with the requests; and (5) how far in advance of the typical discovery process the request was made." *Am. LegalNet*, 673 F. Supp. 2d at 1067; *see also Apple Inc. v. Samsung Elecs. Co., Ltd.*, 11-CV-01846-LHK, 2011 WL 1938154, at *1 (N.D. Cal. May 18, 2011). Mr. Creech can satisfy each factor.

## I. A motion for a preliminary injunction is pending.

The first factor is whether a preliminary injunction is pending. "[E]xpedited discovery is particularly appropriate when a plaintiff seeks injunctive relief because of the expedited nature of injunctive proceedings." *Veeder-Root Fuelquest, LLC v. Wisdom*, No. 2:21-cv-00352-RAJ, 2021 WL 1209257, at *3 (W.D. Wash. Mar. 31, 2021) (quoting *Ellsworth Assocs, Inc. v. United States*, 917 F. Supp. 841, 844 (D.D.C. 1996)). Because of this, "courts have *routinely* granted expedited discovery in cases involving challenges to constitutionality of government action." *Ellsworth Assocs., Inc.*, 917 F. Supp. at 844 (citing *Optic-Electronic Corp. v. United States*, 683 F. Supp. 269, 271 (D.D.C. 1987)). Indeed, "courts *often* find good cause" for expedited

Memorandum in Support of Motion to Expedite Discovery – Page 2

discovery "when confronted with a pending motion for preliminary injunction." *Facebook, Inc. v. Various, Inc.*, No. c-11-01805-SBA (DMR), 2011 WL 2437433, at *3 (N.D. Cal. June 16, 2011) (emphasis added). This only makes sense. Expedited discovery "better enable[s] the court to judge the parties' interests and respective chances for success on the merits" – a judgment the Court needs to make when evaluating whether to grant a preliminary injunction. *Edudata Corp. v. Scientific Computers, Inc.*, 599 F. Supp. 1084, 1088 (D. Minn. 1984) (granting expedited discovery).

Because Mr. Creech has filed a motion for preliminary injunction, *see* Dkt. 4, this factor weighs heavily in his favor. Mr. Creech does not seek discovery in advance of filing for a preliminary injunction. *Cf. Human Rights Watch v. Drug Enforcement Administration*, No. CV-15-2573-PSG (JPRx), 2015 WL 13648069, at *2 (C.D. Cal. July 10, 2015) (denying expedited discovery where "[p]laintiff has not yet filed a preliminary injunction" but acknowledging that "courts often find good cause when confronted with a *pending* motion for preliminary injunction" (emphasis added) (citation omitted)). Instead, he has already filed his motion for preliminary injunction, placing well-defined issues before the Court. The limited discovery he now seeks is germane to the precise issues and claims in his preliminary-injunction motion.

## II. The discovery sought is narrow.

The second factor is the breadth of the discovery requests. Expedited discovery is appropriate where it would "substantially contribute to moving [a] case

Memorandum in Support of Motion to Expedite Discovery – Page 3

forward" and is "narrowly tailored to this benefit." *Semitool, Inc. v. Tokyo Electron America, Inc.*, 208 F.R.D. 273, 277 (N.D. Cal. 2002); *see also Ellsworth Assocs.*, 917 F. Supp. at 844 (granting expedited discovery where "the material [sought] is germane to [plaintiff's] claims and the discovery . . . will expedite the resolution of this matter").

Here, Mr. Creech's discovery requests focus on specific and carefully articulated categories of information that directly relate to his preliminary motion:

a. Specific information related to the bases for the prosecution's assertions to the Idaho Commission of Pardons and Parole ("the Commission") during the commutation hearing about the murder of Daniel Walker; the timeline and nature of the prosecution's investigation into the Walker murder; the prosecution's communications with San Bernardino authorities; and the prosecution's decision not to provide Mr. Creech with notice of the claims it would be making about the Walker murder to the Idaho Commission of Pardons and Parole. *See* Dkt. 4-1 at 4–15; 20–26.

b. Requests targeted at the nature and provenance of the sock depicted in the prosecution's PowerPoint slide, including chain-of-custody documentation; relevant police reports and photographs prepared from the date of the crime to the date of the commutation hearing; access to the physical evidence; and the original photograph. *See* Dkt. 4-1 at 15–26.

Memorandum in Support of Motion to Expedite Discovery – Page 4

    c.   Information related to the Commission's decision not to find a replacement vote for the recused Commissioner. *See* Dkt. 4-1 at 26–28.

All of this requested discovery pertains directly to Mr. Creech's legal claim.

For instance, to examine the sock evidence that the prosecution presented to the Commission, both an expert in photography and in handwriting would need a higher quality photograph than the one featured in the PDF of the PowerPoint slide. In order to assess the legitimacy of the photograph, photograph expert Richard Quindry would need the original JPEG or RAW file from the camera that took the photo. *See* Ex. 1 at 1. For handwriting expert Susan Abbey, direct access to the sock would give her the ability to determine if the handwriting on the sock matches Mr. Creech's handwriting. *See* 2 at 1. Short of that, Ms. Abbey would at a minimum require additional photos of the sock to make the comparison. *Id.* Both experts' analysis would directly support the portion of Mr. Creech's claim related to the sock. Dkt. 4-1 at 15–26. The narrowly-tailored, well-defined nature of Mr. Creech's expedited discovery requests weighs in favor of granting expedited discovery in this case.

## III.   The purpose of expedited discovery is appropriate.

The third factor is the purpose of expedited discovery. This factor also weighs heavily in favor of granting expedited discovery in this case. Mr. Creech's requests for expedited discovery are limited to the production of evidence supporting his preliminary injunction motion. Narrowly focused, as they are, on facts that directly

Memorandum in Support of Motion to Expedite Discovery – Page 5

support his preliminary-injunction claims, his discovery requests go to the heart of his motion for a preliminary injunction, and the Court should therefore grant Mr. Creech's request for expedited discovery. *See Washington v. Lumber Liquidators, Inc.*, No. 15-cv-01475-JST, 2015 WL 2089992, at *2 (N.D. Cal. May 5, 2015) ("Because Plaintiffs seek development of the factual record in support of their preliminary injunction, which seeks to preserve the status quo, the purpose for which discovery is sought weighs in favor of expedited discovery.").

## IV.    The discovery sought would not be unduly burdensome.

Mr. Creech's requested expedited discovery is not unduly burdensome. Conscious of the need for expedited action, Mr. Creech's has carefully tailored his discovery requests to minimize the burden on the State's time and resources.

## V.    How far in advance of discovery the motion is filed

Mr. Creech recognizes that the final factor, how far in advance of the typical discovery process the request was made, cuts against his motion. However, he notes that his death warrant was signed the day after the commutation decision was rendered, the event triggering his complaint. Under those circumstances, it would be unfair to punish Mr. Creech for the timing. In any event, this single factor does not outweigh the strong showing Mr. Creech has made on the others, and the motion remains meritorious.

## VI.    Mr. Creech's specific discovery requests

To provide the Court with the most concrete possible understanding of the discovery Mr. Creech wishes to pursue, he will outline representative examples of

Memorandum in Support of Motion to Expedite Discovery – Page 6

his requests below. With respect to each request or set of requests, Mr. Creech will describe why the material is relevant to his motion for a preliminary injunction.

## A.   Depositions

Depositions are a basic discovery tool under Federal Rule of Civil Procedure 30.[1] There are several depositions Mr. Creech considers necessary to the litigation of his preliminary-injunction motion.

First, Mr. Creech would depose Jill Longhurst. Ms. Longhurst was the lawyer from the Ada County Prosecuting Attorney's Office ("ACPO") who took the lead on advocating against clemency in Mr. Creech's commutation proceedings. At the January 19, 2024 commutation hearing, Ms. Longhurst was the person who told the Commission that Mr. Creech was guilty of the Walker murder.  She was also the one who revealed the purported photograph of the murder-weapon sock for the first time.  As such, Ms. Longhurst is in possession of critical information regarding the claims upon which Mr. Creech is seeking injunctive relief.  *See generally* Dkt. 4-1 at 4–26.

Second, Mr. Creech would depose Tom Taylor. Mr. Taylor appears to be the source of the "new" information supposedly proving Mr. Creech's guilt in the Walker murder. *See* Dkt. 4-1 at 13. According to Mr. Taylor, the information in question stems from interviews he conducted where Mr. Creech described killing a man in a

---

[1] If the Court were unwilling to allow oral depositions under Rule 30, it could in the alternative authorize written depositions pursuant to Federal Rule of Civil Procedure 31.

Memorandum in Support of Motion to Expedite Discovery – Page 7

van in the Barstow, California area who had a diamond ring. *See id.* However, undersigned counsel has no record of any such interview. *See id.* Therefore, it is necessary to depose Mr. Taylor to ascertain the origins of this information, its authenticity, and the reason it is only now surfacing fifty years later.

Third, Mr. Creech would depose Wade Spain. Mr. Spain is an investigator for ACPO. When the ACPO issued a press release on January 29, 2024, touting the denial of clemency, it thanked Mr. Spain in particular, "as he was instrumental in providing San Bernardino County with evidence that led to San Bernardino County announcing Mr. Creech as the suspect in the" Walker case. Ex. 3. The question of whether there is in fact any such evidence, and if so what it is, lies at the heart of Mr. Creech's Walker-related claim. *See* Dkt. 4-1 at 4–15.

Fourth, Mr. Creech would depose the principal custodian of the sock that was allegedly photographed. The preliminary-injunction motion raises the prospect that the image of the sock presented to the Commission falsely depicted Mr. Creech's name on it. *See* Dkt. 4-1 at 15–20. Accordingly, it is essential that undersigned counsel depose the custodian to investigate the circumstances under which the sock was supposedly photographed, and possibly altered.

Fifth, if time allowed, Mr. Creech would desire to depose the key actors in San Bernardino, including Detective Justin Carty and Sergeant Justin Giles, *see* Dkt. 4-4 at 1, San Bernardino Sheriff Shannon Dicus, and cold-case detective Greg Myler, all of whom have direct knowledge of whether it was justified for the ACPO to declare the Walker case solved and Mr. Creech the murderer.

Memorandum in Support of Motion to Expedite Discovery – Page 8

**304**

**B.    Requests for Productions**

Federal Rule of Civil Procedure 34 authorizes requests for production of documents (RFPs).  Mr. Creech will divide up his RFPs with reference to the three different subjects they fall under: the sock; the Walker case; and the tie vote at the Commission.

**1.    Sock**

As set forth above, Mr. Creech intends to use discovery—if permitted—to investigate whether the sock or the photograph of it were improperly modified. The following material to be sought in RFPs would go directly to that area:

      a.    The original formatted version of the photograph used in the PowerPoint slide of the sock, e.g., JPEG, RAW, etc. *See* Ex. 1.

      b.    Records related to the chain of custody of the photograph of the socks used in the prosecutor's PowerPoint slide.

      c.    Records that document the existence of any socks with Mr. Creech's name written on them.

**2.    Walker Case**

The ACPO presented a slide at the commutation hearing and made the claim that Mr. Creech murdered Daniel Walker, *see* Dkt. 4-1 at 4–5, and that the San Bernardino County Sheriff's Department ("SBSD") had closed its case after a thorough investigation, *see id.,* Dkt. 4-3 at 2. There is also reason to believe the ACPO was in communication with the San Bernardino County District Attorney's Office about the case. *See, e.g.*, Dkt. 4-4 at 2 (SBSD press release stating "The San

Memorandum in Support of Motion to Expedite Discovery – Page 9

Bernardino District Attorney's Office reviewed the case and is in consultation with the Ada County District Attorney's Office.").

Counsel also believes that the prosecution provided the Commission with a letter from Daniel Walker's brother Doug Walker. *See* Dkt. 4-1 at 21. And, according to the SBSD, their investigation began on November 15, 2023. *See* Dkt. 4-4 at 2. With the above facts in mind, and in order to support the part of the claim related to the prosecution's use of the Daniel Walker murder to argue against life, Mr. Creech would request the following from the ACPO:

   a. The statement the prosecutor submitted from Doug Walker to the Commission.

   b. Any and all records pertaining to the 1974 death of Daniel Walker through the present.

   c. Records of any and all contact/correspondence between the ACPO and Doug Walker, brother of Daniel A. Walker, from October 1974 to the present.

   d. Records of contact/correspondence between the ACPO and any representative of the media from September 1, 2023 through the present regarding the Daniel Walker case.

   e. Records of contact/correspondence between the ACPO relating to the Walker case, from September 1, 2023 through the present, and involving the Idaho Department of Correction, the Ada

Memorandum in Support of Motion to Expedite Discovery – Page 10

County Sheriff's Office, the SBSD, and the San Bernardino District Attorney's Office.

f.  Copies of all versions of the news releases prepared by the ACPO related to the Daniel Walker case.

g.  Reports written by Tom Taylor about the Daniel Walker case.

h.  Transcripts and/or recordings of any interviews with Mr. Creech and Tom Taylor about the Daniel Walker case.

i.  Reports written by Tom Taylor about the Daniel Walker case.

j.  Reports, transcripts, and/or recordings related to the interview that took place between Mr. Creech and Detective Ted Dykes of the SBSD.

k.  Any records relating to the April 26, 1975 interview of Mr. Creech while he was in the custody of the State of Idaho and relating at least in part to alleged crimes occurring in California.

l.  Reports, transcripts, and or recordings related to any interviews between Mr. Creech and anyone with the SBSD or San Bernardino County District Attorney's Office.

Lastly, on the Walker murder, the Commission considered the prosecution's statements and PowerPoint slides in its decision. *See generally* Dkt. 4-1 at 4–15. The prosecution also stated that Doug Walker had sent a letter of concern to the Commission as well. *See* Dkt. 4-1 at 21. Moreover, the only potential source of new

Memorandum in Support of Motion to Expedite Discovery – Page 11

information undersigned counsel have identified is Tom Taylor. *See* Dkt. 4-1 at 13–15. Therefore, Mr. Creech requests the following from the Commission:

    a. All contact between Tom Taylor and any of the seven Commissioners from September 1, 2023 to the present.

    b. All records of contact between the Commission and Tom Taylor from September 1, 2023 to the present

### 3. Commissioner Recusal

Mr. Creech contends in his motion for a preliminary injunction that his due process rights were violated by the three-three tie vote at the Commission leading to the denial of his commutation petition. *See* Dkt. 4-1 at 26–28. Under Idaho law, any favorable recommendation by the Commission would have gone to the Governor. *See* Idaho Code § 20-1016(2). The Governor is the official who appoints the Commissioners. *See* Idaho Code § 20-1002(1), (2). It is also the Governor who determines "the duties and responsibilities" of the Executive Director to the Commission. Idaho Code § 10-1002(9). In the past, there have been communications between the Commission and the Governor in advance of commutation decisions in capital cases. *See* Ex. 4. Here, such communications would potentially shed light on the recusal and whether any consideration was given to avoiding the due process problem by allowing a replacement to vote in place of the disqualified Commission. Mr. Creech consequently wishes to propound an RFP for all communications between the Commission and the Governor regarding Mr. Creech's commutation proceedings.

Memorandum in Support of Motion to Expedite Discovery – Page 12

**308**

### C.    Interrogatories

Civil discovery invariably involves interrogatories served under Federal Rule of Civil Procedure 33. As before, Mr. Creech will separate his interrogatories out between the sock issue and the Walker case.

#### 1.  Sock

With respect to the sock, the following interrogatories are germane to the preliminary injunction for reasons expressed above:

    a.  Where is the sock?

    b.  Provide names of all individuals who handled, accessed, or photographed the sock from September 1, 2023 to the present.

    c.  Identify the brand of camera or cameras used to take the photograph of the sock presented at the commutation hearing.

    d.  Name the software and programs used to download and/or store the sock photos.

#### 2.  Walker Case

With respect to Mr. Walker, Mr. Creech envisions the following interrogatories to the ACPO:

    a.  What information did Mr. Spain provide to San Bernardino County that supposedly led to the announcement of Mr. Creech as the suspect? *See* Ex. 3.

b. How did Mr. Taylor inform the ACPO about his supposed recollection of his interviews with Mr. Creech regarding the Walker case?

c. When did Mr. Taylor inform the ACPO about his supposed recollection of his interviews with Mr. Creech regarding the Walker case?

d. Who made the decision to describe the Walker case as "solved" in the press release issued by the ACPO on the day of the commutation hearing? *See* Dkt. 4-3.

### D.    Subpoenas

In discovery in the U.S. District Courts, litigants are entitled to serve subpoenas on non-parties under Federal Rule of Civil Procedure 45.

#### 1. Sock

Based on points made earlier, Mr. Creech would utilize subpoenas to demand the following documents:

a. Evidence logs dating back to the date of the crime in 1981 or for as far back as they exist, as kept by the Ada County Sheriff's Office or whatever other agency is safeguarding the material.

#### 2. Walker Case

Based on points made earlier, Mr. Creech would subpoena the following documents in connection with the Walker issue:

Memorandum in Support of Motion to Expedite Discovery – Page 14

a. Any records held by the Ada County Sheriff's Office pertaining to Daniel Walker.

b. Any communications involving any of the following entities pertaining to Daniel Walker, from September 1, 2023 to the present:

    i.   Idaho Department of Correction

    ii.   Idaho Attorney General's Office

    iii.   SBSD

    iv.   San Bernardino District Attorney's Office

c. Reports written by Tom Taylor regarding Mr. Creech and/or Daniel Walker in the possession of the Ada County Sheriff's Office.

d. Transcripts/recordings related to any interviews involving Mr. Creech and San Bernardino law enforcement officials such as Detective Dykes in the possession of the Ada County Sheriff's Office or the SBSD.

e. Any records in the possession of the Idaho Attorney General's Office pertaining to the Walker case.

## VII.   Conclusion

For the reasons set forth above, Mr. Creech respectfully asks for expedited discovery under the conditions set forth above.

Memorandum in Support of Motion to Expedite Discovery – Page 15

DATED this 9th day of February 2024.

/s/ Christopher M. Sanchez
Christopher M. Sanchez
Jonah J. Horwitz
Federal Defender Services of Idaho

*Attorneys for Plaintiff Thomas Eugene Creech*

## CERTIFICATE OF SERVICE

I hereby certify that on this 9th day of February 2024, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which is designed to send a Notice of Electronic Filing to persons including the following:

Dayton P. Reed
Heather McCarthy
Sherry A. Morgan
civilpafiles@adacounty.id.gov
Counsel for Defendant Bennetts

Karin Magnelli
kmagnell@idoc.idaho.gov
Counsel for Defendant Parole Commission

/s/ Julie Hill
Julie Hill

Memorandum in Support of Motion to Expedite Discovery – Page 16

# EXHIBIT 25

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| THOMAS EUGENE CREECH,<br><br>　　　　　Plaintiff,<br><br>　v.<br><br>IDAHO COMMISSION OF PARDONS AND PAROLE; JAN M. BENNETTS, Ada County Prosecuting Attorney, in her official capacity,<br><br>　　　　　Defendants. | Case No. 1:24-cv-00066-AKB<br><br><br>**ORDER** |

**IT IS ORDERED:**

1.　　Plaintiff must serve this Order and Plaintiff's Motion for Preliminary Injunction (Dkt. 4) on Defendants on **February 9, 2024**.

2.　　Defendants' response to Plaintiff's Motion for Preliminary Injunction (Dkt. 4) must be filed no later than **February 13, 2024**.  Plaintiff's reply must be filed no later than **February 16, 2024**.

3.　　Plaintiff's Motion for Excess Pages on Memorandum in Support of Motion for Preliminary Injunction (Dkt. 6) is GRANTED.

DATED: February 09, 2024

Amanda K. Brailsford
U.S. District Court Judge

**314**

# EXHIBIT 26

Case 1:24-cv-00066-AKB   Document 4-1   Filed 02/08/24   Page 1 of 34

Nicole Owens
EXECUTIVE DIRECTOR
Christopher M. Sanchez, Idaho Bar No. 12070
Jonah J. Horwitz, Idaho Bar No. 10494
Assistant Federal Defenders
FEDERAL DEFENDER SERVICES OF IDAHO
702 W. Idaho Street, Suite 900, Boise, ID 83702-8929
Telephone: (208) 331-5530; Facsimile: (208) 331-5559
ECF:  Jonah_Horwitz@fd.org
         Christopher_M_Sanchez@fd.org

*Attorneys for Plaintiff Thomas Eugene Creech*

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| **THOMAS EUGENE CREECH,**      ) | **CASE NO. 1:24-cv-00066-AKB** |
|                 ) | |
|        Plaintiff,      ) | |
| v.                 ) | **MEMORANDUM IN SUPPORT** |
|                 ) | **OF MOTION FOR** |
| **IDAHO COMMISSION OF PARDONS** ) | **PRELIMINARY INJUNCTION** |
| **AND PAROLE; JAN M. BENNETTS,** ) | |
| Ada County Prosecuting Attorney, in her ) | |
| official capacity,      ) | **EXECUTION SCHEDULED** |
|                 ) | **FOR FEBRUARY 28, 2024** |
|        Defendants.     ) | |
|                 ) | |
|                 ) | |
|                 ) | |
|                 ) | |
| _____) | |

      In order to immediately prevent the State of Idaho from executing him until

his due process claim has been resolved, Plaintiff Thomas Eugene Creech respectfully

seeks a preliminary injunction while the case is being litigated.

      "To prevail on a motion for a preliminary injunction," Mr. Creech "must show

that: (1) he is likely to succeed on the merits on his state or federal claims; (2) he is

Memorandum in Support of Preliminary Injunction – Page 1

**316**

likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his favor; and (4) a preliminary injunction is in the public interest." *Cuviello v. City of Vallejo*, 944 F.3d 816, 825 (9th Cir. 2019).[1] Mr. Creech can satisfy each factor.[2]

## I.    Mr. Creech is Likely to Succeed on the Merits.

Mr. Creech can show that he is likely to succeed on the merits of his claim. To prevail on his § 1983 claim, Mr. Creech must show that, while acting under color of state law, the Idaho Commission of Pardons and Parole ("the Commission") and Ada County Prosecuting Attorney Jan M. Bennetts deprived him of a right secured by the Federal Constitution or the laws of the United States. 42 U.S.C. § 1983. At this stage, Mr. Creech need not prove his case. Rather, he need only make a strong showing that he is likely to prevail on the merits of his claim. *See Nken v. Holder*, 556 U.S. 418, 434 (2009). Mr. Creech surpasses this standard here.

When a state offers a procedure for petitioning for clemency, that procedure must comply with minimal due process requirements. *Ohio Adult Parole Authority v. Woodard*, 523 U.S. 272, 289 (1998) (O'Connor, J., concurring). Five Supreme Court Justices agreed on this in *Woodard*. *See id.* at 288–89 (O'Connor, J., concurring), 290–91 (Stevens, J., concurring). Consequently, courts have since considered the Justices agreement as precedential as a matter of federal

---

[1] In this pleading, unless otherwise noted, all internal quotation marks and citations are omitted, and all emphasis is added.

[2] Every part of this memorandum is incorporated into every other part.

Memorandum in Support of Preliminary Injunction – Page 2

constitutional law. *See, e.g.*, *Young v. Hayes*, 218 F.3d 850, 853 (8th Cir. 2000)
(adopting the same reading of *Woodard*).

Due process will be violated in clemency proceedings for the following
reasons. The clemency petitioner must have notice in advance and a chance to
contest evidence that will be presented against them. In *Swarthout v. Cooke*, for
instance, in the parole context, the Supreme Court gave as an example of
compliance with due process when the petitioner has both advanced access to
records and the opportunity to challenge evidence. *See* 562 U.S. 216, 220 (2011). In
an earlier case, that Court did the same when it pointed out how prisoners were
given an opportunity "to insure that the records before the Board" were accurate.
*Greenholtz v. Inmates of Neb. Penal and Corr. Complex*, 442 U.S. 1, 15 (1979).
Similarly, "a lack of adequate notice of the issues to be considered implicates a
fundamental right of due process." *Wilson v. U.S. Dist. Court*, 161 F.3d 1185, 1187
(9th Cir. 1998) (citing *Lankford v. Idaho*, 500 U.S. 110, 126 (1991) and *Woodard*,
523 U.S. at 288).

When it comes to falsehoods used in a clemency proceeding, Justice Stevens
noted in his *Woodard* concurrence that "the deliberate fabrication of false evidence"
is unacceptable under the Due Process Clause. 523 U.S. at 291 (Stevens., J.,
concurring in part). Relatedly, when the conduct of a state official results in a
"fundamentally unfair [proceeding], [i]t unconscionably interferes with a process
that the State itself has created." *Young*, 218 F.3d at 853. Such was the case here.

Memorandum in Support of Preliminary Injunction – Page 3

As Mr. Creech will outline below, the defendants failed to provide minimal due process in his commutation proceeding. First, the Ada County Prosecutor's Office ("ACPO") violated due process with its misrepresentations and use of questionable evidence before the Commission, as well as by failing to provide Mr. Creech with any notice and opportunity to investigate and inspect this evidence. Then, the Commission violated his due process right when it accepted and considered the prosecution's last-minute false statements and questionable evidence without allowing Mr. Creech an opportunity to investigate and demonstrate the prosecution's misrepresentations. Finally, in denying Mr. Creech's petition with a tie vote, the Commission created a fundamentally unfair result.

**A. The Prosecution Provided False Evidence to the Commission**.

Mr. Creech is likely to succeed on the merits of his due process claim with respect to the prosecutor use of the unsolved murder case of Daniel Walker. That is because the prosecutor's presentation and remarks on the Walker murder at the commutation hearing involved both a clear "lack of adequate notice of the issues to be considered," *Wilson v. U.S. Dist. Court*, 161 F.3d 1185, 1187 (9th Cir. 1998), as well as a "deliberate fabrication of false evidence," *Ohio Adult Parole Auth. v. Woodard*, 523 U.S. 272, 291 (Stevens, J., concurring in part).

The ACPO's position at the commutation hearing on January 19, 2024, was that the Commission should not commute Mr. Creech's death sentence. A key argument for this position was that authorities in San Bernardino, California had just solved the 1974 murder of Daniel Walker and Mr. Creech was the killer.

Memorandum in Support of Preliminary Injunction – Page 4

According to the prosecutor, the San Bernardino Sheriff's Department ("SBSD") had just closed the case a week before the hearing. The prosecution showed the Commission the slide below, which was published in the Idaho Statesman:[3]



As is clear from the slide and her remarks, the prosecutor communicated to the Commission that it was a proven fact that Mr. Creech murdered Mr. Walker. And, both because Mr. Creech committed the murder and got away with it, the Commission should reject his petition for clemency.

Undersigned counsel are attorneys with the Capital Habeas Unit for Federal Defender Services of Idaho ("CHU"). The CHU has represented Mr. Creech since

---

[3] *See* Kevin Fixler, *Idaho Death Row Prisoner Thomas Creech Asks Federal Court to Stop His Execution*, Idaho Statesman, Feb. 7, 2024, https://amp.idahostatesman.com/news/local/crime/article285145452.html

Memorandum in Support of Preliminary Injunction – Page 5

1999 with primary responsibility over the last twenty-five years for handling his federal habeas and state post-conviction litigation. *See* Ex. 1 at 1. In connection with its representation, the CHU has maintained an exhaustive file on every document it has obtained from Mr. Creech's prior attorneys as well as from public record requests, court filings, and so forth. *See id.* The CHU's extensive file contains no reference to Mr. Walker by name. *See id.*

Until the commutation hearing on January 19, 2024, no prosecutor from the ACPO had ever suggested publicly that Mr. Creech was involved in the murder of Mr. Walker. On that date the prosecutor not only made the suggestion, but she told the Commission with no uncertainty that Mr. Creech was guilty of the 1974 murder of Mr. Walker and the case was closed. This was a good reason to deny Mr. Creech's petition, according to the prosecutor.

Later that same day, the ACPO issued a press release on the hearing and included the following: "Earlier this week, a cold case was solved in San Bernardino, California when after law enforcement's thorough investigation, they determined Mr. Creech had murdered Daniel A. Walker in October 1974." Ex. 2. This and the prosecution's statement to the Commission that the crime had been "solved" were untrue.

On January 24, 2024, the SBSD issued its own press release. There, however, it announced that Mr. Creech had been "identified as the *suspect* in the 1974 murder of Daniel Walker along Interstate 40." Ex. 3. The SBSD release elaborated that its Cold Case Team "resumed the investigation" into the murder on November

Memorandum in Support of Preliminary Injunction – Page 6

15, 2023. *Id.* It was only after "working with the Ada County District Attorney's Office [sic] in Idaho, [that] Cold Case Detectives were able to corroborate intimate details from statements Creech made regarding Daniel's murder." *Id.* To date, there has been no explanation of what these intimate details were, when they were made, and what changed in the SBSD's investigation from the mid-1970s to the present. And of course, none of that information was turned over to Mr. Creech before the commutation hearing.

What is clear from the SBSD release is that the case is not closed, Mr. Creech has not been charged with the murder, and he has not been convicted of the murder. By suggesting as much to the Commission, the ACPO presented false evidence that the Walker case was closed. And the allegation appears to have had the desired effect—potentially on three of the six Commissioners, and certainly on the media, where the ACPO effectively convicted Mr. Creech in the court of public opinion. *See* Ex. 1 at 5; *see also Cole Case in 1974 attributed to Idaho serial Killer*, CBS2, Jan. 25, 2024, available at https://idahonews.com/news/local/1974-cold-case-attributed-to-idaho-serial-killer-thomas-creech.

Then there is the question of a new investigation and what facts if any were not provided to Mr. Creech. In addition to falsely stating that the case was closed, the prosecution's characterization of what had occurred at the SBSD as a "thorough investigation," Ex. 2, also appears to be misrepresentation. To undersigned counsel's knowledge, there is no new evidence tying Mr. Creech to the murder of Daniel Walker. Whatever information the SBSD is relying on appears to have been

Memorandum in Support of Preliminary Injunction – Page 7

within its possession for the last fifty years. Their January 24, 2024, press release notes that back in the 1970s the SBSD's Homicide Detail "investigated and exhausted all leads at that time." Ex. 3. Mr. Creech was one of those leads and Homicide Detail appears to have ruled him out as a suspect based on the same evidence they have now.

Although Mr. Walker's name does not appear in the CHU files, there is an interview with an investigator from San Bernardino that counsel recognizes, after the commutation hearing, concerned the Walker murder. In April of 1975, SBSD sent an investigator to question Mr. Creech about several possible killings he had allegedly done in San Bernardino. The first interview appears to have taken place on April 27, 1975, with a SBSD detective named Dykes and Ada County Sheriff Eldon "Chuck" Palmer. This interview apparently was not to have been recorded, and it is unclear what types of information were given to Mr. Creech in that interview. The next day, however, there is an extensive interview that was recorded and in which the law enforcement officers refer to some of the previous day's topics.

In the April 28, 1975, interview, only Sheriff Palmer and Detective Dykes are noted as being present with Mr. Creech. *See* Ex. 4 at 1. There is no mention of Sheriff's Deputy Tom Taylor being present. *See id.* As stated previously, Mr. Walker's name is never mentioned in the transcription of the interview. Mr. Creech does tell several elaborate stories about six people he claimed either he or his 17-year-old girlfriend Carol Spaulding killed in San Bernardino County. *See, e.g.*, *id.* at 2–7. For many of these victims, Mr. Creech gives specific directions to where he hid

Memorandum in Support of Preliminary Injunction – Page 8

the bodies in the local mines. *See, e.g.*, *id.* at 10. One of the six victims includes a young man in a van that matches the details of Mr. Walker's death.

In the transcript, Mr. Creech gives Detective Dykes and Sheriff Palmer the following details about the killing of the man in the van: Mr. Creech says he was driving a "goldish" colored van, *id.* at 22; earlier his van got stuck on the side of the freeway and a truck driver helped him and Ms. Spaulding, *id.* at 24; they first encountered the man when Ms. Spaulding was shopping for groceries by herself and the victim made a pass at her, *id.* at 26; they ended up running into the victim later on their trip, *id.* at 27; Mr. Creech used a shotgun in the killing, *id.* at 27; and he stole a "couple of traveler's checks and a few bucks" from the victim, *id.* at 27.

It appears that by the time of the April 28, 1975 interview, the details overlap between Mr. Creech's account and the Walker case as it had been publicized. At the time, the murder had been widely covered on television news programs, in newspaper stories, and paid advertisements as investigators and Mr. Walker's family sought the public's help in solving the crime. *See, e.g.*, Ex. 5 at 2–7, 9–10. These details included the presence of a gold van, a shotgun as the weapon, and the traveler's checks. *See id.* at 3, 7.

It is also clear that, under these circumstances, Detective Dykes had the Walker case in mind when he was questioning Mr. Creech. As noted, Mr. Walker's name is never mentioned and the first time it was would be at the commutation hearing. But after the commutation hearing, it has been possible to at least begin the process of gathering some of the relevant information. Much of which is likely to

Memorandum in Support of Preliminary Injunction – Page 9

**324**

show that the SBSD did not believe Mr. Creech's confession and ruled him out as a suspect.

Part of this information comes from a book by the victim's brother. The prosecutor during her hearing presentation shared that Mr. Walker's brother Doug Walker had coincidentally published a book about the unsolved murder of his brother entitled *Daniel, My Brother: Mystery in the Mojave* in October 2023.[4] First, according to Doug Walker's book, Mr. Walker was driving a Volkswagen van when he was killed. *Id.* at "Just Another Tuesday"[5] This provides context for the 1975 interview. Detective Dykes notes that Mr. Creech couldn't recall the make of the van the day before and wonders if he's had a chance to remember it. Ex. 4 at 22. Mr. Creech responds, "I think it was an old dodge. I'm not sure." Then Sheriff Palmer asks questions about whether the van had a hood in front or "was it a straight off" and was it the type of van with the engine in front of the car or in back. *Id.* Volkswagen vans have a distinct appearance from other vans, and the engine is located in the rear of the vehicle. *See e.g.*, *Day v. Volkswagenwerk Aktiengesellschaft*, 451 F. Supp. 4, 4, 6 (E.D. Pa. 1977) (noting the location of the engine in the rear of a 1968 Volkswagen Type II microbus). Sheriff Palmer's

---

[4] Douglas Walker, *Daniel, My Brother: Mystery in the Mojave* (2023) (Kindle Edition). Because the Kindle edition lacks conventional pagination, Mr. Creech will cite to the chapter titles.

[5] Counsel have found only one earlier reference to the Volkswagen before Doug Walker's book, which was in the special anniversary article on the murder *Emotions Flow in Reopened Desert Killing*, Press Enterprise, Oct. 30, 2010. *See* Ex. 6.

Memorandum in Support of Preliminary Injunction – Page 10

questions appear to be getting at whether Mr. Creech recalls the van being the distinct Volkswagen van as opposed to a Dodge van, for example. This is one possible reason of many that Detective Dykes did not credit Mr. Creech's confession.

That's not the only one though. Doug Walker's book further reports that a hitchhiker named Ken Robinson was in Mr. Walker's van when the killing occurred, and he saw two men in a gold GMC or Chevy van as the murderers. *See My Brother* at "Derrel's House." He also got the impression that Mr. Walker knew the killers. *Id.* at "The Killers and Speculation." The book also reports that police spoke with a beer truck driver who believed he had helped the murderers with their stuck vehicle an hour before the killing. This driver also described two men, one of whom was named "Sam." The truck driver further recalled the men told him they were heading to Indiana to meet up with an ex-wife or child of one of the men. *See id.* at "Just Another Tuesday."

Mr. Creech, in the April 28, 1975, interview, does not say he and Carol Spaulding were traveling with another man. He is also unable to tell Detective Dykes the type of van, despite the probing of Sheriff Palmer, when a Volkswagen van is quite unique compared to other vans. Moreover, during the same period of time, Ms. Spaulding was questioned twice by law enforcement under circumstances that show the officers were exploring the Walker crime. *See* Ex. 7 at 13, 32–33. In both interviews, she denies the allegation and tells the police it sounds like Mr. Creech was fabricating his involvement. *Id.* at 36. Given the outlandish story Mr. Creech launched into right after talking about the Walker murder—about

Memorandum in Support of Preliminary Injunction – Page 11

**326**

vegetarian Satanists in Malibu advertising for hitchhikers they could use in human sacrifices, Ex. 4 at 33–35—and after a fruitless trip to San Bernardino County, it would appear that Detective Dykes and the rest of the SBSD shared Ms. Spaulding's view that Mr. Creech had an overactive imagination.

This futile trip to San Bernardino took place in May of 1975, shortly after the interview. *See* Ex. 8. In addition to Sheriff Palmer, Ada County Deputy Sheriff Tom Taylor and Idaho State Police Investigator Bud Mason all flew to San Bernardino with Mr. Creech. *Id.* This was to locate the bodies of the murdered victims Mr. Creech had told Detective Dykes about. *See id.* Mr. Creech apparently received special treatment from Sheriff Palmer, including being given beer as they drove around searching for bodies that Mr. Creech claimed to have hidden in the local mines. Mr. Creech therefore had an incentive to tell law enforcement about bodies that did not exist and murders that had not happened. The trip was unsuccessful and they did not recover a single body. *See id.* It is unsurprising that the trip found no bodies when one also considers the fact that two of the people that Mr. Creech described as having been killed in the same area appear to be alive and well today. *See* Ex. 1 at 4.

Undersigned counsel are uncertain if there was further questioning of Mr. Creech about the Walker murder on this trip. It certainly seems likely, given that the SBSD had just received a confession from Mr. Creech to an unsolved murder. Then, for some reason, Detective Dykes and the SBSD must have ruled Mr. Creech out as a suspect—Mr. Creech was never charged, prosecuted, or convicted of any

Memorandum in Support of Preliminary Injunction – Page 12

killings in San Bernardino, or even publicly named as a suspect at the time. That is, until the prosecutor sought to convict Mr. Creech of the murder before the Commission on January 19, 2024.

There is only one hint, that undersigned have been able to locate, suggesting the existence of any information supposedly linking Mr. Creech to the Walker murder separate from the April 28, 1975, interview. That hint comes from Mr. Taylor's letter to the Commission, which was included in the ACPO's submissions that were part of the hearing packet.

The letter, dated December 14, 2023, claims that Mr. Taylor was present for interviews with Mr. Creech where Mr. Creech described killing a man in a van in the Barstow, California area who had a diamond ring. *See* Ex. 1 at 4.[6] The April 28 transcript does not refer to a diamond ring. And, after a thorough and extensive search, counsel have been unable to find any reports or references to one in the CHU's files. The April 28 transcript is the only one with an interview about San Bernardino murders, and Mr. Taylor is not recorded as present. There are no reports in undersigned counsel's file suggesting that Mr. Taylor was ever part of conversations with Mr. Creech about San Bernardino—indeed, there are no reports from Mr. Taylor period.

---

[6] As set forth in undersigned counsel's declaration, Mr. Creech is describing the documents that were included in the hearing packet rather than providing them to the Court because of the State's concerns about what use can be made of them in judicial proceedings. *See* Ex. 1 at 2–3.

It is not clear whether there is any information tying Mr. Creech to the Walker case other than an interview conducted nearly fifty years ago and the apparently rediscovered recollections of Mr. Taylor of conversations taking place decades earlier. It is notable in that regard that Mr. Taylor explicitly wrote his letter to the Commission for the purpose of hastening Mr. Creech to his execution, *see id.*, a motivation that would inevitably have influenced his drafting of the document.

Counsel have filed public records requests with the SBSD and the SBDA. The SBSD will not respond until February 15, 2024. *See* Ex. 9. As noted above, the SBDA appears to have no records, *see id.*, which would seem odd given the ACPO's aggressive promotion of how the Walker case had been solved. If SBSD truly considers this case closed and SBDA is in communication with the ACPO about whether to seek a conviction—there must be records of these conversations at a minimum. No records also suggests that SBDA may not share the view of the ACPO that the case is "closed" on the Walker murder. Either way, there is simply not enough time between now and February 28, 2024, when they plan to execute Mr. Creech, to acquire and examine what if any new information has come forward.

But with the limited information we do have, it is clear that after the trip to San Bernardino in May 1975, Mr. Creech was ruled out as a suspect. Apart from the memory of Mr. Taylor apparently recovered shortly before Mr. Creech's commutation hearing, no new information has been shared with Mr. Creech that links him to the Walker murder. Instead, based on the available information, it

Memorandum in Support of Preliminary Injunction – Page 14

appears that the "thorough investigation" referred to by the prosecutor in her press release, was what Mr. Creech told Detective Dykes in 1975, perhaps supplemented by Mr. Taylor's new—and non-contemporaneously documented—memory.

There has been no word that SBDA will seek to prosecute Mr. Creech. But in Idaho, the prosecutor at Mr. Creech's clemency hearing offered no fruits of any "thorough investigation" with the Commission, even though she claimed the case had been closed. When the prosecutor told the Commission the case had been solved, closed, and Mr. Creech was guilty of murdering Mr. Walker, she presented false and unverified claims to support a decision against Mr. Creech.

**B. The Prosecution Used Potentially Tampered Evidence to Support an Execution**

Mr. Creech is likely to succeed on the merits of his due process claim with respect to improprieties committed by the prosecution related to the sock. That is because the role the sock played at the commutation proceedings involved both a clear "lack of adequate notice of the issues to be considered," *Wilson v. U.S. Dist. Court*, 161 F.3d 1185, 1187 (9th Cir. 1998), as well as a likely "deliberate fabrication of false evidence," *Ohio Adult Parole Auth. v. Woodard*, 523 U.S. 272, 291 (Stevens, J., concurring in part).

**1.     Background**

The sock has always been at the center of the Jensen offense. On the day of the crime, the altercation began when Mr. Jensen "approached Creech and swung a weapon at him which consisted of a sock containing batteries." *State v. Creech*, 670 P.2d 463, 465 (Idaho 1983). Mr. Creech removed the sock from Mr. Jensen and,

Memorandum in Support of Preliminary Injunction – Page 15

later in the encounter, used it during the fight that led to the latter's death. *See id.* For many years, the origin of the sock has been vigorously disputed. That has occurred most prominently in the extensive litigation surrounding Mr. Creech's effort to withdraw his guilty plea.

Mr. Creech first moved to withdraw his guilty plea on May 19, 1983. *See State v. Creech*, 710 P.2d 502, 502 (Idaho 1985). One of the principal grounds for the motion was that Mr. Creech at the time of the plea wrongly "believed he had no defenses to the charge." *Id.* at 503. Mr. Creech contended that a theory of "self-defense to the first degree murder charge was not knowingly and intentionally waived." *Id.* at 505. A hearing on the motion was held in February 1984. *See id.* at 504. At the hearing, Mr. Creech testified on his own behalf. While on the stand, Mr. Creech recounted that Mr. Jensen approached him on the day of the crime "and swung at [him] with a sock full of batteries." Ex. 10 at 26. Mr. Creech did not suggest in that testimony that he had anything to do with making the sock or providing it to Mr. Jensen. Similarly, Mr. Creech maintained on appeal that Mr. Jensen "came after" him "with the sock filled with batteries." Ex. 11 at 11 n.4. In response, the State's position was that Mr. Creech "did not kill in self-defense" in part because "he planned the murder in advance." *Creech*, 710 P.2d at 505. The State won—the Idaho Supreme Court determined that Mr. Creech's guilty plea was valid. *See id.* at 506.

Even after the Idaho Supreme Court upheld the guilty plea, the matter continued to be litigated. After substantial briefing here, this Court denied relief on

Memorandum in Support of Preliminary Injunction – Page 16

a corresponding constitutional claim in 2010. *See Creech v. Hardison*, No. CV 99-224, 2010 WL 1338126, at *16–17 (D. Idaho Mar. 31, 2010). Thirteen years later, the Ninth Circuit did the same. *See Creech v. Richardson*, 59 F.4th 372, 389–90 (9th Cir.), *cert. denied*, 144 S. Ct. 291 (2023).

Other significant proceedings also illustrate how significant it was to the State's theory of the case that Mr. Creech be the one who supplied the sock to Mr. Jensen. The State's view of the matter was aptly summarized at the resentencing that took place in March 1995. There, the lead prosecutor on the case for Ada County at the time, Roger Bourne, put the point as follows: "the defendant made a weapon out of a sock with batteries in it. He gave it to another inmate. He transferred it to Mr. Jensen." Ex. 12 at 258. In advocating for the death penalty at the close of the resentencing, Mr. Bourne asserted that the "crime was set up to look like a self-defense claim." Ex. 13 at 374. A significant piece of evidence Mr. Bourne cited to support his description was that Mr. Creech had stated to law enforcement that "the socks were mine." *Id.* at 376. As Mr. Bourne characterized it, Mr. Creech admitted that "the setup" was for him to pass the sock filled with batteries to another inmate who would in turn give them to Mr. Jensen, to set the stage for the fight. *Id.* at 377. The state district court accepted Mr. Bourne's account and relied on it in sentencing Mr. Creech to death, finding that "[t]he sock was later determined to be" his. Ex. 14 at 432.

In short, the idea that the sock full of batteries originated with Mr. Creech has for decades been a fundamental theme in the State's presentation and a subject of great interest to both parties and the courts.

**2.    Argument**

For forty-three years, the state of Idaho cited a single piece of evidence to substantiate its understanding of where the sock came from. That was that an unpaired sock matching the weapon was found in Mr. Creech's cell. *See, e.g.*, Ex. 15 at 8 (noting that after a search of Mr. Creech's "belongings" law enforcement "came up with three white socks, two matching, one odd," and that the odd one appeared "to be the matching sock to the one that was used to carry the batteries").

Then, 15,586 days after the crime, the Ada County Prosecuting Attorney's Office abruptly announced that there had in fact been irrefutable evidence that the sock was Mr. Creech's all along. This discovery came, conveniently, shortly before Mr. Creech's commutation hearing on January 19, 2024. And the revelation was revealed there, during the hearing, for the first time.

Mr. Creech is likely to succeed on his claim that there was a "deliberate fabrication of false evidence," *Woodard*, 523 U.S. at 290–91 (Stevens, J., concurring in part), by the prosecutors involving the sock photograph.

For one thing, there appear to be discrepancies between the image of the sock in the prosecutor's slide and the photograph of the crime scene that was admitted into evidence. *See* Ex. 16; Ex. 17. Most troubling, the item that seems to be the sock in the latter is a much different length than the sock in the PowerPoint. *Compare*

Memorandum in Support of Preliminary Injunction – Page 18

Ex. 16, *with* Ex. 17. At a minimum, the differences call for a full forensic assessment, which the prosecutors' denials of information have prevented undersigned counsel from completing, and which will consequently require discovery in the present case.

For another thing, the circumstances of the sock's emergence in the case is itself suspicious. As outlined above, this case was pending for forty-three years and throughout the entire time the question of whether the sock originated with Mr. Creech was a salient one debated by the parties. For that whole period, the State had a single item of physical evidence on which it pinned its characterization of the sock as coming from Mr. Creech. Namely, a lone mismatched sock was found in Mr. Creech's cell. That was a notably weak evidentiary foundation, as anyone who has ever done laundry can attest. Yet the prosecutors would have us believe that they stuck with that tenuous tack for more than forty decades without a single law enforcement officer thinking to simply *look* at the single most important piece of evidence in the case: the murder weapon. It is a claim lacking in credibility on its face.

And it becomes even less believable when one adds the fact that no defense attorney has ever seen a sock with Mr. Creech's name on it either. That includes Rolf Kehne, who represented Mr. Creech at his original guilty-plea proceedings all the way through his 1995 resentencing. *See Creech*, 59 F.4th at 377. Mr. Kehne never saw such a sock. *See* Ex. 1 at 5–6. It also includes Gus Cahill, who represented Mr. Creech in his first state post-conviction proceedings. *See Creech v.*

Memorandum in Support of Preliminary Injunction – Page 19

*Ramirez*, No. 1:99-cv-224, 2016 WL 8605324, at *3–4 (D. Idaho Jan. 29, 2016). Mr. Cahill remembers no sock of this nature. *See* Ex. 1 at 6. And it includes undersigned counsel's own office, which has represented Mr. Creech for twenty-five years and has conducted an exhaustive search of its comprehensive file. *See id.* The sock with the name on it magically emerged after forty years and only for the eyes of the prosecutors invested in putting Mr. Creech to death. This is a story with a palpable likelihood of evidence tampering. At the very least, Mr. Creech should not be executed until the prospect can be fully vetted, which is impossible to do in three weeks and in the face of the State's obstructionism.

### C. The Prosecution Failed to Provide Notice.

Before the hearing on January 19, 2024, the ACPO provided no notice to Mr. Creech of either the newly discovered writing on the sock or the new and false conclusions about Mr. Creech's involvement in Mr. Walker's murder. As a result, there was a clear "lack of adequate notice of the issues to be considered," *Wilson*, 161 F.3d at 1187, in violation of the minimal due process required in clemency proceedings, *see Woodard*, 523 U.S. at 289. Below Mr. Creech will outline the timeline of the clemency proceedings. At none of these points, however, did the ACPO inform counsel for Mr. Creech of the new sock evidence or its new allegation in the Walker case.

The parties received notice from the Commission on October 18, 2023, that the Commission had voted in favor of granting Mr. Creech a commutation hearing. *See* Ex. 1 at 1. The Commission decided to hold the hearing on January 19, 2024,

Memorandum in Support of Preliminary Injunction – Page 20

shortly after granting the hearing. *See id.* The parties then met with the Commission's Executive Director Ashley Dowell on November 7, 2023, which was memorialized in a letter to the parties from Director Dowell on November 13, 2023. *See* Ex. 18.

After the Commission's investigators interviewed Mr. Creech on November 8, 2023, they filed a report on December 19, 2023. *See* Ex. 1 at 4. The next day, on December 20, 2023, the parties were to submit all the materials they wanted the Commission to consider in its decision. That same day the Commission made all the materials provided by the State, Mr. Creech, and the Commission's investigators available to both sides in a "hearing packet." *See id.* at 2.

### 1.    Failure to Provide Notice of the Walker Allegation

The State's portion of the hearing packet consisted of 2,952 pages of documents. *See id.* However, the first twenty-seven pages of the State's materials were removed from the copy given to counsel for Mr. Creech and replaced with the following text: "THIS PAGE REMOVED DUE TO EXTRACTION OF VICTIM RELATED DOCUMENTS." *See id.* Later, during the commutation hearing, the prosecutor referred to a letter from Doug Walker, the man whose brother was Daniel Walker. "Daniel Walker had been killed in San Bernardino, California in 1974." *See id.* Counsel assumes these first twenty-seven pages contained that letter. As such this was a key point when the State could have alerted Mr. Creech's counsel to the new allegation. But counsel for Mr. Creech still has never seen what was contained in these first pages.

Memorandum in Support of Preliminary Injunction – Page 21

In the ACPO pages Mr. Creech did receive, there is not a single reference to Mr. Walker by name. *See id.* at 4. Nor is there any reference to Mr. Walker by name in either the report prepared by the Commission's investigators or in Mr. Creech's 1994 presentence investigation report—both of which were also in the hearing packet. *See id.* For the State's part, however, the hearing packet would have been an ideal means of putting Mr. Creech on notice of the new Walker allegation. But the State failed to do so.

**2.     Failure to Provide Notice of the New Sock Evidence**

In terms of the sock evidence, Mr. Creech certainly had no reason to expect that the prosecutor would unveil this smoking gun at the commutation hearing. Indeed, it is particularly striking that even in the documentary submissions made by the prosecution to the Commission in advance of the hearing, the State was still beating the drum of its long-established approach to the sock. The prosecutor's exhibits included a letter from Dan Douthit and Garry Carr, two former employees of the Ada County Sheriff's Office who "served as the primary investigators involved in the" Jensen case. *Id.* at 3. Messrs. Douthit and Carr state in their letter that Mr. Creech "provided the sock and batteries used in the initial violent attack," which was proven—to their minds—by the fact that "[t]he spare sock was found in Creech's possessions." *Id.* at 4. There is nothing in this letter, or any other document in the packet, to suggest that Mr. Creech's name was on the murder weapon.

Memorandum in Support of Preliminary Injunction – Page 22

The Douthit letter is dated November 13, 2023. A mere two months later, the prosecutors had an infinitely more damning piece of "evidence." They produced at the hearing for the first time an alleged photograph of the murder-weapon sock visibly bearing Mr. Creech's name on it. *See* Ex. 16. The prosecutor displayed that photograph in a PowerPoint presentation that was delivered at the commutation hearing. *See id.* Needless to say, Mr. Creech had no means of meaningfully exploring the legitimacy of the photography in the few hours that lapsed between the prosecutor's use of the image in her PowerPoint and the conclusion of the hearing. Mr. Creech was diligent in attempting to find space and time to contest the photograph. Only three days after the commutation hearing, on January 22, Mr. Creech's counsel asked the Commission to defer its decision for two months, in part so that they could investigate the authenticity of the photograph. *See* Ex. 19 at 1. There was nothing preventing the Commission from doing so. It had not yet rendered a decision, which did not come until January 29. *See* https://parole.idaho.gov/wp-content/uploads/2024/01/Creech-Decision-with-signatures_Redacted.pdf. And no statute or rule that Mr. Creech is aware of required the Commission to act on his petition within a certain amount of time.

Mr. Creech gave the Commission an opportunity to honor his due process rights on January 25. At that time, Mr. Creech notified the Commission that he had filed a motion in Ada County District Court seeking the evidence needed to examine the sock issue. *See* Ex. 20 at 1. Mr. Creech also informed the Commission that he would be seeking a hearing on the motion at the earliest day allowed by the rules

Memorandum in Support of Preliminary Injunction – Page 23

and consistent with the court's schedule. *See id.* The Commissioners had one final chance on the morning of January 29, when Mr. Creech advised them that the prosecutors had provided his counsel with the slide from the PowerPoint and that it appeared to differ from a crime-scene photograph of the sock. *See* Ex. 21 at 3. Mr. Creech alerted the Commission at that time that additional information was needed to evaluate the photograph, which he would be pursuing in court. *See id.* The Commission refused to wait, and instead issued its decision the same day as Mr. Creech's final letter. *See* Ex. 1 at 5.

In so doing, the Commission's actions—in tandem with the prosecutor's—led to a violation of Mr. Creech's due process right to notice and to contest the evidence considered at his hearing. It is difficult to imagine a more textbook violation of the right to notice and to contest the evidence than the sudden emergency of a damning photograph on the day of a hearing after forty-three years of litigation followed by a decision made ten days later sending a man to his execution before he could even begin analyzing the image in earnest. *See Wilson*, 161 F.3d at 1187 (explaining how a prisoner stated a claim for relief by averring that "the state's communications misled [a death row inmate's] counsel about the issues to be considered in the clemency proceeding"); *see also Swarthout v. Cooke*, 562 U.S. 216, 220 (2011) (implying that due process in the clemency context calls for a chance to contest the evidence used against the prisoner).

To the extent that Mr. Creech has to demonstrate that the sock issue was a serious one at his clemency proceedings, it was. The very first section of Mr.

Memorandum in Support of Preliminary Injunction – Page 24

**339**

Creech's opening PowerPoint presentation at his commutation hearing was focused on the Jensen offense. *See* Ex. 1 at 5.[7] In that section, Mr. Creech's first substantive slide contrasted the statement of Messrs. Carr and Douthit that there was "no way that Jensen initiated an assault" with the finding by Judge Newhouse in 1982 that Mr. Creech "did not instigate the fight with the victim, but the victim, without provocation, attacked him." *Id.* Had undersigned counsel known that the State would be presenting substantial new evidence allegedly proving that Mr. Creech in fact masterminded the incident, they would have reevaluated their strategy as a whole and would at a minimum have zealously investigated such information. The State's ambush prevented them from doing so.

Furthermore, contrary to the rationalization the State has employed elsewhere and will likely employ here, the issue with the sock cannot be brushed off as a weak and late-blooming attempt on the part of Mr. Creech to raise a self-defense theory. The reason undersigned counsel addressed the Jensen crime at the commutation hearing was not to suggest that Mr. Creech was innocent of first-degree murder, which is what self-defense essentially means. *See State v. Bodenbach*, 448 P.3d 1005, 1015 (Idaho 2019) (reiterating that self-defense is a "justification" for a killing and thus when it is present "an essential element" of first-degree murder is absent). Rather, counsel took on the Jensen offense to

---

[7] Mr. Creech's PowerPoint presentation can be viewed in its entirety at https://id.fd.org/sites/id/files/Videos/Tom%20Creech%20Clemency%20Presentation.mp4.

demonstrate that it was not so highly aggravated a crime as to require an execution. A killing that is plotted out in advance is self-evidently more aggravated than one that is not. The State's use of the sock photograph goes directly to that distinction, and it was therefore of great consequence at the hearing.

It is also a notice violation of special strength when considered in light of the State's approach to crime-scene evidence generally. When Mr. Creech sought access to the physical evidence twenty-five years ago, the Ada County Sheriff's Office offered a blanket refusal in response. Ex. 22. Law enforcement officers from the same county then supposedly retrieved the same evidence a month or so before a clemency hearing so that they could railroad Mr. Creech into an execution. Notice violations rarely come with the balance of the equities so plain.

**D.   A Denial Based on a Tie Vote Resulted in an Arbitrary Clemency Proceeding.**

Mr. Creech is likely to succeed on the merits of his claim that the denial of clemency on a three-three tie vote violated his due process rights.

Even in areas where only minimal due process rights exist, an avenue created by a state still may not be "arbitrarily abrogated." *Wolff v. McDonnell*, 418 U.S. 539, 557 (1974). That is what happened to Mr. Creech.

The Idaho Constitution provides that commutations can only be granted by "the decision of a majority of" the Parole Commission. Idaho Const., Art. IV, § 7. When a majority of Commissioners votes in favor of reducing a death sentence to life in prison without parole, the recommendation is forwarded to the Governor for a final decision. *See* Idaho Code § 20-1016(2). By statute, there are seven

Memorandum in Support of Preliminary Injunction – Page 26

Commissioners. *See* Idaho Code § 20-1002(2). This scheme gives rise to a reasonable expectation for a death-row inmate that when he petitions for a commutation, he needs to convince four of seven Commissioners in order to obtain a positive recommendation and the prosecution needs to do the same in order to secure a denial. *See Stiesberg v. California*, 80 F.3d 353, 356 (9th Cir. 1996) (emphasizing that a due process claim arises from "a reasonable expectation of entitlement deriving from existing rules or understandings that stem from an independent source such as state law").

Mr. Creech's reasonable expectation that he would receive the same balanced treatment as other commutation petitioners was dashed. One Commissioner recused himself from the commutation proceedings for reasons that have never been announced. *See* Ex. 1 at 5. This Commissioner was not replaced. *See id.* There were thus six Commissioners who participated in Mr. Creech's commutation hearing and who voted on his petition. Mr. Creech was required to persuade four Commissioners to vote for life, but the prosecution only needed to convince three four death. That is exactly what happened when a tie vote was recorded. *See* https://parole.idaho.gov/wp-content/uploads/2024/01/Creech-Decision-with-signatures_Redacted.pdf. Mr. Creech's reasonable expectation of a level playing field—which Idaho law establishes—was accordingly thwarted.

Idaho had options for dealing with the imbalance. The State could have removed a Commissioner from the panel. Then, each side would have had to convince only three members to obtain a majority and prevail, which would have

Memorandum in Support of Preliminary Injunction – Page 27

restored the system to the equitable arrangement contemplated by Idaho law. Or the Governor could have granted a reprieve and postponed Mr. Creech's execution until the Commission's next session. The Idaho Constitution expressly authorizes him to do so. *See* Idaho Const., Art. IV, § 7. Mr. Creech requested that remedy from the Governor and he declined to afford it. *See* Ex. 1 at 5. To be clear, Mr. Creech is not contending here that he had a due process right to a reprieve. He is merely pointing out that the due process problem created by the recusal was easily redressable by Idaho state actors. It is the failure on the part of those actors to remedy the harm that now requires this Court to intervene.

### E. In Refusing to Pause the Proceedings Once the Fabricated and Questionable Nature of the Prosecution's Evidence Came to Light, the Commission Failed to Protect Mr. Creech's Right to Due Process.

The Commission had an easy tool for safeguarding Mr. Creech's due process rights and declined to use it. Specifically, Mr. Creech's counsel wrote letters to the Commission on January 22, 25, and 29. *See* Exs. 19–21. In each letter, counsel informed the Commission about the problems caused by the prosecution's attempt to convict Mr. Creech of a brand-new crime at the commutation hearing and to reveal a potentially fraudulent smoking-gun photograph of evidence at the same time. *See id.* Counsel requested in the letters that the Commission defer its decision on Mr. Creech's commutation petition for at least two months so that they could conduct the necessary investigation. *See id.* Had the Commission taken this straightforward recommendation, it would have protected Mr. Creech's rights to contest the evidence used against him in the clemency process and it would have

Memorandum in Support of Preliminary Injunction – Page 28

remedied the notice violation which had already occurred. The Commission chose

another path. It declined to postpone its decision and instead denied Mr. Creech's

commutation petition on January 29, 2024, only ten days after the hearing.

Nothing required the Commission to act so rashly. There is no constitutional

provision, statute, or regulation requiring the Commission to rule on a commutation

petition within a certain amount of time. *See generally* Idaho Const., Art. IV, § 7;

Idaho Code § 20-1001 et seq.; Idaho IDAPA 50.01.01.450. When the Idaho

legislature wishes to impose such a deadline, it knows how to do so. *See* Idaho Code

§ 20-1010(1) (giving the Commission twenty days from a hearing to make a decision

on parole revocations). The absence of such a timeline from all of the pertinent

authorities reflects the fact that the Commission is empowered to take as long as it

desires on commutation decisions. Indeed, when the Commission decided its most

recent commutation case prior to Mr. Creech's, in the Pizzuto proceedings, it waited

approximately a month from the hearing, far longer than it did here. *See* Ex. 1 at 5.

Moreover, the window was still plainly open until the afternoon of January

29. The Commission was continuing to deliberate over Mr. Creech's commutation

petition as it headed into January 29's executive session. *See id*. There was nothing

stopping the Commission from honoring Mr. Creech's due process rights and

allowing the modest continuance that had been requested. Since it was the

Commission itself that without explanation chose to improvidently plunge forward

into a hasty decision, it should not be heard now to complain about the need for the

same minimal relief coming from the Court.

Memorandum in Support of Preliminary Injunction – Page 29

**344**

## II.     Irreparable Harm

The next factor in evaluating the need for a preliminary injunction, irreparable harm, is abundantly present: Mr. Creech will be put to death on February 28, 2024 after a clemency proceeding that failed to honor even the most minimal of Mr. Creech's due process rights. The harm is as irreparable as it gets. *See Towery v. Brewer*, 672 F.3d 650, 661 (9th Cir. 2012) (noting that the irreparable-harm factor is always present when the plaintiff is challenging his execution); *see also Beaver  v. Netherland*, 101 F.3d 977, 979 (4th Cir. 1996) ("In cases involving the death penalty when an execution date has been set, as here, it is a certainty that irreparable harm will result if the court of appeals' decision is not stayed."). If Mr. Creech is killed on February 28, it will have been through false statements and questionable evidence of the prosecutor. With him will die any chance that the truth about the Walker murder and the State's newly discovered sock evidence will come out. And the Commission will never have the chance to reconsider its decision with this truth in mind.

Without this Court's intervention, the violations described herein will escape any further scrutiny and will cause Mr. Creech's execution.

## III.    The Balance of Equities and the Public Interest Favor an Injunction.

The last criterion for a preliminary injunction considers the balance of equities and the public interest, which tip heavily in favor of an injunction.

As an initial matter, Mr. Creech has been on death row for more than forty years. *See State v. Creech*, 670 P.2d 463 (Idaho 1983). An injunction for a few more

Memorandum in Support of Preliminary Injunction – Page 30

months to allow Mr. Creech to litigate the substantial issues in this case will do the State no harm. *See Mikutaitis v. United States*, 478 U.S. 1306, 1309 (1986) (Stevens, J., in chambers) (granting a stay and emphasizing that the government would not "be significantly prejudiced by additional short delay"). Indeed, when the Ninth Circuit upheld a stay under very similar circumstances it observed that "the damage to" state officials "is questionable" when their only complaint is that they cannot execute an inmate immediately, which would be the defendants' only possible argument on this factor. *Wilson*, 161 F.3d at 1187.

In addition, it would be illogical to suggest that an injunction would unduly injure the State when the Attorney General was so inflexibly opposed to a reasonable schedule in the commutation proceedings. The Attorney General, speaking in part for the ACPO, "strenuously oppose[d]" the modest request Mr. Creech made to the Parole Commission for two months to investigate the bombshell allegations made by the prosecutor at the commutation hearing. Ex. 23 at 3. Having convinced the Commission to move forward without adequate time, the Attorney General created a need for what will likely be more protracted litigation over issues that could well have been resolved more speedily and informally in the commutation proceedings themselves. Any harm to the defendants is of their own making.

Importantly, Mr. Creech's posture is dramatically different from the many cases in which the inmate's conduct requires a claim to be disposed of on the eve of an execution. *See, e.g.*, *McKenzie v. Day*, 57 F.3d 1461, 1463, 1468–69 (9th Cir.

Memorandum in Support of Preliminary Injunction – Page 31

1995) (discussing a constitutional claim raised for the first time in opposition to a motion to set an execution date). Mr. Creech initiated this lawsuit only five days after the Commission rendered its decision, *see* Dkt. 1, the event that made his claim ripe. By no measure has Mr. Creech "delayed unnecessarily in bringing the claim." *Nelson v. Campbell*, 541 U.S. 637, 650 (2004). His diligence is therefore another reason to grant the preliminary injunction.

Nor does the public interest weigh against the granting of a preliminary injunction. Any interest the members of the public have in the finality of Mr. Creech's case is outweighed by their stronger investment in him receiving the minimal due process that everyone is entitled to in clemency proceedings. *See Zagorski v. Haslam*, No. 3:18-cv-1035, 2018 WL 4931939, at *2, *4 (M.D. Tenn. Oct. 29, 2018) ("[I]t is always in the public interest to prevent violation of a party's constitutional rights.").

## IV.   An Injunction Cannot be Denied Without an Evidentiary Hearing.

Mr. Creech submits that the argument above, considered alongside the exhibits accompanying this Memorandum, is adequate to justify the entry of the modest remedy he seeks, which is a preliminary injunction for a few months so that he can investigate and support the substantial claims he has raised. Insofar as the Court disagrees, it would still be inappropriate to *deny* the injunction without holding an evidentiary hearing. Such a hearing is mandatory "if essential facts are in dispute." *Charlton v. Est. of Charlton*, 841 F.2d 988, 989 (9th Cir. 1988). Taking into account the limitations imposed by the thirty-day death warrant timeframe,

Memorandum in Support of Preliminary Injunction – Page 32

Mr. Creech has presented substantial evidence that is sufficient to meet his burden on all of the preliminary-injunction factors. Therefore, the only reason to refuse an injunction would be if the State contradicts his presentation and the Court agrees with its account. That would represent a dispute over the facts, which would call for an evidentiary hearing.

## V.    Conclusion

For the reasons set forth above, undersigned counsel respectfully ask the Court for a preliminary injunction staying the February 28, 2024 death warrant against Mr. Creech until the claim he has raised here can be fully and fairly adjudicated.

DATED this 8th day of February 2024.

*/s/ Christopher M. Sanchez*
Christopher M. Sanchez
Jonah J. Horwitz

Federal Defender Services of Idaho

*Attorneys for Plaintiff Thomas Eugene Creech*

Memorandum in Support of Preliminary Injunction – Page 33

**348**

## CERTIFICATE OF SERVICE

I hereby certify that on this 8th day of February 2024, I emailed the foregoing document to:

Kristina Schindele
krschind@idoc.idaho.gov
Counsel for Defendant Parole Commission

Karin Magnelli
kmagnell@idoc.idaho.gov
Counsel for Defendant Parole Commission

Jim Dickinson
jimd@adaweb.net
Counsel for Defendant Bennetts

Jan M. Bennetts
jbennetts@adacounty.id.gov
Defendant

I further certify that a hard copy of the document will be hand-delivered by February 9, 2024 at the latest to:

Jan M. Bennetts
200 W. Front St., Ste. 3191
Boise, ID 83702


/s/ L. Hollis Ruggieri
L. Hollis Ruggieri

Memorandum in Support of Preliminary Injunction – Page 34

**349**

# EXHIBIT 27

*Thomas Eugene Creech v. Idaho Commission of Pardons and Parole, et al.*

Case No. 1:24-cv-00066-AKB
Filed in support of Motion for Preliminary Injunction

# EXHIBIT 2

Home > Press Releases > Ada County Prosecutor's Office statement following Thomas Creech's commutation hearing

# PRESS RELEASES

**JAN 19 2024**

## Ada County Prosecutor's Office statement following Thomas Creech's commutation hearing
(https://adacounty.id.gov/prosecutor/press-releases/ada-county-prosecutors-office-statement-following-thomas-creechs-commutation-hearing/)

FOR IMMEDIATE RELEASE

| | |
|---|---|
| Date: | Jan. 19, 2024 |
| Contact: | Emily Lowe<br>Public Information Officer<br>208-287-7700 |
| RE: | State v. Thomas Creech Commutation Hearing |

BOISE – Today, the Ada County Prosecutor's Office requested that Thomas Eugene Creech's death sentence be upheld, and his sentence not be commuted to life imprisonment.

In 1981, the state sought the death penalty against Mr. Creech for the first-degree murder of David Dale Jensen. Mr. Jensen was an inmate at the Idaho Department of Correction. Mr. Creech was serving four life sentences at the time he brutally beat and murdered 23-year-old Jensen, including pummeling him with a battery filled sock and stomping on his face and neck repeatedly. Mr. Creech pled guilty to the murder and was sentenced to death.

Three months prior to Mr. Jensen's murder, Mr. Creech stabbed another inmate in the hopes of getting transferred to his preferred housing unit. When that did not work, he resorted to killing Mr. Jensen. If his sentence is commuted, he would go back into the general prison population where he would have more access to inmates, putting them at risk.

Mr. Creech has been convicted of five murders, including three in Idaho, one in California, and one in Oregon. He is a serial killer who is established to have killed an additional six victims, and has admitted to killing upwards of 40 people. Earlier this week, a cold case was solved in San Bernadino, California when after law enforcement's thorough investigation, they determined Mr. Creech had murdered Daniel A. Walker in October 1974.

Seeking the death penalty in a capital case is not a decision that is taken lightly by any prosecutor's office. The decision can be made only after a careful examination of the statutory factors as applied to the facts and circumstances. The facts and circumstances in Mr. Creech's case warrant the death penalty to this day.

Mr. Jensen's family appeared at Friday's hearing to make their voices heard. The Commission also heard written comments from members of other victims' families impacted by his killings.

"I want to thank Mr. Jensen's family for having the courage to relive their pain and loss from decades ago by delivering extremely powerful and thoughtful victim impact statements to the Parole Commission," said Ada County Prosecutor Jan Bennetts. "Mr. Creech's actions have caused immeasurable pain to countless families, and on behalf of my office, we extend our condolences to Mr. Jensen's family and to other victims' families for their losses."

"I also want to extend my appreciation to my team – Deputy Prosecutor Jill Longhurst, investigators and support staff, the Idaho Attorney General's Office, and law enforcement both local and nationwide, who assisted us on gathering evidence in preparation for this hearing."

We thank the Commission of Pardons and Parole for their attentiveness during today's hearing and await their recommendation.

Posted in Press Releases
(https://adacounty.id.gov/prosecutor/category/press-releases/)

# Other Press Releases

**JAN 29 2024**

(https://adacounty.id.gov/prosecutor/press-releases/2250/)
Read Full Story...
(https://adacounty.id.gov/prosecutor/press-releases/2250/)

---

**JAN 11 2024**

## Boise man sentenced to prison for threatening police officer with a knife
(https://adacounty.id.gov/prosecutor/press-releases/boise-man-sentenced-to-prison-for-threatening-police-officer-with-a-knife/)
Read Full Story...
(https://adacounty.id.gov/prosecutor/press-releases/boise-man-sentenced-to-prison-for-threatening-police-officer-with-a-knife/)

---

**NOV 07 2023**

## Boise man sentenced to life imprisonment for 2018 knife attack on 74-year-old man
(https://adacounty.id.gov/prosecutor/press-releases/boise-man-sentenced-to-life-imprisonment-for-2018-knife-attack-on-74-year-old-man/)
Read Full Story...
(https://adacounty.id.gov/prosecutor/press-releases/boise-man-sentenced-to-life-imprisonment-for-2018-knife-attack-on-74-year-old-man/)

1/2

Case 1:24-cv-00066-AKB   Document 4-3   Filed 02/08/24   Page 3 of 3

# EXHIBIT 28

Nicole Owens
EXECUTIVE DIRECTOR
Christopher M. Sanchez, Idaho Bar No. 12070
Jonah J. Horwitz, Idaho Bar No. 10494
Deborah A. Czuba, ID Bar No. 9648
Mary E. Spears, IN Bar No. 27353-49
Nicole R. Gabriel, ID Bar No. 11603
Assistant Federal Defenders
FEDERAL DEFENDER SERVICES OF IDAHO
702 W. Idaho Street, Suite 900, Boise, ID 83702-8929
Telephone: (208) 331-5530; Facsimile: (208) 331-5559
ECF:  Jonah_Horwitz@fd.org
        Christopher_M_Sanchez@fd.org
        Deborah_A_Czuba@fd.org
        Mary_Spears@fd.org
        Nicole_Gabriel@fd.org

*Attorneys for Plaintiff Thomas Eugene Creech*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| **THOMAS EUGENE CREECH,** | ) | **CASE NO.** |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | **COMPLAINT FOR** |
| | ) | **EQUITABLE, DECLARATORY,** |
| **IDAHO COMMISSION OF PARDONS** | ) | **AND INJUNCTIVE RELIEF** |
| **AND PAROLE**; **JAN M. BENNETTS**, | ) | |
| Ada County Prosecuting Attorney, in her | ) | **EXECUTION SCHEDULED** |
| official capacity;, | ) | **FOR FEBRUARY 28, 2024** |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| _____ | ) | |

COMPLAINT – Page 1

### I.  Nature of the Action

1.     Plaintiff Thomas Eugene Creech is a death-row inmate in Idaho who brings this action pursuant to 42 U.S.C. § 1983 for violations of his constitutional right to due process of law in his clemency proceeding.

2.     Mr. Creech hereby seeks injunctive and declaratory relief prohibiting his execution until the harms against him can be rectified through a new clemency proceeding in which, inter alia, (1) the prosecution[1] is forbidden from using false evidence against him; (2) Mr. Creech is given notice of what the Idaho Commission of Pardons and Parole (hereinafter "the Commission") will consider in its decision; (3) he is given notice of the evidence to be used against him by the prosecution; and (4) he is given a reasonable amount of time to investigate the prosecution's new claims raised for the first time at his clemency hearing.

### II.  Justiciable Case or Controversy

3.     For the reasons set forth below, absent judicial intervention, Mr. Creech will be executed in violation of his constitutional and statutory rights.

4.     There is a real and justiciable case or controversy between the parties.

### III.  Jurisdiction and Venue

5.     This action arises under 42 U.S.C. § 1983.

---

[1] As the prosecution took the lead in representing the State of Idaho against Mr. Creech—counsel from the Attorney General's Office sat in as co-counsel—the plaintiff may refer to the prosecution as "Idaho," "the State of Idaho," "the State," the "prosecutor," and so forth. Likewise, throughout this complaint, the plaintiff refers to all the defendants, variously, as "the defendants." The use of these expressions does not limit the scope of the claims, which are brought against each and every named defendant.

COMPLAINT – Page 2

**356**

6.      The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 (federal question), 1343 (civil rights violations), 2201(a) (declaratory relief), and 2202 (further relief).

7.      The Court has personal jurisdiction over the defendants as they are residents of the State of Idaho and are presently located in the State of Idaho, or are elected or appointed officials of the State of Idaho or otherwise acting on behalf of the State of Idaho.

8.      Venue in this Court is proper under 28 U.S.C. § 1391 because most of the events giving rise to the claims—including the clemency proceedings and Mr. Creech's impending execution—have occurred, are occurring, or will occur in the District of Idaho.

9.      Venue is further proper because, upon information and belief, the defendants all reside in the District of Idaho.

**IV.    Parties**

10.      Mr. Creech is a person within the jurisdiction of the State of Idaho.

11.      Mr. Creech is an inmate under the supervision of the Idaho Department of Correction ("IDOC").

12.      Mr. Creech is confined at the Idaho Maximum Security Institution ("IMSI").

13.      Mr. Creech is under sentence of death.

COMPLAINT – Page 3

14.     As set forth in greater detail below, the defendants are state officials responsible for overseeing Mr. Creech's clemency proceeding and/or prosecuting and representing the interests of the State in executing Mr. Creech in Idaho.

15.     Defendant Idaho Commission of Pardons and Parole ("Commission") is the agency responsible for making the initial determination with respect to petitions for commutation by death-row inmates.

16.     The Commission was responsible for deciding what information to consider in Mr. Creech's commutation proceedings, notifying the parties of the nature of that information, and providing the parties with an opportunity to respond to that information.

17.     Defendant Jan M. Bennetts is the elected Ada County Prosecuting Attorney.

18.     As such, Ms. Bennetts is the head of the Ada County Prosecutor's Office ("ACPO").

19.     The ACPO was given the primary responsibility in representing the State's interests in executing Mr. Creech in the commutation proceedings.

20.     Upon information and belief, the plaintiff and the defendants are all United States citizens.

21.     The defendants are all officials or representatives of the State of Idaho.

22.     All of the actions that have been and will be taken by the defendants towards executing Mr. Creech and any other actions at issue in this complaint were or will be taken under color of state law.

COMPLAINT – Page 4

**358**

23.     The defendants are all sued in their official capacities.

## V.     General Factual Allegations

24.     Mr. Creech incorporates each and every statement and allegation set forth throughout this complaint as if fully rewritten.

25.     Mr. Creech was convicted of first-degree murder for the killing of David Jensen and sentenced to death for that offense in Ada County District Court.

26.     Mr. Creech's murder conviction and death sentence were upheld on direct appeal in 1983.

27.     After Mr. Creech obtained federal habeas relief, he was resentenced to death.

28.     The new death sentence was upheld on direct appeal in 1998.

29.     Once the State obtains a death warrant, which in this case it did on January 30, 2024, it has thirty days to execute Mr. Creech.

30.     Mr. Creech is scheduled to be executed on February 28, 2024.

31.     Mr. Creech brings this action to challenge his execution because the Commission failed to comply with minimal due process requirements by accepting and considering the prosecution's last-minute false statements and questionable evidence without allowing Mr. Creech a chance to investigate and demonstrate the prosecution's misrepresentations. Likewise, Mr. Creech brings this action against the prosecution because it too violated due process through misrepresentations and the use of questionable evidence, as well as its failure to provide Mr. Creech with any notice of this evidence.

COMPLAINT – Page 5

A. **Clemency Proceedings and the Failure to Notify Mr. Creech of Evidence the Commission Would Consider and the Prosecution Would Raise**

32.     Before the State obtained the most recent death warrant, it obtained a warrant on October 12, 2023, setting Mr. Creech's execution for November 8, 2023.

33.     Mr. Creech filed his petition for commutation with the Commission the next day, on October 13, 2023, asking for his death sentence to be reduced to life in prison without the possibility of parole.

34.      On October 18, 2023, the Commission voted in favor of granting Mr. Creech a commutation hearing.

35.     The Commission scheduled the commutation hearing for January 19, 2024.

36.     The parties met with the Commission's Executive Director Ashley Dowell on November 7, 2023, to discuss the hearing.

37.     Director Dowell sent a letter to the parties on November 13, 2023, to memorialize the November 7 meeting.

38.     This letter outlined the rules and logistical details for the hearing and noted that the Ada County Prosecuting Attorney's Office, rather than the Attorney General's Office, would be the "primary point of contact for the State's case."

39.     The Commission's investigators interviewed Mr. Creech on November 8, 2023.

40.     The Commission investigators filed a report with the Commission on December 19, 2023.

COMPLAINT – Page 6

**360**

41.     After the parties had submitted materials for the Commission's consideration, the Commission made all materials provided by the State, Mr. Creech, and the Commission's investigators available to both sides in a "hearing packet" on December 20, 2023.

42.     The State's section of the hearing packet consisted of 2,952 pages of documents.

43.     The first 27 pages of the State's materials, however, were removed from the copy given to counsel for Mr. Creech with the following text: "THIS PAGE REMOVED DUE TO EXTRACTION OF VICTIM RELATED DOCUMENTS."

44.     Upon information, these pages may have included a letter from a man named Doug Walker whose brother Daniel Walker had been killed in San Bernardino, California in 1974.

45.     Counsel for Mr. Creech have never seen these first 27 pages.

46.     When Mr. Creech refers to the packet here, he is referencing the pages that were made available to him.

47.     Among all the State's 2,952 pages that were provided to Mr. Creech, there was no reference to Daniel Walker ("Mr. Walker").

48.     Mr. Walker's name was also absent from the report prepared by the Commission's investigators, as well as Mr. Creech's 1994 presentence investigation report—both of which were also in the hearing packet.

49.     Additionally absent from the State's materials were any photographs of socks.

COMPLAINT – Page 7

**361**

50.     To undersigned counsel's knowledge, the State did not supplement any of its materials between December 20, 2023, and the day of the hearing on January 19, 2024.

### B. The Prosecution Tells the Commission Mr. Walker's Murder Has Been Solved and the Killer was Mr. Creech

51.     At the commutation hearing on January 19, 2024, the ACPO took the position that the Commission should not commute Mr. Creech's death sentence.

52.     To support its position that Mr. Creech should be executed, the prosecution told the Commission that just a week before the hearing, authorities in San Bernardino, California had solved Daniel Walker's murder and that Mr. Creech was responsible for it.

53.     The prosecutor noted as well that Mr. Creech had always been a suspect in the case.

54.     Undersigned counsel are attorneys with the Capital Habeas Unit for Federal Defender Services of Idaho ("CHU").

55.     The CHU has represented Mr. Creech since 1999 and has had primary responsibility over the last twenty-five years for handling his federal habeas and state post-conviction litigation.

56.     In connection with its representation, the CHU has maintained an exhaustive file on every document it has obtained from Mr. Creech's prior attorneys as well as from public record requests, court filings, and so forth.

57.     The CHU's file does not contain any reference to Mr. Walker by name.

COMPLAINT – Page 8

**362**

58.    To undersigned counsel's knowledge, until the commutation hearing, no prosecutor from the ACPO had ever suggested publicly that Mr. Creech was involved in the murder of Mr. Walker.

59.    No charges have ever been filed against Mr. Creech in connection with the Walker case.

60.    At the commutation hearing, the ACPO told the Commission that Mr. Creech was guilty of the 1974 Walker murder and that the case was closed.

61.    On information and belief, the prosecutor's slides included an image of the book Doug Walker wrote about the murder case, which is described below, and the slides also included the date of his brother's death.

62.    The ACPO further indicated that the Commission should consider this new information in support of a decision to deny Mr. Creech's clemency petition.

63.    The same day as the commutation hearing, the ACPO issued a press release, which included the following statement: "Earlier this week, a cold case was solved in San Bernardino, California when after law enforcement's thorough investigation, they determined Mr. Creech had murdered Daniel A. Walker in October 1974."

64.    Both the press release and the prosecutor's statement to the commission were untrue.

65.    The case was not "solved."

COMPLAINT – Page 9

66.     When the San Bernardino Sheriff's Department ("SBSD") issued a press release on January 24, 2024, it announced that Mr. Creech had been "identified as the *suspect* in the 1974 murder of Daniel Walker along Interstate 40."

67.     The SBSD release elaborated that its Cold Case Team "resumed the investigation" into the murder on November 15, 2023.

68.      It was, the release went on, only after "working with the Ada County District Attorney's Office [sic] in Idaho, [that] Cold Case Detectives were able to corroborate intimate details from statements Creech made regarding Daniel's murder."

69.     To undersigned counsel's knowledge, there has been no public explanation as to what these intimate details were, when they were made, and what changed in SBSD's investigation from the mid-1970s to the present.

70.     What is clear from the SBSD release is that the case has not been conclusively solved.

71.     Mr. Creech was named only as a "suspect," and the SBSD release ended by requesting that people contact the Cold Case Team if they have any additional information.

72.     The SBSD's release suggests the case remains open.

73.     The ACPO presented false evidence when it stated to the Commission that the Walker case was closed.

74.     The ACPO's additional claim that the case had been solved after a "thorough investigation" is also a misrepresentation.

COMPLAINT – Page 10

**364**

75.     There is no new evidence tying Mr. Creech to the murder of Daniel Walker.

76.     Records that have been in Mr. Creech's file for decades indicate that SBSD had sent an investigator to Idaho in 1975 to question Mr. Creech about possible killings Mr. Creech had done in San Bernardino back in 1975.

77.     On April 28, 1975, a Detective Dykes from SBSD questioned Mr. Creech alongside Ada County Sheriff Eldon "Chuck" Palmer.

78.     The questioning on April 28, 1975 was recorded and transcribed.

79.     Mr. Walker's name is never mentioned in the transcript.

80.     Only Sheriff Palmer and Detective Dykes are noted as being present with Mr. Creech during the interview in the transcript.

81.     During the interview there are references to what appears to have been an interview of Mr. Creech involving Detective Dykes the day before, April 27, 1975.

82.     There are several references in the April 28, 1975, transcript that indicate both Detective Dykes and Sheriff Palmer had discussed the killings with Mr. Creech the day before.

83.     Counsel has been unable to locate a recording or transcription of the April 27, 1975, interview.

84.     In the transcript of the April 28, 1975, interview, Mr. Creech tells Detective Dykes and Sheriff Palmer elaborate stories about six people he claimed either he or his 17-year-old girlfriend Carol Spaulding killed in San Bernardino.

COMPLAINT – Page 11

85.     For many of these victims, Mr. Creech gives very specific directions to where he hid the bodies in the local mines.

86.     One of the six victims includes a young man in a van.

87.     He gives Detective Dykes and Sheriff Palmer various details about the killing of this man in a van: Mr. Creech tells them he was driving a "goldish" colored van; this van got stuck on the side of the freeway earlier and a truck driver helped them; they first encountered the victim when Ms. Spaulding was shopping for groceries by herself and the victim made a pass at her; they ended up running into the victim later on their trip; Mr. Creech used a shotgun in the killing; and he stole a few traveler's checks from the victim.

88.     By the time of the April 28, 1975 interview, all of the details that overlap between Mr. Creech's account and the Walker case were already widely publicized on television news programs, in newspaper stories, and paid advertisements as investigators and Mr. Walker's family sought the public's help in solving the crime. These details included the presence of a gold van, a shotgun as the weapon, and the theft of traveler's checks.

89.     It is therefore clear, under the circumstances, that Detective Dykes had in mind the Walker case when he was questioning Mr. Creech.

90.     At the commutation hearing, the prosecutor noted that Daniel Walker's brother Doug Walker recently published a book about the unsolved murder entitled *Daniel, My Brother: Mystery in the Mojave*, in October 2023.

COMPLAINT – Page 12

91. According to Doug Walker's book, Daniel Walker was driving a Volkswagen van when he was killed.

92. The book further reports that a hitchhiker named Ken Robinson was in Mr. Walker's van when the killing occurred, and he described two men in a gold GMC or Chevy van as the murderers. He also got the impression that Mr. Walker knew the killers.

93. As Doug Walker's book recounts, police later spoke with a beer truck driver who believed he had helped the murderers with their stuck vehicle an hour before the killing. This driver also described two men, one of whom was named "Sam." The truck driver further recalled the men told him they were heading to Indiana to meet up with an ex-wife or child of one of the men.

94. Mr. Creech, in the April 28, 1975, interview, does not say he and Carol Spaulding were traveling with another man, and he is unable to remember what type of van the victim was driving despite the unique design of a Volkswagen van in comparison to others.

95. During the same period of time, Ms. Spaulding was questioned twice by law enforcement under circumstances that make clear that law enforcement were exploring the Walker crime.

96. At those two interviews, Ms. Spaulding denied the allegations and informed the officers that it sounded to her like Mr. Creech was fabricating his involvement in the crime.

COMPLAINT – Page 13

**367**

97.     Immediately after talking about the van murder, Mr. Creech launches into telling Detective Dykes and Sheriff Plamer about a ranch in Malibu, California owned by vegetarian Satanists who had a practice of advertising in the newspaper for hitchhikers who would unwittingly be used for human sacrifices.

98.     In early May 1975, Sheriff Palmer, Ada County Deputy Sheriff Tom Taylor, and Idaho State Police Investigator Bud Mason all flew to San Bernardino with Mr. Creech.

99.     The purpose of this trip was to aid the SBSD in locating the several bodies Mr. Creech claimed to have hidden in the area.

100.    There may have been further questioning about the Walker murder during this trip as well.

101.    Upon information, the Sheriff gave Mr. Creech special treatment in exchange for helping law enforcement, such as providing him with beer while they drove around looking for bodies that Mr. Creech claimed to have hidden in the local mines.

102.    Mr. Creech therefore had an incentive to tell law enforcement about bodies that did not exist.

103.    The May 1975 trip to San Bernardino was unsuccessful and they did not recover a single body.

104.    After all this, Detective Dykes and SBSD appear to have ruled Mr. Creech out as a suspect in Mr. Walker's murder despite his confession.

COMPLAINT – Page 14

**368**

105.    That is because Mr. Creech was never charged, prosecuted, or convicted for any killings in San Bernardino, or even publicly named as a suspect at the time.

106.    During the same period of time, law enforcement officials publicly linked Mr. Creech to dozens of murders, some real and others of people who seem to never have existed or who were found in good health.

107.    So far as undersigned counsel are aware, there is only one hint suggesting the existence of any information supposedly linking Mr. Creech to the Walker murder separate from the April 28, 1975 interview.

108.    That hint comes from Mr. Taylor's letter to the Commission, which was included in the ACPO's submissions that were made part of the hearing packet.

109.    In his letter dated December 14, 2023, Mr. Taylor claims that he was present for interviews where Mr. Creech described killing a man in a van in the Barstow, California area who had a diamond ring.

110.    The April 28 transcript does not refer to a diamond ring.

111.    Counsel conducted a thorough and extensive search of their file and found no reports by Mr. Taylor or any references to one.

112.    The only transcript of an interview on the subject of San Bernardino murders in counsel's file is the April 28 transcript and Mr. Taylor is not recorded as being present.

113.    It is not clear whether there is any information tying Mr. Creech to the Walker case other than an interview conducted nearly fifty years ago and the

COMPLAINT – Page 15

**369**

apparently rediscovered recollections of Mr. Taylor of conversations taking place decades earlier.

114.    Shortly after the commutation hearing, undersigned counsel filed a public records request with the SBSD, which has informed counsel that it will need a fourteen-day extension and will not respond until February 15, 2024.

115.    It is already clear, however, that after the trip to San Bernardino in May 1975, the SBSD decided not to pursue their investigation into Mr. Creech even after he had offered a confession to one of their detectives.

116.    Apart from the memory Mr. Taylor apparently recovered shortly before Mr. Creech's commutation hearing, no new information has been shared with Mr. Creech or the public that links Mr. Creech to the Walker murder.

117.    Instead, the "thorough investigation," referred to by the prosecutor in her press release, appears to have been reminding the SBSD about what Mr. Creech told Detective Dykes in 1975, perhaps supplemented by Mr. Taylor's new memory.

118.    According to the SBSD press release, the SBPO is in close contact with Ada County.

119.    There has been no word that the SBPO will seek to prosecute Mr. Creech.

120.    Instead, both the SBPO and the SBSD will be spared the burden of offering any proof to the public or to a court once Mr. Creech has been executed.

COMPLAINT – Page 16

121.     Here, in any case, the prosecutor at Mr. Creech's clemency hearing offered no new evidence and did not share the fruits of any thorough investigation with the Commission.

122.     Nevertheless, the prosecutor declared before the Commission that the Walker case had been closed.

123.     The prosecutor told the Commission the case had been solved.

124.     The prosecutor told the Commission that Mr. Creech was guilty of murdering Mr. Walker.

125.     The Commission considered the prosecution's false and unverified claims in its decision.

126.     Undersigned counsel made several requests that the Commission postpone its decision until Mr. Creech could gather information about the Walker case.

127.     On January 22, 2024, counsel notified the Commission about the issues surrounding the State's claims regarding the Walker case and asked that it wait two months before reaching a decision so counsel could conduct an investigation into the State's new accusation.

128.     Then, on January 25, 2024, counsel updated the Commission on the discrepancy between the prosecution's statements and the SBSD press release as to whether the case was "closed." Counsel also informed the Commission that his office had timely sent out public records requests related to the Walker investigation. For

COMPLAINT – Page 17

both of these reasons, counsel renewed the request for two months to complete an investigation and respond to these new allegations.

129.    On January 26, 2024, Deputy Attorney General L. LaMont Anderson stated in a letter to the Commission that there is additional information linking Mr. Creech to the Walker murder undisclosed in the public statements referenced above.

130.    This additional information has, to date, never been turned over to Mr. Creech, the Commission, or the public.

131.    Finally, on January 29, 2024, counsel provided the Commission with a letter and attachments further demonstrating the need for a short period of time to gather more information about the San Bernardino allegation.

132.    These requests were denied.

133.    The Commission made a final decision on Mr. Creech's commutation petition on January 29, 2024, after receiving the last letter from undersigned counsel.

134.    The decision was a 3-3 tie, which the Commission regarded as a denial of the petition.

135.    The seventh Commissioner recused himself from the proceedings for reasons that were never conveyed to undersigned counsel.

136.    With this recusal, Mr. Creech still had to convince four of the now six Commissioners, while the State only had to get three Commissioners to support execution.

COMPLAINT – Page 18

137.    The recusal only harmed Mr. Creech.

138.    The Commission did not seek an alternate Commissioner to sit in on the case so there would be an odd number of Commissioners to avoid a tie.

139.    Nor did the Commission remove a Commissioner from the panel so that each side would have to convince three members in order to obtain a majority and prevail.

140.    Three Commissioners believed that clemency was appropriate and only three felt it was unwarranted. Nevertheless, the Commission decided to deny the petition rather than seek a tie-breaking vote from either the Executive Director or an alternate Commissioner.

141.    Had seven Commissioners been present for Mr. Creech's hearing, as was supposed to be the case, then he would have had the chance to persuade one more person to vote for life.

142.    Instead, the prosecution only needed to win half the votes of the Commissioners, while Mr. Creech had to win two thirds.

143.    Idaho law provides that there are seven Commissioners.

144.    Under the Idaho Constitution, a majority of votes in favor of a commutation are necessary in order to secure a favorable recommendation from the Commission to the Governor.

145.    Idaho's scheme therefore envisions that each side in a capital commutation hearing must convince four Commissioners to vote for their position.

COMPLAINT – Page 19

146.    Mr. Creech had a reasonable expectation that such a balanced approach would be followed in his case.

147.    That reasonable expectation was unmet because of the unexplained recusal and the subsequent 3-3 vote.

148.    The prosecution obtained a death warrant the next day and is intent on killing Mr. Creech on February 28, 2024, before the truth about the Walker case surfaces.

149.    In the United States, everyone has the right to a trial by jury. The prosecution here stole that right from Mr. Creech in a matter of minutes when it charged him, tried him, and convicted him of killing Daniel Walker in the mere moments it took to change a slide in their PowerPoint presentation. This irresponsible and unfair abuse of power was intentionally designed to rob Mr. Creech of what was clearly a strong bid for clemency.

### C.    The Prosecution Reveals a Photo of the Murder Weapon for the First Time Before the Commission

150.    The fight that led to the death of David Jensen began when Mr. Jensen attacked Mr. Creech with a sock filled with batteries.

151.    Mr. Creech took the weapon away from Mr. Jensen, who returned to his cell and brought back a toothbrush with a razor blade attached.

152.    The fight continued until Mr. Creech hit Mr. Jensen with the battery-filled sock several times.

153.    The sock broke open and some of the batteries fell out.

COMPLAINT – Page 20

154.    Over the last forty-three years, there have been two main theories for where the sock originated: under one account Mr. Creech provided Mr. Jensen with the sock and under a different account it was another inmate who provided the sock.

155.    The answer would have been of great importance throughout the case because it would have either helped the State show Mr. Creech planned the whole assault out in advance, as the prosecution posited, or it would have shown that some other inmate set the scheme in motion, which was one of Mr. Creech's main arguments.

156.    This dispute was particularly critical in the yearslong litigation over whether Mr. Creech was entitled to withdraw his guilty plea on the ground that his trial attorney never advised him properly about the nature of self defense.

157.    During the entire history of Mr. Creech's case, to undersigned counsel's knowledge, no one until the commutation hearing had ever maintained or even suggested the sock had Mr. Creech's name written on it.

158.    To undersigned counsel's knowledge, none of the police reports surrounding the murder note that Mr. Creech's name is written on the sock.

159.    Detective Dan Douthit was responsible for collecting evidence at the crime scene.

160.    The official police report states that police collected "a white sock with five D cell batteries in it. There was a small amount of blood on the sock."

COMPLAINT – Page 21

**375**

161.    The police were looking for evidence that the sock had belonged to Mr. Creech.

162.    The official police report states the following: "Prior to our departure, R/O along with Lt. Carr, went in and searched suspect Creech's belongings. We were looking for a matching sock to the one that was used to carry the batteries, since we could not find one in the victim's cell. We came up with three white socks, two matching, one odd. The odd one looked, to this officer, to be the matching sock to the one that was used to carry batteries."

163.    Even though there was a clear incentive to prove the sock belonged to Mr. Creech, no report states that the sock collected from the crime scene had his name written on it.

164.    The commutation hearing on January 19, 2024, was the first time that changed when the prosecutor showed the Commission a slide with an image of a sock with Mr. Creech's name allegedly written on it in marker.

165.    This image was not included in the State's section of the hearing packet that was made available in advance to undersigned counsel.

166.    Previous attempts by undersigned counsel's office to access any of the relevant materials had been denied over the years, including when, on July 7, 1999, the Ada County Sheriff's Office refused to make any evidence available to the CHU.

167.    Mr. Creech was represented during his guilty-plea proceedings in the 1980s and again at his 1995 resentencing by attorney Rolf Kehne.

COMPLAINT – Page 22

168.    Mr. Kehne does not recall ever seeing or hearing about Mr. Creech's name written on the sock.

169.    Undersigned counsel filed a motion with the state district court to access the sock on January 25, 2024.

170.    This motion remains pending and will be heard on February 15, 2024.

171.    On January 26, 2024, the ACPO provided undersigned counsel with a copy of the slide of the sock that prosecution used during its presentation.

172.    There appear to be discrepancies between the image of the sock in the prosecutor's slide and images taken of the sock from the crime scene.

173.    The socks in the images appear to have multiple differences including the stains on them, the size, and the style of sock.

174.    The discoloration in the prosecutor's image does not seem consistent with discoloration caused by the blood in the crime-scene photograph.

175.    It also appears the sock in the prosecutor's image is a crew length while the one in the crime scene photo appears to be a longer, calf-length sock.

176.    Undersigned counsel sent the Commission letters on January 22, 2024, January 25, 2024, and January 29, 2024, notifying it of the facts above regarding the prosecutor's image, including that he had filed a motion with the state district court for access to the sock. As a result, counsel asked the Commission for two months so counsel could review the new evidence presented by the prosecutor on the day of the commutation hearing.

COMPLAINT – Page 23

**377**

177.   Counsel's request was denied, and the Commission considered this questionable evidence against Mr. Creech in reaching its decision.

## VI.   Claim 1—Defendants Violated Due Process

178.   Mr. Creech incorporates each and every statement and allegation set forth throughout this complaint as if fully rewritten.

179.   The Due Process Clause of the Fourteenth Amendment applies to clemency proceedings. *See Ohio Adult Parole Auth. v. Woodard*, 523 U.S. 272, 288 (1988) (O'Connor, J., concurring); *see also id.* at 290–91 (Stevens, J., concurring in part). At a minimum, due process in clemency proceedings requires advance notice and a chance to contest evidence that will be presented against a petitioner. *Swarthout v. Cooke*, 562 U.S. 216, 220 (2011). Similarly, in the clemency context, "a lack of adequate notice of the issues to be considered implicates a fundamental right of due process." *Wilson v. U.S. Dist. Court*, 161 F.3d 1185, 1187 (9th Cir. 1998) (citing *Lankford v. Idaho*, 500 U.S. 110, 126 (1991) and *Woodard*, 523 U.S. at 288). Furthermore, "the deliberate fabrication of false evidence" is unacceptable in clemency proceedings under the Due Process Clause. *Woodard*, 523 U.S. at 291 (Stevens, J., concurring in part).

180.   By virtue of the above stated facts, defendants deprived Mr. Creech of his constitutional right to due process of law by (1) failing to give him adequate notice of the allegations and evidence the prosecution would present; (2) presenting false evidence against him regarding the murder of Daniel Walker and the status of San Bernardino's investigation into the crime; (3) presenting potentially tampered

COMPLAINT – Page 24

**378**

with evidence in the form of an image of a sock with Mr. Creech's name written on it; (4) failing to give notice that the prosecution would be using the image of the sock in its presentation and failing to make examination of the sock available to Mr. Creech prior to the hearing; (5) failing to allow Mr. Creech the chance to contest the evidence against him once he had informed the Commission of the issues with the prosecution's presentation; and (6) denying Mr. Creech's petition on the basis of a tie vote when he had a reasonable expectation that each side would be required to persuade the same name of Commissioners to secure a favorable outcome.

181.    In sum, the prosecution created the illusion of a new murder conviction as it prepared for the commutation hearing. Then, for the first time at the hearing, the prosecution revealed never-before-seen images of the murder weapon that mysteriously appeared as the prosecution prepared for the commutation hearing. The prosecution gave no notice before presenting either the image of the sock or its false statement about the Walker murder to the Commission. Then, the Commission, once on notice of the prosecution's due process violations, refused to allow Mr. Creech time to respond to the new, suspicious, and, at a minimum in regards to the Walker case, objectively false information from the prosecution.

## VII.    Prayer for Relief

182.    In light of the above, Mr. Creech respectfully requests that the Court:

a)  Stay the February 28, 2024 death warrant against Mr. Creech.

COMPLAINT – Page 25

**379**

b) Enjoin the State from seeking a death warrant until Mr. Creech has a reasonable time to investigate the prosecution's claims during the commutation hearing.

c) Order the Commission to provide Mr. Creech with a new hearing with adequate notice of the issues the Commission will consider and adequate notice of the evidence the prosecution will use against him; or, in the alternative, order the Commission to withdraw its decision and consider any information Mr. Creech is able to present within a reasonable amount of time before making a final determination.

d) Enjoin the defendants from attempting to execute Mr. Creech until this Court orders otherwise.

e) Declare that Mr. Creech's commutation proceedings were unconstitutional and that the Commission's denial of his petition was therefore legally invalid.

f) Authorize appropriate and necessary discovery and an evidentiary hearing to permit Mr. Creech to prove his claim.

g) Grant any such other relief that is just and proper.

DATED this 5th day of February 2024.

/s/ *Christopher M. Sanchez*
Christopher M. Sanchez
Jonah J. Horwitz
Deborah A. Czuba
Mary E. Spears
Nicole R. Gabriel

*Attorneys for Plaintiff*

COMPLAINT – Page 27

**381**

# EXHIBIT 29

Filed: 01/30/2024 10:10:30
Fourth Judicial District, Ada County
**Trent Tripple, Clerk of the Court**
By: Deputy Clerk - Stokes, Sabrina

IN THE DISTRICT COURT OF THE FOURTH JUDICIAL DISTRICT

OF THE STATE OF IDAHO, IN AND FOR THE COUNTY OF ADA

| | | |
|---|---|---|
| STATE OF IDAHO, | ) | CASE NO. CR-FE-0000-10252 |
| Plaintiff, | ) | |
| | ) | DEATH WARRANT |
| vs. | ) | |
| | ) | |
| THOMAS EUGENE CREECH, | ) | |
| Defendant. | ) | |

**TO:** Josh Tewalt, Director of the Idaho Department of Correction, and Tim Richardson, Warden, Idaho Maximum Security Institution:

**WHEREAS** the above-named Defendant, THOMAS EUGENE CREECH, on the 28th day of August, 1981, pled guilty to the crime of First-Degree Murder; and,

**WHEREAS** on the 17th day of April, 1995, the Honorable Robert G. Newhouse entered his Findings of the Court in Considering the Death Penalty and a Judgment of Conviction finding that the above-named Defendant, THOMAS EUGENE CREECH is guilty of First-Degree Murder and imposing the sentence of Death; and,

**WHEREAS** the Honorable Robert G. Newhouse did, on the 12th day of December, 1996, enter an order denying the above-named Defendant, THOMAS EUGENE CREECH, post-conviction relief; and,

*DEATH WARRANT - 1*

**383**

**WHEREAS,** on the 19th day of August, 1998, the Idaho Supreme Court issued its opinion upholding the conviction and sentence and affirming the denial of post-conviction relief and issued its Remittitur on the 23rd day of October, 1998, and,

**WHEREAS,** on 1st day of June, 1999, the United States Supreme Court, denied a Petition for Certiorari for the above-named Defendant, THOMAS EUGENE CREECH, and,

**WHEREAS,** on the 24th day of March, 2017, the Honorable B. Lynn Winmill entered Judgment denying the above-named Defendant, THOMAS EUGENE CREECH, federal habeas relief; and,

**WHEREAS,** on the 6th day of February, 2023, the United States Court of Appeals, Ninth Circuit, affirmed the denial of federal habeas relief; and,

**WHEREAS,** on the 10th day of October, 2023, the United States Supreme Court denied a Petition for Certiorari for the above-named Defendant, THOMAS EUGENE CREECH; and,

**WHEREAS,** on the 29th day of January, 2024, the Idaho Commission of Pardons and Parole denied the Commutation Petition for the above-named Defendant, THOMAS EUGENE CREECH; and,

**WHEREAS,** Idaho Code § 19-2715(3) mandates that the state apply for a death warrant from the district court in which the conviction was had after a stay of execution has been granted but the Commission denies commutation; and

**WHEREAS,** pursuant to Idaho Code § 19-2715(5) the Court has inquired and finds there is an existing death sentence and that no valid stays of execution are currently in place; and

**WHEREAS,** Idaho Code § 19-2715(2) mandates that, upon such application, the district court shall set a new execution date not more than thirty (30) days thereafter;

*DEATH WARRANT - 2*

**384**

**NOW THEREFORE, YOU ARE HEREBY COMMANDED,** pursuant to Idaho Code § 19-2716 and the Judgment of this Court, to receive said Defendant, THOMAS EUGENE CREECH, into your custody, and on the **28th day of February** 2024, you shall cause the execution of said sentence of death to take place, unless said sentence is stayed by law, and that you shall make a return upon this Death Warrant, showing the time, mode and manner in which it was executed pursuant to Idaho Code § 19-2718.

DATED this 30th day of January, 2024 ~~2023~~.

JASON SCOTT
DISTRICT JUDGE

*DEATH WARRANT - 3*

385

# EXHIBIT 30

Filed: 10/19/2023 14:08:38
Fourth Judicial District, Ada County
**Trent Tripple, Clerk of the Court**
By: Deputy Clerk - Stokes, Sabrina

## IN THE DISTRICT COURT OF THE FOURTH JUDICIAL DISTRICT

## FOR THE STATE OF IDAHO, IN AND FOR THE COUNTY OF ADA

STATE OF IDAHO,

      Plaintiff,

v.

THOMAS EUGENE CREECH,

      Defendant.

**CASE NO. CR-FE-0000-10252**

**ORDER STAYING EXECUTION**

**(CAPITAL CASE)**

The Court has been advised that the Idaho Commission of Pardons and

Parole has granted Mr. Creech's request for a commutation hearing.

Therefore, pursuant to I.C. § 19-2715(1), the Court ORDERS that the

execution scheduled in the Death Warrant issued by the Court on October 12,

2023, is stayed until the conclusion of the commutation proceedings.

      Section 19-2715(1) entitles Creech to a stay of execution in these
circumstances. In its opposition brief, the State does not disagree. Instead, the
State contends that only the Governor, and not also the Court, is vested with
statutory authority to grant the requested stay. The Court respectfully disagrees.
That authority is shared.

*Jason D. Scott*  10/19/2023 1:54:31 PM
_____
Jason D. Scott
DISTRICT JUDGE

ORDER STAYING EXECUTION - 1

## CLERK'S CERTIFICATE OF SERVICE

I certify that on _____10/19/2023_____, I served a copy of this document as follows:

Ada County Prosecutor
apcourtdocs@adacounty.id.gov

Deborah A. Czuba
Jonah J. Horwitz
Federal Defender Services of Idaho
Capital Habeas Unit
Deborah_A_Czuba@fd.org
Jonah_Horwitz@fd.org

TRENT TRIPPLE
Clerk of the District Court

10/19/2023 2:09:02 PM

By: _____

Deputy Court Clerk

ORDER STAYING EXECUTION - 2

# EXHIBIT 31

Electronically Filed
10/19/2023 11:08 AM
Fourth Judicial District, Ada County
Trent Tripple, Clerk of the Court
By: Jennifer Keyes, Deputy Clerk

**JAN M. BENNETTS**
Ada County Prosecuting Attorney

**Jill Longhurst**
Deputy Prosecuting Attorney
Idaho State Bar No. 4390
200 W. Front Street, Room 3191
Boise, ID  83702
Telephone:  (208) 287-7700
Fax: (208) 287-7709
acpocourtdocs@adaweb.net

IN THE DISTRICT COURT OF THE FOURTH JUDICIAL DISTRICT OF

THE STATE OF IDAHO, IN AND FOR THE COUNTY OF ADA

| | | |
|---|---|---|
| THE STATE OF IDAHO, | ) | |
| | ) | |
| | ) | **Case No. CR-FE-0000-10252** |
| | ) | |
| vs. | ) | **OPPOSITION TO MOTION TO** |
| | ) | **STAY EXECUTION** |
| THOMAS EUGENE CREECH, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

**COMES NOW**, Jill Longhurst, Ada County Deputy Prosecuting Attorney on behalf of the State of Idaho, and hereby objects to this Court issuing a stay of execution on the grounds that the District Court does not have jurisdiction to issue a stay of execution based on commutation proceedings.  The authority to issue a stay of execution due to the existence of a commutation proceeding rests solely with the executive branch of government, specifically with the governor himself.

Creech has requested that this Court issue an order staying execution because he alleges that the Commission of Pardons and Parole has granted him a commutation hearing.

All commutation/clemency proceedings occur under the authority of the executive branch. "As demonstrated since statehood, the power to grant pardons and commutations in Idaho has always been vested in the executive branch." *State v. Pizzuto*, 171 Idaho 100, 518 P.3d 796, 802

**OPPOSITION TO MOTION TO STAY EXECUTION**
**(CREECH – ADA COUNTY CRIMINAL CASE NO. CR-FE-0000-10252 )**  Page 1

**390**

(2022), reh'g denied (Oct. 28, 2022)(citing IDAHO CONST. art. IV, § 7). The United States Supreme Court has further recognized that the clemency/commutation proceedings are part of the executive branch functioning not the judiciary.

> Clemency proceedings are not part of the trial-or even of the adjudicatory process. They do not determine the guilt or innocence of the defendant, and are not intended primarily to enhance the reliability of the trial process. They are conducted by the executive branch, independent of direct appeal and collateral relief proceedings. And they are usually discretionary, unlike the more structured and limited scope of judicial proceedings. While traditionally available to capital defendants as a final and alternative avenue of relief, clemency has not traditionally been the business of courts.

*Ohio Adult Parole Auth. v. Woodard*, 523 U.S. 272, 284, 118 S. Ct. 1244, 1251, 140 L. Ed. 2d 387 (1998)(citations and quoting references omitted). See also *Connecticut Bd. of Pardons v. Dumschat*, 452 U.S. 458, 463, 101 S. Ct. 2460, 2464, 69 L. Ed. 2d 158 (1981).

The Idaho Supreme Court has recognized that "commutation is an act of grace and a matter of discretion, and may be refused" by the executive branch. *Pizzuto,* at 518 P.3d at 802 (quoting *State v. Evans*, 73 Idaho 50, 60, 245 P.2d 788, 794 (1952)). Accordingly, the decision to grant a commutation proceeding is an act of discretion exercised solely by the executive branch acting on the authority of the governor[1] and is not within the court's concern or power. Likewise, the authority to issue an order staying Creech's execution while commutation proceedings are pending rests with the governor under Idaho law, I.C. §19-2715(1) and §19-2715(6).

This Court's authority to issue an order staying execution is limited by statute. I.C. §19-2708 provides that "no judge, court or officer, can suspend the execution of a judgment of death, except as provided in sections 19-2715 and 19-2719, Idaho code."

Idaho Code §19-2715 governs the procedures and "ministerial actions" relating to stays of execution." I.C. 19-2715(1) specifically indicates that an execution shall be stayed for proceedings taken pursuant to an appeal from I.C. §19-2719, during the automatic review of judgments imposing the punishment of death provided by I.C. §19-2827, by order of a federal court **"or as**

---

[1]"As last amended in 1986, Article IV, section 7 [of the Idaho Constitution] places 'the pardoning power' with the Idaho Commission of Pardons and Parole, an executive branch agency whose members are appointed by the governor and confirmed by the senate. I.C. § 20-1002 (establishing that the governor shall appoint a seven-member commission and the executive director, with each member serving a three-year term). The legislature created the Commission '[I]n accordance with the state constitution's requirement that the legislature create a board of pardons responsible for exercising the pardon power'. Thus, the Commission of Pardons and Parole operates as the 'board of pardons' listed in the Idaho Constitution. *State v. Pizzuto*, 171 Idaho 100, 518 P.3d 796, 802 (2022), reh'g denied (Oct. 28, 2022) (citations omitted).

**OPPOSITION TO MOTION TO STAY EXECUTION**
**(CREECH – ADA COUNTY CRIMINAL CASE NO. CR-FE-0000-10252 )** Page 2

**part of a commutation proceeding pursuant to section 20-1015, Idaho Code.**" *emphasis added*.[2]   I.C. §20-1015 refers to the authority of the executive branch and provides, in part, that the "governor shall have power to grant respites or reprieves in all cases of convictions for offenses against the state, except treason or imprisonment on impeachment."

Likewise, I.C. §19-2715(6) further notes that for "purposes of this section, the phrase "stay of execution" shall refer to a temporary postponement of an execution as a result of a court order **or an order of the governor postponing the execution while a petition for commutation is pending**." *emphasis added.*  Clearly the statute grants the governor authority to issue the stay of execution when the stay is caused by a pending petition for commutation.

In this statute, which addresses only procedural and ministerial actions relating to stays of execution, resetting execution dates and an order for execution of judgment of death, the legislature specifically referred not once, but twice to the authority of the executive relating to a stay of execution when the stay is related to commutation proceedings.  Not only does this statute refer to the authority of the executive branch in  I.C. §20-1015 when identifying when a stay could be granted, but the statute also specifically refers to "an order of the governor postponing the execution while a petition for commutation is pending" when defining a  "stay of execution."   In ascertaining whether this court has authority to issue the requested stay because of the commutation proceeding or whether that authority rests solely with Idaho's governor, this legislation must be afforded its clear and plain meaning.

> The objective of statutory interpretation is to derive the intent of the legislative body that adopted the act. Statutory interpretation begins with the literal language of the statute. Provisions should not be read in isolation, but must be interpreted in the context of the entire document. The statute should be considered as a whole, and words should be given their plain, usual, and ordinary meanings.

*State v. Dunlap*, 155 Idaho 345, 361, 313 P.3d 1, 17 (2013).  The clear meaning of the statute is that when the request for a stay of execution is sought due to commutation proceedings, it is the governor who holds the authority to issue a stay of execution, not the district court.

Creech is asking this Court to issue an order staying execution based on a commutation hearing which he alleges was granted by the executive branch of government to which neither this Court nor the Ada County Prosecuting Attorney are parties.  Indeed, the *Motion for Stay of Execution* filed yesterday initially only attempted to demonstrate the existence of the alleged

---

[2] See also legislative changes made by the legislature in 2021 – House Bill 150.

**OPPOSITION TO MOTION TO STAY EXECUTION**
**(CREECH – ADA COUNTY CRIMINAL CASE NO. CR-FE-0000-10252 )** Page 3

**392**

commutation proceeding through hearsay stating: "Undersigned counsel have been informed that the Idaho Commission of Pardons and Parole has decided to hold a hearing on Mr. Creech's commutation petition." *Motion for Stay of Execution*, pp. 1-2. To be clear, Creech's initial request to stay his execution was made based solely on a hearsay representation and with the footnote reference to the fact a media outlet had reported on the commutation proceeding. See *Motion for Stay of Execution*, footnote one. A district court judge cannot be expected to grant a stay of execution for an execution date set after 40 years of litigation based solely on the hearsay claims of Creech's counsel and the reference to a media report. Media reports are not evidence. References to what Creech's counsel have been told by other parties is not evidence.

The decision to grant a commutation hearing is an action known to the executive branch and not verifiable by any judicial court record. These facts clearly demonstrate that the actions of the executive branch are so removed from these judicial proceedings that it is Idaho's executive officer who must intervene on the issue of a stay – not the district court. Notably, when Creech filed a supplemental document to his "emergency" request for a stay of execution trying to demonstrate to this Court the actions of the executive branch regarding his commutation petition, it was by providing a copy of a letter on State of Idaho letterhead with the Governor's name at the top followed by the name Ashley Dowell, Executive Director – further verifying that any commutation/clemency actions taken were taken by Idaho's executive branch of government and under their authority.

This request is not based on pending court or judicial proceedings.

Creech has sought commutation from the executive branch of Idaho's government – not through the judiciary. Only the executive branch can grant Creech the commutation he hopes for and only the governor himself has the authority to issue a stay of execution to Creech during the commutation proceedings.

**RESPECTFULLY SUBMITTED,** this 19th day of October, 2023.

**JAN M. BENNETTS**
Ada County Prosecuting Attorney

By: Jill Longhurst
Deputy Prosecuting Attorney

**OPPOSITION TO MOTION TO STAY EXECUTION**
**(CREECH – ADA COUNTY CRIMINAL CASE NO. CR-FE-0000-10252 )** Page 4

393

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on this 19th day of October, a true and correct copy of the foregoing Opposition to motion to Stay Execution was served to the following in the manner noted below:

Ada County Public Defender
200 W. Front St. Rm 1107
Boise, Idaho 83702

- ❑  XX By e-mailing copies of the same to public.defender@adacounty.id.gov

Deborah Czuba
Jonah Horwitz
Federal Defender Services of Idaho
Capital Habeas Unit
702 W. Idaho, Suite 900
Boise, Idaho 83702
Deborah_A_Czuba@fd.org
Jonah_Horwitz@fd.org

- ❑  XX By E-mailing copies of the same to Deborah_A_Czuba@fd.org and
    Jonah_Horwitz@fd.org

_____

**OPPOSITION TO MOTION TO STAY EXECUTION**
**(CREECH – ADA COUNTY CRIMINAL CASE NO. CR-FE-0000-10252 )** Page 5

# EXHIBIT 32

Electronically Filed
10/18/2023 2:18 PM
Fourth Judicial District, Ada County
Trent Tripple, Clerk of the Court
By: Chynae Hull, Deputy Clerk

Deborah A. Czuba, ID Bar No. 9648
Jonah J. Horwitz, ID Bar No. 10494
Federal Defender Services of Idaho
Capital Habeas Unit
702 W. Idaho, Suite 900
Boise, Idaho 83702
Telephone: (208) 331-5530
Facsimile: (208) 331-5559
Deborah_A_Czuba@fd.org
Jonah_Horwitz@fd.org

Attorneys for Defendant Thomas Eugene Creech

## IN THE DISTRICT COURT OF THE FOURTH JUDICIAL DISTRICT FOR THE STATE OF IDAHO, IN AND FOR THE COUNTY OF ADA

| | |
|---|---|
| STATE OF IDAHO,<br><br>        Plaintiff,<br><br>    v.<br><br>THOMAS EUGENE CREECH,<br><br>        Defendant. | **CASE NO. CR-FE-0000-10252**<br><br>**EMERGENCY MOTION FOR STAY OF EXECUTION**<br>**Oral Argument Requested**<br><br>**Execution Scheduled November 8, 2023**<br><br>**(CAPITAL CASE)** |

For the reasons set forth below, and so that Idaho's constitutionally prescribed clemency process can be completed in an orderly and lawful fashion, Defendant Thomas Eugene Creech respectfully moves for a stay of execution.

This Court signed a death warrant on October 12, 2023, setting an execution for November 8, 2023. Undersigned counsel have been informed that the Idaho

MOTION FOR STAY OF EXECUTION - 1

**396**

Commission of Pardons and Parole has decided to hold a hearing on Mr. Creech's commutation petition.[1]  It is counsel's understanding that the Commission has not yet scheduled a hearing.  However, undersigned counsel have been further advised that the hearing will take place after the November 8, 2023 date on which Mr. Creech's execution is currently scheduled.  Indeed, it would be constitutionally impossible for a commutation hearing to take place prior to November 8.  Before a commutation hearing, the Commission is required to provide notice "by publication in some newspaper of general circulation at least once a week for four weeks."  Idaho Const., Art IV, § 7.  November 8 is only twenty-one days from today, which does not give the Commission enough time to perform its constitutional duty by keeping the public adequately informed.

Additionally, Idaho Code § 19-2715(1) provides that "a stay of execution *shall be granted* . . . as part of a commutation proceeding."  (Emphasis added.)  Because the Commission has granted Mr. Creech's request for a commutation hearing, and because one cannot take place by November 8, the Court must stay the execution until the conclusion of the clemency proceedings under the mandatory language of § 19-2715(1).

The same situation recently arose in Gerald Ross Pizzuto, Jr.'s case, which therefore offers a helpful point of comparison.  In Mr. Pizzuto's proceedings, the

---

[1] The Commission's decision to grant a hearing has also been reported in the media. *See* Kevin Fixler, *Idaho's first execution in 11 years delayed as parole board grants inmate clemency review*, Idaho Statesman, Oct. 18, 2023, available at https://www.idahostatesman.com/news/local/crime/article280645790.html.

Motion for Stay of Execution - 2

**397**

Idaho County District Court signed a death warrant.  The Commission then granted a commutation hearing.  In the *Pizzuto* case, the inmate's counsel and the Attorney General's Office agreed on a stipulation to stay the execution until commutation proceedings were complete, which the district court then signed.  *See* Exs. 1, 2.  The same result is plainly dictated here by the unambiguous terms of § 19-2715(1).  To promptly resolve the issue in accordance with the statute, and to spare the Court needless litigation, undersigned counsel contacted the Ada County Prosecuting Attorney to propose a stipulation along the lines of the *Pizzuto* agreement.  *See* Ex. 3 at 1.  The ACPA offered the following response: "No."  *Id.*  Given the prosecutor's position, Mr. Creech was forced to file the instant motion.

In light of the exigencies, where the State is actively preparing to execute Mr. Creech in three weeks' time, undersigned counsel will seek to be heard on this motion as soon as practicable, and in all events by the end of the day tomorrow, October 19.  Considering how straightforward the legal issue presented is, the Court might also wish to sign a stay order prior to any hearing.  To assist the Court with that process, Mr. Creech is submitting a proposed stay order along with the present motion, which is modeled on the document signed by Judge Gaskill in the *Pizzuto* litigation described above.  *See* Ex. 2.

Respectfully submitted this 18th day of October 2023.

*/s/ Deborah A. Czuba*_____
Deborah A. Czuba

*/s/ Jonah J. Horwitz*_____
Jonah J. Horwitz

Motion for Stay of Execution - 3

**398**

## CERTIFICATE OF SERVICE

A copy of this Emergency Motion for Stay of Execution has been served on the following on this 18th day of October 2023, through iCourt's e-filing and serve system to:

Jill Longhurst
Ada County Prosecutor's Office
200 W. Front St., Rm. 3191
Boise, ID 83702
jlonghurst@adacounty.id.gov

/s/ Jonah J. Horwitz
Jonah J. Horwitz

Motion for Stay of Execution - 4

*State v. Creech,* Case No. CR-FE-0000-10252
Filed in Support of Plaintiff Thomas Eugene Creech's Emergency Motion for Stay of
Execution

# Exhibit 1

Electronically Filed
5/18/2021 3:00 PM
Second Judicial District, Idaho County
Kathy Ackerman, Clerk of the Court
By: Nikki Sickels, Deputy Clerk

LAWRENCE G. WASDEN
Attorney General
State of Idaho

COLLEEN D. ZAHN
Deputy Attorney General
Chief, Criminal Law Division

L. LaMONT ANDERSON, ISB # 3687
Deputy Attorney General
Chief, Capital Litigation Unit
Special Prosecuting Attorney
 For Idaho County
P.O. Box 83720
Boise, ID  83720-0010
Telephone: (208) 334-4539
Fax:  (208) 854-8074
E-mail: lamont.anderson@ag.idaho.gov

Attorneys for Plaintiff

## IN THE DISTRICT COURT OF THE SECOND JUDICIAL DISTRICT OF

## THE STATE OF IDAHO, IN AND FOR THE COUNTY OF IDAHO

| | | |
|---|---|---|
| STATE OF IDAHO, | ) | CASE NO. CR-1985-22075 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | STIPULATION FOR STAY OF |
| | ) | EXECUTION |
| GERALD ROSS PIZZUTO, JR., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| _____ | ) | |

Come Now, Plaintiff, State of Idaho, and the Defendant, Gerald Ross Pizzuto, Jr.,

by and through undersigned counsel and stipulate and jointly move the Court for its order

staying the execution as ordered in the Death Warrant issued by the Court on May 6, 2021,

*STIPULATION FOR STAY OF EXECUTION - 1*

**401**

until completion of the proceedings on Pizzuto's pending commutation petition before the Idaho Commission of Pardons and Parole (Commission).

Today, the Commission held a hearing in executive decision to consider Pizzuto's request for a commutation hearing. Undersigned counsel for the State of Idaho has been informed by counsel for the Commission, Deputy Attorney General Mark A. Kubinski, that the Commission granted Pizzuto's request for a commutation hearing and will schedule that hearing for its November, 2021 hearing session.

Idaho Code § 19-2715(1), provides in pertinent part that "no further stays of execution shall be granted to persons sentenced to death except that a stay of execution <u>shall be granted</u> … as part of a commutation proceeding pursuant to section 20-240, Idaho Code." (emphasis added). Because the Commission has granted Mr. Pizzuto's request for a commutation hearing, the parties stipulate that, pursuant to I.C. § 19-2715(1), this Court must stay the Death Warrant until the conclusion of the commutation proceedings related to Mr. Pizzuto's current commutation petition. The state will obtain a new death warrant setting a new date if it seeks Mr. Pizzuto's execution in the future.

DATED this 18th day of May, 2021.


*/s/ L. LaMont Anderson*　　　　　　　　*/s/ Jonah. J. Horwitz*
L. LaMONT ANDERSON　　　　　　　JONAH J. HORWITZ

*STIPULATION FOR STAY OF EXECUTION - 2*

*State v. Creech,* Case No. CR-FE-0000-10252
Filed in Support of Plaintiff Thomas Eugene Creech's Emergency
Motion for Stay of Execution

# Exhibit 2

Electronically Filed
5/18/2021 3:21 PM
Second Judicial District, Idaho County
Kathy Ackerman, Clerk of the Court
By: Nikki Sickels, Deputy Clerk

IN THE DISTRICT COURT OF THE SECOND JUDICIAL DISTRICT OF

THE STATE OF IDAHO, IN AND FOR THE COUNTY OF IDAHO

| | | |
|---|---|---|
| STATE OF IDAHO, | ) | CASE NO. CR-1985-22075 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | ORDER STAYING |
| | ) | EXECUTION |
| GERALD ROSS PIZZUTO, JR., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

Pursuant to the Stipulation for Stay of Execution signed on May 18, 2021, by counsel for the State of Idaho and the Defendant, Gerald Ross Pizzuto, Jr., the Court has been advised that the Idaho Commission of Pardons and Parole has granted Pizzuto's request for a commutation hearing that will be scheduled for its November 2021 hearing session. Therefore, pursuant to I.C. § 19-2715(1), the Court ORDERS that the execution as ordered in the Death Warrant issued by the Court on May 6, 2021, is stayed until the conclusion of the commutation proceedings related to Mr. Pizzuto's current commutation petition.

DATED this **18** day of May, 2021.

Jay Gaskill
District Court Judge

*ORDER STAYING EXECUTION*

**404**

*State v. Creech,* Case No. CR-FE-0000-10252
Filed in Support of Plaintiff Thomas Eugene Creech's Emergency Motion for
Stay of Execution

# Exhibit 3

| From: | Jill Longhurst |
|---|---|
| To: | Jonah Horwitz; Jan Bennetts; Shawna Dunn |
| Cc: | Deborah A Czuba |
| Subject: | RE: Stay of Execution in Creech |
| Date: | Wednesday, October 18, 2023 12:21:28 PM |

No.

**From:** Jonah Horwitz <Jonah_Horwitz@fd.org>
**Sent:** Wednesday, October 18, 2023 12:10 PM
**To:** Jan Bennetts <jbennetts@adacounty.id.gov>; Shawna Dunn <sdunn@adacounty.id.gov>; Jill Longhurst <jlonghurst@adacounty.id.gov>
**Cc:** Deborah A Czuba <Deborah_A_Czuba@fd.org>
**Subject:** [EXTERNAL] Stay of Execution in Creech

> **CAUTION:** This email originated from outside Ada County email servers. Do not click on links or open attachments unless you recognize the sender and know the content is safe. Verify the sender by mouse-hovering over their display name in order to see the sender's full email address and confirm it is not suspicious. If you are unsure an email is safe, please report the email by using the 'Phish Alert' button in Outlook.

Good afternoon:

We've been told that the Parole Commission has decided to hold a hearing on Thomas Creech's commutation petition. It's our understanding that the hearing will be scheduled for after November 8, which is the date set for Mr. Creech's execution. Idaho Code sec. 19-2715(1) provides that "no further stays of execution shall be granted to persons sentenced to death except that a stay of execution shall be granted . . . as part of a commutation proceeding." When we dealt with essentially the same situation in the Pizzuto case, we worked with the Attorney General's Office to agree on a stipulated motion to stay the execution. I've attached the filed stipulation from the Pizzuto case for your reference, along with the order by the district court granting the stay of execution in those proceedings.

I'm hoping that we can agree on a similar stipulation in Creech. I've taken the liberty of preparing a draft stipulation, which is attached. If the stipulation is acceptable to you, feel free to add a signatory from your office—or we'd be happy to do so at your direction. Don't hesitate to email or call me with any questions or concerns. Thank you.

Respectfully,

Jonah J. Horwitz
Assistant Federal Defender
Capital Habeas Unit
Federal Defender Services of Idaho
702 W. Idaho St., Ste. 900
Boise, ID 83702

**406**

(208) 331-5541
Jonah_Horwitz@fd.org

_____

# EXHIBIT 33

NO. _____
A.M. _____ FILED _____ P.M. 2:00

OCT 1 2 2023

TRENT TRIPPLE, Clerk
By SABRINA STOKES
DEPUTY

IN THE DISTRICT COURT OF THE FOURTH JUDICIAL DISTRICT

OF THE STATE OF IDAHO, IN AND FOR THE COUNTY OF ADA

| | | |
|---|---|---|
| STATE OF IDAHO, | ) | CASE NO. CR-FE-0000-10252 |
| | ) | |
| Plaintiff, | ) | |
| | ) | DEATH WARRANT |
| vs. | ) | |
| | ) | |
| THOMAS EUGENE CREECH, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**TO:** Josh Tewalt, Director of the Idaho Department of Correction, and Tim Richardson, Warden, Idaho Maximum Security Institution:

**WHEREAS** the above-named Defendant, THOMAS EUGENE CREECH, on the 28th day of August, 1981, pled guilty to the crime of First-Degree Murder; and,

**WHEREAS** on the 17th day of April, 1995, the Honorable Robert G. Newhouse entered his Findings of the Court in Considering the Death Penalty and a Judgment of Conviction finding that the above-named Defendant, THOMAS EUGENE CREECH is guilty of First-Degree Murder and imposing the sentence of Death; and,

**WHEREAS** the Honorable Robert G. Newhouse did, on the 12th day of December, 1996, enter an order denying the above-named Defendant, THOMAS EUGENE CREECH, post-conviction relief; and,

*DEATH WARRANT - THOMAS EUGENE CREECH - 1*

**409**

**WHEREAS,** on the 19th day of August, 1998, the Idaho Supreme Court issued its opinion upholding the conviction and sentence and affirming the denial of post-conviction relief and issued its Remittitur on the 23rd day of October, 1998, and,

**WHEREAS,** on 1st day of June, 1999, the United States Supreme Court, denied a Petition for Certiorari for the above-named Defendant, THOMAS EUGENE CREECH, and,

**WHEREAS**, on the 24th day of March, 2017, the Honorable B. Lynn Winmill entered Judgment denying the above-named Defendant, THOMAS EUGENE CREECH, federal habeas relief; and,

**WHEREAS**, on the 6th day of February, 2023, the United States Court of Appeals, Ninth Circuit, affirmed the denial of federal habeas relief; and,

**WHEREAS**, on the 10th day of October, 2023, the United States Supreme Court denied a Petition for Certiorari for the above-named Defendant, THOMAS EUGENE CREECH; and,

**WHEREAS**, on the 10th day of October, 2023, the United States Court of Appeals, Ninth Circuit, issued its Mandate; and,

**WHEREAS,** Idaho Code § 19-2715(3) mandates that, upon termination of a stay of execution, the state shall apply for another warrant from the district court in which the conviction was had; and

**WHEREAS,** pursuant to Idaho Code § 19-2715(5) the Court has inquired and finds there is an existing death sentence and that no valid stays of execution are currently in place; and

**WHEREAS,** Idaho Code § 19-2715(3) mandates that, upon such application, the district court shall set a new execution date not more than thirty (30) days thereafter;

**NOW THEREFORE, YOU ARE HEREBY COMMANDED,** pursuant to Idaho Code § 19-2716 and the Judgment of this Court, to receive said Defendant, THOMAS EUGENE

*DEATH WARRANT - THOMAS EUGENE CREECH - 2*

**410**

CREECH, into your custody, and on the 8th day of November 2023, you shall cause the execution of said sentence of death to take place, unless said sentence is stayed by law, and that you shall make a return upon this Death Warrant, showing the time, mode and manner in which it was executed pursuant to Idaho Code § 19-2718.

DATED this 12th day of October, 2023.

_____
DISTRICT JUDGE

*DEATH WARRANT - THOMAS EUGENE CREECH - 3*

**411**