**FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

**FILED**

OCT 16 2024

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| In re:  THOMAS EUGENE CREECH | No. 24-4455 |
| | D.C. No. 1:24-cv-00066-AKB |
| THOMAS EUGENE CREECH, | |
| Petitioner. | OPINION |
| v. | |
| UNITED STATES DISTRICT COURT FOR THE DISTRICT OF IDAHO, BOISE, | |
| Respondent. | |
| IDAHO COMMISSION OF PARDONS AND PAROLE; JAN M BENNETTS, Ada county Prosecuting Attorney, in her official capacity, | |
| Real Parties in Interest. | |

Petition for a Writ of Mandamus

Submitted October 16, 2024*
San Francisco, California

Before: William A. Fletcher, Jay S. Bybee, and Morgan B. Christen, Circuit Judges

---

* The panel unanimously concludes this case is suitable for decision without oral argument.  *See* Fed. R. App. P. 34(a)(2); *cf. id.* 21(b)(5).

BYBEE, Circuit Judge:

In this case, we consider Thomas Eugene Creech's petition for a writ of mandamus. Creech has been on death row for over four decades for the 1981 murder of fellow inmate David Dale Jensen. In January 2024, the Idaho Commission of Pardons and Parole held a hearing to consider whether Creech should be granted clemency. Creech alleges in his underlying § 1983 suit that the prosecutor's office, including Ada County Prosecutor Jan Bennetts, introduced fabricated or intentionally misleading evidence at the clemency hearing. The mandamus petition seeks to recuse U.S. District Judge Amanda K. Brailsford from presiding over the suit. Creech argues that Judge Brailsford and Bennetts are close friends, and that each has acknowledged that friendship publicly and recently.

Although we are confident that Judge Brailsford would in fact "weigh the scales of justice equally between contending parties," *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 886 (2009) (citation omitted), it is clear that her "impartiality might reasonably be questioned" under the unique circumstances of this case, 28 U.S.C. § 455(a). Applying the demanding mandamus standard, we grant the petition.

## I. BACKGROUND

A.    *Facts and Proceedings*

2

In the forty-odd years that Creech has been on death row, both we and the Idaho Supreme Court have thoroughly documented the facts of Creech's offenses and his journey through the criminal justice system. *See*, *e.g.*, *State v. Creech* ("*Creech I*"), 670 P.2d 463, 465–67 (Idaho 1983); *State v. Creech* ("*Creech II*"), 710 P.2d 502, 502–04 (Idaho 1985); *Creech v. Arave* ("*Creech III*"), 947 F.2d 873, 875–76, 878–79, 881–85, 888 (9th Cir. 1991); *Arave v. Creech* ("*Creech IV*"), 507 U.S. 463, 465–70 (1993); *State v. Creech* ("*Creech V*"), 966 P.2d 1, 4–6 (Idaho 1998); *Creech v. Richardson* ("*Creech VI*"), 59 F.4th 372, 376–82 (9th Cir. 2023), *cert. denied*, 144 S. Ct. 291 (2023); *Creech v. Idaho Comm'n of Pardons & Parole* ("*Creech VII*"), 94 F.4th 851, 853–54 (9th Cir. 2024) (per curiam), *cert. denied*, 144 S. Ct. 1027 (2024). We therefore recite only those facts relevant to Creech's pending mandamus petition.

In 1981, and while serving life sentences without parole for multiple earlier murders, Creech beat to death a fellow inmate—David Dale Jensen—with a sock full of batteries. *Creech VII*, 94 F.4th at 854; *Creech VI*, 59 F.4th at 376–77; *Creech V*, 966 P.2d at 5. In the words of the U.S. Supreme Court, the circumstances of this killing "could not be more chilling." *Creech IV*, 507 U.S. at 465. Jensen, who was physically and mentally disabled, *Creech VI*, 59 F.4th at 376, approached Creech with the sock-turned-weapon, *Creech IV*, 507 U.S. at 466. Creech disarmed Jensen. Jensen went back to his cell but returned shortly thereafter, armed with a

razor blade fastened to a toothbrush. *See id.*; *Creech I*, 670 P.2d at 465. "Jensen made some movement toward Creech, who then struck Jensen between the eyes with the battery laden sock." *Creech I*, 670 P.2d at 465. Creech's assault was brutal; he repeatedly hit Jensen "in the head . . . until the plate embedded in his skull shattered, his skull caved in, and blood was splashed on the floors and walls." *Creech VI*, 59 F.4th at 376–77. "Creech took breaks during the beating. After the sock broke and the batteries fell out, Creech kicked Jensen in the throat while Jensen lay sprawled on the floor." *Id.* at 377. Jensen was taken to the hospital; he died on the operating table. *Id.*

Creech ultimately pleaded guilty, *Creech VII*, 94 F.4th at 854, but he gave inconsistent accounts of the circumstances surrounding Jensen's initial attack, *see Creech IV*, 507 U.S. at 466. "In one version, Creech killed Jensen in self-defense." *Id.* But in another version, he acknowledged that "through an intermediary, [he] provided Jensen with makeshift weapons and then arranged for Jensen to attack him, in order to create an excuse for the killing." *Creech VII*, 94 F.4th at 854 (alteration in original) (citation omitted); *see Creech V*, 966 P.2d at 14. At the initial sentencing hearing in 1982, the trial judge found that "Creech did not instigate the fight with the victim" and that he was "initially justified in protecting himself." *Creech IV*, 507 U.S. at 467 (citation and quotation marks omitted). But the judge concluded that Creech's acts "went well beyond self-defense." *Id.* (citation omitted).

After obtaining certain postconviction relief not relevant here, *see id.* at 478–79, Creech was resentenced in 1995.  This time, the sentencing judge found that "the murder of Jensen was planned and executed by Creech."  *Creech V*, 966 P.2d at 7.  The judge found "'beyond a reasonable doubt . . . [that] [a]ll the weapons which were used in this murder were made by Tom Creech. . . .  The sock was later determined to be Creech's.'"  *Creech VII*, 94 F.4th at 858 (citation omitted).  The judge imposed a death sentence.  After weighing the evidence in mitigation against statutory aggravating factors, the judge again imposed the death penalty.  *Creech VI*, 59 F.4th at 380.

B.    *The Clemency Hearing*

In 2023, the State of Idaho sought and obtained a death warrant for Creech's execution.  *Creech VII*, 94 F.4th at 854.  "[T]he warrant was stayed pending Creech's petition for commutation to life without parole."  *Id.*  The Idaho Commission of Pardons and Parole ("Commission") granted Creech a hearing on his petition.[1]

---

[1] Idaho has an unusual scheme for granting clemency, one which gives checks and balances to both the governor and the Idaho Commission of Pardons and Parole. The Commission of Pardons and Parole possesses the exclusive power to grant commutations and pardons, but "only as provided by statute . . . ." Idaho Const. art. IV, § 7.  The Commission is comprised of seven Commissioners.  *See* Idaho Code § 20-1002(1).  Except in certain cases not relevant here, "[a]ny decision of the full Commission requires a majority vote of four (4) Commissioners."  IDAPA § 50.01.01.200.08.a.  Idaho law further requires recusal in certain cases, *see id.* § 50.01.01.200.07, but it does not supply a tie-breaking method or mechanisms for the appointment of an interim Commissioner in the event of a recusal.

5

Before that hearing, Commission investigators interviewed Creech. During the interview, "Creech contradicted the sentencing judge's 1995 factual finding that the murder weapon was his by stating that it belonged to another inmate." *Id.* at 858. Instead, he maintained that "the weapon was labeled 'Garza.'"

The Commission held Creech's clemency hearing in January 2024. The Ada County Prosecutor's Office ("ACPO")—led by elected Prosecuting Attorney Jan Bennetts—opposed Creech's petition for clemency. To rebut Creech's claims of remorse, ACPO pointed to Creech's pre-clemency statement to investigators, which reverted to his story "that he killed David Jensen in self-defense."[2] According to ACPO, "Mr. Creech blamed Mr. Jensen for being murdered." ACPO then introduced a slide with a photo of a sock labeled "Creech," ostensibly "to refute Creech's pre-clemency assertion that the murder weapon never belonged to him." *Id.* at 858. The sock on the slide was not a photo of the murder weapon itself; instead,

---

In the case of capital offenses, the Commission may issue a pardon or commutation "only after first presenting a recommendation to the governor." Idaho Code § 20-1016(2). If the Governor approves the recommendation within thirty days, "the commission's pardon or commutation shall issue." *Id.* If the Governor rejects the recommendation or fails to act upon it within thirty days, "no pardon or commutation shall issue from the commission, and the commission's recommendation shall be of no force or effect." *Id.*

[2] There is no official transcript of the clemency hearing, so we draw our description of the facts from the thorough meeting minutes. We acknowledge that Creech contests the accuracy of these minutes. Because resolving their veracity is not necessary to decide Creech's petition for mandamus, we express no opinion on the accuracy of the meeting minutes.

ACPO "displayed a photograph of the matching sock that was found in Mr. Creech's cell," affixed with Creech's name.[3]  With one commissioner recused, an evenly divided Commission denied Creech's clemency petition.  *Id.* at 854.  Creech's execution was scheduled for February 28, 2024.

C.    *Procedural Posture*

Creech filed a § 1983 suit in the U.S. District Court for the District of Idaho and moved to preliminarily enjoin his impending execution.  Among other claims, Creech alleged that ACPO violated his Fourteenth Amendment due process rights by "presenting potentially tampered with evidence in the form of an image of a sock with Mr. Creech's name written on it."  Creech alleged that "[t]here appear to be discrepancies between the image of the sock in the prosecutor's slide and the images taken of the sock from the crime scene," including "the size, and the style of sock."  The complaint included other claims of prosecutorial misconduct, such as allegations that the prosecution misled the Commission into believing that Creech had been definitively identified as the killer of Daniel Walker, whom Creech had previously been suspected of murdering in California.

_____

[3] Creech maintains that, notwithstanding the meeting minutes, ACPO represented that the sock on the slide was itself the murder weapon.  When we reviewed Creech's appeal from the denial of a preliminary injunction, we relied primarily on the meeting minutes despite this disagreement.  *See Creech VII*, 94 F.4th at 858. We express no opinion as to whether this dispute satisfies the pleading standard at the motion to dismiss stage.

The district court denied Creech's motion for a preliminary injunction, and we affirmed.  *See Creech VII*, 94 F.4th at 859.  The Supreme Court denied Creech's application for a stay of execution and his petition for a writ of certiorari.  *See* 144 S. Ct. 1027.  The State of Idaho attempted to execute Creech by lethal injection on February 28, 2024.  The attempt was unsuccessful, and the death warrant expired that same day.

Because we denied him only the "extraordinary remedy" of preliminary relief, *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008), Creech continues to litigate the merits of his § 1983 claim in the district court.  Our decision in *Creech VII* took place "at a very preliminary stage of the proceedings," and Creech seeks "[f]urther development of the record," because new factual information "as this case progresses may alter our conclusions."  *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 780 (9th Cir. 2018); *see also Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981) ("[T]he findings of fact . . . made by a court [deciding] a preliminary injunction are not binding at trial on the merits."); *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1189 (9th Cir. 2024).

Before the district court could rule on the Commission's and ACPO's motions to dismiss Creech's amended complaint, Creech filed a motion to disqualify Judge Brailsford.  Creech argued that Judge Brailsford and Ada County Prosecutor Jan Bennetts have a close, personal relationship stemming from their days as co-clerks

on the Ninth Circuit.  Creech pointed to Judge Brailsford's investiture to the Idaho Court of Appeals in 2019, where Bennetts publicly recounted her friendship with Judge Brailsford.[4]  Creech also emphasized that Judge Brailsford previously recused herself in a case in which Bennetts was sued in her personal capacity.

Judge Brailsford denied Creech's recusal motion.  She explained that, although she and Bennetts were close while clerking on the Ninth Circuit, she has since "lost touch with her."  She concluded that "a reasonable person with knowledge of *all* the facts of my relationship with Ms. Bennetts would *not* either conclude my impartiality might reasonably be questioned or perceive a significant risk that I would resolve the case on a basis other than the merits."

Creech filed a petition for a writ of mandamus seeking to recuse Judge Brailsford.  We invited Judge Brailsford and the two real parties in interest to file briefs in response to Creech's petition if they felt an answer was warranted.  All three parties declined.

## II. ANALYSIS

We have jurisdiction to review a petition for a writ of mandamus under 28 U.S.C. § 1651(a).  "The writ of mandamus is a drastic and extraordinary remedy

---

[4] A recording of the investiture proceedings is available under the "Idaho Supreme Court Proceedings" tab at the following link: https://www.idahoptv.org/shows/idahoinsession/archive/.  A transcript of Bennett's remarks is available at Exhibit 3 to Creech's mandamus petition. *See* ACMS No. 1.1 at 112–14.

9

reserved for really extraordinary causes." *In re United States*, 884 F.3d 830, 834 (9th Cir. 2018) (citation omitted); *accord Gulfstream Aerospace Corp. v. Mayacamas Corp.*, 485 U.S. 271, 289 (1988). In deciding whether to grant mandamus, we consider the five *Bauman* factors:

> (1) whether the petitioner has no other means, such as a direct appeal, to obtain the desired relief;
> (2) whether the petitioner will be damaged or prejudiced in any way not correctable on appeal;
> (3) whether the district court's order is clearly erroneous as a matter of law;
> (4) whether the district court's order is an oft repeated error or manifests a persistent disregard of the federal rules; and
> (5) whether the district court's order raises new and important problems or issues of first impression.

*In re United States*, 884 F.3d at 834 (citing *Bauman v. U.S. Dist. Ct.*, 557 F.2d 650, 654–55 (9th Cir. 1977)). "[W]e are neither compelled to grant the writ when all five factors are present, nor prohibited from doing so when fewer than five, or only one, are present." *In re Sussex*, 781 F.3d 1065, 1071 (9th Cir. 2015). Instead, we "weigh the factors holistically to determine whether, on balance, they justify the invocation of this extraordinary remedy." *In re Kirkland*, 75 F.4th 1030, 1040–41 (9th Cir. 2023) (citation and quotation marks omitted). With that said, "the absence of factor three . . . will always defeat a petition for mandamus." *In re Swift Trans. Co. Inc.*, 830 F.3d 913, 916 (9th Cir. 2016) (per curiam) (citation omitted).

We have previously reviewed the merits of recusal claims on a mandamus posture, although we have never granted a petition in such a case. *See*, *e.g.*, *Clemens*

10

*v. U.S. Dist. Ct. for Cent. Dist. of Cal.*, 428 F.3d 1175, 1180 (9th Cir. 2005) (per curiam); *Cordoza v. Pac. States Steel Corp.*, 320 F.3d 989, 998–1001 (9th Cir. 2003); *King v. U.S. Dist. Ct. for Cent. Dist. of Cal.*, 16 F.3d 992, 992–93 (9th Cir. 1994) (unsigned order); *see also*, *e.g.*, *In re Cement Antitrust Litig.*, 688 F.2d 1297, 1299, 1308–13 (9th Cir. 1982) (reviewing a judge's order granting a recusal motion on a mandamus posture).   Our sister circuits have uniformly acknowledged that mandamus can be an appropriate vehicle for seeking recusal so long as its demanding standard is satisfied.[5]

We conclude that mandamus is appropriate in this case.  We first describe why the third *Bauman* factor—clear error as a matter of law—weighs in favor of relief. We then discuss the first and second *Bauman* factors, both of which also favor relief in this case.

A.    *Clear Error As a Matter of Law*

The third *Bauman* factor is "the most important for our consideration."  *In re Swift*, 830 F.3d at 916.  On the one hand, "we have held that a definite and firm

---

[5] *See*, *e.g.*, *In re Bulger*, 710 F.3d 42, 43 (1st Cir. 2013) (Souter, Ret. Circuit Justice); *In re IBM Corp.*, 45 F.3d 641, 642 (2d Cir. 1995); *Alexander v. Primerica Holdings, Inc.*, 10 F.3d 155, 163 (3d Cir. 1993); *In re Holley*, 862 F.2d 314 (4th Cir. 1988); *In re Placid Oil Co.*, 802 F.2d 783, 786 (5th Cir. 1986); *Mischler v. Bevin*, 887 F.3d 271, 271 (6th Cir. 2018) (per curiam); *In re Gibson*, 950 F.3d 919, 922 (7th Cir. 2019); *In re Kan. Pub. Emps. Ret. Sys.*, 85 F.3d 1353, 1358 (8th Cir. 1996); *Nichols v. Alley*, 71 F.3d 347, 350 (10th Cir. 1995) (per curiam); *In re Moody*, 755 F.3d 891, 898 (11th Cir. 2014); *In re Hawsawi*, 955 F.3d 152, 156 (D.C. Cir. 2020).

conviction that a mistake has been committed weighs in favor of granting the writ." *In re Sussex*, 781 F.3d at 1071 (citation and quotation marks omitted). On the other hand, "the absence of factor three . . . will always defeat a petition for mandamus." *In re Swift*, 830 F.3d at 916 (citation omitted). A finding of "clear error as a matter of law" is, accordingly, a necessary and sometimes even sufficient condition for granting the writ.

The "clear error as a matter of law" standard is demanding. We will not grant the writ "simply because a district court commits an error, even one that would ultimately require reversal on appeal." *Id.*; *see*, *e.g.*, *In re Boon Glob. Ltd.*, 923 F.3d 643, 654 (9th Cir. 2019). Instead, the standard "requires of us a 'firm conviction' that the district court misinterpreted the law . . . or committed a 'clear abuse of discretion.'" *In re Walsh*, 15 F.4th 1005, 1009 (9th Cir. 2021) (alteration in original) (citation omitted). A clear abuse of discretion is one in which "the error is 'clear' to all." *In re Bundy*, 840 F.3d 1034, 1041 (9th Cir. 2016).[6] But the standard is not

---

[6] We observed in *In re Bundy*:

> "Clearly erroneous as a matter of law" is a standard that is not familiar to us in any other context. "Clearly erroneous" is the standard we associate with reviewing findings of fact. *See* Fed. R. Civ. P. 52(a)(6) ("Findings of fact . . . must not be set aside unless clearly erroneous . . . ."). We assume that by "clear error" in law, we mean something like "plain error," the standard we use to identify when a district court has committed an obvious error of law, but one that was not preserved for appeal by a timely objection. *See* Fed. R. Crim. P. 52(b); *Puckett v. United States*, 556 U.S. 129, 135 (2009).

840 F.3d at 1041 n.6.

12

insuperable, and we have found the factor satisfied with respect to discretionary decisions in multiple cases.  *See*, *e.g.*, *In re United States*, 791 F.3d 945, 955 (9th Cir. 2015); *In re Perez*, 749 F.3d 849, 855 (9th Cir. 2014).

The facts in this case leave us firmly convinced that the district court's failure to recuse herself was based on a clear error of law.  "Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned."  28 U.S.C. § 455(a).  We have interpreted this rule to require recusal "where a reasonable person with knowledge of all the facts would conclude that the judge's impartiality might reasonably be questioned."  *United States v. Carey*, 929 F.3d 1092, 1104 (9th Cir. 2019) (citations and quotation marks omitted).  "The reasonable person is not someone who is hypersensitive or unduly suspicious, but rather is a well-informed, thoughtful observer."  *United States v. Mikhel*, 889 F.3d 1003, 1027 (9th Cir. 2018).  The standard is objective.  "[W]hat matters is not the reality of bias or prejudice but its appearance."  *Carey*, 929 F.3d at 1104 (quoting *Liteky v. United States*, 510 U.S. 540, 548 (1994)); *Mikhel*, 889 F.3d at 1027 ("The goal of section 455(a) is to avoid even the appearance of partiality."  (citations omitted)).  This is necessarily a fact-bound inquiry that "turn[s] on subtleties in the particular case."  *United States v. Holland*, 519 F.3d 909, 913 (9th Cir. 2008); *id.* ("[T]he analysis of a particular section 455(a) claim must be guided, not by comparison to similar situations addressed by prior

13

jurisprudence, but rather by an independent examination of the unique facts and circumstances of the particular claim at issue." (citation omitted)). We are mindful not to construe the standard so broadly "that it becomes, in effect, presumptive, so that recusal is mandated upon the merest unsubstantiated suggestion of personal bias or prejudice." *Mikhel*, 889 F.3d at 1027. If the case is close, the judge should recuse. *See Holland*, 519 F.3d at 912 ("If it is a close case, the balance tips in favor of recusal." (citing *United States v. Dandy*, 998 F.2d 1344, 1349 (6th Cir. 1993)); *see also Dandy*, 998 F.2d at 1349 ("Where the question is close, the judge must recuse himself.").

Creech has pressed two grounds for the district court's recusal: First, that Judge Brailsford and Bennetts have a longstanding friendship and, second, that unlike a run-of-the-mill case in which the judge knows one of the attorneys well, Bennetts may have a personal stake in the proceedings because Creech's claims of prosecutorial misconduct, if proven, may reach Bennetts herself. We will consider each point.

### 1. Judge Brailsford's friendship with Bennetts

The nature of Judge Brailsford's friendship with Bennetts weighs in favor of recusal. Judge Brailsford and Bennetts became friends in 1993, during the year they spent together as co-clerks to Judge Thomas Nelson, our former colleague on the U.S. Court of Appeals for the Ninth Circuit. As we consider that relationship, we

14

may draw on our own experiences as judges and former law clerks. Our clerks represent the best and the brightest from American law schools. Although the selection process is highly competitive, once our clerks begin—typically for a one- or two-year period of service—they are no longer competitors but colleagues in service to the courts of the United States. Our clerks work long hours in monastic conditions, bound by duties of confidentiality and loyalty to the judge. Chambers are tight-knit environments that depend on constant collaboration between co-clerks. The friendships developed between co-clerks can be especially intimate and enduring, often lasting long beyond the clerkship itself.

It is a testament to the strength of friendship between co-clerks that Bennetts spoke at Judge Brailsford's investiture to the Idaho Court of Appeals some twenty-five years after they completed their clerkships. At the 2019 investiture, Bennetts recounted her "vivid memories" of spending "nearly 24/7 in the chambers" with Judge Brailsford. She recalled how the two of them "discussed [their] lives, [their] challenges, [their] hopes, [their] dreams for the future." Bennetts continued, "Amanda and I met by circumstance, but we became friends by choice. Amanda is the kind of friend you feel incredibly fortunate to find. They're few and far between."

When Judge Brailsford took the podium, she thanked her "dear friend" Bennetts, and described the two of them as "kindred spirits." In her order denying

15

Creech's request that she recuse herself, Judge Brailsford described her time with her co-clerk, Jan Bennetts, in Judge Nelson's chambers in classic terms: It "had the hallmarks of a clerkship with which many current and former law clerks are familiar, including long hours in chambers, hard work, mutual support, and camaraderie among chambers staff."

In the order denying Creech's recusal motion, Judge Brailsford suggested that she "lost touch" with Bennetts after their clerkship and that they "did not pursue a personal friendship independent of [their] shared clerkship experience." Judge Brailsford also observed that she and Bennetts have never visited each other's homes, "taken vacations together, celebrated holidays together, or shared family occasions together." But Bennetts' public statements at Judge Brailford's investiture (and Judge Brailsford's remarks in response) could cause a reasonable person to question Judge Brailsford's impartiality. Importantly, Bennetts remarked at the investiture that she and Judge Brailsford "have continued to share lunches" together and described her friendship with Judge Brailsford in the active tense, declaring that Judge Brailsford "shares in the excitement of successes and is supportive in challenging times." Although Bennetts acknowledged that she and Judge Brailsford sometimes "go months and even years without catching up," Bennetts expressed that "Amanda is the kind of friend for whom I would drop everything if she needed me *and I know she would do the same*." As we have explained, this is not atypical of

16

co-clerk friendships.  The bonds forged over the course of a year in chambers are often long-lasting, even if communication between co-clerks becomes sporadic.  For this reason, it is not surprising that Bennetts was one of just two speakers at Judge Brailford's 2019 investiture.  Other evidence could lead a reasonable observer to believe that their friendship is ongoing.  On her 2023 Questionnaire for Judicial Nominees, filled out prior to her confirmation as a federal district judge, Judge Brailsford disclosed that she recused herself in 2019 in a case against Bennetts in her personal capacity because Bennetts "*is* a personal friend."  (Emphasis added.)

Judge Brailsford's public remarks about Bennetts also go beyond simply commenting on their friendship.  At the investiture, Judge Brailsford commended Bennetts for "receiv[ing] the Professionalism Award from the Idaho State Bar," which—in Judge Brailsford's words—"is most apropos of Jan, a consummate professional every day, all day, for her entire career."  As we explain in the next section, Creech's allegations of prosecutorial misconduct are in tension with Judge Brailsford's laudatory comments on Bennetts' professionalism.  A reasonable observer could question Judge Brailsford's impartiality in a case that may challenge Bennetts' professional and ethical reputation.

2.    The allegations against Bennetts in Creech's complaint

Judge Brailsford's friendship with Bennetts, taken alone, would not necessarily require recusal in a run-of-the-mill case involving ACPO.  *See In re*

17

*Complaint of Jud. Misconduct*, 816 F.3d 1266, 1268 (9th Cir. 2016).  But this is hardly a run-of-the-mill case.  The complaint raises allegations of misconduct committed by prosecutors under Bennetts' supervision, including that "the prosecution falsely told the Commission Mr. Walker's murder had been solved and the killer was Mr. Creech," and that "the prosecution falsely told the Commission that the murder weapon bore Mr. Creech's name" in a deliberate attempt to mislead the Commission.[7]

The complaint also alleges Bennetts' direct involvement in the claimed violation of Creech's constitutional rights.  It states that Bennetts herself was present at the clemency hearing, and thus implies that Bennetts might have had an obligation to correct any misrepresentations made to the Commission, for which she could be held liable.  *See Rodriguez v. County of Los Angeles*, 891 F.3d 776, 798 (9th Cir. 2018) ("A supervisory official is liable under § 1983" if she "refus[ed] to terminate a series of acts by others, which [the supervisor] knew or reasonably should have known would cause others to inflict a constitutional injury."  (second alteration in original) (citation omitted)).  Moreover, the complaint claims that Bennetts put out the press release involving the allegedly false statements about Creech's murder of Daniel Walker.  *Cf.* Idaho Rules of Pro. Conduct R. 3.8 ("The prosecutor . . . shall . . .

---

[7] We emphasize that for purposes of this mandamus petition we accept as true the allegations in the complaint.  We express no view on the truthfulness of those claims.

18

refrain from making extrajudicial comments that have a substantial likelihood of heightening public condemnation of the accused . . . .").  Also, because Creech has alleged that "the minutes do not accurately reflect what the prosecutor said to the Commission," Bennetts may be called to provide evidence or testimony about the hearing itself.  We need not decide whether any one of these things alone would require recusal, because they operate in combination in this case such that a reasonable person could question Judge Brailsford's impartiality.

That Bennetts has been sued in her official rather than her personal capacity does not dilute our conviction as to the necessity of Judge Brailsford's recusal. Creech's allegations of prosecutorial misconduct, if substantiated, could impose professional and reputational costs on Bennetts.  *See* Idaho Rules of Pro. Conduct R. 3.3 ("A lawyer shall not knowingly . . . make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law . . . . [or] offer evidence that the lawyer knows to be false . . . ."); *id.* 3.4 ("A lawyer shall not . . . falsify evidence . . . ."); *cf. Rodriguez*, 891 F.3d at 798.  In fact, those reputational consequences could accrue even if Creech's § 1983 suit ultimately fails on the merits.

In sum, Judge Brailsford's longstanding friendship with Jan Bennetts is not grounds for recusal because a matter under Bennetts's supervision has come before Judge Brailsford.  It is, rather, because Judge Brailsford may be called upon to make

judgments about Bennetts's personal involvement—and thus her personal and professional reputation—in the clemency hearing.  There is no reason for Judge Brailsford to subject herself to the very human pressures that arise out of sitting in judgment in cases involving people we know and value as friends.

We hold that Judge Brailsford committed a clear abuse of discretion by failing to recuse herself.  The third *Bauman* factor favors granting the petition.

B.    *Adequate Relief and Noncorrectable Prejudice*

The first and second *Bauman* factors—"whether petitioner has other, adequate means of relief or will suffer irreversible damage or prejudice"—ensure that mandamus does not become an end-run around the final-judgment rule.  *In re Boon Glob.*, 923 F.3d at 654.  We generally find the first factor satisfied when "'contemporaneous ordinary appeal' is unavailable."  *In re Henson*, 869 F.3d 1052, 1058 (9th Cir. 2017) (per curiam).  Put another way, the first factor is typically satisfied when the district court order is neither final nor subject to interlocutory appeal.  *See, e.g.*, *In re Mersho*, 6 F.4th 891, 898 (9th Cir. 2021) ("Without the availability of an interlocutory appeal, it is fair to conclude that the plaintiffs do not have an adequate remedy, other than mandamus, from the district court's order." (citation and quotation marks omitted)); *Barnes v. Sea Hawaii Rafting, LLC*, 889 F.3d 517, 535–36 (9th Cir. 2018) (finding the first *Bauman* factor satisfied because "Barnes could not have immediately appealed the district court's pretrial denials of

summary judgment," nor was it likely "that the district court would have granted . . . a request [for certification for interlocutory appeal]"); *In re Henson*, 869 F.3d at 1058.

The second factor is slightly different and often cabins the effect of the first factor. Even when contemporaneous appeal is unavailable, we hesitate to grant mandamus unless the petitioner "will be damaged or prejudiced in any way not correctable on appeal." *In re United States*, 884 F.3d at 835 (citation omitted); *see*, *e.g.*, *In re Boon Glob.*, 923 F.3d at 654 ("While[] '[a]n order staying proceedings and compelling arbitration is not a final decision that is subject to ordinary appeal,' any prejudice to the Third Parties is ordinarily correctable on appeal from the final judgment." (second alteration in original) (citation omitted)). When considering the prejudice factor, we have required petitioners to "demonstrate some burden . . . other than the mere cost and delay that are the regrettable, yet normal, features of our imperfect legal system." *In re United States*, 884 F.3d at 835–36 (citation omitted). To list a few examples, prejudice exists when "one's claim will obviously be moot by the time an appeal is possible," *id.* at 836 (citation and quotation marks omitted), or where some legal consequence attaches from the delay, such as when a petitioner "would lose his status as a class representative" if compelled into arbitration, *In re Henson*, 869 F.3d at 1058; *see also In re Mersho*, 6 F.4th at 903 ("Petitioners could technically challenge the district court's order on appeal. But the harm to Petitioners

21

will not be meaningfully corrected on appeal.  Once the district court determined that Petitioners satisfied step two, they became entitled to the lead plaintiff presumption." (citation omitted)).

We conclude that these two *Bauman* factors, considered together, are met here. It is true that the failure to recuse is reviewable on direct appeal.  *See*, *e.g.*, *Jorgensen v. Cassiday*, 320 F.3d 906, 911–12 (9th Cir. 2003).  It is also true that, because an appellate court can vacate all orders of a district judge who should have been recused, *see*, *e.g.*, *In re Al-Nashiri*, 921 F.3d 224, 241 (D.C. Cir. 2019), a party will rarely suffer prejudice beyond the normal costs and delays of litigation.  But there are compelling institutional reasons to use mandamus when the grounds for recusal are obvious, as here.  For one, as Justice Souter recognized while sitting by designation, "public confidence is enhanced where a clearly disqualified judge is removed swiftly." *In re Bulger*, 710 F.3d at 45 (quoting *In re Martinez-Catala*, 129 F.3d 213, 217–18 (1st Cir. 1997)); *In re al-Nashiri*, 791 F.3d 71, 79 (D.C. Cir. 2015) ("Public confidence in the courts requires that [bias] question[s] be disposed of at the earliest possible opportunity."  (alterations in original) (citation omitted)).  This fact militates in favor of mandamus even though recusal is ordinarily reviewable on direct appeal.  The failure to remove immediately a judge who may be perceived as biased inflicts an institutional injury on the judiciary that is not correctable through the normal appellate process. *See In re al-Nashiri*, 791 F.3d at 79 ("With apparent

22

bias, ordinary appellate review fails to restore 'public confidence in the integrity of the judicial process' . . . ." (citation omitted)); *In re Sch. Asbestos Litig.*, 977 F.2d 764, 778 (3d Cir. 1992) ("[T]he adjudication of a case by a judge with an actual *or* apparent bias is an 'abuse of judicial power,' because it is a threat to the integrity of the judicial system.  Interlocutory review of disqualification issues on petitions for mandamus is both necessary and appropriate to ensure that judges do not adjudicate cases that they have no statutory power to hear . . . ." (citation omitted)).

Even where an appeal will be available at the conclusion of the district court proceedings, the appeal itself may be tainted, thus prejudicing the petition.  *See In re Al-Nashiri*, 921 F.3d at 233 ("[M]andamus provides an appropriate vehicle for seeking recusal of a judicial officer during the pendency of a case, as ordinary appellate review following a final judgment is insufficient to remove the insidious taint of judicial bias." (citation and quotation marks omitted)).  After all, the judge whose recusal is sought has compiled the record being reviewed by the court of appeals.  *See Gladstein v. McLaughlin*, 230 F.2d 762, 763 (9th Cir. 1955) (expressing concern that the court of appeals would "consider the record made up by a judge [it] know[s] to be prejudiced and which well could be infected with his prejudice").  Confidence in subsequent appellate proceedings turns in part on confidence in the compilation of the record on appeal and suggests that a judge who must recuse

23

should do so sooner rather than later in order to mitigate questions concerning her judgment.

We conclude that the first and second *Bauman* factors are satisfied in this case because the failure to disqualify a judge who ought to have recused herself undermines confidence in the judicial proceedings.

## III.  CONCLUSION

Mandamus and disqualification are both highly fact-dependent inquiries. Based on the specific facts here, we have a firm conviction that Judge Brailsford abused her discretion in declining to recuse herself.  We conclude that Creech has shown that Judge Brailsford's order was clearly erroneous as a matter of law because her longstanding relationship with Prosecuting Attorney Jan Bennetts might call into question any judgments she would have to make regarding Bennetts's own professional and ethical obligations.  Although that misjudgment might be reviewable on direct appeal, the district court's power to shape the record on appeal means that the error might not be correctable through an ordinary appeal.  We conclude that the first, second, and third *Bauman* factors have been satisfied here, giving us ample reason to grant the writ here.  *See In re Kirkland*, 75 F.4th at 1040–41 ("This is not a mechanical analysis; we weigh the factors holistically to determine whether, on balance, they justify the invocation of this extraordinary remedy. . . . [W]e are neither compelled to grant the writ when all five factors are present, nor

24

prohibited from doing so when fewer than five, or only one, are present." (citation and quotation marks omitted)).

We again emphasize our faith that Judge Brailsford would, in fact, "think dispassionately and submerge private feeling on every aspect of [this] case." *Pub. Utils. Comm'n of D.C. v. Pollak*, 343 U.S. 451, 466 (1952) (Frankfurter, J., in chambers). But "justice must satisfy the appearance of justice." *Offut v. United States*, 348 U.S. 11, 14 (1954). We therefore grant the petition for a writ of mandamus and remand the case for reassignment.

**GRANTED and REMANDED.**